Maurice B. VerStandig, Esq.
Bar No. MD18071
The Belmont Firm
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
Phone: (202) 991-1101
mac@dcbankruptcy.com
*Proposed Counsel for the Debtors*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-378-ELG |
| | ) | (Chapter 11) |
| Banners of Abingdon, LLC, *et al.*[1] | ) | |
| | ) | |
| Debtors. | ) | |

**MOTION TO JOINTLY ADMINISTER AND SUBSTANTIVELY
CONSOLIDATE BANKRUPTCY ESTATES FOR ALL PURPOSES**

Come now Banners of Abingdon, LLC and the 40 related debtors referenced in footnote 1 hereto (collectively, the "Debtors" and each a "Debtor"), by and through undersigned proposed counsel, and move this Honorable Court to jointly administer—and substantively consolidate—the Debtors' bankruptcy cases and estates for all purposes, and in support thereof state as follows:

---

[1] The Debtors in these cases are Banners of Abingdon, LLC; Banners of Reston, Inc.; Banner's of Dulles Town, Inc.; Banner's of Fair Oaks, LLC; Banner's Of Ashburn, LLC; Banner's of Gainesville, LLC; Banner's of Warrenton, LLC; Banner's of South Riding, LLC; Banner's of Stafford, LLC; Banner's of Oakton, LLC; Banner's of Bradlee Center, LLC; Banners of Fair Lakes, LLC; Banners of Woodbridge LLC; Banners of Williamsburg LLC; Banners of Newport News LLC; Banners of Commonwealth Midlothian LLC; Banners of Village Market Place Midlothian LLC; Banners of Fairfield Virginia Beach LLC; Banners of Hilltop Virginia Beach LLC; Banners of Central Park Fredericksburg LLC; Banners of Cosner's Corner Fredericksburg LLC; Banners of York River LLC; Banners of Lynchburg, LLC; Banners of Harrisonburg VA LLC; Banners of Winchester LLC; Banners of Christiansburg VA LLC; Banners of Chesapeake VA LLC; Banners of Columbus Village VA Beach LLC; Banner's of Burke, LLC; Banner's of Kamp Washington, LLC; Banners of Suffolk II LLC; Banners of Suffolk LLC; Banners of Henrico LLC; Banners Of Waynesboro LLC; Banners of Roanoke LLC; Banners of Rocky Mount VA, LLC; Banners of Manassas II LLC; Banners of Charlottesville LLC; Banners of Kingstowne LLC; Banners of Leesburg, LLC; and LBPO Management, LLC.

1

I.  **Introduction**

The Debtors in these cases are comprised of some 39 special purpose entities formed—and operating—for purposes of renting consumer-facing commercial real estate spaces, one (1) special purpose entity that formerly served such a purpose but that has since relinquished lease rights under a sale agreement, and one (1) overarching management company that operates—and always has operated—each of the other Debtors. The 41 companies all share common ownership (a non-filing parent company), all share an operating bank account, all share a single payroll, and all have historically conducted business as a predominately unified entity. As they now collectively endeavor to reorganize, parties in interest will be uniformly best served by permitting the Debtors to substantively consolidate and have their estates recognized as a unitary corpus.

To be sure, what is proposed herein is nothing more than the formal recognition of what counterparties have seemingly always informally recognized: 41 tightly related entities, all in the business of operating Hallmark-branded stores and all based in a contiguous geographic region, are really one company. The Debtors' management company—LBPO Management LLC ("LBPO"), which is, itself, one of the filing entities—has long been the primary procurer of goods and services for the related entities, has long paid the debts of the related entities, has long collected the revenues of the related entities, and has long served as the *de facto* operating entity of the group.

With the Debtors now entering chapter 11, formal recognition of these realities becomes paramount. Not only will substantive consolidation greatly streamline these proceedings administratively by reducing unnecessary complexities and professional fees, but substantive consolidation will also permit a targeted focus on the future in lieu of a dilatory obsession with the past. Though exceedingly detailed corporate records are assuredly extant in nature, and each

constituent store does maintain its own point-of-sale ("POS") system, the long-consolidated nature of the Debtors' finances cannot be much untangled or unwound without the commitment of a disproportionately hefty financial and temporal burden on the part of both external professionals and members of the Debtors' management team.

