**SUMMARY OF INDICATIVE TERMS
FOR $4,300,000.00 SENIOR SECURED SUPERPRIORITY
DEBTOR IN POSSESSION
CREDIT FACILITY**

September 22, 2025

| | |
|---|---|
| DEBTORS: | LBPO Management LLC, a Maryland limited liability company and each of the entities identified on Schedule A hereto as debtors and debtors-in-possession (collectively the "*Debtors*") under chapter 11 of Title 11 of the United States Code (as amended, the "*Bankruptcy Code*") in the chapter 11 case(s) (whether one or more, the "*Chapter 11 Cases*") to be filed or already filed in the United States Bankruptcy Court for the District of Columbia (the "*Bankruptcy Court*"). |
| DIP LENDER: | Hallmark Marketing Company, LLC, a Kansas limited liability company or any of its affiliates, successors, and assigns, including each of entities identified on Schedule B hereto as DIP Lenders (whether one or more, the "*DIP Lender*"). |
| DEBTOR-IN-POSSESSION CREDIT FACILITY: | The DIP Lender shall extend to the Debtors as joint and several obligors a senior-secured superpriority debtor-in-possession in kind credit facility in the principal amount of $4,300,000 paid not in cash but through in-kind advances in the form of the shipment of goods, products, and merchandise (at gross wholesale value, as customarily sold by DIP Lender to Debtors), by the DIP Lender to one or more of the Debtors, subject to the delivery terms set forth in the Prepetition Agreements, which shall be in a manner consistent with its ordinary course of dealings with the Debtors, and the Minimum Inventory Requirement, as defined below ("*In-Kind Advances*") plus any amounts capitalized thereon in accordance with the terms set forth below, including the Roll-Up Obligations, as defined below (the "*DIP Credit Facility*"). The In-Kind Advances made by, and other obligations owed to, the DIP Lender on and from time to time after the Closing Date (as defined below) are referred to herein as the "*DIP Loans*" and commitments with respect to such DIP Loans, the "*Commitment*", are to be made as set forth below and in the Documentation (as defined below), and are subject to the entry of an Interim Order and a Final Order (each as defined below, the "*DIP Orders*"), as applicable, by the Bankruptcy Court approving the DIP Credit Facility. All DIP Loans and other obligations outstanding under the DIP Credit Facility shall become due and payable on the Maturity Date (as defined below). |
| PURPOSE: | Upon entry of the Interim Order and any other 'first day' orders, each In-Kind Advance and all proceeds resulting from the sale thereof, and from the sale of any other goods, products and merchandise used or sold in the ordinary operation of Debtors' business (*i.e.*, not In-Kind Advances, Prepetition Collateral or other goods, products and merchandise supplied to Debtors by third parties that are not the DIP Lender), and all proceeds resulting therefrom, shall be used solely for: (i) the payment of transaction |

1

fees, expenses and costs incurred in connection with the DIP Credit Facility, (ii) the payment of fees, expenses and costs incurred in connection with the Chapter 11 Cases, (iii) the payment of any adequate protection payments approved in the Interim Order or Final Order, and (iv) working capital, capital expenditures, and other general corporate purposes of the Debtors including the payment of professional fees and expenses, in each case, consistent with, subject to, and within the categories and limitations contained in the Approved Budget.

Without limiting any contrary provision herein, no portion of the proceeds of any DIP Loan, or any cash collateral subject to the liens of the Prepetition Secured Parties or the DIP Lender, may be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to: (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtors owing to the Prepetition Secured Parties or the DIP Lender, or (ii) liens or security interests in the collateral securing such indebtedness, including challenges to the perfection, priority or validity of the liens granted in favor of any Prepetition Secured Party or the DIP Lender with respect thereto; provided that, notwithstanding the foregoing, no more than an aggregate of $25,000 of the Carve-Out (as defined below) may be used by an official committee of unsecured creditors in the Chapter 11 Cases (the "*Committee*"), if any, to investigate the matters described in the foregoing clauses (i) and (ii) prior to the date of the hearing to approve Debtors' Plan (as defined below).

As used herein, the terms "*Interim Order*" and "*Final Order*" mean an unstayed order in form and substance satisfactory to the DIP Lender, in its sole discretion, entered upon an application or motion of the Debtors, which shall also be in form and substance satisfactory to the DIP Lender, which among other things: (i) authorizes the Debtors to enter into the transactions contemplated by this Summary of Indicative Terms ("*Term Sheet*"), including the authorization to borrow under the DIP Credit Facility on the terms set forth herein, (ii) grants the superpriority claim status and senior priming and other liens contemplated in this Term Sheet, (iii) subject to entry of the Final Order, contains provisions prohibiting claims against the collateral of the Prepetition Secured Parties (as defined below) and the DIP Lender pursuant to 11 U.S.C. § 506(c), a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and a waiver of the equitable doctrine of marshalling, (iv) approves payment by the Debtors of all amounts, costs, fees and expenses provided for herein, and (v) shall not have been stayed, vacated, reversed or rescinded, or, without the prior written consent of the DIP Lender, amended or modified.

