Maurice B. VerStandig, Esq.
Bar No. MD18071
The Belmont Firm
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
Phone: (202) 991-1101
mac@dcbankruptcy.com
*Counsel for the Debtors*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-378-ELG |
| | ) | (Chapter 11) |
| Banners of Abingdon, LLC, *et al.*[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

## OPPOSITION TO MOTION TO DISMISS BANNERS OF ABINGDON, LLC AND TRANSFER OR DISMISS ALL REMAINING CASES

Come now Banners of Abingdon, LLC and the 40 related debts in these jointly administered cases, by and through undersigned counsel, and in opposition to the Motion to Dismiss Banners of Abingdon, LLC and Transfer or Dismiss All Remaining Cases, DE #37 (the "Motion"), filed by the United States Trustee (the "US Trustee") states as follows:

---

[1] The Debtors in these cases are Banners of Abingdon, LLC; Banners of Reston, Inc.; Banner's of Dulles Town, Inc.; Banner's of Fair Oaks, LLC; Banner's Of Ashburn, LLC; Banner's of Gainesville, LLC; Banner's of Warrenton, LLC; Banner's of South Riding, LLC; Banner's of Stafford, LLC; Banner's of Oakton, LLC; Banner's of Bradlee Center, LLC; Banners of Fair Lakes, LLC; Banners of Woodbridge LLC; Banners of Williamsburg LLC; Banners of Newport News LLC; Banners of Commonwealth Midlothian LLC; Banners of Village Market Place Midlothian LLC; Banners of Fairfield Virginia Beach LLC; Banners of Hilltop Virginia Beach LLC; Banners of Central Park Fredericksburg LLC; Banners of Cosner's Corner Fredericksburg LLC; Banners of York River LLC; Banners of Lynchburg, LLC; Banners of Harrisonburg VA LLC; Banners of Winchester LLC; Banners of Christiansburg VA LLC; Banners of Chesapeake VA LLC; Banners of Columbus Village VA Beach LLC; Banner's of Burke, LLC; Banner's of Kamp Washington, LLC; Banners of Suffolk II LLC; Banners of Suffolk LLC; Banners of Henrico LLC; Banners Of Waynesboro LLC; Banners of Roanoke LLC; Banners of Rocky Mount VA, LLC; Banners of Manassas II LLC; Banners of Charlottesville LLC; Banners of Kingstowne LLC; Banners of Leesburg, LLC; and LBPO Management, LLC.

1

## I.      Introduction

With a filing made less than two weeks into the pendency of these cases—before schedules were docketed, an initial debtor interview was conducted, or a meeting of creditors was held—the US Trustee has elected to accuse the debtors of bad faith and seek to upend the largest retail reorganization in the District of Columbia in recent memory. Tellingly, not a single creditor has joined in this misplaced effort, nor does it appear any economically-impacted party is likely to do so. And for good reason: the Motion is premised upon factual assertions that are oftentimes (albeit not always) underinformed or misleading, whilst being rooted in a legal theory that has an at-best-marginal foothold in governing law.

As a threshold issue, Banners of Abingdon, LLC ("Abingdon") had its principal place of business in the District of Columbia for the 180 days next preceding the petition date in these cases. While the entity did not formally declare such until later, it is the actual principal place of business—and not the formalistic filing of a recitation thereof with state authorities—that controls the statutory inquiry. Moreover, Abingdon's pre-petition presence in this district ought to come as little surprise insofar as the entity sold all of its tangible assets well before these cases were filed and was thusly left to manage only legal rights (including potential litigation claims) thereafter. That such management occurred from the home office of the entity's principal is unremarkable. That pre-sale management also occurred from the same home office is likewise unremarkable: in an age of telecommuting, the debtors in all of these cases have seized the efficiencies of Microsoft Teams, e-mail, phone calls, and other decentralized managerial methods.

Equally, Abingdon is a good faith bankruptcy case. As has been manifest from the outset of these chapter 11 proceedings, the debtors operate as a singular enterprise, often eschewing corporate formalities in favor of pragmatic operational electives. In seeking to reorganize, the

debtors wish look to every good faith source of potential monies that can be used to pay the claims of creditors. Insofar as certain litigation claims appear to emanate from the sale of Abingdon's assets, it is logical for the debtors to ensure Abingdon—a stronger plaintiff, on paper, than any other debtor—be part of the reorganization effort. Such is all the truer where, as here, there is a first day effort to substantively consolidate the debtors' cases and estates (an effort that, perhaps not coincidentally, *only* the US Trustee is opposing).