Additionally, even if an effort to untangle the Debtors' individual affairs were to be undertaken, the same would assuredly become a patchwork of educated guesses and perilous detours. As is common in the retail industry, myriad vendors do not match the names on invoices to the legal names of the entities with whom they are dealing. And such is not a formalistic insistence that some ambiguity exist where the letters "LLC" are removed from a merchandise bill. Such is, rather, a recognition that numerous generic names—not readily attributable to either individual lessors of real estate or LBPO—so often grace invoices as to render likely impossible any efforts to meaningfully discern who each such creditor believes to be the debtor with whom they have been conducting business.

It, quite genuinely, appears the overwhelming majority of creditors have understood their dealings to be with LBPO. Such is certainly true of the largest creditors in these cases but, too, more often than not true of the smaller creditors. To now suggest that such was but an elaborate illusion, and LBPO neither owns the inventory it has acquired nor has rights in the cash proceeds of the stores to which it has shipped that inventory, would be to work a demonstrable—and severe—financial prejudice upon creditors. The Debtors would actually stand to benefit (quite palpably) from the propagation of such a façade: almost all debts would lie with LBPO while almost all assets would lie with individual stores, creating a prism whereby LBPO could easily liquidate to the detriment of creditors while individual stores reorganize with simplistic ease as their scant individual debts are readily satisfied by the sale of their generous provisions of

3

inventory. But propagation of this illusion would also be wholly inconsistent with the fiduciary duty owed by the Debtors to their creditors, would be at odds with the equitable principles that underlie Title 11 of the United States Code (the "Bankruptcy Code"), and would be rightful fodder for the incursion of near-endless intercreditor skirmishes as these cases progress.

For these reasons, and as extrapolated upon *infra*, it is respectfully urged these 41 cases be jointly administered and the correlative 41 estates be substantively consolidated for all purposes. The companies that have now entered bankruptcy are, in essence, a single corporate body. Law and equity both well dictate the Debtors should be accordingly recognized as a single corporate body.

**II.    Background Facts**

The Debtors believe the following facts—all to be supported by the testimony of Michael Postal ("Mr. Postal")—to be chiefly pertinent to the consideration of this motion:

1.    All of the Debtors, except for LBPO and Banners of Abingdon, LLC ("Abingdon"), are obligated on commercial leases of real property in consumer-facing locales (the "Leased Locations").

2.    Each of the Leased Locations is used as a retail establishment with Hallmark branding.

3.    Each of the Leased Locations is also branded with some conjugated iteration of the proper noun "Banner," being a reference to the founder—and derivative co-owner—of the Debtors.

4.    Each of the Leased Locations is used to sell some combination of Hallmark-branded merchandise and non-Hallmark merchandise (with the non-Hallmark merchandise being

4

colloquially known as "Allied" inventory, and the wholesalers of non-Hallmark merchandise being colloquially known as "Allied" vendors or "Allied" creditors).

5. LBPO procures inventory to be sold at each of the Leased Locations and collects all revenues from the sale of inventory at each of the Leased Locations.

6. When LBPO procures inventory from Hallmark, such is done in the name of LBPO.

7. When LBPO procures inventory from Allied vendors, such is normatively done in (i) the name of LBPO; (ii) a generic name combining some combination of "Banner" and "Hallmark," or (iii) an improper name that vaguely correlates to the geographic description of one or more Leased Locations but that does not readily coincide with the legal name of any of the Debtors herein.

8. When revenue is collected, monies flow directly into the operating accounts of LBPO; there do no not exist independent bank accounts correlative to any of the Leased Locations.

9. Each of the Leased Locations is staffed by various individuals on an hourly and/or salaried basis, with the correlative payroll obligations being met by LBPO.