**AVAILABILITY:**  In-Kind Advances under the DIP Credit Facility shall be made as set forth herein and in accordance with the terms of the DIP Financing Agreement (defined below) and the Approved Budget up to $4,300,000.00 (the "*DIP Loan Cap*"). Without limiting any other provision herein, the unadvanced portion of the Commitment and any obligation of the DIP Lender to make In-Kind Advances to Debtors shall terminate on the Maturity Date.

2

|  |  |
|---|---|
|  | In-Kind Advances shall be made available and shipped to the Debtors in an amount up to $3,200,000, as soon as commercially reasonable following the date of entry of the Interim Order, and, in an amount up to the greater of $1,100,000 and the remaining unadvanced Commitment amount, as soon as commercially reasonable following the date of the entry of the Final Order. The goods, products and merchandise comprising the In-Kind Advances shall be shipped to Debtors in a manner consistent with its ordinary course of dealings with Debtors. |
| DOCUMENTATION | Definitive documentation with respect to the DIP Credit Facility (the "*Documentation*"), including, without limitation, a secured DIP promissory note and DIP loan agreement (together the "*DIP Financing Agreement*"), and all motions relating thereto, shall be in form and substance acceptable to the DIP Lender and its counsel, in their sole discretion; provided that on the date on which the last of the Bankruptcy Cases are filed (the "*Petition Date*") until the Documentation is fully executed, this Term Sheet (and the Interim Order) shall govern the terms of the DIP Facility, including, for the avoidance of doubt, the affirmative covenants, negative covenants, events of default and remedies described herein. Any Documentation shall be consistent with the terms and conditions set forth in this Term Sheet, other than to the extent any additional representations, warranties or covenants are contained in ancillary documentation (including collateral agreements and/or guarantees), which shall in such case be acceptable to the DIP Lender in its sole discretion. |
| EXISTING AGREEMENTS: | The agreement(s) identified on <u>Schedule C</u> hereto (whether one or more, the "*Prepetition Agreements*") by and among the Debtors and the DIP Lender (the "*Prepetition Secured Parties*"), evidence indebtedness secured by the Debtors' goods, inventory, equipment, furnishings, accounts, and other personal property (the "*Prepetition Collateral*") delivered to Debtors on credit terms for sale in the operation of Debtors' business. |
| ROLL-UP | The DIP Orders shall provide for a deemed roll-up of one hundred percent (100%) of the Debtors' prepetition indebtedness owing to the Prepetition Secured Parties under the Prepetition Agreements (the "*Roll-Up Obligations*"), with one-half (1/2) of Roll-Up Obligations being approved upon entry of the Interim Order, and the remaining Roll-Up Obligations being approved upon entry of the Final Order. |
| INTEREST RATE: | Interest shall accrue on each In-Kind Advance and, without duplication, on the outstanding principal balance of the DIP Credit Facility (the "*Principal Balance*") at a fixed rate of twelve percent (12%) per annum. The principal amount of each In-Kind Advance made to the Debtors hereunder shall be based on the "gross wholesale value" for goods, products and merchandise ordered by Debtors from the Prepetition Secured Parties in accordance with the terms of the Prepetition Agreements. Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default (as defined herein), interest |