Unsurprisingly, it is not a coincidence that Abingdon was the first of the debtors to seek chapter 11 relief. Just as in so many bankruptcy cases, a cognizant election was made, pre-petition, to utilize this Honorable Court's venue. The election was based on myriad factors including (i) the economic savings that can be occasioned through the conduct of hearings over Zoom; (ii) the economic savings that can be occasioned through not requiring out-of-state counsel to engage local counsel and pay for local counsel to attend hearings; (iii) the centralized and readily-accessible nature of the courthouse—not just for the debtors and their counsel but, too, for seemingly every large firm in America—for those hearings that require some in-person component; (iv) the court's clear ability to accommodate a larger case; and (v) the court's presence outside of a judicial circuit that permits bankruptcy cases to be bogged down with moot cases and constitutionally-infirm proceedings.[2]

This filing choice, however, is neither a byproduct nor indicia of bad faith. The election is, rather, the clear decision of a group of debtors looking to ensure their interests, and those of their creditors, are best protected in an economically and logistically reasonable and efficient manner. And, as these cases march toward the one month mark, it would seem that counsel for seemingly

---

[2] *See Kiviti v. Bhatt*, 80 F.4th 520 (4th Cir. 2023) (holding bankruptcy courts may adjudicate moot cases, and entertain matters devoid of any case or controversy, because Article I courts are unmoored to the restraints of Article III).

all economically impacted parties have found this election to be ultimately beneficial. Yet, for reasons that genuinely escape comprehension, the US Trustee wishes to see these cases dismissed or these proceedings uprooted and transferred.

## II.   Relevant Facts

As part of a seeming "ready, fire, aim" approach, the US Trustee misstates various facts or, at minimum, presents various facts in a contextually-vacuous manner. As such, certain key points that necessarily animate the motion do, too, merit clarification herein:

1.     Most managerial employees of the debtors—excepting those who are assigned to specific retail locations or specific groupings of retail locations—work remotely, with the majority of the debtors' executive business being conducted over Microsoft Teams. While there does exist corporate office space for LBPO Management, LLC ("LBPO") in Maryland, and while certain managerial employees do regularly use that space, such is not the buzzing campus depicted in the Motion, with Mr. Postal instead managing the majority of the debtors' affairs from his home office in Washington, DC.

2.     Abingdon indicated, on its petition for bankruptcy relief, that no bankruptcy cases are pending on behalf of affiliates for the simple reason that Abingdon was the first to file of the entities and, as such, no other cases were then-pending. The US Trustee suggests this to have been an act of dishonesty, *see* Motion, DE #37, at ¶ 16, yet neglects to so much as mention that notes appended to the Abingdon petition read, *inter alia*, "Banners of Abingdon, LLC . . . and a series of related companies engaged in the business of operating Hallmark-licensed stores are seeking chapter 11 relief in this Honorable Court on September 14 and 15, 2025," *see* Petition, DE #1, at p. 8.

3.      The US Trustee asserts Abingdon does not have any assets, *see* Motion, DE #37, at ¶ 20, but also acknowledges, later, that Abingdon believes it holds litigation claims, *id.* at p. 11, n. 7. This is confounding, since the existence of such litigation claims was discussed in open court before the Motion was ever filed, with the US Trustee—as they acknowledge in the Motion—asking questions about these very claims, on the record.

4.      Nearly all high level decisions regarding the management of Abingdon are made—and, historically, have been made—from Mr. Postal's home office in the District of Columbia, with such being true not merely of post-sale decisions regarding the management of litigation rights and the pursuit of such rights through the bankruptcy process but, too, pre-sale decisions regarding the sale itself and the optimal corporate stewardship of the entity.

5.      While a retainer was not paid until August 2025, discussions between Mr. Postal and insolvency counsel, concerning a potential bankruptcy filing for the various debtors (including Abingdon), date back several months. These discussions were chiefly engaged from Mr. Postal's home office (via telephone). The nature and extent of those discussions is privileged and will not be further discussed or highlighted, but the existence of such discussions—coupled with the timing of such discussions—speaks to the clear existence of Abingdon's principal place of business, within the District of Columbia, for the majority of the 180 days preceding the petition date.