10. The Debtors share a common management team that is compensated by LBPO.

11. Abingdon was formerly operated in a manner identical to the other Leased Locations but ceased being so operated when a sale of the Debtors' Maryland-centric operations was completed in June 2025 (the "Maryland Sale").

12. The *only* obligations of the filing Debtors, that are not clearly or presumptively the direct obligations of LBPO, are in the nature of (i) rent payable to landlords for Leased Locations; and (ii) utility obligations for Leased Locations.

13. While there does exist some delinquent rent payable to certain landlords (as well as some accrued-but-not-yet due utility payments for the various Leased Locations), the Debtors'

pre-petition rental obligations form a collectively *de minimis* portion of the total debt obligations to be addressed through these bankruptcy cases.

14.     Notwithstanding the foregoing, LBPO pays (and historically has paid) the rent—and the utilities—for each Leased Location, with such being not merely an operational regularity of the Debtors but, too, a reflection of the use of a unified group of operating accounts.

### III.     Argument: Substantive Consolidation is Appropriate

LBPO is in the business of operating Hallmark-licensed stores and accomplishes these ends through utilization of the Leased Locations. The overwhelming majority of parties on the mailing matrix in these cases see—and always have seen—the Debtors as a singular economic unit. In fact, logic well dictates that many (albeit not all) may not have ever had the slightest realization that a conglomerate of commonly-owned and commonly-operated entities collectively comprise the Banner line of retail establishments. And the Debtors have, too, carried on as a singular enterprise, pooling financial resources and operational tools, synergizing their collective might, and using their grouped heft to compile a regional retail outfit that now endeavors to strategically reorganize. If ever there was a case that called out for substantive consolidation, this is precisely that case.

Substantive consolidation is a common law doctrine passively recognized by the Supreme Court more than 80 years ago. *See In re Owens Corning*, 419 F.3d 195, 206 (3d Cir. 2005) (citing *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941)). As explained by the *Owens Corning* Court:

> Substantive consolidation, a construct of federal common law, emanates from equity. It "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor."

*Owens Corning*, 419 F.3d at 205 (quoting *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*, 402 F.3d 416, 423 (3d Cir. 2005)).

The District of Columbia Circuit was actually amongst the first federal courts of appeal to establish a standard for the relief fleetingly acknowledged by the Supreme Court in *Sampsell*, creating a test that would become one of the two leading national theories for addressing substantive consolidation. *Owens Corning*, 419 F.3d at 207. Specifically:

> Although the Bankruptcy Code nowhere specifically authorizes consolidation of separate estates, courts may order consolidation by virtue of their general equitable powers. When they do so, it is typically to avoid the expense or difficulty of sorting out the debtor's records to determine the separate assets and liabilities of each affiliated entity. However, because every entity is likely to have a different debt-to-asset ratio, consolidation almost invariably redistributes wealth among the creditors of the various entities. This problem is compounded by the fact that liabilities of consolidated entities inter se are extinguished by the consolidation. Before ordering consolidation, a court must conduct a searching inquiry to ensure that consolidation yields benefits offsetting the harm it inflicts on objecting parties. The proponent must show not only a substantial identity between the entities to be consolidated, but also that consolidation is necessary to avoid some harm or to realize some benefit.

*Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.)*, 810 F.2d 270, 276 (D.C. Cir. 1987) (citing *In re Continental Vending Machine Corp*, 517 F.2d 997, 1000 (2d Cir. 1975); *Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966); *Flora Mir Candy Corp. v. R.S. Dickson & Co.*, 432 F.2d 1060, 1063 (2d Cir. 1970); *In re Snider Bros., Inc.*, 18 B.R. 230, 237-38 (Bankr. D. Mass. 1982)).

This Honorable Court, in turn, has distilled the District of Columbia Circuit's guidance into a familiar—even if scantly-invoked—two prong test: "the party seeking substantive consolidation must allege '(i) whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit,' or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.'" *Webster v. TCA TrustCorp Am. (In re Du Hancourt)*, 2020 Bankr. LEXIS 3305, at *19 (Bankr. D.D.C. Nov. 24, 2020) (quoting *In re S. Terrace, L.P.*, 1998 Bankr. LEXIS 1975, at *4 (Bankr. D.D.C. Feb. 5, 1998) (quoting *Union*

7

*Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2d Cir. 1988))).