3

|  |  |
|---|---|
|  | on the Principal Balance shall accrue at the rate set forth above plus five percent (5%). Accrued interest on the Principal Balance shall accrue and be shall be paid monthly (in arrears on the first day of each month) in kind ("*PIK*") with such PIK interest being added the Principal Balance on such date and added to any credit bid amount which may be made by the DIP Lender in connection the purchase of Debtors' assets under a section 363 sale in the Chapter 11 Cases; provided, however, that interest shall be payable on the Maturity Date by wire transfer of immediately available funds in the event Debtors' assets are not sold to the DIP Lender pursuant to a credit bid in a section 363 sale consummated prior to the Maturity Date. All interest will be calculated using a 360-day year and actual days elapsed. |
| COMMITMENT FEE: | $172,000 (4% of the Commitment amount), which amount shall be earned and due upon entry of the Interim Order, to be added to the Principal Balance on such date. |
| EXIT FEE: | $172,000 (4% of the Commitment amount), which amount shall be earned and due upon occurrence of the Maturity Date, and added to the Principal Balance on such date or otherwise paid in accordance with the terms hereof. |
| CLOSING DATE: | Closing Date as used herein means the date on which (i) all conditions precedent (including entry of the Interim Order) to the obligation of the DIP Lender to make the DIP Loan available to the Debtors have been satisfied, as determined in the sole discretion of the DIP Lender, and (ii) the definitive Documentation is fully executed by Debtors and the DIP Lender, which is anticipated to occur not later than ten (10) business days following entry of the Interim Order (the "*Closing Date*"). |
| MATURITY: | All obligations under the DIP Credit Facility, accrued or otherwise, shall be due and payable in full on the earliest of (the "*Maturity Date*"): (i) March 2, 2026, if said date is not extended by a confirmed Plan (as defined below), (ii) 30 days after entry of the Interim Order if the Final Order has not been entered prior to the expiration of such 30-day period, (iii) the acceleration of the DIP Loans as a result of any Event of Default under the Documentation, (iv) the effective date of a plan of reorganization of the Debtors (a "*Plan*"), that is confirmed pursuant to an order entered by the Bankruptcy Court in the Chapter 11 Cases, unless said Plan extends the date by which all obligations shall be due and payable, or (v) entry of an order by the Bankruptcy Court in the Chapter 11 Cases: (A) dismissing such cases or converting such cases to a case(s) under Chapter 7 of the Bankruptcy Code, or (B) appointing a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of the Debtors (*i.e.*, powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), in each case without the consent of the DIP Lender. All accrued and amounts outstanding under the DIP Credit Facility shall be due and payable in full, and the Commitment thereunder shall terminate, on the Maturity Date. |

| | |
|---|---|
| REPAYMENT | Except for Mandatory Prepayments (as described below), no repayments of any DIP Loan under the DIP Credit Facility shall be due until the Maturity Date. Upon the Maturity Date, the unpaid Principal Balance, together with all PIK and other unpaid interest, capitalized fees (*i.e.*, the Commitment Fee and the Exit Fee), and all other costs, fees, expenses, indemnities, and other amounts due under the DIP Credit Facility shall be due and payable in full without demand by the DIP Lender or consent or further action by the Bankruptcy Court. |
| VOLUNTARY PREPAYMENTS AND COMMITMENT REDUCTIONS: | The Debtors may prepay the DIP Loans in whole or in part at any time without premium or penalty, subject to customary notice requirements to be mutually agreed upon by the Debtors and the DIP Lender. |
| MANDATORY PREPAYMENTS: | The Debtors shall prepay the DIP Loans, in full or in part, immediately (i) upon the occurrence of an Event of Default under the DIP Financing Agreement, (ii) upon any sale or disposition of any Prepetition Collateral or any other DIP Collateral outside the ordinary course of business (unless otherwise agreed to by the DIP Lender in writing), (iii) upon and the conversion of the Chapter 11 Cases to a Chapter 7 Case(s) under the Bankruptcy Code, or (iv) upon any dismissal of the Chapter 11 Case for any reason. (each a "*Mandatory Prepayment Event*"). |
| | Except as otherwise provided in the Approved Budget, mandatory repayments of the DIP Loans shall be required in an amount equal to: (i) 100% of the net sale proceeds resulting from non-ordinary course asset sales of the Collateral (as defined below) including, without limitation, a sale of all or substantially all of the Debtors' assets, (ii) 100% of the proceeds of the incurrence of any indebtedness by any Debtor other than in the ordinary course of business, or otherwise approved by the DIP Lender in its sole discretion, (iii) 100% of any insurance proceeds received by the Debtors from any casualty or other loss of any Collateral, and (iv) any condemnation or similar proceeds received by the Debtors in respect of any Collateral. |
| | In the event of a sale of all or substantially all of the assets of any Debtor under Section 363 of the Bankruptcy Code or otherwise consented to by the DIP Lender, the net proceeds of any such sale shall be paid to the DIP Lender first, to repay outstanding DIP Loans, and all other amounts under the DIP Financing Agreement, until paid in full, and second, to repay outstanding indebtedness under the Prepetition Agreements (to the extent such amount has not been rolled-up in accordance with this Term Sheet or any DIP Order) until paid in full. |
| SECURITY: | Subject to the Carve Out (as defined below), the DIP Credit Facility will be secured by a first priority, priming and senior security interest and lien, pursuant to sections 364(d) of the Bankruptcy Code (collectively, the "*DIP Liens*") on all tangible and intangible personal property of the Debtors, which shall include, without limitation, all of Debtors' respective rights, |