## III.    Argument

### a.  **Abingdon's Principal Place of Business is—and for a Statutorily-Sufficient Time Period has Been—in the District of Columbia**

While there exists a good faith contention that *all* of the debtors have their principal place of business in the District of Columbia, insofar as the nation's capital is the locale from which critical managerial decisions are made, such is not the most pertinent inquiry. Rather, the US Trustee acknowledges—even if only passingly—that so long as the first of several affiliates to

5

seek bankruptcy protection does so in this judicial district with a proper legal foundation, the other affiliates may follow without regard to their connections, *vel non*, to the district. Somewhat familiarly, this is why so many large corporate cases find their way into the bankruptcy courts situated in Texas, New Jersey and, in a time not too long gone by, Virginia. In these cases, it is clear that Abingdon had the statutory right to petition to reorganize in the District of Columbia.

Title 28 of the United States Code allows for the filing of a case in the judicial district where a debtor's "principal place of business in the United States, or principal assets in the United States. . ." have been located for the plurality of the preceding 180 days. 28 U.S.C. § 1408(1).

As observed by the United States Court of Appeals for the Seventh Circuit, there is a reason the foregoing statute provides for *either* a principal place of business or a principal place of assets: the two are oftentimes not one and the same. Indeed, ". . . the 'most important, consequential, or influential' place where a corporation or partnership does its business is likely to be the place where its management decisions are made." *Granader v. Peachtree Lane Assocs. (In re Peachtree Lane Assocs.)*, 150 F.3d 788, 795 (7th Cir. 1998) (quoting *Commissioner v. Soliman*, 506 U.S. 168, 174 (1993)). Moreover, "[t]his focus on the location of the entity's primary decisionmakers is particularly appropriate, we think, in a reorganization case like this one, as such proceedings generally will involve the financial management of the debtor, rather than its day-today operations." *Granader*, 150 F.3d at 795 (citing *In re Commonwealth Oil Refin. Co.*, 596 F.2d 1239, 1246 (5th Cir. 1979); *Capitol Motor Courts v. Le Blanc Corp.*, 201 F.2d 356, 359 (2d Cir. 1953)).

Indeed, nothing about this notion is particularly new. To the contrary, and going as far back as proceedings under the Bankruptcy Act, courts have recognized that:

> Allowing venue in the district where a debtor manages its business is particularly appropriate in both Chapter X and XI cases. A corporate arrangement or reorganization is primarily a financial proceeding. The debtor is maintained as a

going enterprise and its finances are put back in order. Where the corporation transacts its corporate business is a logical place for venue in such proceedings.

*In re Commonwealth Oil Refin. Co*., 596 F.2d 1239, 1246 (5th Cir. 1979) (citing Note, 52 N.Y.U.L.Rev. 362, 362 n.5 (1977)).

Even the Supreme Court has acknowledged—albeit in the prism of a different statutory scheme—that a home office often qualifies as a "principal place" of business, with the verbiage standing in important contrast to that of "principal office." *See, e.g.*, *Commissioner v. Soliman*, 506 U.S. 168, 174 (1993) ("The statute does not refer to the 'principal office' of the business. If it had used that phrase, the taxpayer's deduction claim would turn on other considerations. The statute refers instead to the 'principal place' of business. It follows that the most important or significant place for the business must be determined.").

Here, there does not appear to be any dispute but that Mr. Postal manages the corporate—and, in particular, financial—affairs of Abingdon from his home office in the District of Columbia. Even before the sale of the entity's physical assets, the limited liability company was overseen by Mr. Postal, who made critical decisions and guided the retailer's course, from within Washington, DC. It was in this district that he recognized a bankruptcy filing may aid in various reorganizational ambitions; it was in this district that he chose to engage in a sale of the majority of the company's assets; it was in this district that he came to focus on potential litigation claims—including those arising under Chapter 5 of the Bankruptcy Code—that may be pursued by Abingdon; it was in this district that he made the ultimate decision to have Abingdon petition for bankruptcy relief; and it is from within this district that he is managing Abingdon's bankruptcy proceedings.