Here, the first disjunctive prong is readily satisfied. The Debtors enter bankruptcy burdened by approximately $22 million in putative liabilities.[2] *See* Consolidated Balance Sheet, attached hereto as Exhibit B. More than $21 million of that debt is owed to a combination of third party vendors and providers of credit that either (i) furnished goods to LBPO with an at-least-tacit understanding that it was LBPO—not individual entities tied to specific Leased Locations—that would be selling those goods and using the proceeds thereof to make payments; or (ii) furnished credit to some combination of LBPO and other Debtors with the at-least-tacit understanding such credit was being used to operate a common enterprise.

By contrast, the only obligations that appear to be specific to individual Debtors (aside from LBPO) are in the nature of lease and utility debts. Yet there are no extant utility debts aside from those incurred in the ordinary course and not yet due. And while there is approximately $383,000.00 in past due rental obligations spread amongst various landlords, the sum of those debts is minor juxtaposed to the funds due to other, enterprise-wide creditors.

Of equal import, though, endeavoring to keep the Debtors separate would work a demonstrable injustice upon either generalized creditors or landlords. Plainly, if entities are to have their estates separately administered, a prism is created whereby the Debtors' assets—chiefly comprised of inventory—would need to be allotted either (i) to the individual Leased Location-correlative Debtors or (ii) to LBPO. Since LBPO is obligated on the Hallmark-centric payables

---

[2] Certain putative liabilities—including those owed to purveyors of so-called "merchant cash advances"—are disputed in nature; the arguments contained herein ought not be construed as an admission of the validity, *vel non*, of any one debt or of the total size of the Debtors' financial obligations.

8

(derived from the purchase of Hallmark goods), and since LBPO generally purchases inventory on a system-wide basis, logic dictates that the allocation of inventory between and amongst the Debtors would be in favor of LBPO and not individual store lessors. This allocation would benefit the overwhelming majority of creditors, who look to LBPO to satisfy their correlative claims. Yet this would also be to the disadvantage of the landlord creditors, who would look solely to Leased Location-specific Debtors to satisfy rental claims only to discover those Debtors do not actually have any assets with which to satisfy such claims.

This reality is all the more pronounced in light of the fact that all of the presently-operating Leased Locations are located within the Commonwealth of Virginia, which maintains an at-best-unorthodox legal regime concerning the ownership of fixtures. Whereas landlords in other states may well have recourse against the in-store improvements held by a tenant endeavoring to reorganize in bankruptcy, the Old Dominion state has long adopted a legal scheme whereby *any* personal property used in a manner consistent with the intended utilization of a space may be considered a fixture, even if not physically annexed thereto. *See Taco Bell of Am., Inc. v. Commonwealth Transp. Comm'r of Va.*, 710 S.E.2d 478. 482 (Va. 2011); *accord In re Alterman*, 127 B.R. 356, 361 (Bankr. E.D. Va. 1991) (citing *Danville Holding Corp. v. Clement*, 16 S.E.2d 345, 349 (Va. 1941)).

Stated otherwise, even the in-store improvements that could normatively be used to secure landlord claims may not be available for such purposes in these cases for the simple reason that those improvements are potentially already assets of the correlative landlords.[3] And failing to substantively consolidate could thusly give rise to a scenario in which seemingly all of the Debtors'

---

[3] The Debtors do list fixtures on their consolidated balance sheet and are in the process of assessing how best to schedule such items, if at all. As with debts, the characterization of assets herein is intended to be limited to the instant motion.

9

assets are available to most creditors (whose claims lay against LBPO) but are unavailable to landlords (whose claims are specific to one or more Leased Locations).