5

titles and interests in, to and under (i) all Prepetition Collateral, (ii) all goods, equipment, fixtures, inventory, accounts, accounts receivable, general intangibles, payment intangibles, contract rights, rights to payment, investment property (including a pledge of the direct ownership interest in each domestic subsidiary of each Debtor), deposit accounts, documents, instruments, chattel paper, supporting obligations, letter-of-credit rights, commercial tort claims, and books and records relating thereto; (iii) any owed or leased real property, including without limitation any and all of Debtors rights in real property leases, options, easements, licenses, and related rights arising from or related thereto; (iv) all avoidance actions under Chapter 5 of the Bankruptcy Code ("*Avoidance Actions*") and the proceeds thereof (other than those arising under Section 549 of the Bankruptcy Code and amounts necessary to reimburse the DIP Lender for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other avoidance actions); and, (iv) all proceeds of any of the foregoing, including, but not limited to, proceeds of any insurance policies and proceeds of leases and claims against third parties (collectively, the "*DIP Collateral*" or "*Collateral*"), in each case, whether acquired or arising prior or subsequent to the commencement of the Chapter 11 Cases. For the avoidance of doubt, all existing liens, rights and interests granted to or for the benefit of the DIP Lender under any of the Prepetition Agreements shall be primed and made subject and subordinate to the DIP Liens, which shall also prime any liens granted after the commencement of the Chapter 11 Cases to provide adequate protection in respect of any other prepetition credit facilities or liens, unless otherwise consented to by the DIP Lender, in its sole discretion.

The DIP Loans extended to the Debtors under the DIP Credit Facility will also be secured by a super-priority administrative claim under Section 364(c)(1) of the Bankruptcy Code having priority over all other administrative claims, including, without limitation, those specified in Bankruptcy Code Sections 503(b) or 507(b), but subject to the Carve Out, as defined below (the "*DIP Superpriority Claim*"). Notwithstanding anything to the contrary set forth herein, the DIP Credit Facility will not be secured by goods or products in which Debtors are permitted by the DIP Lender, in its sole discretion, to grant purchase-money security interests, and the liens and claims relating thereto (including post-petition, pre-petition, and adequate protection), which will be subject and subordinate to the Carve Out (defined below). For the avoidance of doubt, DIP Lender shall not consent to any other debtor-in-possession financing or other financing to Debtors, which shall include terms which include an interest rate above twelve percent (12%) per annum or any term which impairs or is superior or preferential in any respect to any the DIP Lenders rights, liens or interests hereunder or under the DIP Financing Agreements.

Each Prepetition Secured Party under any Prepetition Agreement, whose liens are primed as set forth above, shall receive, for adequate protection for such priming, and current interest at the default rate set forth in such Prepetition Agreement, if any.

6

| | |
|---|---|
| EXPENSES: | Debtors will pay all documented out-of-pocket costs and expenses associated with the negotiation, preparation, due diligence, administration, and closing of all Documentation, including, without limitation, the documented legal fees of counsel to the DIP Lender, (including any local bankruptcy counsel to the DIP Lender), regardless of whether the DIP Credit Facility is closed. |
| CARVE OUT: | The "*Carve Out*" shall mean the following: |

    i.    allowed administrative expenses for (a) statutory fees and interest payable to the Office of the U.S. Trustee (pursuant to 28 U.S.C. § 1930(a)(6) and 31 U.S.C. § 3717, respectively), as determined by agreement of the U.S. Trustee or by final order of this Court, and (b) fees required to be paid to the Clerk of the Bankruptcy Court (pursuant to 28 U.S.C. § 156(c));

    ii.    accrued and unpaid fees, disbursements, costs and expenses, allowed at any time by the Bankruptcy Court and incurred by professionals retained by the Debtors or a statutory committee, if any, (the "*Case Professionals*"), up to and as limited by the respective Approved Budget amounts for each Case Professional or category of Case Professional, less the amount of pre-petition retainers received by such Case Professionals and not previously applied to fees and expenses; and

    iii.    accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals from and after the date of service of a Carve Out Trigger Notice, which means a notice sent by the DIP Lender to Debtors and each other applicable interested party in the Cases that the Post-Trigger Carve Out Cap (as defined below) has been invoked, to the extent allowed at any time, in an aggregate amount not to exceed $30,000.00 (the "*Post-Trigger Carve Out Cap*"), less the amount of pre-petition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (ii) above. The Post-Trigger Carve Out Cap shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve Out Trigger Notice in respect of fees and expenses incurred after delivery of the Carve Out Trigger Notice; and

    iv.    an amount for unsecured creditors equal to the lesser of (a) two percent (2%) of the aggregate value any liens and claims of the DIP Lenders which are avoided or otherwise disallowed in the Chapter 11 Cases and (b) $100,000.00.