The *Granader* holding is instructive in assessing the impact of that management coming from within a home office. There, the Seventh Circuit confronted a 400-unit apartment building in Texas, *Granader*, 150 F.3d at 789, being managed by a company in California, *id.* at 790, where

7

the debtor's derivative equity interests made decisions from within Chicago or a nearby Illinois community, *id.* at 791. Those decisions were macro-level considerations, including how to address the interests of creditors pre-petition. *Id.* Yet the sole asset—the apartment building—remained in Texas, and was being managed almost solely from within Texas and by one or more persons in California. *Id.*

With those facts, "the bankruptcy court found that Peachtree's principal place of business was located in the Northern District of Illinois because it was there that the debtor's significant business decisions during the venue period were made." *Id.* at 791-92 (citing *In re Peachtree Lane Assocs.*, 198 B.R. 272, 281-83 (Bankr. N.D. Ill. 1996)). And the Seventh Circuit upheld that ruling, finding that "Peachtree's Chapter 11 proceeding was properly filed in the Northern District of Illinois." *Granader*, 150 F.3d at 797.

As noted *supra*, this is actually true of *all* of the debtors: Mr. Postal's management occurs from within the District of Columbia. And it may be thusly posited that all 41 debtors in these cases are properly eligible to seek chapter 11 relief in this Honorable Court, regardless of whether Abingdon—the first to file of the grouping—has docketed a good faith petition for relief.

### b.  Abingdon's Case is not Filed in Bad Faith

The US Trustee also attacks Abingdon's filing *en toto*, asserting the lead debtor's case to be one cloaked in bad faith and accordingly meritorious of dismissal. Oddly, however, in so doing, the US Trustee applies this Honorable Court's somewhat-dated ruling from *In re Franklin Mortg. & Inv. Co.*, 143 B.R. 295 (Bankr. D.D.C 1992), in lieu of the more recent holding from *In re JPK NewCo LLC*, Case No. 25-200-ELG (Bankr. D.D.C. 2025). Though both holdings embrace the Fourth Circuit standard, as announced in *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989) an refined in ensuing years, the *JPK* ruling is assuredly more topically on point insofar as such

8

embraces the necessity of a bad faith finding being pegged to both objective futility *and* subjective bad faith.

Under applicable law, "the complaining party must show both 'subjective bad faith' and the 'objective futility of any possible reorganization.'" *Bestwall LLC v. Off. Comm. of Asbestos Claimants (In re Bestwall LLC)*, 71 F.4th 168, 182 (4th Cir. 2023) (quoting *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*, 64 F.4th 84, 98 n.8 (3d Cir. 2023) (quoting *Carolin Corp*, 886 F.2d at 694)).

Moreover, there is a compelling bankruptcy-centric rationale for this two-pronged rigor:

> Such a test obviously contemplates that it is better to risk proceeding with a wrongly motivated invocation of Chapter 11 protections whose futility is not immediately manifest than to risk cutting off even a remote chance that a reorganization effort so motivated might nevertheless yield a successful rehabilitation. Just as obviously, it contemplates that it is better to risk the wastefulness of a probably futile but good faith effort to reorganize than it is to risk error in prejudging its futility at the threshold. We believe that such a stringent test is necessary to accommodate the various and conflicting interests of debtors, creditors, and the courts that are at stake in deciding whether to deny threshold access to Chapter 11 proceedings for want of good faith in filing.

*Carolin Corp*., 886 F.2d at 701. *See also Coleman v. Cmty. Tr. Bank (In re Coleman)*, 426 F.3d 719, 727 (4th Cir. 2005) (reaffirming the policy rationale).

Here, the US Trustee—without first convening a meeting of creditors, before ever holding an initial debtor interview, and without so much as laying eyes upon schedules—has determined that Abingdon's case is brought in bad faith. This takes, at irreducible minimum, an enormous quotient of chutzpah.

Core to the thesis appears to be the notion that Abingdon has neither creditors nor assets. Yet, as noted above, the US Trustee itself learned—during questioning at first day hearings—that Abingdon *does* hold litigation rights. And the US Trustee seems to also ignore, for reasons that appear to be solely rooted in convenience and gamesmanship, that if substantive consolidation is

granted in these cases (which, tellingly, *only* the US Trustee is actively opposing), Abingdon will have all the 250+ creditors of every other debtor in these jointly administered cases.