Creditors of LBPO will, no doubt, benefit from a reorganization founded upon access to the assets—including leasehold rights—of all Debtors. Similarly, creditors of Debtors that correlate to only one Leased Location will benefit from a reorganization founded upon access to the inventory procured—and historically paid for—by LBPO.

Equally, however, analysis of the second *Webster* prong also favors substantive consolidation. Plainly, it would be almost impossible to untangle the affairs of the various Debtors in these cases. As noted *passim*, the entities all share a single operating account. Inventory is purchased by LBPO and spread to individual stores. Sales revenues flow directly to LBPO. The Debtors all maintain a consolidated payroll. LBPO pays each entity's lease and utility obligations. The Debtors maintain a single balance sheet. And while the various retail locales do each have individual POS systems that could, theoretically, allow for the tracking of which monies have flowed from which Leased Location operations, such would prove little more than a burdensome exercise likely to yield limited returns for the simple reason that monies are fungible and those revenues, once placed in the common operating account, have all historically been applied to enterprise-wide commitments.

Specifically, while it may be possible to track individual store sales and even the movement of inventory to and between individual stores, such an effort would not nearly serve to fully untangle the complex inner relationship maintained between and amongst the Debtors. Numerous overhead expenses are borne for the collective benefit of all Debtors. Certain key employees are not assigned to any one Leased Location but, rather, serve an enterprise-wide role. And the credit

of LBPO has been used, time and again, to procure monies that have then benefited any combination of Leased Locations.

In short, both *Webster* prongs are readily satisfied *sub judice*, even though the disjunctive test requires only one of the two criteria be present to warrant substantive consolidation. Moreover, these are cases where equitable analysis overwhelmingly favors substantive consolidation, since such will actually work to the benefit of *all* creditors, without impairing the rights of *any* creditors. Such will also serve to streamline the administration of the Debtors' estates, reduce—quite dramatically—the administrative burden (including professional fees) attendant to the chapter 11 process,[4] and ensure all parties in interest are able to properly focus on the efforts necessary to ensure one unified company emerges from bankruptcy in the healthiest-possible condition.

### IV.    Specific Relief Requested

Through joint administration and substantive consolidation, the Debtors specifically seek, *inter alia*, the following varieties of relief:

1.   These cases be jointly administered under the caption utilized at the top of this motion;

2.   The Debtors be permitted to file a single, unified set of schedules, together with a single, unified statement of financial affairs;

3.   The Debtors be permitted to file a single, unified operating report each month;

4.   The Debtors be permitted to file a single plan of reorganization alongside a correlative disclosure statement;

---

[4] Based on the tiered formula used to calculate quarterly fees payable to the United States Trustee, the Debtors are aware that substantive consolidation may invite the incursion of marginally higher fees. Yet that increased administrative burden is likely to be handily dwarfed by the savings in professional fees that will be realized by substantive consolidation.

5. A single meeting of creditors be held in these cases;

6. All motions, petitions, docket entries, and claims be docketed in the lead case;

7. The clerk enter a notation, in each of the Debtors' cases except for the lead case, indicating no items or claims are to be docketed therein;

8. The liabilities of each Debtor's estate be accepted as the liabilities of all Debtors' estates as a single, unitary entity; and

9. The assets of each Debtor's estate be accepted as the assets of all Debtors' estates as a single, unitary entity.

### V. Conclusion

WHEREFORE, the Debtors respectfully pray this Honorable Court (i) jointly administer the various Debtors' cases; (ii) substantively consolidate the Debtors' estates for all purposes; (iii) afford that specific relief denoted in Section IV of this motion; and (iv) afford such other and further relief as may be just and proper.

Respectfully submitted,

Dated: September 15, 2025    By:    /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
Bar No. MD18071
The Belmont Firm
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
Phone: (202) 991-1101
mac@dcbankruptcy.com
*Proposed Counsel for the Debtors*

*[Certificate of Service on Following Page]*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 15th day of September, 2025, a copy of the foregoing was served electronically upon filing via the ECF system, with copies being sent to all parties receiving electronic notice herein.

/s/ Maurice B. VerStandig
Maurice B. VerStandig