For the avoidance of doubt, the amount of fees and expenses for investigation of the pre-petition liens and claims against the DIP Lender or any other Prepetition Secured Party under any Prepetition Agreement shall not exceed $25,000.00. No portion of the proceeds of the DIP Credit Facility or the Carve Out shall be used for the payment of fees or expenses of any person challenging the pre-petition liens and/or claims of any Prepetition Secured Party under any Prepetition Agreement or pursuing or prosecuting any claims or actions against

7

|  |  |
|---|---|
|  | the DIP Lender or any other Prepetition Secured Party under the Prepetition Agreements, including any claim under Chapter 5 of the Bankruptcy Code in respect of any Prepetition Agreement. |
| **ADEQUATE PROTECTION:** | Until any period for the challenge of the pre-petition claims and liens under the Prepetition Agreements has expired and, if a challenge is filed, such claims are determined to be fully secured claims, the DIP Lender or any other Prepetition Secured Party under any Prepetition Agreement shall receive adequate protection as follows: |

    i.   replacement liens and security interests on the Prepetition Collateral (subject only to the Carve Out and the DIP Liens);

    ii.   an adequate protection super-priority administrative claim under Section 507(b) of the Bankruptcy Code, subject only to the Carve Out and the super-priority administrative claim of DIP Lender under Section 364(c)(1) of the Bankruptcy Code to secure the obligations under the DIP Credit Facility, subject and junior to the DIP Superpriority Claim;

    iii.   payment of the documented out-of-pocket costs and expenses of the attorneys of the DIP Lender;

    iv.   until repayment in full of the obligations under the Prepetition Agreements, on the last business day of each month, payment of accrued and unpaid interest, at the default rate, on the outstanding loans under the Prepetition Agreements, in a sum correlative to that indicated in the Approved Budgets;

    v.   until payment in full in cash of the DIP Loans, application of proceeds of the DIP Collateral to the DIP Loans in accordance with the terms of the DIP Financing Agreements, except to the extend said proceeds are used in connection with the purpose of the DIP Loans and pursuant to the parameters of the Approved Budgets; and

    vi.   the right to receive information and reports from the Debtors reasonably requested by the DIP Lender.

| | |
|---|---|
| **CONDITIONS PRECEDENT TO CLOSING:** | The closing and the initial DIP Loan under the DIP Credit Facility will be subject to satisfaction of the conditions precedent deemed appropriate by the DIP Lender in its sole discretion, including, but not limited to, the following: |

    i.   The negotiation, execution, and delivery of definitive documentation with respect to the DIP Credit Facility;

    ii.   The DIP Lender shall have received endorsements naming the DIP Lender as an additional insured or loss payee under all insurance policies to be maintained with respect to any DIP Collateral;

    iii.   The DIP Lender shall have received (a) the Interim Order authorizing the DIP Credit Facility from the Bankruptcy Court that is in full force

8

and effect and is not subject to a stay or appeal, (b) corporate resolutions, certificates and other documents as the DIP Lender shall require from each Debtor, and (c) satisfactory evidence that the DIP Lender shall have a valid and perfected lien and security interest in all DIP Collateral and a super-priority administrative claim, each with the priority referred to under the section entitled "*Security*" set forth above (provided that the entry of the Interim Order by the Bankruptcy Court shall be deemed to have satisfied this clause (iii) until the Closing Date); and

iv. The DIP Lender shall have received and approved the Approved Budget referenced in the section titled "*Other Covenants*" below and a detailed professional fee budget acceptable to the DIP Lender. and

v. All "first day" motions and proposed orders shall be acceptable to the DIP Lender in its sole discretion, with said "first day" motions having been filed prior to the execution of this Term Sheet and the DIP Lender's acceptance thereof being evidenced by the DIP Lender's endorsement upon this Term Sheet.

**CONDITIONS PRECEDENT TO ALL EXTENSIONS OF CREDIT:** Usual and customary for transactions of this type, including, without limitation: (i) all of the representations and warranties in the definitive Documentation shall be true and correct in all material respects as of the date of each DIP Loan; (ii) no event of default under the DIP Financing Agreement shall have occurred and be continuing, or would result from the making of any DIP Loan; (iii) the sum of the aggregate principal amount of all DIP Loans outstanding under the DIP Credit Facility after giving effect to the applicable borrowing of any DIP Loan shall not exceed the DIP Loan Cap; (iv) each credit extension complies with the Approved Budget; and (v) there shall not be pending any motion, complaint or other pleading challenging the pre-petition claims, security interests and liens securing any Prepetition Agreement, the Prepetition Collateral, or any other similar challenge under Chapter 5 of the Bankruptcy Code or otherwise.