For want of ambiguity, the debtors believe various litigation rights to stem from the sale of several Maryland stores. Having the entity correlative to the operations of one those stores be amongst the filing entities accordingly seems quite wise, vis a vis shoring up standing to pursue those claims for the benefit of all of the debtors' estates. The debtors have an enduring desire to not place their litigation plans or strategy on the public docket until necessary, and to not be compelled to share attorney work product in response to a premature dismissal motion brought by the US Trustee. Suffice it to posit, however, that a sale of various assets, for $5.1 million, did not actually fetch the receipt of $5.1 million. It may also be conservatively noted that various other debtors (including, at minimum, LBPO) appear to be still obligated on various monetary debts correlative to equipment in the since-sold Maryland locations.

These realities alone render clear that Abingdon's case is not objectively futile. And, if substantive consolidation is granted, it will be clear that Abingdon's case cannot be deemed any more futile—or pegged to subjective bad faith—than any of the 40 accompanying cases presently in this Honorable Court. Such would work a demonstrable benefit upon *all* of the debtors' estates, as such would allow the proceeds of any litigation rights to be utilized to aid in the exit of a substantively consolidated, singular debtor from bankruptcy. But even without substantive consolidation, it is difficult to look at an entity that has sold the majority of its assets, that did not receive the bargained-for consideration in that sale, and that still owes money to creditors, as petitioning for bankruptcy relief in bad faith.

### c.   Even if Venue is Errant, a Transfer Would be Improper

Some attention is properly paid to the most glaring absurdity underlying the Motion: the US Trustee is arguing that it is bad faith for entities operated from the District of Columbia, with physical locales in Maryland and Virginia, to seek to reorganize in the District of Columbia. The US Trustee did not make this argument when a company based in San Diego, with operations in Tijuana, sought to reorganize in this Honorable Court. *See In re National Small Business Alliance, Inc.*, Case No 21-31-ELG (Bankr. D.D.C. 2021). Nor does it appear the US Trustee has made this argument when companies with only the barest connections to New Jersey or Texas suddenly endeavor to reorganize in those states. But in the prism of this case, where the selected venue is literally the locale between all of the debtors' physical places of operation, and where the selected venue is far and away the most convenient and economically sensible, the US Trustee has suddenly urged a transfer of venue to be appropriate.

As discussed in detail *supra*, none of these cases have been filed in an improper venue. However, even assuming, *arguendo*, that there did exist a defect in venue, neither dismissal nor transfer would be the appropriate remedy. Rather, as noted by the governing rule: "If a petition is filed in an improper district, the court *may* dismiss the case or *may* transfer it to another district. . ." Fed. R. Bankr. P. 1014(a)(2) (emphasis added).

The language in the foregoing rule is discretionary. While the US Trustee points to an advisory committee note that appears to suggest otherwise, *see* Motion, DE #37, at p. 12 (citing Fed. R. Bankr. P. 1014, 1987 Advisory Comm. Note), case law reveals the folly of the advisory committee's comment:

> It would make no sense to permit a transfer to any other district, i.e., one in which venue might be improper, and not permit retention in an improper venue. It would be anomalous to conclude that a debtor is prohibited from staring out in an improper venue when the case could be transferred to an improper venue.

*In re Lazaro*, 128 B.R. 168, 173 (Bankr. W.D. Tex. 1991). *See also In re Jordan*, 313 B.R. 242, 256 (Bankr. W.D. Tenn. 2004) ("The trend in the law is thus away from a harsh, rigid rule and toward a more practical, flexible alternative. The advisory committee's note to current Bankruptcy Rule 1014(a), by contrast, seems to back peddle toward rigidity and inflexibility, concluding as it does that Section 1406 must apply to bankruptcy cases, when the deletion of Section 1477 by the BAFJA amendments could just as easily be interpreted as the logical next step in Congress' continuing retreat from rigid rules relating to venue in federal cases.").

A number of pragmatic considerations underlie why it would be inequitable and improper to transfer these cases. First, and perhaps most notably, by the time the Motion comes on for hearing, these matters will be more than a month old. The US Trustee did not seek to hold a hearing on an expedited basis, nor did the US Trustee even chose the next available hearing date for the Motion. Rather, the US Trustee filed the Motion and then allowed the case to proceed—through multiple substantive hearings, through an initial debtor interview and, by the time a hearing is conducted, through the meeting of creditors—without seeking a ruling. This Honorable Court, in the interim, has come to know the debtors and their creditor bases, has analyzed two relatively complex post-petition lending facilities (one of which involves the in-kind provision of millions of dollars of goods), has managed a series of contested cash collateral hearings, has approved a priming lien and a roll-up of pre-petition secured claims, and has heard initial arguments on substantive consolidation.