**REPRESENTATIONS AND WARRANTIES:** Usual and customary for transactions of this type, based upon those contained in the Prepetition Agreements, with such additions and modifications as the DIP Lender may deem necessary as a result of the filing of the Chapter 11 Case, including, without limitation, the following: (i) legal existence, qualification and power; (ii) due authorization and no contravention of law, contracts or organizational documents; (iii) governmental and third party approvals and consents; (iv) enforceability; (v) accuracy and completeness of specified financial statements and other information and other than events leading up to and resulting from the commencement of the Chapter 11 Case; (vi) no material litigation which has not been stayed; (vii) no default; (viii) ownership of Collateral and other property (including disclosure of all liens associated therewith); (ix) insurance matters; (x) identification of subsidiaries, affiliates, equity

9

|  |  |
|---|---|
|  | interests and loan parties; (xi) accuracy of disclosures; and (xii) such other matters as the DIP Lender shall require. |
| COVENANTS: | Usual and customary for transactions of this type, based upon those contained in the Prepetition Agreements, with such additions and modifications as the DIP Lender may deem necessary as a result of the filing of the Chapter 11 Cases, including, without limitation, the following: |
|  | *Affirmative Covenants* (i) delivery of budgets and forecasts; (ii) delivery by any Debtor of copies of all pleadings filed in the Chapter 11 Cases or the provision of reasonable information that renders such copies accessible to the DIP Lender; (iii) delivery of notices (of any default, material adverse condition, etc.); (iv) payment of post-petition obligations; (v) use of DIP Loan proceeds restricted to uses under the Approved Budget; (vi) compliance with material contracts; (vii) maintenance of minimum inventory levels at each Debtor location for goods, products and merchandise (including In-Kind Advances, and other goods, products and merchandise from time to time supplied to the Debtors by third parties), as such levels as shall be reasonably determined in the sole discretion of the DIP Lender (the "*Minimum Inventory Requirement*") and which shall include inventories of goods, products and merchandise provided by the DIP Lender and by any third-parties as the DIP Lender may determine from time to time to be necessary to permit the continued orderly on-going operation of the Debtors' business, (viii) all shipment of goods, products, and merchandise (at gross wholesale value, as customarily sold by DIP Lender to Debtors), by the DIP Lender to one or more of the Debtors other than the In-Kind Advances, shall be subject to the delivery terms set forth in the Prepetition Agreements, and repayment of the In-Kind Advances shall be made in accordance with the terms of the Approved Budget. For the avoidance of doubt, delivery of any other goods, products, and merchandise to Debtors by the DIP Lender or its affiliates, after delivery of the In-Kind Advances, shall be on a cash-in-advance basis only; and (ix) such other reasonable matters as the DIP Lender shall require. |
|  | *Negative Covenants* Subject to the prior consent of the DIP Lender, restrictions on (i) liens; (ii) indebtedness; (iii) mergers and other fundamental changes; (iv) sales and other dispositions of property or assets outside the ordinary course of business; (v) transactions with affiliates; (vi) amendments of organizational documents in a manner materially adverse to the DIP Lender; (vii) prepayments of other indebtedness (including limitations on critical vendor payments but excluding the payment of pre-petition employee wage claims); (viii) assumption, rejection, or assignments of any lease without the prior written consent of the DIP Lender, which consent shall not be unreasonably withheld; and (ix) such other matters as the DIP Lender shall reasonably require. |
| CASE MILESTONES | In addition to the Other Covenants set forth below, by no later than 45 days from entry of Final Order (as defined above), Debtors shall file a Plan and Disclosure Statement in the Chapter 11 Cases that is acceptable to the |

10

DIP Lender in its reasonable discretion. As an alternative, Debtors may file a motion to sell substantially all their assets within 45 days.

**OTHER COVENANTS:**

*Confirmation of Plan.* By not later than one hundred five (105) days following the entry of the Final Order, Debtors' Plan shall be confirmed by the Bankruptcy Court, which shall be in a form and substance acceptable to the DIP Lender in its reasonable discretion.

*Approved Budget.* Debtors shall have delivered the Approved Budget to the DIP Lender. As used herein "*Approved Budget*" shall mean the rolling consolidated 13-week cash flow and financial projections of the Debtors initially covering the period ending on December 14, 2025, and itemizing on a weekly basis all uses, and anticipated uses, of DIP Loans made under the DIP Credit Facility and proceeds thereof, revenues and other payments projected to be received, and all expenditures proposed to be made during such period, which shall at all times be in form and substance satisfactory to the DIP Lender in its sole discretion which Approved Budget may be amended only with the prior written consent of the DIP Lender. For the avoidance of doubt, the revenue and payment provisions of the Approved Budget (and each variance report and all reporting required in connection therewith) shall provide and allow for treatment of non-cash debits and credits among Debtors and the DIP Lender and its affiliates as determined in the discretion of the DIP Lender.