To be sure, "improper venue can be waived as it can be waived in ordinary civil litigation." *In re Shapiro*, 128 B.R. 328, 331 (Bankr. E.D.N.Y. 1991). *See also* Fed. R. Bankr. P. 1014(a) (requiring a challenge to venue be "timely" in nature). The US Trustee may have filed its Motion expeditiously but the US Trustee, in the prism of cases that, per DIP-lending terms, are bound to

conclude in only a few months, has assuredly not brought the matter on for resolution in a timely manner.

Yet there are also the more pragmatic realities that underlie the selection of this district in the first place. The debtors need to reorganize in an economically efficient manner. This Honorable Court allows parties to attend hearings via Zoom, thereby saving the costs of travel to and from the courthouse. This Honorable Court does not require local counsel for out-of-state attorneys, much less the presence of local counsel at hearings. And when hearings are held in person, this Honorable Court not only allows others to view via Zoom but, too, permits attorneys and parties to carry cellular telephones and thereby maximize productivity.

Equally, this is not a case where the parties and their counsel are all on one coast or the other and a venue in the heartland, well removed from convenient airports, has been selected. To the contrary, the District of Columbia is the "lawyer capital of the known universe." THE WEST WING: *Transition* (NBC television broadcast, aired Apr. 23, 2006). Counsel for seemingly every major stakeholder in these cases either has an office in the District of Columbia or is affiliated with a firm that has an office in the District of Columbia. And while numerous lawyers are, no doubt, elsewhere in the United States, none of the alternative venues suggested by the US Trustee would seemingly appease the geographic quirks of those attorneys (excepting, perhaps, one landlord's attorney based in Richmond, Virginia).

Indeed, it seems the *only* party in interest that would be convenienced by a transfer of venue is the US Trustee. While the Department of Justice is familiarly headquartered in the District of Columbia, Region 4 of the US Trustee has its closest office in the Eastern District of Virginia. Yet, assuredly, such is not a sensible rationale to transfer venue, especially considering the US Trustee is already present in this Honorable Court (albeit virtually) on nearly every hearing date.

The foregoing concerns ought not be construed as ones pegged to laziness or immobility, either. Rather, the reality is that the debtors must pay not merely their counsel but, too, the lawyers of various creditors there are bound to indemnify. Hearings in this Honorable Court do not require an overabundance of counsel or needless travel. Hearings in neighboring jurisdictions mandate in-person attendance, the presence of local counsel and, in some (but not all) circumstances, that attorneys give up any hopes of multitasking (and ergo not billing a single client for the full day) by having cellular telephones left outside the courthouse. Inflicting those added expenses on the debtors, when this venue is wholly sensible and legally proper, is not only illogical but seemingly at odds with the economic synergies that underlie the reorganizational process.

## IV.    If Venue is to be Transferred, Maryland is the Most Appropriate Forum

Finally, while the debtors firmly believe venue ought not be transferred in any of these cases, they do respectfully ask that such a transfer—if entertained—be to the United States District Court for the District of Maryland and, more particularly, within the Greenbelt division of that court. That bankruptcy court has grown increasingly adept at using Zoom technology over the past several months and years, has an oftentimes more relaxed approach to the presence of local counsel (though such is far from guaranteed), and permits parties and their counsel to carry cellular telephones. Conducting these cases, in that court, will cost significantly more than in this Honorable Court. And there will be a needless loss of so many intangible benefits of staying with the court in which the first several hearings have been held. But if this Honorable Court were to conclude a transfer is necessitated, the debtors' preference would be to see a transfer to Greenbelt, Maryland.

## V.    Conclusion

WHEREFORE, the debtors respectfully pray the Motion be denied or, in the alternative, that venue be transferred to the Greenbelt division of the United States District Court for the District of Maryland, and for such other and further relief as may be just and proper.

Respectfully submitted,

Dated: October 15, 2025          By:    /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
Bar No. MD18071
The Belmont Firm
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
Phone: (202) 991-1101
mac@dcbankruptcy.com
*Counsel for the Debtors*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of October, 2025, a copy of the foregoing was served electronically upon filing via the ECF system, with copies being sent to all parties receiving electronic notice herein.

/s/ Maurice B. VerStandig
Maurice B. VerStandig