*Budget Variance.* Debtors shall not make or commit to making any payments other than those identified in the Approved Budget. Debtors shall not permit aggregate expenditures under the Approved Budget to exceed one hundred and ten percent (110%) of the total budgeted expenses or aggregate cash receipts under the Approved Budget to be less than eighty-five percent (85%) of the total budgeted cash receipts, in each case calculated on a rolling two-week basis commencing as of the Petition Date, with the first such testing to begin two weeks after the Petition Date.

*Reporting.* In addition to such other reporting as may be required under the DIP Financing Agreement, after entry of the Interim Order, the Debtors shall provide to the DIP Lender, as soon as available but no later than 5:00 p.m. Central Time on the last Friday of each rolling two-week period, a budget variance and reconciliation report setting forth: (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Approved Budget, and (ii) the percentage variance of the aggregate receipts and aggregate disbursements, for (A) the rolling two-week period ended on (and including) the last Sunday of the two-week reporting period and (B) the cumulative period to date and (iii) projections for the following 13 weeks, including a rolling cash receipts and disbursements forecast for such period.

|  |  |
|---|---|
|  | *Reporting regarding Professional fees and expenses*: Upon request, the Debtors shall provide the DIP Lender with periodic summaries regarding accrued and unpaid expenses of all Case Professionals. |
| CASH DOMINION: | The Debtors will implement cash management procedures customary for facilities of this type and reasonably satisfactory to the DIP Lender, including, but not limited to, the establishment of customary agreements, which will provide for the DIP Lender to have viewing access to the Collection Account, as defined below. From and after the date ten (10) business day succeeding the Closing Date, the Debtors will cause or direct all cash receipts and collections received by the Debtors and Debtors affiliates from all sources, including all proceeds from the sale of goods, products, merchandise, and inventory and other DIP Collateral, in an account(s) to be held at Axos Bank (the "*Collection Account*"). All amounts deposited into the Collection Account shall be held for application in accordance with the Approved Budget, including to the DIP Loans. |
| EVENTS OF DEFAULT: | Usual and customary in transactions of this type, with grace periods to be negotiated and agreed, based upon those contained in the Prepetition Agreements, with such additions and modifications as the DIP Lender may deem necessary as a result of the filing of the Chapter 11 Case, including, without limitation, the following: (i) non-payment of principal, interest, fees or other amounts; (ii) failure to perform or observe covenants set forth in the definitive DIP Financing Agreement, within a specified period of time, where customary and appropriate, after such failure; (iii) any representation or warranty in the definitive DIP Financing Agreement proving to have been incorrect in any material respect when made or confirmed; (iv) conversion of the Debtors' Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (v) appointment of a trustee or examiner under Section 1104 of the Bankruptcy Code, (vi) the entry of an order granting relief from stay to any other creditor as to a material portion of the Collateral; (vii) the failure of the Debtors to obtain a Final Order in form and substance reasonably satisfactory to the DIP Lender within 30 days after the commencement of the Chapter 11 Cases; (viii) actual or asserted invalidity or impairment of DIP Financing Agreement or any DIP Liens; (ix) cessation of business of any Debtor or Debtor affiliate, (x) the failure of the Debtors to obtain additional cash debtor-in-possession financing in an amount not less than $1,000,000 by no later than 5 business days from entry of the Interim Order, which financing shall be subordinate in all respect to the DIP Loan, provided that the provider of such financing shall be entitled to a priority purchase money security interest in any goods, products and merchandise actually purchased with the proceeds of such loan; and provided that the proceeds resulting from any disposition of such goods, products and merchandise shall not be repaid, except as provided in the Approved Budget and in each instances subject to the prior consent of the DIP Lender, and (xi) failure at any time during the term of the DIP Loan to satisfy the Minimum Inventory Requirement and achieve the weekly cash budget targets set forth in the Approved Budget. The DIP Orders will provide for written notice of an Event of Default with an opportunity to cure within five (5) days after notice is sent, except for an Event of Default described in sections (iv), (v) or (vi) of this paragraph. |

12

| | |
|---|---|
| **DEFAULT REMEDIES:** | Usual and customary in transactions of this type, with grace periods to be negotiated and agreed, based upon those contained in the Prepetition Agreements, with such additions and modifications as the DIP Lender may deem necessary as a result of the filing of the Chapter 11 Cases, including, without limitation, the following: (i) terminate any portion of the Commitment which has not been advanced to the Debtors; (ii) declare all or any portion of the Principal Balance to be immediately due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Debtors; and (iii) exercise any rights and remedies provided to the DIP Lender under the Documentation, at law or in equity, including all remedies provided under the Bankruptcy Code, the Uniform Commercial Code or other applicable law, which shall include, without further order from the Bankruptcy Court (A) the right to take immediate possession and control of all DIP Collateral, to operate or permit a designated third party to operate Debtors' stores under a transition services agreement (acceptable to the DIP Lender in its sole discretion) providing for the orderly operation and sale of Debtors' business, and (B) permit the transfer, sale or other disposition of all rights and interests in any DIP Collateral by the DIP Lender to itself or its assignees, designees, affiliates, receivers, liquidators and/or third parties, and such other terms as the DIP Lender may require. |
| **CHALLENGE PERIOD:** | The Debtors shall stipulate in the DIP Orders as to validity, priority, and security of the obligations under the Prepetition Agreements. Appending this Term Sheet to said DIP Orders, coupled with the Debtors' endorsement of this Term Sheet, shall satisfy the foregoing rigor of stipulating to the validity, priority and security of the obligations under the Prepetition Agreements. Those stipulations shall be binding upon the Debtors upon entry of the Interim Order, and upon each other party in interest, including any statutory committee, unless such party in interest commences a challenge by (i) with respect to any statutory committee, 21 days after the initial appointment of such committee, provided that such committee is appointed within 91 days after the Petition Date, and (ii) with respect to any other party in interest, 14 days after the date of entry of the Interim Order. |
| **GOVERNING LAW:** | District of Columbia and the Bankruptcy Code. |
| **JURISDICTION:** | Each of the parties shall waive its right to a trial by jury and submit to the jurisdiction of the U.S. Bankruptcy Court for the District of Columbia as to matters for which the bankruptcy court otherwise has subject matter jurisdiction and the state and federal courts sitting in the District of Columbia for all other matters including matters where bankruptcy subject matter jurisdiction has terminated, has been removed from the bankruptcy court, or from which the reference has been withdrawn from the bankruptcy court. |

[Signature Page Immediately Follows]

13

DEBTORS:

LBPO Management LLC, a Maryland limited liability company,
for itself and for each other Debtor

By: Michael Postal
Their: Authorized Agent

DIP LENDER:

HALLMARK MARKETING COMPANY, LLC, a Kansas limited liability company

By: SaraBeth Burton
Its: President

[SIGNATURE PAGE TO SUMMARY OF INDICATIVE TERMS]

CORE/9990000.7791/231655252.8

SCHEDULE A

DEBTORS

LBPO Management LLC
Banner's of Reston, Inc.
Banner's of Dulles Town, Inc.
Banner's of Fair Oaks, L.L.C.
Banner's of Ashburn, L.L.C.
Banner's of Gainesville, L.L.C.
Banner's of Warrenton, L.L.C.
Banner's of South Riding LLC
Banners of Stafford, LLC
Banner's of Oakton, LLC
Banner's of Bradlee Center, L.L.C.
Banners of Fair Lakes LLC
Banners of Woodbridge LLC
Banners of Williamsburg LLC
Banners of Newport News LLC
Banners of Commonwealth Midlothian LLC
Banners of Village Marketplace Midlothian LLC
Banners of Fairfield Virginia Beach LLC
Banners of Hilltop Virginia Beach LLC
Banners of Central Park Fredericksburg LLC
Banners of Cosner's Corner Fredericksburg LLC
Banners of York River LLC
Banners of Lynchburg LLC
Banner's Hallmark – VA Valley Mall [Banner's of Harrisburg VA LLC]
Banners Hallmark – Apple Blossom Mall [Banner's of Winchester LLC]
Banners Hallmark – New River Valley Mall [Banner's of Christianburg VA LLC]
Banners Hallmark – Greenbrier Market Center [Banner's of Chesapeake VA LLC]
Banners Hallmark – Columbus Village East [Banner's of Columbus Village VA Beach, LLC]
Banner's of Burke L.L.C.
Banner's of Kamp Washington L.L.C.
Banners of Suffolk LLC
Banners of Suffolk II LLC
Banners of Henrico LLC
Banners of Waynesboro LLC
Banners of Roanoke LLC
Banners of Rocky Mount VA LLC
Banner's of Manassas II LLC
Banners of Charlottesville LLC
Banners of Kingstowne LLC
Banners of Leesburg LLC
Banners of Abington LLC

15

## SCHEDULE B

<u>DIP Lenders</u>:

Hallmark Marketing Company, LLC

## SCHEDULE C

<u>Prepetition Agreements</u>

- Hallmark Account Agreement

- Agreement dated October 28, 2019

- Amended and Restated Loan and Security Agreement and Release dated as of January 1, 2020 (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement")

- Promissory Note dated June 2024, executed under the Loan Agreement