**<u>Exhibit A</u>**

Revised 11/22/95
03/23/99
04/12/99
10/18/99

Lease for

Cloverleaf Card Corporation, a VA Corporation ("TENANT")

VILLAGE MARKETPLACE SHOPPING CENTER

MIDLOTHIAN, VIRGINIA

Lease Date: October 11, 2001

SCANNED

JUL 1 4 2009

VILLAGE MARKETPLACE

MIDLOTHIAN, VIRGINIA

STORE LEASE

<u>INDEX</u>                                                              <u>PAGE</u>

ARTICLE 1.   BASIC LEASE PROVISIONS AND ENUMERATION OF
             EXHIBITS ....................................................................... 1
SECTION 1.1  BASIC LEASE PROVISIONS ......................................... 1
SECTION 1.2  SIGNIFICANCE OF BASIC LEASE PROVISIONS ........... 1
SECTION 1.3  ENUMERATION OF EXHIBITS ..................................... 1

ARTICLE 2.   LEASED PREMISES AND TERM ..................................... 2
SECTION 2.1  SHOPPING CENTER ...................................................... 2
SECTION 2.2  LEASED PREMISES ........................................................ 2
SECTION 2.3  LEASE TERM and LEASE YEAR.................................... 2

ARTICLE 3.   CONSTRUCTION AND DELIVERY OF LEASED PREMISES ..... 2
SECTION 3.1  DELIVERY OF THE LEASED PREMISES ...................... 2

ARTICLE 4.   PARKING; USE OF COMMON AREAS ........................... 2

ARTICLE 5.   MINIMUM RENTAL ....................................................... 3

ARTICLE 6.   DELETED ........................................................................

ARTICLE 7.   TENANT'S SHARE OF TAXES AND ASSESSMENTS ....... 3

ARTICLE 8.   SUBORDINATION AND ATTORNMENT ....................... 4
SECTION 8.1  SUBORDINATION OF LEASE ...................................... 4
SECTION 8.2  ATTORNMENT .............................................................. 4
SECTION 8.3  CONFIRMATION OF SUBORDINATION ..................... 4
SECTION 8.4  ESTOPPEL CERTIFICATE ............................................ 5

ARTICLE 9.   ADDITIONAL CONSTRUCTION ................................... 5

ARTICLE 10.  CONDITION OF LEASED PREMISES ........................... 5

ARTICLE 11.  REPAIRS AND MAINTENANCE ................................... 5

ARTICLE 12.  FIXTURES,    ALTERATIONS    AND    LEASEHOLD
             IMPROVEMENTS ............................................................. 5
SECTION 12.1 NO ALTERATIONS ....................................................... 5
SECTION 12.2 LEASEHOLD IMPROVEMENTS .................................. 5
SECTION 12.3 TRADE FIXTURES AND EQUIPMENT ......................... 6

ARTICLE 13.  TAXES ON LEASED PREMISES AND LEASEHOLD
             IMPROVEMENTS ............................................................. 6

ARTICLE 14.   LIENS .......................................................................................... 6

ARTICLE 15.   LAWS AND ORDINANCES ...................................................... 6
SECTION 15.1 COMPLIANCE WITH LAWS ...................................................... 6
SECTION 15.2 PROHIBITED CONDUCT ............................................................ 6

ARTICLE 16.   UTILITIES SERVICES .............................................................. 6

ARTICLE 17.   COMMON AREAS AND OPERATING EXPENSES ............... 7
SECTION 17.1 DEFINITION OF COMMON AREAS ........................................ 7
SECTION 17.2 MAINTENANCE AND USE OF COMMON AREAS ............... 7
SECTION 17.3 DEFINITION OF OPERATING EXPENSES ............................ 7
SECTION 17.4 TENANT'S SHARE OF OPERATING EXPENSES ................. 7
SECTION 17.5 ADJUSTMENT OF TENANT'S SHARE OF OPERATING
                          EXPENSES ...................................................................... 7

ARTICLE 18.   DAMAGE TO LEASED PREMISES ......................................... 8

ARTICLE 19.   TENANT'S INSURANCE ........................................................... 8

ARTICLE 20.   INDEMNIFICATION ................................................................. 9
SECTION 20.1 INDEMNIFICATION ................................................................... 9
SECTION 20.2 WAIVER OF CLAIMS ................................................................ 9

ARTICLE 21.   ASSIGNMENT, SUBLETTING AND OWNERSHIP ............... 9
SECTION 21.1 NO ASSIGNMENT OR SUBLETTING .................................... 9
SECTION 21.2 FURTHER TRANSFERS ............................................................ 9
SECTION 21.3 ASSUMPTION OF OBLIGATIONS ......................................... 9
SECTION 21.4 OWNERSHIP ............................................................................... 9
SECTION 21.5 PAYMENT OF FEES .................................................................. 9

ARTICLE 22.   ACCESS TO PREMISES ........................................................... 10

ARTICLE 23.   EVENTS OF DEFAULT; REMEDIES OF LANDLORD .......... 10

ARTICLE 24.   REMEDIES CUMULATIVE ..................................................... 12

ARTICLE 25.   SELF-HELP ............................................................................... 12

ARTICLE 26.   DELETED .................................................................................

ARTICLE 27.   TENANT'S CONDUCT OF BUSINESS .................................. 12
SECTION 27.1 OBLIGATION TO OPEN .......................................................... 12
SECTION 27.2 TENANT'S ADVERTISING ...................................................... 12
SECTION 27.3 TENANT'S SIGNAGE ............................................................... 12

ARTICLE 28.   RULES AND REGULATIONS ................................................. 13

ARTICLE 29.   EMINENT DOMAIN ................................................................ 13
SECTION 29.1 CONDEMNATION ..................................................................... 13
SECTION 29.2 AWARDS .................................................................................... 14

ARTICLE 30.   ATTORNEY'S FEES ................................................................. 14

ARTICLE 31.   SALE OF PREMISES BY LANDLORD .................................. 14

ARTICLE 32.   NOTICES ................................................................................... 14

ARTICLE 33.   SUCCESSORS AND ASSIGNS ............................................... 14

ARTICLE 34. REPRESENTATIONS ........................................................... 14

ARTICLE 35. EFFECT OF WAIVER ........................................................... 15

ARTICLE 36. HOLDING OVER ................................................................. 15

ARTICLE 37. RELATIONSHIP OF PARTIES ............................................. 15

ARTICLE 38. FINANCING STATEMENT .................................................. 15

ARTICLE 39. COVENANT OF QUIET ENJOYMENT ............................... 15

ARTICLE 40. SECURITY DEPOSIT .......................................................... 15

ARTICLE 41. BROKERS ............................................................................ 15

ARTICLE 42. LEASE STATUS .................................................................. 15

ARTICLE 43. RECORDING ....................................................................... 16

ARTICLE 44. FORCE MAJEURE .............................................................. 16

ARTICLE 45. APPLICABLE LAW ............................................................ 16

ARTICLE 46. EXECUTION OF LEASE BY LANDLORD ......................... 16

ARTICLE 47. AGENCY OR INDEPENDENT CONTRACTS .................... 16

ARTICLE 48. LIMITATION OF LIABILITY .............................................. 16

ARTICLE 49. MORTGAGEE'S APPROVAL .............................................. 16

ARTICLE 50. JOINT AND SEVERAL LIABILITY .................................... 17

ARTICLE 51. CAPTIONS .......................................................................... 17

ARTICLE 52. MERCHANT'S ASSOCIATION .......................................... 17

ARTICLE 53. AGENCY .............................................................................. 17

VILLAGE MARKETPLACE SHOPPING CENTER
MIDLOTHIAN, VIRGINIA
STORE LEASE

## ARTICLE 1.  BASIC LEASE PROVISIONS AND ENUMERATION OF EXHIBITS

### SECTION 1.1  BASIC LEASE PROVISIONS

A.  DATE OF LEASE:  October 11, 2001

B.  LANDLORD:  Village Associates, L.L.C.

C.  ADDRESS OF LANDLORD:
    P. O. Box 5204
    Richmond, VA  23220-0204

D.  TENANT: Cloverleaf Card Corporation, a VA Corporation

E.  ADDRESS OF TENANT:
    13112 Midlothian Turnpike
    Midlothian, VA 23113

F.  TENANT'S TRADE NAME: Barnett's Hallmark Shop

G.  LEASE TERM:  Five ( 5 ) Lease Year(s)  (See Section 2.3)

H.  RENEWAL OPTIONS: Two (2) at Five (5) years each

I.  DATE FOR DELIVERY OF LEASED PREMISES TO TENANT: November 1, 2001.

J.  COMMENCEMENT DATE:   As per attached Exhibit F, page 2, article 3 RENT COMMENCEMENT

K.  MINIMUM ANNUAL RENT:  As per attached Exhibit C.
Sixty Thousand and no/100 Dollars ($5,000.00 per month)

L.  PERCENTAGE RENTAL: DELETED

M.  PERMITTED USE: As per attached Exhibit F, page 5, article 13, USE CLAUSE

N.  APPROXIMATE SIZE OF LEASED PREMISES: 4,800 square feet

O.  SECURITY DEPOSIT: N/A

P.  ADVANCED RENTAL: N/A

### SECTION 1.2 SIGNIFICANCE OF BASIC LEASE PROVISIONS.

Each reference in this Lease to any of the Basic Lease Provisions contained in Section 1.1 shall be deemed and construed to incorporate all of the terms set forth in each such Basic Lease Provision.

### SECTION 1.3  ENUMERATION OF EXHIBITS.

The Exhibits enumerated in this Section and attached to this Lease are incorporated in this Lease by this reference and are to be construed as part of this Lease.

    Exhibit A.    Site Plan

    Exhibit B.    Tenant Design Criteria.

1

Exhibit C.       Schedule of Rent.

Exhibit D.       Lease Plan

Exhibit E.       Renewal Option

Exhibit F.       Hallmark Letter (consisting of 12 pages) In the event that the language in these lease terms conflicts with the language in Exhibit F, or the language from Exhibit F is omitted from the lease, Exhibit F will control.

## ARTICLE 2.  LEASED PREMISES AND TERM

SECTION 2.1  SHOPPING CENTER.  Landlord is the owner of a tract of land situated in Midlothian, in the County of Chesterfield, Commonwealth of Virginia, which tract of land, together with the buildings and improvements thereon, are depicted on Exhibit A hereto and are hereinafter referred to as "Village Marketplace" or the "Shopping Center".  It is agreed that the depiction of Village Marketplace on Exhibit A does not constitute a representation, covenant or warranty of any kind by Landlord, and Landlord reserves the right at anytime to change the number and location of buildings, building dimensions, the number of floors in any of the buildings, store dimensions, the identity and type of other stores and tenancies in Village Marketplace, and the size and layout of the parking areas and facilities, including the right to add or subtract from their shape and size, as well as to alter their location.

SECTION 2.2  LEASED PREMISES.  Landlord hereby leases and demises to Tenant, and Tenant hereby accepts from Landlord, subject to the terms and provisions of this Lease, the store premises (hereinafter referred to as the "Leased Premises") more particularly described as follows:

Store No.___5__, consisting of approximately 4,800 square feet of Floor Area,
located in Village Marketplace, and shown as outlined in red on Exhibit D.

SECTION 2.3  LEASE TERM and LEASE YEAR.  The term of this Lease shall commence per Exhibit F, page 2, article 3, RENT COMMENCEMENT and the Lease Year shall be per Exhibit F, page 1, article 2, LEASE TERM.

## ARTICLE 3.  CONSTRUCTION AND DELIVERY OF LEASED PREMISES

SECTION 3.1  DELIVERY OF THE LEASED PREMISES.  Tenant shall complete, on or before the Commencement Date, all of the work specified in Exhibit B, and any and all additional work (including, without limitation, the installation of fixtures and equipment) required so as to render the Leased Premises suitable for the Permitted Use specified in Section 1.1M hereof (collectively hereinafter sometimes called "Tenant's Work").  All fixtures and equipment shall be new or completely reconditioned.  All work done by or on behalf of Tenant shall be performed in a good and workmanlike manner in compliance with all governmental requirements, in compliance with all of the terms of this Lease, and at such times and in such a manner as to not interfere with other work in progress and with the transaction of other business in the Shopping Center.  Tenant's Work shall be performed only in accordance with complete plans and specifications theretofore submitted to and approved by Landlord, which are set forth in Exhibit B, and further, in compliance with all applicable statues, ordinances, regulations and codes.

Tenant shall and hereby agrees to indemnify and hold Landlord, its agents, officers and employees harmless from and against any and all liability, claims, demands, expenses, fees, fines, penalties, suits, proceedings, actions and causes of action of any and every kind and nature arising or growing out of, or resulting from any work done by or on behalf of Tenant in or about the Leased Premises.  This obligation to indemnify shall include legal and investigation costs and all other costs, expenses and liabilities incurred from the date the indemnitee receives notice that any claim has been made or may be made.

## ARTICLE 4.  PARKING; USE OF COMMON AREAS

Landlord grants to Tenant, its employees, agents, customers and invitees, a non-exclusive right to use, during the term of this Lease, the common areas, including parking areas, as shown on Exhibit A, which areas are acknowledged to be for use by such persons, along with others

2

similarly entitled, for parking and for ingress and egress between the Leased Premises and all other portions of the Shopping Center and the adjoining streets, alleys and sidewalks.

Notwithstanding the foregoing, Tenant and Tenant's employees shall park their motor vehicles only in those portions of the parking area designated by Landlord for tenant and employee parking.  Upon taking possession of the Leased Premises, Tenant shall furnish to Landlord the state automobile license numbers assigned to Tenant's motor vehicles and the motor vehicles of Tenant's employees. If Tenant or Tenant's employees shall park in portions of the parking area other than those areas designated for tenant and employee parking, and such vehicle or vehicles shall continue to be parked in such other areas after notice of such violation is given to Tenant by Landlord, Landlord may at any time thereafter, in addition to any other remedies it may have, have any such vehicle removed at Tenant's expense and levy such fines therefor as Landlord shall elect.

ARTICLE 5.  MINIMUM RENTAL

Tenant agrees to pay as rental for the use and occupancy of the Leased Premises, at the times, in the manner and upon the conditions hereinafter provided, the following sums of money:

(a)  MINIMUM ANNUAL RENTAL:  Commencing as per Exhibit F. Tenant, in consideration of said demise, does hereby covenant and agree with Landlord to pay to Landlord, without demand, deduction, set-off or counterclaim of any kind, the sums set forth on Exhibit C as Minimum Annual Rental for said Leased Premises, said Minimum Annual Rental to be payable in equal monthly installments, in advance, upon the first day of each and every month during the Lease Term, as provided for in Exhibit C. If the monthly rental payments are not made by the fifth of the month, Landlord may charge Tenant a five percent (5%) late payment charge or may call a default.  In the event such rental shall commence on a day other than the first day of a month, then the monthly installment of Minimum Annual Rental for the period from the Commencement Date until the first day of the month next following shall be prorated accordingly.        All past due rentals, additional rentals, and/or other sums due to Landlord under the term[...] percent (10%) from the due date until paid by Tenant.  Al[...] hereinafter stipulated as well as said Minimum Annual Rental [...]

Village Associates, L.L.C.
P. O. Box 5204
Richmond, Virginia 23220-0204

or to such other payee or at such other address as Landlord m[...]

ARTICLE 6.  DELETED

ARTICLE 7.  TENANT'S SHARE OF TAXES AND ASSE[...]

In addition to the Minimum Annual Rental pr[...] agrees to pay to Landlord additional rent as follows:

(a)  Tenant shall pay its proportionate share [...] and assessments (hereinafter referred to as "real estate taxes") [...] which may be levied or assessed against the Shopping Center or any part thereof by any lawful authority, including any extraordinary and/or special assessments assessed or imposed upon the Shopping Center and any improvements thereon, which real estate taxes (without limiting the generality of the foregoing) shall include all school, sewer, and other taxes or charges and related costs and fees.  Tenant's proportionate share of said real estate taxes shall be equal to the product obtained by multiplying such real estate taxes by a fraction, the numerator of which shall be the number of square feet of Floor Area in the Leased Premises and the denominator of which shall be the total number of square feet of gross leasable floor area in the Shopping Center, determined by Landlord as of the day of assessment.  If at any time during the term of this Lease the methods of taxation prevailing at the commencement of the term hereof shall be altered so that in lieu of or as a supplement to or a substitute for the whole or any part of the real estate taxes now levied, assessed or imposed on the Shopping Center or any part thereof, there shall be levied, assessed or imposed (i) a tax, assessment, levy, imposition or charge, wholly or partially as a capital levy or otherwise, on the rents received therefrom, or (ii) a tax, assessment, levy (including but not limited to any municipal, state or federal levy), imposition or charge measured by or based in whole or in part upon the Shopping Center or any part thereof and imposed upon Landlord, or (iii) a license fee measured by the rent payable under this Lease and/or other leases in the Shopping Center, or (iv) a

[Handwritten note on sticky note: 7/2/09  Per Rich Johnson  this is an error &  use 5% Late Fee  (VB)]

3

license fee or other charge measured by the number or area of parking spaces in the Shopping Center, then all such taxes, assessments, levies, impositions, fees and charges, or the part thereof so measured or based, shall be deemed to be included in the real estate taxes payable by Tenant pursuant to this Article 7 and Tenant shall pay and discharge the same as herein provided in respect to the payment of present real estate taxes.

(b) Tenant's proportionate share of real estate taxes during the term hereof shall be paid, in advance, upon billing therefor by Landlord, or, at Landlord's election, in monthly installments, in an amount equal to one-twelfth (1/12th) of Tenant's annual proportionate share of real estate taxes as estimated at any time and from time to time by Landlord. Upon confirmation of all tax bills and assessment bills attributed to any Lease Year during the term hereof, Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's proportionate share of real estate taxes for such Lease Year. If the total amount paid by Tenant under this Article for any Lease Year during the term of this Lease shall be less than the actual amount due from Tenant for such Lease Year as shown on such statement, Tenant shall pay the deficiency to Landlord within ten (10) days after demand therefor by Landlord, and if the total amount paid by Tenant hereunder for any such Lease Year shall exceed such amount due from Tenant for such Lease Year, Tenant shall be entitled to offset the excess against payments next thereafter becoming due under this Article.

Landlord's and Tenant's obligations under this Article shall survive the expiration of the term of this Lease.

For the purposes of this Article 7, Landlord's estimate of Tenant's proportionate share of real estate taxes for the first year of Tenant's occupation of the Leased Premises is $ 3,984.00.

(c) If Landlord endeavors at any time to contest any tax or assessment against the Shopping Center or to obtain a reduction in the assessed valuation upon the Shopping Center for the purpose of reducing any such tax assessment, Tenant agrees to pay its proportionate share of Landlord's expenses in so contesting such tax or assessment, said proportionate share to be determined and paid in the same manner as set forth in this Article for real estate taxes. Under no circumstances shall Tenant have the right to withhold any payments to Landlord pursuant to this Article or any other Article of this Lease nor shall Landlord have any obligation to withhold the payment of any real estate taxes levied or assessed by any lawful authority against the Shopping Center. If Tenant shall have paid an amount in excess of its proportionate share of taxes for any Lease Year as the result of a subsequent reduction in total taxes for such Lease Year, such excess (net of Landlord's expenses of obtaining the same) shall be refunded by Landlord to Tenant when all refunds to which Landlord shall be entitled from the taxing authority with respect to such Lease Year shall have been received by Landlord.

## ARTICLE 8.  SUBORDINATION AND ATTORNMENT

SECTION 8.1  SUBORDINATION OF LEASE. This Lease, and all rights of Tenant hereunder, are and shall be subject and subordinate at all times to the lien of any mortgages or any deeds of trust which may now or hereafter affect the Leased Premises or the Shopping Center, securing notes and bonds issued by Landlord, and to all renewals, modifications, consolidations, replacements and extensions thereof and all amendments and supplements to mortgages or deeds of trust. This clause shall be self-operative without the execution of any further instrument of subordination.

SECTION 8.2  ATTORNMENT. In the event any proceedings are brought for foreclosure of any mortgage or deed of trust covering the Leased Premises, or in the event of the exercise of the power of sale under any mortgage or deed of trust made by Landlord covering the Leased Premises, Tenant shall attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as the Landlord under this Lease. Tenant further agrees to execute any attornment agreement required to effectuate the provisions hereof, containing such provisions as such purchaser reasonably requires.

Notwithstanding the foregoing, any such mortgagee or trustee may at any time subordinate its mortgage or deed of trust to this Lease, without Tenant's consent, by notice in writing to Tenant and thereupon this Lease shall be deemed prior to such mortgage or deed of trust without regard to their respective dates of execution and delivery, and in that event, such mortgagee or trustee shall have the same rights with respect to this Lease as though it had been executed and delivered prior to the execution and delivery of the mortgage or the deed of trust and had been assigned to such mortgagee or trustee.

SECTION 8.3  CONFIRMATION OF SUBORDINATION. Tenant shall, upon request of any party in interest, execute promptly such instruments or certificates to carry out the intent of the various sections of this Article 8 as shall be requested by Landlord. If within ten (10) days after the date of a request by Landlord to execute any such instrument Tenant shall not have executed and

4

delivered the same, Tenant hereby irrevocably appoints Landlord as its agent and attorney-in-fact with full power and authority to execute and deliver in the name of Tenant any such instruments or certificates, and Landlord may, at its option, cancel this Lease without incurring any liability on account thereof, and the term hereby granted is expressly limited accordingly.

SECTION 8.4 ESTOPPEL CERTIFICATE. Within ten (10) days after request therefor by the Landlord or any mortgagee or trustee under a mortgage or deed of trust covering the Leased Premises, or if, upon any sale, assignment or other transfer of the Leased Premises by Landlord, an estoppel certificate shall be requested from Tenant, Tenant at its expense shall deliver to Landlord in recordable form a statement to any proposed mortgagee or other transferee, or to Landlord certifying any facts that are then true with respect to this Lease Agreement, including without limitation (if such be the case) that this Lease Agreement is in full force and effect, that Tenant is in possession, that Tenant has commenced the payment of rent, that there have been no amendments to or modifications of this Lease Agreement and no prepayment of rental hereunder, and that there are no defenses or offsets to the Lease Agreement claimed by Tenant.

## ARTICLE 9. ADDITIONAL CONSTRUCTION

Landlord hereby reserves the right at any time to make alterations or additions to, and to build additional stories on, the building in which the Leased Premises are contained and to build adjoining the same. Landlord also reserves the right to construct other buildings or improvements, including elevated or double-deck parking facilities; from time to time and to make alterations or additions thereto, and to build additional stories on any such building or buildings, and to build adjoining the same.

## ARTICLE 10. CONDITION OF LEASED PREMISES

Tenant's taking possession of the Leased Premises shall be conclusive evidence of Tenant's acceptance thereof and Tenant's acknowledgement that the same are in good order and satisfactory condition and that Landlord has complied with all of the terms and conditions of this lease with respect to the performance of Landlord's Work. Tenant agrees that no representations respecting the condition of the Leased Premises and no promises to decorate, alter, repair or improve the Leased Premises either before or after the execution hereof, have been made by Landlord or its agents to Tenant unless the same are contained herein and made a part hereof.

## ARTICLE 11. REPAIRS AND MAINTENANCE

Landlord agrees to keep the foundations and exterior walls, except for windows, doors and door jambs located in the exterior walls of the Leased Premises in good condition and repair; provided, however that (i) Landlord shall not be liable to Tenant for any damage caused by the same being or becoming out of repair until it has had reasonable opportunity to have the same repaired after being notified in writing of the need of same by Tenant; (ii) Landlord shall not be liable for any damage to the roof, foundation or exterior walls caused by Tenant's act or negligence, and (iii) Landlord shall not be liable to Tenant for any damage to merchandise, trade fixtures or personal property of Tenant caused by water leakage from the roof, water lines, sprinkler or heating and air-conditioning equipment. Tenant agrees, at Tenant's expense, to keep all other parts of the Leased Premises, including, but not limited to, the heating and air-conditioning equipment in good order and repair, and in a clean, sanitary and safe condition, including the replacement of equipment, fixtures and all plate glass, and to paint and decorate the Leased Premises when necessary in order to maintain at all times a clean and sightly appearance. If Tenant refuses or neglects to make any necessary repairs and/or to maintain the Leased Premises or any part hereof in a manner satisfactory to Landlord, Landlord shall have the right to make such repairs or perform such maintenance on behalf of and for the account of Tenant and, in such event, such work shall be paid for by Tenant as additional rental within ten (10) days of receipt of a bill therefor.

## ARTICLE 12. FIXTURES, ALTERATIONS AND LEASEHOLD IMPROVEMENTS

SECTION 12.1 NO ALTERATIONS. Tenant shall not make or cause to be made any alterations, decorations, additions or improvements or install or cause to be installed any fixtures, machinery or equipment, in, on or to the Leased Premises, without first obtaining Landlord's written approval. Tenant shall present to Landlord detailed plans and specifications for such work each time approval is sought.

SECTION 12.2 LEASEHOLD IMPROVEMENTS. All alterations, decorations, additions and improvements made by Tenant, or made by Landlord on Tenant's behalf, shall remain the

property of Tenant for the term of the Lease, and any extension or renewal thereof, and shall not be removed from the Leased Premises without the prior written consent of Landlord. All such alterations, decorations, additions and improvements shall remain upon the Leased Premises at the expiration or earlier termination of this Lease and shall thereupon become the property of Landlord, unless Landlord shall have given written notice to Tenant to remove all or any part of the same, in which event Tenant shall remove such alterations, decorations, additions and improvements and restore the Leased Premises to the same good order and condition in which it was at the commencement of this Lease. Should Tenant fail so to do, Landlord may do so, collecting from Tenant upon demand the cost and expense thereof as additional rent.

    SECTION 12.3  TRADE FIXTURES AND EQUIPMENT.  All trade machinery, trade equipment, trade fixtures, furniture and furnishings installed by Tenant in the Leased Premises may be removed at the expiration or earlier termination of this Lease or any renewal or extension thereof, provided Tenant shall not then be in default under this Lease, and provided further, that in the event of removal Tenant shall promptly restore the Leased Premises to their original order and condition. Any such trade machinery, trade equipment, trade fixtures, furniture and furnishings not removed at or prior to such termination shall be and become the property of Landlord and may be retained by Landlord or disposed of by Landlord at Tenant's expense.

## ARTICLE 13.  TAXES ON LEASED PREMISES AND LEASEHOLD IMPROVEMENTS

    Tenant shall pay before delinquency all taxes, assessments, license fees and public charges levied, assessed or imposed upon its business operations in the Leased Premises as well as upon its machinery, equipment, fixtures (including, without limitation all trade machinery, trade equipment and trade fixtures), furniture, furnishings, alterations, decorations, additions and improvements (including, but not limited to, those Tenant is required to make in accordance with the provisions of Section 3.1 hereof), stock in trade and other personal property in, on or upon the Leased Premises. If any such items of property are assessed with property of Landlord, then such assessment shall be divided between Landlord and Tenant so that Tenant shall pay only its equitable proportion of such assessment. Landlord shall determine the basis of so prorating any such assessments and such determination shall be binding upon both Landlord and Tenant.

## ARTICLE 14.  LIENS

    Tenant agrees to pay promptly for any work done (or material furnished) by or on behalf of Tenant in or about the Leased Premises, and Tenant shall not permit or suffer any lien to attach to the Leased Premises or the Shopping Center by reason of any work, labor, services or materials performed at or furnished to, or claimed to have been performed at or furnished to, the Leased Premises by, or at the direction or sufferance of, Tenant or anyone holding the Leased Premises through or under Tenant, and Tenant shall promptly cause any such lien, or any claim therefor, to be released.

## ARTICLE 15.  LAWS AND ORDINANCES

    SECTION 15.1  COMPLIANCE WITH LAWS.  Tenant agrees to comply with all laws, ordinances, orders and regulations affecting the use and occupancy of the Leased Premises and the cleanliness, safety and operation thereof. Tenant agrees to comply with the regulations and requirements of any insurance underwriter, inspection bureau, or similar agency with respect to the Leased Premises. Tenant also agrees to permit Landlord to comply with such recommendations and requirements with respect to that portion of the Leased Premises furnished or installed by Landlord.

    SECTION 15.2  PROHIBITED CONDUCT.  Tenant agrees not to (i) permit any immoral practice to be carried on or committed on the Leased Premises; (ii) make use of or allow the Leased Premises to be used for any purposes other than that specified in Section 1.1M hereof that might invalidate or increase the rate of insurance therefor; (iii) keep or use or permit to be kept or used on the Leased Premises any flammable fluids or explosives without the prior written permission of Landlord; (iv) use the Leased Premises for any purpose whatsoever which might create or tend to create a nuisance or injure or tend to injure the reputation of the Leased Premises or of the Shopping Center; (v) deface or injure the Leased Premises; (vi) overload the floors in the Leased Premises; or (vii) commit or suffer any waste in the Leased Premises.

## ARTICLE 16.  UTILITIES SERVICES

    Landlord shall initially pay for the water and sewer provided to the Leased Premises, however, the cost of the same shall be recovered by Landlord as part of the Operating Expenses for the

Shopping Center. Tenant shall pay for heating the water, electricity and telephone services used on or about the Leased Premises as and when charges therefor shall become due and payable, and for all costs and expenses involved in the care, maintenance, management, and use thereof. Tenant shall make all appropriate applications to the local utility companies and pay all required deposits for service for all utilities within sixty (60) days after the date of this Lease. Notwithstanding the foregoing, Landlord may, at Landlord's option, elect to supply or make available any utility used and/or consumed at the Leased Premises, and Tenant agrees to purchase and pay for the same, as additional rent, every month during the term hereof. In no event shall Landlord be liable to Tenant in damages or otherwise for any interruption, curtailment or suspension of any utility services, nor shall Tenant be entitled to any abatement of rent by reason of the same.

In the event any utility or utility services are furnished to Tenant for which a lien could be filed against the Leased Premises, the Shopping Center or any portion thereof (such as water rent or sewage disposal), Tenant shall, at Landlord's request, pay the cost thereof to Landlord as and when the charges therefor become due and payable, or in monthly installments if Landlord shall so direct; otherwise, Tenant shall deliver original receipted bills therefor to Landlord within thirty (30) days after the same are due and payable without interest or penalty.

## ARTICLE 17.  COMMON AREAS AND OPERATING EXPENSES

SECTION 17.1  DEFINITION OF COMMON AREAS.  The "common areas", as herein referred to, shall consist of all parking areas, roadways, sidewalks, curbs, driveways, landscaped areas, loading platforms, roofs, canopies, washrooms, lounges and shelters, if any, and any other facilities which Landlord may make available from time to time for the common use and benefit of all of the tenants in Village Marketplace, and their respective employees, agents, customers, licensees and invitees.

SECTION 17.2  MAINTENANCE AND USE OF COMMON AREAS.
Landlord shall, subject to events beyond its reasonable control, maintain, or cause to be maintained, the common areas.  Landlord shall have and hereby reserves at any time or times during the term of this Lease: (i) the right to redesignate and to change the size, location, shape and arrangement of the common areas and to promulgate and enforce rules and regulations in connection with the use thereof; (ii) the right to grant to others the nonexclusive use of the common areas; and (iii) the right to close all or any portion of the common areas including, but not by way of limitation, the parking areas, parking facilities, approaches, exits, entrances, roadways and all other common and public facilities to such extent as may, in the opinion of Landlord, be necessary to prevent a dedication thereof or the accrual of any rights therein in any person.

SECTION 17.3  DEFINITION OF OPERATING EXPENSES.  As used in this Lease, the term "operating expenses" means the total of all items of Landlord's expense relating to operating, managing, equipping, policing and protecting, lighting, repairing, replacing and maintaining the Shopping Center, including the common areas, in as good condition as when originally installed (including equipment depreciation used in the maintenance of the Shopping Center, including the common areas).  Such costs shall include, but not be limited to, pest extermination, supervised fire sprinkler alarm service, music, removal of trash, snow, ice, rubbish, dirt and debris, costs of planting, replanting and replacing flowers and landscaping and supplies required therefor, and all cost of utilities used in connection therewith, including, but not by way of limitation, all costs of maintaining lighting facilities, signage, and storm drainage systems, and all premiums for liability, property damage, fire with extended coverage endorsements and Worker's Compensation insurance, wages, unemployment taxes, social security taxes, personal property taxes, fees for required licenses and permits, management fees, and administrative and overhead costs equal to 15% of all of the foregoing and all other operating expenses.

SECTION 17.4  TENANT'S SHARE OF OPERATING EXPENSES.  Tenant shall pay to Landlord, in monthly installments in amounts estimated at any time and from time to time by Landlord, Tenant's proportionate share of the operating expenses, which proportionate share shall be the product obtained by multiplying such operating expenses by a fraction, the numerator of which shall be the number of square feet of Floor Area in the Leased Premises, and the denominator of which shall be the total number of square feet of gross leasable floor area in the Shopping Center.

For the purposes of this Section 17.4, Landlord's estimate of Tenant's proportionate share of operating expenses for the first year of Tenant's occupation of the premises is $ 5,040.00 .

SECTION 17.5  ADJUSTMENT OF TENANT'S SHARE OF OPERATING EXPENSES.  Upon written request, Landlord shall furnish to Tenant a statement showing the total operating expenses for the period just expired, the amount of Tenant's share of such operating expenses

7

and payments made by Tenant during such period under Section 17.4 hereof. If Tenant's share of such operating expenses for such period shall exceed Tenant's payments so made, Tenant shall pay to Landlord the deficiency within ten (10) days after receipt of said statement. If Tenant's payments shall exceed Tenant's share of such operating expenses as shown on such statement, Tenant shall be entitled to offset the excess against payments next thereafter becoming due under Section 17.4 hereof.

## ARTICLE 18.  DAMAGE TO LEASED PREMISES

       If the Leased Premises shall be partially damaged by a fire or casualty covered under insurance policies carried by Landlord pursuant to Article 17 hereof, Landlord shall, upon receipt of the insurance proceeds, repair and restore the same; provided, however, that the obligation of Landlord to repair and restore the Leased Premises as herein provided shall be limited to such restoration as can be paid for in full by such insurance proceeds as shall actually be received by Landlord, free and clear from collection by any mortgagees and after deducting the cost and expense, if any, including attorney's fees of settling with the insurer, and provided further, that in no event shall Landlord be responsible for the repair, restoration or replacement of any of Tenant's alterations, decorations, additions, improvements, stock in trade, machinery, equipment, fixtures, furnishings, furniture, carpeting, wall coverings, drapes and equipment, the repair, restoration or replacement of which shall be the sole responsibility of Tenant.

       If (a) the Leased Premises by reason of a fire or casualty are rendered wholly untenantable or partially untenantable to the extent of twenty percent (20%) of the value thereof, (b) the Leased Premises are damaged as a result of a risk which is not covered by Landlord's insurance, or (c) the Leased Premises are damaged in whole or in part during the last one (1) year of the term of this Lease or any renewal thereof, or (d) all or any portion of the common areas or other buildings within the Shopping Center are damaged, whether or not the Leased Premises are damaged, to such an extent that the Shopping Center cannot, in the reasonable judgement of Landlord, be operated as an integral unit, then in any such event, Landlord may elect either to repair the damage or to cancel this Lease. If Landlord shall elect to terminate this Lease, Landlord shall so notify Tenant in writing within ninety (90) days after the date of the casualty. In the event of termination, this Lease shall expire at the end of the calendar month in which such notice of termination is given, and Tenant shall vacate and surrender the Leased Premises to Landlord on or before said date. In the event that Landlord shall not serve notice of termination, Landlord and Tenant shall commence their respective obligations to repair and restore as soon as is reasonably possible and shall prosecute the same to completion with all due diligence.

## ARTICLE 19.  TENANT'S INSURANCE

       Tenant shall keep in full force and effect a Broad Form Comprehensive Liability Insurance policy with respect to the Leased Premises during the entire term hereof, with minimum limits of not less than One Million Dollars ($1,000,000.00) for personal injury or death arising out of any one occurrence, and not less than One Million Dollars ($1,000,000.00) for damage to property arising out of any one occurrence. If the term of this Lease is in excess of two (2) years, Landlord may on the second anniversary of the Commencement Date, and every second anniversary thereafter, reasonably increase the minimum limits of the insurance required pursuant to this Article 19.

       Tenant further agrees to carry sprinkler leakage and damage insurance (if required), insurance against vandalism and malicious mischief, and insurance against fire and such other risk as are from time to time included in standard broad form extended coverage insurance, for the full insurable value of Tenant's stock in trade, machinery, equipment, fixtures, furniture, furnishings, wall coverings, floor coverings, draperies, equipment and other items of personal property located on or within the Leased Premises, and all alterations, decorations, additions and improvements made in and about the Leased Premises. Tenant shall also carry plate glass insurance if plate glass is now or hereafter installed on the Leased Premises.

       All policies of insurance required to be maintained by Tenant hereunder shall name Landlord, any person, firms or corporations designated by Landlord, and Tenant as insured, shall name Landlord as additional insured, and shall contain an express waiver of any right of subrogation against Landlord.

       Tenant agrees that all insurance Tenant is required to maintain under this Lease shall be in insurance companies lawfully doing business in the Commonwealth of Virginia and of good credit satisfactory to Landlord, and that the original policies or true copies or certificates evidencing all of the aforementioned insurance coverage shall be delivered to Landlord within twenty (20) days prior to the commencement of the term hereof and shall contain a clause that the insurer will not cancel or change

the insurance without first giving the Landlord twenty (20) days' prior written notice thereof and, further, that new or renewal policies shall be delivered by Tenant to Landlord at least twenty (20) days before the expiration date or sooner termination of each policy.

       If Tenant shall not comply with its covenants made in this Article, Landlord may, at its option, cause insurance as aforesaid to be issued and in such event, Tenant agrees to pay the premiums for such insurance promptly upon Landlord's demand, as additional rent.

## ARTICLE 20.  INDEMNIFICATION

       SECTION 20.1  INDEMNIFICATION.  Tenant shall and hereby agrees to indemnify and hold Landlord, its agents, officers and employees harmless from and against any and all liability, claims, demands, expenses, fees, fines, penalties, suits, proceedings, actions, and causes of action of any and every kind and nature arising or growing out of or in any way connected with Tenant's use, occupancy, management or control of the Leased Premises and/or Tenant's operations or activities in the Shopping Center.  This obligation to indemnify shall include legal and investigation costs and all other costs, expenses and liabilities incurred from the date the indemnitee receives notice that any claim or demand has been made or may be made.

       SECTION 20.2  WAIVER OF CLAIMS.  Landlord, its agents and employees, shall not be liable and Tenant hereby waives, to the extent permitted by applicable law, all claims for any damage to persons or property sustained by Tenant or any person claiming through Tenant located in or about the Leased Premises, or for the loss of or damage to any property of Tenant or of others by theft or otherwise, whether caused by other tenants or persons in the Shopping Center or in or about the Leased Premises, occupants of adjacent property, or the public, or caused by operations related to the construction of any private, public or quasi-public work.  All property of Tenant kept or stored in or about the Leased Premises shall be so kept or stored at the risk of Tenant only and Tenant shall hold Landlord harmless from any claims arising out of damage to the same or damage to Tenant's business, including subrogation claims by Tenant's insurance carrier.

## ARTICLE 21.  ASSIGNMENT, SUBLETTING AND OWNERSHIP

       SECTION 21.1  NO ASSIGNMENT OR SUBLETTING. Subject to Exhibit F, page 7, article 19 SUBLEASE OR ASSIGNMENT Tenant shall not transfer, assign, sublet, enter into license or concession agreements, change ownership or hypothecate this Lease or Tenant's interest in and to the Leased Premises without first obtaining the written consent of Landlord.  Any attempted transfer, assignment, subletting, license or concession agreement, change of ownership or hypothecation without the Landlord's written consent shall be void and confer no rights upon any third party.  The prohibitions of this Section shall be construed to refer to any acts or events referred to whether they occur by operation of law, legal process, receivership, bankruptcy or otherwise.  Notwithstanding any transfer, assignment, subletting, license or concession agreement, change of ownership or hypothecation, Tenant shall remain fully liable under this Lease for the performance of all of the terms, covenants and provisions hereof to be performed by Tenant.

       SECTION 21.2  FURTHER TRANSFERS.  The consent by Landlord to any transfer, assignment, subletting, license or concession agreement, change of ownership or hypothecation shall not constitute a waiver of the necessity for such consent to any subsequent attempted transfer, assignment, subletting, license or concession agreement, change of ownership or hypothecation.

       SECTION 21.3  ASSUMPTION OF OBLIGATIONS.  Any transfer, assignment, subletting, license or concession agreement or hypothecation to which there has been consent shall be by instrument in writing, in form satisfactory to Landlord, and shall be executed by the transferor, assignor, sublessor, licensor, concessionaire, hypothecator or mortgagor, and the transferee, assignee, sublessee, licensee, concessionaire, or mortgagee shall agree in writing for the benefit of Landlord, to assume, to be bound by, and to perform all the terms, covenants and conditions of this Lease to be done, kept and performed by Tenant.  One executed copy of such written instrument shall be delivered to Landlord.  Failure to first obtain in writing Landlord's consent or failure to comply with the provisions of this Section shall operate to prevent any such transfer assignment, subletting, license, concession agreement or hypothecation from becoming effective.

       SECTION 21.4  OWNERSHIP.  If control of Tenant or Tenant's business changes at any time during the term hereof, then Landlord may, at its option, by giving Tenant fifteen (15) days prior written notice, declare such a change a default under this Lease, thereby entitling Landlord to terminate this Lease and/or exercise such other remedies as Landlord may have in the event of a default by Tenant under this Lease.

       SECTION 21.5  PAYMENT OF FEES.  Tenant agrees to reimburse Landlord for any

attorney's fees and costs incurred by Landlord in conjunction with the processing and documentation of any such requested transfer, assignment, subletting, licensing or concession agreement, change of ownership or hypothecation of this Lease or Tenant's interest in and to the Leased Premises.

## ARTICLE 22.  ACCESS TO PREMISES

Tenant agrees that Landlord, its agents, employees or servants, or any person authorized by Landlord, may enter the Leased Premises for the purpose of (a) inspecting the condition of same; (b) making such repairs, additions or improvements thereto, or to the building of which they are a part, as Landlord may elect or be required to make; (c) exhibiting the same to prospective purchasers of the building and/or prospective tenants who may want to lease space in the shopping center in which the Leased Premises are contained; and (d) placing notices and/or For Lease signs, during the last four (4) months of the term hereof, in and upon said premises at such places as may be determined by Landlord.  Tenant agrees that neither Tenant nor any person within Tenant's control will interfere with such notices.

## ARTICLE 23.  EVENTS OF DEFAULT; REMEDIES OF LANDLORD

(a)  The occurrence of any of the following shall constitute a default and a breach of this Lease by Tenant:

(i)  A failure by Tenant to commence business with a full staff of employees and a full stock of merchandise within the time period specified in Section 2.3 hereof;

(ii)  A failure by Tenant to pay when due any installment of rent, or any other payment required to be made by Tenant hereunder;

(iii)  The discontinuance by Tenant of the conduct of business in the Leased Premises;

(iv)  A failure by Tenant to observe and perform any other provision of this Lease to be observed or performed by Tenant, which failure shall continue for ten (10) days after written notice thereof from Landlord to Tenant; provided, however, that if the nature of the failure is such that the same cannot reasonably be cured within such ten (10) day period, Tenant shall not be deemed to be in default if Tenant shall within such period commence the cure thereof and thereafter shall diligently prosecute the same to completion;

(v)  (aa) The entry of a decree or order for relief by a court having jurisdiction in respect of Tenant or any guarantor of this Lease (any and all such guarantors hereinafter individually referred to as "Guarantor") in an involuntary proceeding under present or future federal bankruptcy laws, or any other applicable federal or state bankruptcy, insolvency or other similar law, or (bb) The appointment of, or consent by Tenant or any Guarantor to the appointment of, a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) for Tenant or any Guarantor or for part of the Leased Premises (or Tenant's property located therein) or for any substantial part of Tenant's or any Guarantor's property, or (cc) The entry (and continuance unstayed and in effect for a period of sixty (60) consecutive days) of an order or decree winding-up or liquidating Tenant's or any Guarantor's affairs, or (dd) The commencement by Tenant or any Guarantor of a voluntary proceeding under present or future federal bankruptcy laws, or any other applicable federal or state bankruptcy, insolvency or other similar law, or (ee) The consent by Tenant or any Guarantor to the taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) or any part of the Leased Premises (or Tenant's property located therein) or any substantial part of Tenant's or any Guarantor's property, or (ff) The making by Tenant or any Guarantor of any assignment for the benefit of creditors, or (gg) The failure of Tenant or any Guarantor generally to pay Tenant's or any Guarantor's debts as such debts become due, or (hh) The taking of corporate action by Tenant or any Guarantor in furtherance of any of the foregoing, or (ii) Tenant permitting the Leased Premises or Tenant's effects or interests therein to be taken, levied upon or attached under legal process against Tenant.

(b)  In the event of any default under this Lease as hereinabove set forth or otherwise, Landlord may, at any time thereafter, with or without notice or demand, and without limiting Landlord in the exercise of any other remedy at law or in equity or otherwise which Landlord may have by reason of the default, do one or more of the following:

(i)  Landlord may elect to terminate this Lease and all rights of Tenant hereunder by giving written notice of such termination to Tenant, whereupon this Lease shall terminate on the date specified in such notice of cancellation, and Tenant shall thereupon surrender the Leased Premises to Landlord, but Tenant shall remain liable to Landlord as hereinafter provided.

In such event Landlord may recover from Tenant: (aa) the amount of any unpaid rent which had been

10

earned at the time of such termination; plus (bb) all damages Landlord incurred by reason of Tenant's default, including the cost of recovering the Leased Premises, attorneys' fees and, in addition, the worth at the time of such termination of the amount of rent reserved in this Lease for the remainder of the Lease Term, all of which amount shall be immediately due and payable from Tenant to Landlord; plus (cc) any other amount necessary to compensate Landlord for all detriment caused by Tenant's failure to perform its obligations under this Lease; and (dd) at Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

The term "rent" as used in this Article 23 shall mean the Minimum Annual Rental and all other sums required to be paid by Tenant pursuant to the terms of this Lease. For the purpose of calculating the amount of rent due Landlord from Tenant after any default by Tenant and re-entry of the Leased Premises or termination of this Lease by Landlord, all such sums, other than the Minimum Annual Rental, shall be computed on the basis of the average monthly amount thereof which accrued during the twenty-four (24) month period immediately preceding the default, except that if such sums other than Minimum Annual Rental have been payable for a period of time less than such twenty-four (24) month period, then such sums shall be computed on the basis of the average monthly amount accruing during such shorter period.

(ii) Landlord may continue this Lease in full force and effect, regardless of whether or not Tenant has abandoned the Leased Premises, and this Lease will continue in effect as long as Landlord does not terminate this Lease as hereinabove provided, and Landlord shall have the right to collect rent as and when due. In addition:

(aa) During the period that Tenant is in default, Landlord may elect to enter the Leased Premises and relet the same, or any part thereof. Any rentals received by Landlord from such reletting shall be applied: first, to the payment of indebtedness other than rent due hereunder from Tenant to Landlord; second, to the payment of any cost of such reletting; third, to the payment of the cost of any alterations and repairs to the Leased Premises; fourth, to the payment of the rent due and unpaid hereunder; and the residue, if any shall be held by Landlord and applied in payment of future rent as the same may become due and payable hereunder. If that portion of the rentals received from such reletting during any month which is to be applied to the payment of rent hereunder is less than the rent payable for that month by Tenant hereunder, then Tenant shall pay such deficiency to Landlord. Such deficiency shall be calculated and paid monthly. Tenant shall also pay to Landlord, as soon as ascertained, any costs and expenses incurred by Landlord in such reletting or in making such alterations and repairs not covered by the rentals received from such reletting of the Leased Premises.

(bb) Neither Landlord's acts of maintenance or preservation or efforts to relet the Leased Premises, nor the appointment of a receiver upon the initiative of the Landlord to protect Landlord's interests under the Lease, shall constitute a termination of Tenant's right to possession unless Landlord notifies Tenant that Landlord has elected to terminate this Lease.

(iii) Landlord may re-enter the Leased Premises and remove all persons and property from the Leased Premises; such property may be removed and stored in a public warehouse or elsewhere at the cost of and for the account of Tenant.

No re-entry or taking possession of the Leased Premises by Landlord pursuant to this Article 23 shall be construed as an election to terminate this Lease, unless a written notice of termination has been given to Tenant. Notwithstanding any reletting because of any default of Tenant without termination by Landlord, Landlord may at any time after such reletting elect to terminate this Lease because of any such default.

The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Leased Premises or any claim of injury or damage. In the event Landlord commences any proceedings for nonpayment of Minimum Annual Rental or any other charge due hereunder, Tenant will not interpose any counterclaim of whatever nature or description in any such proceedings.

Tenant hereby expressly waives any and all rights of redemption granted by or under present or future laws in the event of Tenant being evicted or dispossessed for any cause or in the event of Landlord obtaining possession of the Leased Premises by reason of the violation by Tenant of any of the provisions of this Lease or otherwise.

In the event of a breach or threatened breach by Tenant of any provision of this Lease, Landlord shall have the right of injunction as if other remedies were not provided for herein. The rights and remedies given to Landlord in this Lease are distinct, separate and cumulative remedies, and the exercise of any of them shall not be deemed to exclude Landlord's right to exercise any or all of the

11

others or those which may be permitted by law.

Tenant expressly waives any right of defense which it may have to claim a merger and neither the commencement of any action or proceeding nor the settlement thereof or entering of judgement therein shall bar Landlord from bringing subsequent actions or proceedings from time to time.

## ARTICLE 24.  REMEDIES CUMULATIVE

No mention in this Lease of any specific right or remedy shall preclude Landlord from exercising any other right or from having any other remedy or from maintaining any action to which it may otherwise be entitled either at law or in equity; and the failure of Landlord to insist in any one or more instances upon a strict performance of any covenant of this Agreement or to exercise any option or right herein contained shall not be construed as a waiver or relinquishment for the future of such covenant, right or option, but the same shall remain in full force and effect unless the contrary is expressed in writing by Landlord.

## ARTICLE 25.  SELF-HELP

If Tenant shall fail to perform any of its obligations under this Lease as and when said performance shall be required, Landlord may, (but shall not be obligated to do so), in addition to any other rights it may have at law or equity, cure such default on behalf of Tenant, and Tenant shall reimburse Landlord for any sums paid or costs incurred by Landlord in curing such default, including interest, at Ten percent (10%) per annum on all sums advanced by Landlord as aforesaid, which sums and costs together with interest thereon shall be deemed additional rent payable hereunder by Tenant.

## ARTICLE 26.  DELETED

## ARTICLE 27.  TENANT'S CONDUCT OF BUSINESS
### SECTION 27.1 OBLIGATION TO OPEN.

Tenant covenants and agrees that it will open for business in the Leased Premises within thirty (30) days of the delivery of possession of the Leased Premises by Landlord to Tenant subject to Exhibit F, page 4, article 9 OPENING CO-TENANCY article 10 MAJOR TENANT CO-TENANCY and page 5, article 11 SPECIALITY STORE CO-TENANCY  Tenant agrees to continuously operate its business in 100% of the Leased Premises, and at all times in a first-class manner consistent with reputable business standards and practices.  Tenant agrees that it will at all times employ a full staff of trained personnel and keep and maintain within and upon the Leased Premises a full stock of merchandise and trade fixtures to service and supply the usual and ordinary demands and requirements of its customers and that it will keep the Leased Premises in a neat, clean and orderly condition.  Tenant also agrees to conduct Tenant's business only under the trade name set forth in Section 1.1F hereof.  Tenant further agrees to keep the Leased Premises open and to operate the business conducted thereon no less than the following hours:

|  |  |
|---|---|
| Monday - Friday | 9:00am - 8:00pm |
| Saturday | 9:00am - 6:00pm |
| Sunday | Closed |

### SECTION 27.2  TENANT'S ADVERTISING.

Tenant agrees to refer to the Shopping Center as "Village Marketplace, Midlothian, Virginia" in designating the location of the Leased Premises in all newspaper or other advertising, stationery, other printed material and all other references to Tenant's location; to include the address and identity of its business activity in the Leased Premises in all advertisements made by Tenant in which the address and identity of any other business activity of like character conducted by Tenant within the metropolitan area in which the Shopping Center is located shall be mentioned, and to use, in such advertisement, only Tenant's trade name as set forth in Section 1.1F hereof.

### SECTION 27.3  TENANT'S SIGNAGE.

Subject to Exhibit F, page 7, article 21 SIGNAGE and in order to assure orderly and aesthetically coordinated signage throughout the Shopping Center, Tenant shall install or cause to be installed, at Tenant's sole cost and expense, a sign of individual letter type being a metal channel letter internally illuminated with a flat plexiglas face and bronze trim cap on the facia of the Leased Premises, bearing Tenant's trade name.  Within thirty (30) days from the date hereof, Tenant shall, at its sole cost and expense, deliver to Landlord drawings for said sign, designating the size sign selected by Tenant from choices provided by Landlord.  Said drawings shall be subject to Landlord's prior written

12

approval as to size, nature, design and aesthetic properties and shall conform with such other sign design criteria as Landlord shall deliver to Tenant following the execution of this Lease. Tenant shall not place or suffer to be placed or maintained on any exterior door, wall or window of the Leased Premises or on the roof of the Leased Premises any sign (except as hereinabove provided), awning or canopy, or any advertising matter or other thing of any kind, and will not place or maintain any decoration, lettering or advertising matter on the glass (interior or exterior) of any window or door of the Leased Premises without first obtaining Landlord's written approval. Tenant further agrees to maintain in good condition and repair at all times such sign, awning, canopy, decoration, lettering, advertising matter or other thing as may be approved by Landlord as aforesaid.

## ARTICLE 28. RULES AND REGULATIONS

Tenant covenants and agrees that Tenant will comply with all rules and regulations established by Landlord from time to time for the operation of Village Marketplace, including but not limited to the following:

(a) No awning or other projections shall be attached to the outside walls of the Leased Premises or the building of which they form a part, without the prior written consent of Landlord;

(b) All loading and unloading of goods shall be done in the areas and through the entrances designated for such purpose by Landlord;

(c) Tenant shall provide for Tenant's own garbage and trash removal; provided, however that should Landlord elect to supply or cause to be supplied a trash removal service, Tenant agrees to purchase and pay Landlord for the same and to deposit Tenant's trash as and where directed by Landlord;

(d) No loudspeakers, televisions, phonographs, radios, flashing lights or other devices shall be used in a manner so as to be heard or seen outside of the Leased Premises without the prior written consent of Landlord;

(e) No auction, fire, bankruptcy, or selling-out sales shall be conducted on or about the Leased Premises without the prior written consent of Landlord;

(f) Tenant shall keep Tenant's display windows illuminated each and every day of the term hereof from dusk until 10 p.m.

(g) The outside areas immediately adjoining the Leased Premises shall be kept clear at all times by Tenant, and Tenant shall not place nor permit any obstructions, garbage, refuse, merchandise or displays in such areas;

(h) Nothing is to be attached or placed on the roof or exterior walls of the Leased Premises without Landlord's prior approval, and Tenant's access to the roof shall be limited to maintenance of equipment installed with Landlord's approval and inspections for damage. Tenant shall not enter the roof at any time without the prior written approval of Landlord;

(i) Tenant shall use, at Tenant's expense, such pest extermination contractor as Landlord may direct and at such intervals as Landlord may require, said expense to be included as part of operating expenses defined in Article 17 hereof;

(j) Tenant, its employees and/or its agents, shall not solicit business in the parking or other common areas, nor shall Tenant, its employees and/or agents, distribute any handbills or other advertising matter in or on automobiles parked in the parking or other common areas;

(k) In the event Landlord installs a supervised fire sprinkler alarm system for the protection of all or part of the Shopping Center (including the Leased Premises), Tenant agrees to pay its prorata share of the monthly alarm service charge, such charge to be included as part of the operating expenses defined in Article 17 hereof;

(l) Tenant shall not make any use of the Leased Premises except as expressly permitted under Section 1.1M, and Tenant shall not operate any instrument, apparatus, equipment or device which emits an odor or causes a noise discernible outside of the Leased Premises or which may be deemed offensive in nature.

Landlord shall, for the enforcement of the covenants, conditions and agreements now or hereafter made a part of this Article 28 (referred to as "Rules and Regulations") have all remedies in this Lease provided for breach of the provisions hereof.

## ARTICLE 29. EMINENT DOMAIN

SECTION 29.1 CONDEMNATION. If twenty percent (20%) or more of the Leased Premises shall be acquired or condemned by right of eminent domain for any public or quasi-public use or purpose, then either Landlord or Tenant may, at their election, terminate this Lease by giving the

other party ninety (90) days' prior written notice of their election to do so, and in such event all rentals shall be apportioned and adjusted as of the date of termination.

If ten percent (10%) or more of the Shopping Center shall be acquired or condemned by right of eminent domain for any public or quasi-public use or purpose, then Landlord may, at its election, terminate this Lease by giving Tenant ninety (90) days' prior written notice of its election to do so, and in such event all rentals shall be apportioned and adjusted as of the date of such termination.

If the Lease shall not be terminated as aforesaid, then it shall continue in full force and effect, and Landlord shall within a reasonable time after possession is physically taken (subject to delays due to shortage of labor, materials, or equipment, labor difficulties, breakdown of equipment, governmental restrictions, fires, or other casualties or other causes beyond the control of the Landlord) repair or rebuild what remains of the Leased Premises for Tenant's occupancy; provided, however that the obligation of Landlord to restore the Leased Premises as herein provided shall be limited to such restoration as can be paid for in full by such condemnation proceeds as shall actually be received by Landlord, free and clear from collection by any mortgagees, and after deducting the cost and expense, if any, including attorney's fees, of settling with the condemning authority. An appropriate proportion of the Minimum Annual Rental and other charges shall be abated according to the nature and extent of the injury to the Leased Premises until such repairs and rebuilding are completed, and thereafter for the balance of the Lease Term.

SECTION 29.2 AWARDS. Landlord reserves, and Tenant waives for the benefit of Landlord and assigns to Landlord, all rights and damages on account of any taking or condemnation or any act of any public or quasi-public authority for which damages are payable. Tenant shall execute such instruments of assignment as Landlord requires, join with Landlord in any action for the recovery damages, if requested by Landlord, and turn over to Landlord any damages recovered in any proceeding. If Tenant fails to execute instruments required by Landlord or undertake such other steps as requested, Landlord shall be deemed the duly authorized irrevocable agent and attorney-in-fact for the Tenant to execute such instruments and undertake such steps on behalf of Tenant.

## ARTICLE 30. ATTORNEY'S FEES

In the event that at any time during the term of this Lease or thereafter, Landlord shall institute any action or proceedings against Tenant relating to the provisions of this Lease or any default by Tenant hereunder, then Tenant shall reimburse Landlord for the expense of such attorney's fees and disbursements as are incurred therein by Landlord should the Landlord prevail.

## ARTICLE 31. SALE OF PREMISES BY LANDLORD

In the event of any sale or exchange of the Leased Premises by Landlord, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission relating to the Leased Premises or this Lease.

## ARTICLE 32. NOTICES

Any notices, demands, consents or approvals required or permitted to be made or given hereunder shall be in writing and shall be made or given by personal delivery or be sent by certified or registered mail addressed, if to Landlord, at the address at which the last rental payment was made or required to be made, and if to Tenant, addressed to Tenant at Village Marketplace 13112 Midlothian Turnpike, Midlothian, VA 23113 , or to such other address as was last specified respectively by notice by Landlord or Tenant. Notice sent by mail shall be deemed given on the date of mailing thereof.

## ARTICLE 33. SUCCESSORS AND ASSIGNS

All covenants, promises, conditions, representations and agreements herein contained shall be binding upon, apply and inure to the parties hereto and their respective heirs, executors, administrators, successors and assigns, it being understood and agreed, however, that the provisions of Article 21 hereof are in nowise impaired by this Article 33.

## ARTICLE 34. REPRESENTATIONS

It is understood and agreed by Tenant that Landlord and Landlord's agents have made no representations or promises with respect to the Leased Premises or the making or entry into this Lease, except as in this Lease expressly set forth, and that no claim or liability, or cause for termination, shall be asserted by Tenant against Landlord for, and Landlord shall not be liable by reason of, the

14

breach of any representations or promises not expressly stated in this Lease.

ARTICLE 35.  EFFECT OF WAIVER
                    The failure of Landlord to insist upon strict performance by Tenant of any of the covenants, conditions, and agreements of this Lease shall not be deemed a waiver of any of Landlord's rights or remedies and shall not be deemed a waiver of any subsequent breach or default by Tenant in any of the covenants, conditions and agreements of this Lease.  No surrender of the Leased Premises shall be effected by Landlord's acceptance of rental or by any other means whatsoever unless the same be evidenced by Landlord's written acceptance of such a surrender.

ARTICLE 36.  HOLDING OVER
                    See Exhibit F, page 7, article 22 HOLD OVER.

ARTICLE 37.  RELATIONSHIP OF PARTIES
                    The parties hereto agree that it is their intention hereby to create only the relationship of Landlord and Tenant, and no provision hereof, or act of either party hereunder, shall ever be construed as creating the relationship of principal and agent, or of partnership, or of joint venture or other enterprise between the parties hereto.

ARTICLE 38.  FINANCING STATEMENT
                    Tenant shall not enter into, execute or deliver any financing agreement that can be considered as a priority to any lease, mortgage or deed of trust upon the Leased Premises, and in the event Tenant does so execute or deliver such financing agreement such action on the part of Tenant shall be considered a breach of the terms and conditions of this Lease entitling Landlord to such remedies as are provided herein.  Tenant agrees that Landlord shall have an express contractual lien (in additions to any statutory lien) for the performance of all of Tenant's obligations pursuant to this Lease, upon all of the fixtures, machinery, equipment, goods, inventory and personalty which are, or hereafter may be, placed in or upon the Leased Premises.

ARTICLE 39.  COVENANT OF QUIET ENJOYMENT
                    Upon payment of the rentals and performance of covenants upon Tenant's part to be performed hereunder, Tenant shall and may peaceably and quietly have, hold and enjoy the Leased Premises and improvements thereon during the Lease Term, subject to the terms and conditions of this Lease and any  mortgages, and deeds of trust to which this Lease is subordinate, and subject to the powers of eminent domain of public and quasi-public authorities.

ARTICLE 40.  SECURITY DEPOSIT  N/A

ARTICLE 41.  BROKERS
                    Tenant warrants and represents that it has not had any negotiations with or dealt with any realtor, broker, agent or finder in connection with the negotiation and execution of this Lease, other than General Land Company of Virginia, Inc., and S.L. Nusbaum and Tenant agrees to pay and to hold Landlord harmless from any cost, expense or liability (including cost of suit and reasonable attorneys' fees) for any compensation, commissions or charges claimed by any realtor, broker, agent or finder, other than General Land Company of Virginia, Inc.,and S.L. Nusbaum with respect to this Lease and the negotiation thereof.

ARTICLE 42.  LEASE STATUS
                    At any time and from time to time, upon request of Landlord, Tenant will execute, acknowledge and deliver to Landlord an instrument prepared by Landlord, stating, if the same shall be true, that (i) this Lease is a true and exact copy of the lease between the parties hereto and that there are no amendments hereof (or stating what amendments there may be); (ii) that this Lease is then in full force and effect; (iii) that to the best of Tenant's knowledge there are then no offsets, defenses or counterclaims with respect to the payment of rent reserved hereunder or in the performance of the other terms, covenants and conditions hereof on the part of Tenant to be performed; (iv) that as of such date no default has been declared hereunder by either party hereto and that Tenant at that time has no knowledge of any facts or circumstances which it might reasonably believe would give rise to a default by either party; (v) that no notice of an assignment of Landlord's interest in this Lease has been given to Tenant, and (vi) that rent has not been paid by Tenant more than thirty (30) days in advance.  If within

15

ten (10) days after the date of a request by Landlord to execute any such instrument Tenant shall not have executed and delivered the same, Tenant hereby irrevocably appoints Landlord as its agent and attorney-in-fact with full power and authority to execute and deliver in the name of Tenant any such instrument, and Landlord may, at its option, cancel this Lease without incurring any liability on account thereof, and the term hereby granted is expressly limited accordingly.

## ARTICLE 43.  RECORDING

Tenant shall not record this Lease without the written consent of Landlord; provided however, upon the request of either party hereto, the other party shall join in the execution of a memorandum or so-called "short form" lease for the purpose of recordation.  Said memorandum or short form lease shall describe the parties, the Leased Premises, and the term of this Lease and shall incorporate this Lease by reference.  Tenant agrees to pay all costs and expenses in connection with or prerequisite to such recording.

## ARTICLE 44.  FORCE MAJEURE

In the event either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under the terms of this Lease, then performance of such act shall be excused for the period of delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.  The provisions of this Article shall not operate to excuse Tenant from the prompt payment of Minimum Annual Rental, additional rent or any other payments required by the terms of this Lease.

## ARTICLE 45.  APPLICABLE LAW

The laws of the Commonwealth of Virginia shall govern the validity, performance and enforcement of this Lease.  The invalidity or unenforceability of any provision of this Lease shall not affect or impair any other provision.

## ARTICLE 46.  EXECUTION OF LEASE BY LANDLORD

The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Leased Premises and this document shall become effective and binding only upon the execution and delivery hereof by Landlord and by Tenant. All negotiations, considerations, representations and understanding between Landlord and Tenant are incorporated herein and may be modified or altered only by agreement in writing between Landlord or its successors and Tenant, and no act or omission of any employee or agent of Landlord or of Landlord's broker, if any, shall alter, change or modify any of the provisions hereof.

## ARTICLE 47. AGENCY OR INDEPENDENT CONTRACTS

Any service which Landlord is required or elects to furnish under this Lease may be furnished by any agent employed by Landlord or by an independent contractor, and the cost to Landlord of such agent or independent contractor shall be included in any cost chargeable to Tenant for such services.

## ARTICLE 48.  LIMITATION OF LIABILITY

Notwithstanding anything contained herein to the contrary, there shall be absolutely no personal liability on persons, firms or entities which constitute Landlord with respect to any of the terms, covenants, conditions and provisions of this Lease, and Tenant agrees to look solely to the interest of Landlord, its successors and assigns, in Landlord's Tract for the satisfaction of each and every remedy of Tenant in the event of default by Landlord hereunder.  Such exculpation of personal liability is absolute and without any exception whatsoever.

## ARTICLE 49.  MORTGAGEE'S APPROVAL

If any mortgagee or prospective mortgagee of the Shopping Center shall at any time require any modification of the terms and provisions of this Lease as a condition to such financing as Landlord may desire, then Landlord shall have the right to cancel this Lease if Tenant fails or refuses to approve and execute such modification(s) within twenty (20) days after Landlord's request therefor provided that such modification does not adversely change any material provisions of this Lease. Upon

16

such cancellation by Landlord, this Lease shall be null and void and neither party shall have any liability either for damages or otherwise to the other by reason of such cancellation.

## ARTICLE 50. JOINT AND SEVERAL LIABILITY

If Tenant is a partnership or other business organization the members of which are subject to personal liability, the liability of each such member shall be deemed to be joint and several.

## ARTICLE 51. CAPTIONS

Captions throughout this Lease are for convenience and reference only and the words contained therein shall in no way be held to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Lease.

## ARTICLE 52. MERCHANT'S ASSOCIATION

Tenant agrees to join and maintain membership, subject to Exhibit F, page 4, article 8 ADVERTISING. MERCHANTS ASSOCIATION AND/OR PROMOTIONAL FUND in the businessmen's organization that will be organized, formed or sponsored by Landlord for substantially (excepting doctors, dentists, lawyers, CPAs) all retail business in the Shopping Center and to pay to such organization as membership fees therein such reasonable annual dues, if any, as may be established for the period in question by the membership to be used (except for reasonable administrative expenses) at the direction of the officers thereof for the promotion of the Shopping Center as a desirable place to shop; provided that under the bylaws of such organization no matters (including, without limitation, the election of officers and the establishment of such annual dues) shall be deemed to have been adopted by such organization for the purposes of this section unless approved by Occupants who occupy at least sixty-seven percent (67%) of all floor space used for retail business purposes in the Shopping Center at the time in question.

## ARTICLE 53. AGENCY

The parties hereto acknowledge that C. J. McInnis and Richard S. Johnson are members in Village Associates, L.L.C. and are licensed real estate agents in the Commonwealth of Virginia.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first above written.

LANDLORD:  VILLAGE ASSOCIATES, L.L.C.
a Virginia limited liability company

By:_____

Richard S. Johnson
Member

By:     The McRyan Company, a Virginia limited
partnership, Its Member

By:_____

C. J. McInnis, III
General Partner

TENANT:
Cloverleaf Card Corporation, a VA corporation

By:_____

Edmund M. Barnett  -  President

54 - 1875988
FEIN

[AFFIX CORPORATE SEAL]

18

# EXHIBIT A

## RIDER TO STORE LEASE
### DATED October 11, 2001
### VILLAGE ASSOCIATES, L.L.C. ("LANDLORD")
### AND

### Cloverleaf Card Corporation, a VA corporation ("TENANT")


Village Marketplace
Midlothian, Virginia



VILLAGE MARKET PLACE

Landlord 10/16/01 Date

Tenant 10/6/01 Date

EXHIBIT B

RIDER TO STORE LEASE
DATED October 11, 2001
VILLAGE ASSOCIATES, L.L.C. ("LANDLORD")
AND

Colverleaf Card Corporation, a VA corporation ("TENANT")

Village Marketplace
Midlothian, Virginia

Tenant Design Criteria

As outlined in Exhibit F on pages 7, 8, 9, 10, 11 & 12.

_____ Landlord _10/18/01_ Date
_____ Tenant   _10/3/_ Date

EXHIBIT C
RIDER TO STORE LEASE
DATED  October 11, 2001
Village Associates, L.L.C. ("LANDLORD")
AND

Cloverleaf Card Corporation, a VA corporation ("TENANT")

Village Marketplace Shopping Center
Midlothian, Virginia

| Lease Year | Ends | | Monthly Base Rent | C.A.M.* | Tax* | Total |
|---|---|---|---|---|---|---|
| 1 | | 2-28-03 | $5,000.00 | $420.00 | $332.00 | $5,752.00 |
| 2 | 3-1-03 | 2-29-04 | $5,152.00 | $420.00 | $332.00 | $5,904.00 |
| 3 | 3-1-04 | 2-28-05 | $5,304.00 | $420.00 | $332.00 | $6,056.00 |
| 4 | 3-1-05 | 2-28-06 | $5,464.00 | $420.00 | $332.00 | $6,216.00 |
| 5 | 3-1-06 | 2-28-07 | $5,628.00 | $420.00 | $332.00 | $6,380.00 |
| First Option Renewal | | | | | | |
| 6 | 3-1-07 | 2-29-08 | $5,796.00 | $420.00 | $332.00 | $6,548.00 |
| 7 | 3-1-08 | 2-28-09 | $5,968.00 | $420.00 | $332.00 | $6,720.00 |
| 8 | 3-1-09 | 2-28-10 | $6,148.00 | $420.00 | $332.00 | $6,900.00 |
| 9 | 3-1-10 | 2-28-11 | $6,332.00 | $420.00 | $332.00 | $7,084.00 |
| 10 | 3-1-11 | 2-28-12 | $6,520.00 | $420.00 | $332.00 | $7,272.00 |
| Second Option Renewal | | | | | | |
| 11 | 3-1-12 | 2-28-13 | $6,720.00 | $420.00 | $332.00 | $7,472.00 |
| 12 | 3-1-13 | 2-28-14 | $6,920.00 | $420.00 | $332.00 | $7,672.00 |
| 13 | 3-1-14 | 2-28-15 | $7,128.00 | $420.00 | $332.00 | $7,880.00 |
| 14 | 3-1-15 | 2-29-16 | $7,340.00 | $420.00 | $332.00 | $8,092.00 |
| 15 | 3-1-16 | 2-28-17 | $7,560.00 | $420.00 | $332.00 | $8,312.00 |

*Subject to Exhibit F, page 3, article 6 ANCILLARY RENTS

_____ Landlord 10/100/ Date
_____ Tenant    10/11/ Date

EXHIBIT D

RIDER TO STORE LEASE
DATED October 11, 2001
VILLAGE ASSOCIATES, L.L.C. ("LANDLORD")
AND

Cloverleaf Card Corporation, a VA corporation ("TENANT")

Village Marketplace
Midlothian, Virginia



Landlord 10/15/01 Date

Tenant 10/12/01 Date

EXHIBIT E

RIDER TO STORE LEASE
DATED October 11, 2001
VILLAGE ASSOCIATES, L.L.C. ("LANDLORD")
AND

Cloverleaf Card Corporation, a VA corporation  ("TENANT")
VILLAGE MARKETPLACE
MIDLOTHIAN, VIRGINIA

Renewal Option:    Anything herein contained to the contrary notwithstanding, this Lease shall be automatically renewed and extended  for successive  two ( 2 ) additional period(s) of  five ( 5  ) years (hereinafter referred to as the "Renewal Term") beyond the expiration of the term herein created, unless the Tenant shall give to the Landlord written notice of its election not to extend or renew, such notice shall be given to Landlord not less than six (6) months or more than twelve (12) months prior to the expiration of the initial term hereof or the renewal term as the case may be.
The rental for said renewal term(s) shall be as set out on Exhibit C, attached hereto.

_____ Landlord _____ Date

_____ Tenant _____ Date

HALLMARK CARDS

EXHIBIT TO LEASE CONSTRUCTION EXHIBIT C-1



**HALLMARK MARKETING CORPORATION**
6163 Osprey Ridge Dr.
Mt. Airy, MD 21771
Phone 301-829-8862
Fax 301-829-8863
Lkile1@Hallmark.com

**Lizanne Kile**
Area Real Estate & Site Development Director

September 12, 2001

General Land Company of Virginia, Inc.
Richard Johnson
P.O. Box 5204
Richmond, VA 23220

**EXHIBIT "F"**

RE: Village Marketplace
Midlothian, VA

Dear Rich,

Enclosed you will find the proposal for the 4800 square footage location currently occupied by video 2000.

The agreed upon business terms and conditions will be reviewed and approved by our retailer, retailers attorney and Hallmark Marketing Corporation.

The comprehensive nature of this proposal is necessary to insure that we address all the business issues with you as well as, provide a thorough location review for a prospective retailer.

*Please consider our offer:*

1. **DESCRIPTION OF PREMISES**: (The "Premises")
   A.   Located in Village Marketplace, Shopping Center, Space # 5
   B.   Area of Midlothian,
   C.   State of Virginia,
   D.   Containing a total square footage of approximately 4800 square feet.
   E.   Consisting of at least 80 feet of frontage by approximately 60 feet in depth

2. **LEASE TERM**: The Lease Term shall be five (5) "Lease Years." The first Lease Year will be from the Rent Commencement Date through the following February 28 (or 29) plus the next 12

Village Marketplace, Midlothian, Virginia

consecutive months.  The succeeding Lease Years will be the successive 12 month periods thereafter, each of which shall commence on March 1 and expire on the last day of February.

3. **RENT COMMENCEMENT**:

   A.   The Rent Commencement Date and Tenant's obligations to pay rents and charges under the Lease shall occur on the earlier of (1) the date Tenant opens the Premises for business to the public, or (2) 90 days after the last to occur of: (i) full execution and delivery of the Lease by Landlord and Tenant; (ii) Landlord's substantial completion of Landlord's work in the Premises and delivery of Premises to Tenant (delivery of Premises to be effective fifteen (15) days from Tenant's receipt of Landlord's notice of delivery); (iii) Landlord's approval of Tenant's plans and specifications; and (iv) receipt by Landlord for Tenant of all building permits and other governmental approvals necessary to start construction of Tenant's work.

   B.   If the Rent Commencement Date occurs during the months of, November or December, Tenant may elect to delay the Rent Commencement Date until the earlier of:  (i) January 15 or (ii) the date Tenant opens for business in the Premises.

4. **RENEWAL OPTIONS:**

   A.   Tenant may extend the Lease Term for two (2) additional term(s) of 5 Lease Years at the Annual Minimum Rent (or Substitute Rent, if applicable) set forth in the Lease.  Tenant shall notify Landlord in writing of Tenant's intention to exercise any option at least six months prior to the expiration of the then current Lease Term.

5. **ANNUAL MINIMUM RENT:**

| Rent Payment Periods | | | Annual | Annual | Monthly |
|---|---|---|---|---|---|
| | Begins | Ends | Rent Rate | Rent | Rent |
| Rent Commencement Date Through | | 2/28/2003 | $12.50 | $60,000.00 | $5,000.00 |
| 2 | 3/1/2003 | 2/29/2004 | $12.88 | $61,824.00 | $5,152.00 |
| 3 | 3/1/2004 | 2/28/2005 | $13.26 | $63,648.00 | $5,304.00 |
| 4 | 3/1/2005 | 2/28/2006 | $13.66 | $65,568.00 | $5,464.00 |
| 5 | 3/1/2006 | 2/28/2007 | $14.07 | $67,536.00 | $5,628.00 |
| 6 | 3/1/2007 | 2/29/2008 | $14.49 | $69,552.00 | $5,796.00 |
| 7 | 3/1/2008 | 2/28/2009 | $14.92 | $71,616.00 | $5,968.00 |
| 8 | 3/1/2009 | 2/28/2010 | $15.37 | $73,776.00 | $6,148.00 |
| 9 | 3/1/2010 | 2/28/2011 | $15.83 | $75,984.00 | $6,332.00 |
| 10 | 3/1/2011 | 2/29/2012 | $16.30 | $78,240.00 | $6,520.00 |
| 11 | 3/01/2012 | 2/28/2013 | $16.80 | $80,640.00 | $6,720.00 |
| 12 | 3/01/2013 | 2/28/2014 | $17.30 | $83,040.00 | $6,920.00 |
| 13 | 3/01/2014 | 2/28/2015 | $17.82 | $85,536.00 | $7,128.00 |
| 14 | 3/01/2015 | 2/29/2016 | $18.35 | $88,080.00 | $7,340.00 |
| 15 | 3/01/2016 | 2/28/2017 | $18.90 | $90,720.00 | $7,560.00 |

   A.   There shall be no increases in Annual Minimum Rent except as specifically set forth herein

Page 2

Village Marketplace S/C, Midlothian, VA
Construction Exhibit Add-1
EXHIBIT F TO HALLMARK LEASE.doc

B.  Tenant's Annual Minimum Rent, Ancillary Rent shall abate for the first three (3) full months immediately following the Rent Commencement Date.

C.  Percentage Rent: None

## 6. ANCILLARY RENTS:

A.  Common Area Maintenance Expenses, Real Estate Taxes, and other prorata shares shall be based on 100% of the Gross leasable area of the shopping center.

B.  Tenant's annual proportionate share of the CAM for the first full Lease Year shall not exceed $1.88 per square foot of Tenant's Floor Area, calculated on an annual basis.

C.  Any increase in Tenant's proportionate share of CAM shall not exceed, from year to year, 4% of Tenant's proportionate share of CAM for the prior year, excluding taxes and insurance.

D.  CAM shall not include any: (i) reserve fund contributions; (ii) expenditures for replacements, improvements or alterations which are capital in nature pursuant to generally accepted accounting principles; (iii) costs not attributable to the normal operation and maintenance of the Common Areas; (iv) debt service on the Shopping Center; (v) cost of removal or abatement of hazardous materials from within, upon or beneath the Shopping Center; (vi) insurance claims not covered by Landlord's insurance policies whether such claims resulted from Landlord's deductibles under such policies or from Landlord's underinsuring an insurable risk; (vii) the cost of the initial Shopping Center improvements or replacement thereof; or (viii) management and/or administrative charges, costs or fees, except to the extent the 15% administrative fee specifically set forth hereinbelow is applied thereto. Nor may Landlord bill Tenant for the foregoing items pursuant to any other provision of the Lease.

E.  Administration fees and/or management charge shall be a part of CAM and shall not exceed Fifteen (15%) percent on CAM expenses excluding taxes, utilities and insurance.

F.  Tenant may audit Landlord's books and records pertaining to any costs included in Ancillary Rents, any excess charges shall be reimbursed to Tenant and if the amount charged Tenant is 3% or more than the actual costs then Landlord shall pay the cost of the audit.

G.  Landlord must notify Tenant of any year-end adjustments of Ancillary costs within 18 months or any such deficiency shall be deemed waived and discharged.

## 7. GROSS SALES:
The term "Gross Sales" shall mean and include all sales of merchandise of every kind and character and all revenues from all departments, merchandise, services and sources made from the Premises, both for cash and on credit, including all orders taken and merchandise sold from the Premises and filled or delivered from any other store or place and including any revenue from any licensee or concessionaire doing business on the Premises; provided, however, if Tenant offers a catalogue or internet service to its customers and Tenant does not operate, own or control the business engaged in such catalogue business or internet service, any orders placed by customers for merchandise in such catalogue or on the internet shall be excluded from Tenant's Gross Sales to the extent Tenant does not receive payment therefor; provided, further, any service fee received by Tenant for processing

Page 3

such catalogue or internet sale shall be included in Tenant's Gross Sales. It being the intention of the parties that the price of any merchandise ordered from any catalogue or the internet merely as a convenience to Tenant's customers shall not be included in Tenant's Gross Sales provided Tenant is not required to recognize such sale as part of its income under any state or federal income or sales tax laws and such sales are for the convenience of Tenant's customers and not for the purpose of avoiding any Percentage Rent or Substitute Rent due Landlord under the Lease. Further, the following items shall also be excluded from Gross Sales: (i) the selling price of merchandise delivered to customers in exchange for merchandise returned by customers to the extent that no additional consideration is paid therefor; (ii) the selling price of merchandise returned without exchange and refunds or credits allowed on returns of merchandise or customer complaints; (iii) the amount of any tax collected by Tenant as and for federal, state, municipal or local sales, use or excise taxes which Tenant is required to pay in connection with the sales of merchandise or services, whether such taxes are added separately to the selling price; (iv) purchases by employees at the Premises of merchandise on a discount basis, which in no event shall exceed five percent (4%) of Tenant's Gross Sales from the Premises in any Calendar Year; (v) the transfer or exchange of merchandise between the Premises and any other store or stores of Tenant or any affiliate of Tenant to the extent made for the convenient operation of Tenant's business and not for the purpose of evading the payment of Percentage Rent or Substitute Rent hereunder; (vi) returns of merchandise to shippers, suppliers or manufacturers; (vii) receipts from sales or other disposition of fixtures, furnishings, equipment or supplies not constituting stock in trade for sale to the general public or the bulk sale or transfer of Tenant's inventory, fixtures or personal property.

**8. ADVERTISING, MERCHANTS ASSOCIATION AND/OR PROMOTIONAL FUND:** Fees generated by any advertising program shall not be used to advertise the presence at the Shopping Center of any one or more specific occupants, but, instead, shall be used to promote the Shopping Center as a whole. The Merchant's Association Fee at Village Marketplace will be $25.00 a quarter or $100.00 per year with no planned increases.

**9.OPENING CO-TENANCY**: The "Opening Co-Tenancy" is the requirement that the following tenants are open for business at the Shopping Center on a continuous basis: (i) Food Lion and (ii) other bona fide retail tenants occupying at least 80% of the total gross leasable area of the Shopping Center (excluding from the denominator Tenant's Floor Area and the floor area occupied or to be occupied by CVS). In calculating the floor area of bona fide retail tenants that are open in the Shopping Center, the floor area of the Major Tenants, Tenant's Premises, Temporary Tenants, movie or theatre tenants, office tenants and bank tenants shall be excluded. "Temporary Tenant" shall mean any store or business in the Shopping Center operated by a tenant, licensee or occupant under a lease, license or agreement (oral or written) having a term of less than one (1) year or any store or business which is not required to remain open to the public for business for twelve (12) or more consecutive months. If the Opening Co-Tenancy is not fully satisfied prior to the scheduled Rent Commencement Date, the Rent Commencement Date and Tenant's obligation and complete Tenant's Work shall be deferred until the Opening Co-Tenancy is fully satisfied. Notwithstanding the foregoing, "Temporary Tenant" will also not include those tenants whose long-term lease is concluding its term.

**10. MAJOR TENANT CO-TENANCY**: The "Major Tenant Co-Tenancy" is the requirement that the Major Tenants, Food Lion, is open for business at the Shopping Center on a continuous basis. If, at any time during the Lease Term, the Major Tenant Co-Tenancy is not fully satisfied, until such closed Major Tenant is replaced with a Major Tenant of similar size, use, scope and quality which is open and operating in the Shopping Center on a continuous basis, Minimum Rent shall abate, and Tenant shall

**Page 4**

pay "Substitute Rent" equal to the lesser of: (i) 4% of Tenant's monthly Gross Sales; or (ii) monthly Minimum Rent otherwise due at that time. Substitute Rent shall be paid, together with Ancillary Rents, within 25 days after the expiration of the month in which the sales occurred. If the Major Tenant Co-Tenancy remains unsatisfied for more than 180 days then Tenant may, at anytime thereafter, terminate the Lease by giving Landlord 30 days' written notice, and the parties shall be relieved of any further obligations under the Lease.

**11. SPECIALTY STORE CO-TENANCY: The** "Specialty Store Co-Tenancy" is the requirement that at least 60% of the gross leasable area of the Shopping Center (excluding from the denominator the area occupied or to be occupied by Food Lion and Tenant's Floor Area) is occupied by bona fide permanent retail tenants which are open for business at the Shopping Center on a continuous basis. In calculating the floor area of bona fide retail tenants that are open in the Shopping Center, the floor area of the Major Tenants, Tenant's Premises, Temporary Tenants, movie or theatre tenants, office tenants and bank tenants shall be excluded. "Temporary Tenant" shall mean any store or business in the Shopping Center operated by a tenant, licensee or occupant under a lease, license or agreement (oral or written) having a term of less than one (1) year or any store or business which is not required to remain open to the public for business for twelve (12) or more consecutive months. Upon the request of Tenant, Landlord shall provide Tenant with all applicable documentation necessary to support the calculation of the monthly Occupancy Percentage of the Shopping Center. If at any time during the Lease Term, the Specialty Store Co-Tenancy is not fully satisfied, then, until the Specialty Store Co-Tenancy is fully satisfied, Minimum Rent shall abate, and Tenant shall pay "Substitute Rent" equal to the lesser of: (i) 4 % of Tenant's monthly Gross Sales; or (ii) monthly Minimum Rent otherwise due at that time. Substitute Rent shall be paid, together with Ancillary Rents, within 25 days after the expiration of the month in which the sales occurred. If the Specialty Store Co-Tenancy remains unsatisfied for more than 180 days or if at any time during the Lease Term less than 50 % of the gross leasable area in the Shopping Center (excluding the area occupied or to be occupied by the tenants named above) is leased to bona fide permanent retail tenants which are open for business on a continuous basis, Tenant may, at anytime thereafter, terminate the Lease by giving Landlord 30 days' prior written notice, in which event, Landlord shall reimburse Tenant within 30 days of Landlord's receipt of notice, for the cost of leasehold improvements installed in the Premises at the cost of Tenant (if any), and the parties shall be relieved of any further obligations under the Lease.

**12. TENANTS RIGHT TO TERMINATION:** If Tenant's Gross Sales from its business in the Premises for the period from 25th month through 36th month do not exceed $400,000. Tenant may terminate the Lease by giving Landlord 90 days' written notice.

**13. USE CLAUSE**: The business conducted on the Premises shall be that of a licensed Hallmark card shop, which features and promotes primarily Hallmark brand products, and which does business under a trade name that includes the "Hallmark" name and which may sell at retail some or all of the following products: greeting cards, stationery, party supplies, gift wrap, candles, Christmas ornaments, albums, candy, T-shirts, trend items, puzzles, "Crayola" products, crafts, writing instruments, engraving, gift books, photograph frames, gifts, flowers and flower services, any product or service sold or marketed by Hallmark Cards, Inc., and such items normally sold in social expression shops. Tenant may install a computer(s); printer(s), monitor(s) and/or other peripheral equipment used for preparation of Tenant's "Hallmark Creations" products and/or other computerized social expression products. Tenant shall also have the right to sell stamps, and offer party planning services. Tenant may install a monitor used for preparation of Tenant's "Birthday/Anniversary Times" greeting and/or "Personalize It" greetings.

Page 5

Village Marketplace S/C, Midlothian, VA
Construction Exhibit Add-1
EXHIBIT F TO HALLMARK LEASE.doc

**14.USE RESTRICTIONS**: A "Use Restriction Violation" occurs upon either or both of the following events:  (1) any tenant or occupant in the Shopping Center carries any Restricted Item; or (2) the Shopping Center contains a Temporary Store that sells any Restricted Item. "Restricted Items" mean and include any of the following products: Christmas ornaments, greeting cards, gift wrap and party supplies.  "Temporary Store" means any store or business in the Shopping Center operated by a tenant, licensee or occupant under a lease, license or agreement (oral or written) having a term of less than one year or any store or business which is not required by lease or license agreement to remain open to the public for business for 12 or more consecutive months.    The term "Shopping Center" includes and consists of any contiguous land owned, leased or otherwise controlled or managed, either directly or indirectly, by Landlord or any affiliate of Landlord.

During any Use Restriction Violation occurrence, Annual Minimum Rent shall abate, and Tenant shall pay, in lieu thereof, Alternate Rent equal to the lesser of (i) 50% of Tenant's Monthly Minimum Rent or (ii) 4% of Tenant's monthly Gross Sales. "Alternate Rent" shall be paid, together with Ancillary Rents, within 25 days after the end of the month in which the sales were generated.    Such Alternate Rent shall commence upon Tenant's notification to Landlord of a violation of the Use Restriction and shall continue until the earlier of the date that (i) the violation of the Use Restriction no longer exists or (ii) Tenant terminates the Lease as permitted herein.  In addition, upon the occurrence of a Use Restriction Violation, Tenant may (in addition to any other rights it may have) terminate this Lease upon delivery of 90 days' prior written notice to Landlord.  In which event, Landlord shall reimburse Tenant within 30 days of Landlord's receipt of written notice for the unamortized value (using a straight-line amortization schedule over the unextended Lease Term) of the leasehold improvements installed in the Premises at the cost of Tenant (if any), and Landlord and Tenant shall be relieved of any further obligations hereunder.

The Use Restriction does not apply to the following tenant, Food Lion, or (a) any existing tenant that carries, in the aggregate, less than 20 lineal feet of Restricted Items (each spinner rack containing any Restricted Item shall be equal to six lineal feet); or (b) Hallmark Cards, Inc., or any of its subsidiaries or affiliates, or any licensee approved to sell Hallmark products by Hallmark Cards, Inc. or any of its subsidiaries or affiliates.

**15.  RELOCATION**:  The size and/or location of the Premises may not be changed.

**16.  PAD BUILDINGS / KIOSKS: Landlord** will not construct any additional freestanding or pad buildings that are not shown on the Shopping Center site plan attached to the Lease. Landlord will not install any permanent or temporary kiosk or other obstruction within 30 feet of the Premises unless such kiosk or obstruction is shown on the Shopping Center site plan attached to the Lease.

**17.  LANDLORD'S SECURITY:**

    A.   No security deposit is required of Tenant.

    B.   No personal guarantee of the Lease is required.

**18.  RADIUS RESTRICTION:** No radius or any other restriction which prohibits, limits or penalizes the operation of other businesses by the Tenant or Hallmark Cards, Incorporated, or either of their

**Page 6**

Village Marketplace S/C, Midlothian, VA
Construction Exhibit Add-1
EXHIBIT F TO HALLMARK LEASE.doc

subsidiaries, affiliate, successors, heirs or assigns is enforceable against Tenant pursuant to the terms of this Lease.

**19. SUBLEASE OR ASSIGNMENT:** Tenant, or its permitted assigns, may assign the Lease or sublet the Premises without Landlord's consent to Hallmark Cards, Incorporated, or any other corporation or partnership owned or controlled by Hallmark Cards to a person or entity approved as a Hallmark licensee by Hallmark Cards, Incorporated without any fee or proceeds due Landlord and in such event, Tenant shall be relieved of any further liability under the Lease. Any option(s) to extend the Lease Term shall remain in full force and effect as to any permitted assignee or subtenant. Landlord may not unreasonably withhold or delay its consent to any other transfer, assignment or subletting, when such consent is required

**20. HAZARDOUS MATERIALS:** Landlord shall be responsible for any hazardous materials <u>not installed by Tenant</u> and indemnify and defend Tenant, its subtenants and assignees and their respective agents, employees, officers and directors from and against any and all claims, damages, actions, awards, fines, clean-up costs, expenses, attorneys' fees and court costs which arise as a result of any claim or finding that hazardous materials are present within, upon or beneath the Shopping Center or Premises.

**21. SIGNAGE**: Subject to the restrictions of the local governmental authorities, Landlord shall permit the use of the Hallmark Gold Crown signage, containing the colors and design on the attached Exhibit, or at Tenant's sole option, such other signage as may be consistent with Tenant's trade name, as provided in the Lease. The length of such sign may be up to 80% of the width of the storefront of the Premises. If the Landlord's exterior sign criteria specifies a letter height of less than two feet, Landlord shall permit the upper case "H" and lower case "k" in the word "Hallmark" on Tenant's sign to be of a height in excess of the specified letter height. If Landlord permits any Shopping Center tenant occupying premises which are equal to or less than the area of the Premises to place its name and/or logo on the Shopping Center pylon sign or pole structure, Tenant shall also have the right to place on such Shopping Center pylon sign or pole structure, or on one which may be constructed by Landlord, either the Hallmark Gold Crown signage, or signage consistent with Tenant's trade name on a double-faced panel. In addition, Tenant shall have the right to erect temporary seasonal banners advertising such events as grand openings and holidays on the exterior of the Premises (including the facade), provided such banners shall not be erected on more than five holiday drive periods during any Lease Year, and in no event for a period in excess of seven days on each such occasion.

**22. HOLD OVER:** Tenant shall not require Landlord's consent to hold over if Tenant and Landlord are negotiating in good faith for a renewal or extension of this Lease, in which case the amount of rent shall be the same as the last month of the term of this Lease.   If such negotiations are terminated without the execution of a new lease or extension of this Lease, Tenant shall vacate the premises within sixty days after the negotiations are terminated.

**23. LEASEHOLD IMPROVEMENTS:**

   A.   Landlord shall construct the Premises in accordance with Tenant's plans and specifications and the attached Exhibit "C."

   B.   Landlord shall deliver the Premises in compliance with all-applicable laws, codes, regulations and insurance requirements.

Page 7

Village Marketplace S/C, Midlothian, VA
Construction Exhibit Add-1
EXHIBIT F TO HALLMARK LEASE.doc

C.   Landlord may not install any conduits, pipes, utility lines, columns, vents, ducts, flues, sprinkler mains or valves, support walls or expansion joints or other utility equipment or apparatus within the Premises, other than those presently existing or shown on Tenant's plans and specifications, except that Landlord may install or construct such items above the ceiling, below the floor or behind existing demising walls so long as Landlord promptly, at Landlord's expense, restores any damage to the Premises caused thereby and does not unreasonably interfere with Tenant in the conduct of Tenant's business.  During any period of unreasonable interference with Tenant's ability to conduct business in the Premises, Tenant's rental obligations shall abate in their entirety.

D.   To the extent that the heating, venting and air conditioning ("HVAC"), mechanical and electrical systems servicing the Premises are not warranted for at least the initial Lease Term, Landlord warrants the major components of the HVAC system (i.e. motors, condensers, etc.) for the initial Lease Term against defect or failure and shall replace or repair the same at Landlord's sole cost and expense. Tenant will be responsible for no more than one thousand ($1,000.00) on an annual basis for the repair or replacement of the HVAC. Any remaining HVAC on an annual basis to be the responsibility of the Landlord.

Please be advised that until such time as fully executed counterparts of the lease document have been delivered by and between the parties, there can not and shall not be any lease agreement or obligation upon which either party may rely.

<u>If all is acceptable approve by signing this letter and returning. After approval by Hallmark Retail Real Estate, You may prepare an addendum. If you need additional information or have any comments please advise.</u>

Time is of the essence in completing our discussions. My company's time line is to complete our discussions within the next week.

Please be advised that until such time as fully executed counterparts of the lease document have been delivered by and between the parties, there can not and shall not be any lease agreement or obligation upon which either party may rely.

Sincerely,

> Acknowledged and Accepted
>
> this _24_ day of _September_, 2001,
>
> by _[signature] VILLAGE ASSOCIATES LLC_

Lizanne Kile
**Hallmark Marketing Corporation**
Retail Real Estate


Attachment:   Construction Exhibit C-1
              Sign Exhibit


**Page 8**

Village Marketplace S/C, Midlothian, VA
Construction Exhibit Add-1
EXHIBIT F TO HALLMARK LEASE.doc

cc: Phil Maxwell
    Rhonda Wydeven
    Steve Barnett

## Construction Exhibit C

### DEFINITION OF LANDLORD'S WORK AND TENANT'S WORK

Landlord shall construct within the Premises the improvements set forth in this Exhibit C. The responsibilities and obligations as between Landlord and Tenant shall be as hereinafter set forth. Landlord will deliver the Premises to Tenant for Tenant's work by giving Tenant no less than fifteen (15) days prior written notice of the date that Landlord expects to substantially complete Landlord's work. Tenant shall complete Tenant's final inspection of the Premises within 14 days after the completion of Landlord's work. Tenant shall submit a punchlist to Landlord within said 14 day period, which punchlist shall set forth (i) items that require additional Landlord work, (ii) defective work by Landlord or (iii) any other matters requiring Landlord's attention. Landlord shall complete, correct and/or repair the items set forth on the punchlist within 7 days of receipt thereof.

All work designated as Landlord's work shall be completed by Landlord within sixty (60) days from the later of (i) the date Landlord receives Tenant's Plans or (ii) the date of execution and delivery of the Lease by both parties. Tenant shall submit Tenant's Plans within sixty (60) days of the later of (i) full lease execution or (ii) receipt of Landlord's floor plans for the Premises. Landlord shall submit to Tenant a "Work Schedule" setting forth the dates Landlord anticipates to (i) commence Landlord's Work, (ii) complete each of the major portion of the items set forth under this Exhibit, and (iii) complete and deliver the Premises to Tenant pursuant to the Lease and this Exhibit. Landlord's Work Schedule shall be delivered to Tenant at least 7 days prior to the anticipated construction start date. Landlord shall notify Tenant of any variance from such schedule. If Landlord fails to complete Landlord's Work and deliver the Premises to Tenant within the time period set forth in Landlord's Work Schedule, as the same may, from time to time, be modified, Tenant shall be entitled, as liquidated damages for the losses and additional expenses incurred by Tenant due to such failure by landlord, to the following abatements of Minimum Rent: (i) for the first 30 days past the date set forth in Landlord's Work Schedule, Tenant shall be entitled to one (1) day's abatement of Minimum Rent for each day past the date set forth in Landlord's Work Schedule that Landlord fails to deliver the Premises as required hereunder and (ii) after the 31st day and each subsequent day past the date set forth in Landlord's Work Schedule, Tenant shall be entitled to two (2) day's abatement of Minimum Rent for each day from and after the eighth day past the date set forth in Landlord's Work Schedule that Landlord fails to deliver the Premises as required hereunder. Due to the difficulty in ascertaining the extent and value of Tenant's damages and losses, the parties agree that the foregoing liquidated damages are fair and reasonable. To be effective, notice of any Landlord revisions of the Work Schedule must be given to Tenant at least 7 days prior to the date Landlord originally anticipated completion of Landlord's Work.

NOTE: Tenant's prototype plans are generic in nature, not site specific. Tenant's prototype plans show the kind of construction and amount of construction typically required. Tenant's Plans

**Page 9**

show the store for Landlord's specific location.  The exact amount Landlord's work vary from store to store.  The two sets of plans are different and were developed for different purposes. Landlord's work for Tenant shall be done in accordance with the Tenant's Plans and the quality and detail shown on Tenant's prototype plans.

## LANDLORD'S WORK

Landlord shall, at Landlord's sole cost and expense, complete the construction, installation and erection of the following fixtures and/or improvements in and upon the Premises.

1. GENERAL REQUIREMENTS.  All work shall be in accordance with all building codes, and/or requirements of organizations having jurisdictional authority.  All work shall be completed in professional and workmanlike manner.  If required for Landlord to complete Landlord's Work, Landlord shall obtain all architectural and engineering drawings, calculations, and specifications required to build out Tenant's space as described below.

2. BUILDING SHELL.  Building shell shall include but not limited to the following:
   a. Complete structural building system with columns, beams, joists, (exposed construction) with all required fireproofing and recommended insulation as required by location.
   b. Complete waterproof roof and drainage system.
   c. Finished building exterior with flat functional concrete walk.
   d. Metal back door with frame, dead bolt lock, hardware and ramp for disabled persons.
   e. Storefront, including glazing must be acceptable to tenant. Storefront shall be comprised of fixed glass with aluminum frame and a double door as shown on Tenant's Plans.
   f. Minimum 4" thick, level, without holes, concrete floor slab.
   g. Demolition of all previous tenant improvements which will not be used by Tenant.
   h. Fire extinguisher(s) and/or smoke detector(s) as required by codes.

3. ELECTRICITY AND NATURAL GAS.  All electricity and gas (if needed for store heating) stubbed to Premises, connected to all meters and all hook-up, turn-on and/or tap fees required to initiate service shall be paid in full.  Service to be on individual meters.

4. WALLS & DOORS.  All walls partitions shall be covered with 5/8" gypsum wallboard taped, spackled, sanded and ready for finished.  Interior walls shall not have protrusions.
   a. Finish all perimeter walls to the underside of roof for 1-hour fire rating or per code.
   b. Locate and finish all partitions, including stockroom wall, columns and cashwrap wall, as shown on Tenant's Plans.  All walls shall be painted/ except where covered by Tenant's wall fixtures.
   d. Construct fire corridors as required by code.
   e. Interior doors shall be wood with wood frames

5. CEILING.  Suspended acoustical tile ceiling at Nine (9) feet, four (4") inches) or as shown on Tenant's site-specific plans.  Suspended T-Bar ceiling grid using acceptable quality ceiling tile.  Ceiling to have a 2x4-foot grid.

**Page 10**

Village Marketplace S/C, Midlothian, VA
Construction Exhibit Add-1
EXHIBIT F TO HALLMARK LEASE.doc

6. PLUMBING & WATER. Water and sewer service stubbed to premises and connected to meter, if required.
   a. Hot and cold toilet room facilities, as per code. with mirror, one paper towel dispenser and one toilet paper holder. All fixtures and floor drain per code.
   b. Painted, smooth finished gypsum board walls and ceiling or as required by code.
   c. A switched exhaust fan.
   d. A two foot fluorescent light fixture with cover and one duplex receptacle.
   e. All fixtures required to accommodate individuals with disabilities.

7. FIRE SPRINKLER. Install complete system, as required by code.

8. HVAC. An air conditioning/heating system with all ductwork will be provided:
   a. Air conditioning for Tenant's floor area shall be sufficient quantity and size to comply with ASHRAE design standards for the Premises location. (In most locations, the rate of one ton for each 400 square feet of floor space is sufficient.)
   b. Heating as required maintaining a 70-degree temperature throughout the Premises.
   c. Provide programmable set back thermostat for HVAC equipment.

9. ELECTRICAL. Electrical service connected to an individual meter and shall include:
   a. Electrical service and panel(s) at a Tenant approved location with a min. 200 amps for 277/480 Volts (or min. 400 amps 120/208 3 phase, 4 wire for stores of 4500 sq. ft. or more) 3 phase, 4 wire, with a sufficient number of circuit breakers (minimum 72) to satisfy the requirements of the Tenant.
   b. If electrical service is 277/480 volt, then provide a (min. 30 KVA) dry type transformer, with a sufficient number of circuit breakers (minimum 72) to satisfy the requirements of the Tenant. In no event shall the amount of power provided by the Landlord be less than as required by the National Electric Code.
   c. Provide three lamp recessed Lithonia lighting fixtures or equal with electronic ballast. Typically, one Three (3) tube fixture is required (or at Retailer's option 4 tube Prismatic) one per (approximately) 64 square feet with 34 watt, 4100 Kelvin temperature lamps as shown on Tenant's site specific plans or provide credit for such.
   d. Provide code required emergency and exit lights which do not interfere with Tenant's wall fixtures.
   e. Provide conduit, wiring as required to the exterior signband for exterior storefront sign and/or canopy sign.
   f. Install wall duplex receptacles per Tenant's Plans in sales area & 4 outlets in stockroom area.
   g. Electrical requirements of store fixturing as shown on Tenant's Plans. The fixturing will require one of the following: (A) Install one (1) Reloc Conversion Module #CM-120-E21 in handy box at 89" from finished floor per 120 continual feet of wall (Two (2) twenty amp circuits are required per Conversion Module), or (B) Install a duplex outlet every 8 feet on wall at height shown on Tenant's site specific plans.
   i. Provide a 7-day time clock for storefront sign and lighting control.
   j. Telephone service conduit to premises. Landlord shall provide sufficient telephone lines to the Shopping Center. A minimum of four lines shall be reserved for the Tenant.
   k. If Tenant's Preliminary Plans show an island cashwrap, then Landlord shall provide recessed isolated ground floor duplex receptacles in the sales area as shown on Tenant's

**Page 11**

Preliminary Plans with circuit locks if allowed by code. Landlord shall provide a minimum 3/4 inch conduit from administrative POS cash register to each of the other POS cash registers as shown on Tenant's Preliminary Plans.  Landlord shall provide a 1-½ inch conduit from the administrative POS cash register to the backroom PC location as shown on Tenant's Preliminary Plans. Landlord shall leave pull strings in conduits and diagram of how conduits are run.  The conduit shall be a straight run in the slab from administrative location to each of the other locations.

l.  If tenant's plans show a wall cashwrap, then Landlord shall provide a minimum 1-1/2 inch conduit from the location on the wall next to the administrative POS cash register to the backroom PC location as shown on Tenant's Preliminary Plans. Landlord shall leave pull strings in conduits and diagram of how conduits are run

m.  Landlord shall provide four- (4) foot white chain hung commercial striplite fixtures in the stockroom.

10.  Subject to approval by Chesterfield County, Landlord will install fabric awning on the exterior of the store front.

**Page 12**



**HALLMARK MARKETING CORPORATION**
6163 Osprey Ridge Dr.
Mt. Airy, MD 21771
Phone 301-829-8862
Fax 301-829-8863
Lkile1@Hallmark.com

**Lizanne Kile**
Area Real Estate & Site Development Director



September 12, 2001

*Exhibit F*

General Land Company of Virginia, Inc.
Richard Johnson
P.O. Box 5204
Richmond, VA 23220

RE: Village Marketplace
Midlothian, VA

Dear Rich,

Enclosed you will find the proposal for the 4800 square footage location currently occupied by video 2000.

The agreed upon business terms and conditions will be reviewed and approved by our retailer, retailers attorney and Hallmark Marketing Corporation.

The comprehensive nature of this proposal is necessary to insure that we address all the business issues with you as well as, provide a thorough location review for a prospective retailer.

*Please consider our offer:*

1. **DESCRIPTION OF PREMISES**: (The "Premises")
   A.  Located in Village Marketplace, Shopping Center, Space # 5
   B.  Area of Midlothian,
   C.  State of Virginia,
   D.  Containing a total square footage of approximately 4800 square feet.
   E.  Consisting of at least 80 feet of frontage by approximately 60 feet in depth

2. **LEASE TERM**:  The Lease Term shall be five (5) "Lease Years."  The first Lease Year will be from the Rent Commencement Date through the following February 28 (or 29) plus the next 12

Village Marketplace, Midlothian, Virginia

consecutive months.  The succeeding Lease Years will be the successive 12 month periods thereafter, each of which shall commence on March 1 and expire on the last day of February.

3. **RENT COMMENCEMENT:**

    A.    The Rent Commencement Date and Tenant's obligations to pay rents and charges under the Lease shall occur on the earlier of (1) the date Tenant opens the Premises for business to the public, or (2) 90 days after the last to occur of: (i) full execution and delivery of the Lease by Landlord and Tenant; (ii) Landlord's substantial completion of Landlord's work in the Premises and delivery of Premises to Tenant (delivery of Premises to be effective fifteen (15) days from Tenant's receipt of Landlord's notice of delivery); (iii) Landlord's approval of Tenant's plans and specifications; and (iv) receipt by Landlord for Tenant of all building permits and other governmental approvals necessary to start construction of Tenant's work.

    B.    If the Rent Commencement Date occurs during the months of, November or December, Tenant may elect to delay the Rent Commencement Date until the earlier of:  (i) January 15 or (ii) the date Tenant opens for business in the Premises.

4. **RENEWAL OPTIONS:**

    A.    Tenant may extend the Lease Term for two (2) additional term(s) of 5 Lease Years at the Annual Minimum Rent (or Substitute Rent, if applicable) set forth in the Lease.  Tenant shall notify Landlord in writing of Tenant's intention to exercise any option at least six months prior to the expiration of the then current Lease Term.

5. **ANNUAL MINIMUM RENT:**

| Rent Payment Periods | Begins | Ends | Annual Rent Rate | Annual Rent | Monthly Rent |
|---|---|---|---|---|---|
| Rent Commencement Date Through | | 2/28/2003 | $12.50 | $60,000.00 | $5,000.00 |
| 2 | 3/1/2003 | 2/29/2004 | $12.88 | $61,824.00 | $5,152.00 |
| 3 | 3/1/2004 | 2/28/2005 | $13.26 | $63,648.00 | $5,304.00 |
| 3 | 3/1/2005 | 2/28/2006 | $13.66 | $65,568.00 | $5,464.00 |
| 4 | 3/1/2006 | 2/28/2007 | $14.07 | $67,536.00 | $5,628.00 |
| 5 | 3/1/2007 | 2/29/2008 | $14.49 | $69,552.00 | $5,796.00 |
| 6 | 3/1/2008 | 2/28/2009 | $15.37 | $73,776.00 | $6,148.00 |
| 7 | 3/1/2009 | 2/28/2010 | $15.83 | $75,984.00 | $6,332.00 |
| 8 | 3/1/2010 | 2/28/2011 | $16.31 | $78,288.00 | $6,524.00 |
| 9 | 3/1/2011 | 2/29/2012 | $16.80 | $80,636.64 | $6,719.72 |
| 10 | 3/01/2012 | 2/28/2013 | $17.30 | $83,040.00 | $6,920.00 |
| 11 | 3/01/2013 | 2/28/2014 | $17.82 | $85,536.00 | $7,128.00 |
| 12 | 3/01/2014 | 2/28/2015 | $18.36 | $88,128.00 | $7,344.00 |
| 13 | 3/01/2015 | 2/29/2016 | $18.91 | $75,640.00 | $6,303.00 |
| 14/15 | 3/01/2016 | 2/28/2017 | $19.48 | $93,504.00 | $7,792.00 |
| 15 | 3/01/2017 | 2/28/2018 | $20.06 | $96,288.00 | $8,024.00 |

*(handwritten annotations: 14.92-?, 15.37, 15.83, 16.30, 16.80, 17.30, 17.82, 18.35, 18.90)*

    A.    There shall be no increases in Annual Minimum Rent except as specifically set forth herein

Page 2

B.  Tenant's Annual Minimum Rent, Ancillary Rent shall abate for the first three (3) full months immediately following the Rent Commencement Date.

C.  Percentage Rent: None

## 6. ANCILLARY RENTS:

A.  Common Area Maintenance Expenses, Real Estate Taxes, and other prorata shares shall be based on 100% of the Gross leasable area of the shopping center.

B.  Tenant's annual proportionate share of the CAM for the first full Lease Year shall not exceed $1.88 per square foot of Tenant's Floor Area, calculated on an annual basis.

C.  Any increase in Tenant's proportionate share of CAM shall not exceed, from year to year, 4% of Tenant's proportionate share of CAM for the prior year, excluding taxes and insurance.

D.  CAM shall not include any: (i) reserve fund contributions; (ii) expenditures for replacements, improvements or alterations which are capital in nature pursuant to generally accepted accounting principles; (iii) costs not attributable to the normal operation and maintenance of the Common Areas; (iv) debt service on the Shopping Center; (v) cost of removal or abatement of hazardous materials from within, upon or beneath the Shopping Center; (vi) insurance claims not covered by Landlord's insurance policies whether such claims resulted from Landlord's deductibles under such policies or from Landlord's underinsuring an insurable risk; (vii) the cost of the initial Shopping Center improvements or replacement thereof; or (viii) management and/or administrative charges, costs or fees, except to the extent the 15% administrative fee specifically set forth hereinbelow is applied thereto.  Nor may Landlord bill Tenant for the foregoing items pursuant to any other provision of the Lease.

E.  Administration fees and/or management charge shall be a part of CAM and shall not exceed Fifteen (15%) percent on CAM expenses excluding taxes, utilities and insurance.

F.  Tenant may audit Landlord's books and records pertaining to any costs included in Ancillary Rents, any excess charges shall be reimbursed to Tenant and if the amount charged Tenant is 3% or more than the actual costs then Landlord shall pay the cost of the audit.

G.  Landlord must notify Tenant of any year-end adjustments of Ancillary costs within 18 months or any such deficiency shall be deemed waived and discharged.

**7. GROSS SALES:**  The term "Gross Sales" shall mean and include all sales of merchandise of every kind and character and all revenues from all departments, merchandise, services and sources made from the Premises, both for cash and on credit, including all orders taken and merchandise sold from the Premises and filled or delivered from any other store or place and including any revenue from any licensee or concessionaire doing business on the Premises; provided, however, if Tenant offers a catalogue or internet service to its customers and Tenant does not operate, own or control the business engaged in such catalogue business or internet service, any orders placed by customers for merchandise in such catalogue or on the internet shall be excluded from Tenant's Gross Sales to the extent Tenant does not receive payment therefor; provided, further, any service fee received by Tenant for processing

Page 3

such catalogue or internet sale shall be included in Tenant's Gross Sales. It being the intention of the parties that the price of any merchandise ordered from any catalogue or the internet merely as a convenience to Tenant's customers shall not be included in Tenant's Gross Sales provided Tenant is not required to recognize such sale as part of its income under any state or federal income or sales tax laws and such sales are for the convenience of Tenant's customers and not for the purpose of avoiding any Percentage Rent or Substitute Rent due Landlord under the Lease. Further, the following items shall also be excluded from Gross Sales: (i) the selling price of merchandise delivered to customers in exchange for merchandise returned by customers to the extent that no additional consideration is paid therefor; (ii) the selling price of merchandise returned without exchange and refunds or credits allowed on returns of merchandise or customer complaints; (iii) the amount of any tax collected by Tenant as and for federal, state, municipal or local sales, use or excise taxes which Tenant is required to pay in connection with the sales of merchandise or services, whether such taxes are added separately to the selling price; (iv) purchases by employees at the Premises of merchandise on a discount basis, which in no event shall exceed five percent (4%) of Tenant's Gross Sales from the Premises in any Calendar Year; (v) the transfer or exchange of merchandise between the Premises and any other store or stores of Tenant or any affiliate of Tenant to the extent made for the convenient operation of Tenant's business and not for the purpose of evading the payment of Percentage Rent or Substitute Rent hereunder; (vi) returns of merchandise to shippers, suppliers or manufacturers; (vii) receipts from sales or other disposition of fixtures, furnishings, equipment or supplies not constituting stock in trade for sale to the general public or the bulk sale or transfer of Tenant's inventory, fixtures or personal property.

**8. ADVERTISING, MERCHANTS ASSOCIATION AND/OR PROMOTIONAL FUND:** Fees generated by any advertising program shall not be used to advertise the presence at the Shopping Center of any one or more specific occupants, but, instead, shall be used to promote the Shopping Center as a whole. The Merchant's Association Fee at Village Marketplace will be $25.00 a quarter or $100.00 per year with no planned increases.

**9. OPENING CO-TENANCY:** The "Opening Co-Tenancy" is the requirement that the following tenants are open for business at the Shopping Center on a continuous basis: (i) Food Lion and (ii) other bona fide retail tenants occupying at least 80% of the total gross leasable area of the Shopping Center (excluding from the denominator Tenant's Floor Area and the floor area occupied or to be occupied by CVS). In calculating the floor area of bona fide retail tenants that are open in the Shopping Center, the floor area of the Major Tenants, Tenant's Premises, Temporary Tenants, movie or theatre tenants, office tenants and bank tenants shall be excluded. "Temporary Tenant" shall mean any store or business in the Shopping Center operated by a tenant, licensee or occupant under a lease, license or agreement (oral or written) having a term of less than one (1) year or any store or business which is not required to remain open to the public for business for twelve (12) or more consecutive months. If the Opening Co-Tenancy is not fully satisfied prior to the scheduled Rent Commencement Date, the Rent Commencement Date and Tenant's obligation and complete Tenant's Work shall be deferred until the Opening Co-Tenancy is fully satisfied. Notwithstanding the foregoing, "Temporary Tenant" will also not include those tenants whose long-term lease is concluding its term.

**10. MAJOR TENANT CO-TENANCY:** The "Major Tenant Co-Tenancy" is the requirement that the Major Tenants, Food Lion, is open for business at the Shopping Center on a continuous basis. If, at any time during the Lease Term, the Major Tenant Co-Tenancy is not fully satisfied, until such closed Major Tenant is replaced with a Major Tenant of similar size, use, scope and quality which is open and operating in the Shopping Center on a continuous basis, Minimum Rent shall abate, and Tenant shall

Page 4

pay "Substitute Rent" equal to the lesser of: (i) 4% of Tenant's monthly Gross Sales; or (ii) monthly Minimum Rent otherwise due at that time.  Substitute Rent shall be paid, together with Ancillary Rents, within 25 days after the expiration of the month in which the sales occurred. If the Major Tenant Co-Tenancy remains unsatisfied for more than 180 days then Tenant may, at anytime thereafter, terminate the Lease by giving Landlord 30 days' written notice, and the parties shall be relieved of any further obligations under the Lease.

**11. SPECIALTY STORE CO-TENANCY: The** "Specialty Store Co-Tenancy" is the requirement that at least 60% of the gross leasable area of the Shopping Center (excluding from the denominator the area occupied or to be occupied by Food Lion and Tenant's Floor Area) is occupied by bona fide permanent retail tenants which are open for business at the Shopping Center on a continuous basis. In calculating the floor area of bona fide retail tenants that are open in the Shopping Center, the floor area of the Major Tenants, Tenant's Premises, Temporary Tenants, movie or theatre tenants, office tenants and bank tenants shall be excluded. "Temporary Tenant" shall mean any store or business in the Shopping Center operated by a tenant, licensee or occupant under a lease, license or agreement (oral or written) having a term of less than one (1) year or any store or business which is not required to remain open to the public for business for twelve (12) or more consecutive months.  Upon the request of Tenant, Landlord shall provide Tenant with all applicable documentation necessary to support the calculation of the monthly Occupancy Percentage of the Shopping Center.  If at any time during the Lease Term, the Specialty Store Co-Tenancy is not fully satisfied, then, until the Specialty Store Co-Tenancy is fully satisfied, Minimum Rent shall abate, and Tenant shall pay "Substitute Rent" equal to the lesser of: (i) 4 % of Tenant's monthly Gross Sales; or (ii) monthly Minimum Rent otherwise due at that time. Substitute Rent shall be paid, together with Ancillary Rents, within 25 days after the expiration of the month in which the sales occurred.  If the Specialty Store Co-Tenancy remains unsatisfied for more than 180 days or if at any time during the Lease Term less than 50 % of the gross leasable area in the Shopping Center (excluding the area occupied or to be occupied by the tenants named above) is leased to bona fide permanent retail tenants which are open for business on a continuous basis, Tenant may, at anytime thereafter, terminate the Lease by giving Landlord 30 days' prior written notice, in which event, Landlord shall reimburse Tenant within 30 days of Landlord's receipt of notice, for the cost of leasehold improvements installed in the Premises at the cost of Tenant (if any), and the parties shall be relieved of any further obligations under the Lease.

**12. TENANTS RIGHT TO TERMINATION:** If Tenant's Gross Sales from its business in the Premises for the period from 25th month through 36th month do not exceed $400,000. Tenant may terminate the Lease by giving Landlord 90 days' written notice.

**13. USE CLAUSE:** The business conducted on the Premises shall be that of a licensed Hallmark card shop, which features and promotes primarily Hallmark brand products, and which does business under a trade name that includes the "Hallmark" name and which may sell at retail some or all of the following products: greeting cards, stationery, party supplies, gift wrap, candles, Christmas ornaments, albums, candy, T-shirts, trend items, puzzles, "Crayola" products, crafts, writing instruments, engraving, gift books, photograph frames, gifts, flowers and flower services, any product or service sold or marketed by Hallmark Cards, Inc., and such items normally sold in social expression shops. Tenant may install a computer(s); printer(s), monitor(s) and/or other peripheral equipment used for preparation of Tenant's "Hallmark Creations" products and/or other computerized social expression products. Tenant shall also have the right to sell stamps, and offer party planning services. Tenant may install a monitor used for preparation of Tenant's "Birthday/Anniversary Times" greeting and/or "Personalize It" greetings.

**Page 5**

**14.USE RESTRICTIONS:** A "Use Restriction Violation" occurs upon either or both of the following events:  (1) any tenant or occupant in the Shopping Center carries any Restricted Item; or (2) the Shopping Center contains a Temporary Store that sells any Restricted Item. "Restricted Items" mean and include any of the following products: Christmas ornaments, greeting cards, gift wrap and party supplies.  "Temporary Store" means any store or business in the Shopping Center operated by a tenant, licensee or occupant under a lease, license or agreement (oral or written) having a term of less than one year or any store or business which is not required by lease or license agreement to remain open to the public for business for 12 or more consecutive months.   The term "Shopping Center" includes and consists of any contiguous land owned, leased or otherwise controlled or managed, either directly or indirectly, by Landlord or any affiliate of Landlord.

During any Use Restriction Violation occurrence, Annual Minimum Rent shall abate, and Tenant shall pay, in lieu thereof, Alternate Rent equal to the lesser of (i) 50% of Tenant's Monthly Minimum Rent or (ii) 4%of Tenant's monthly Gross Sales. "Alternate Rent" shall be paid, together with Ancillary Rents, within 25 days after the end of the month in which the sales were generated.   Such Alternate Rent shall commence upon Tenant's notification to Landlord of a violation of the Use Restriction and shall continue until the earlier of the date that (i) the violation of the Use Restriction no longer exists or (ii) Tenant terminates the Lease as permitted herein.  In addition, upon the occurrence of a Use Restriction Violation, Tenant may (in addition to any other rights it may have) terminate this Lease upon delivery of 90 days' prior written notice to Landlord.  In which event, Landlord shall reimburse Tenant within 30 days of Landlord's receipt of written notice for the unamortized value (using a straight-line amortization schedule over the unextended Lease Term) of the leasehold improvements installed in the Premises at the cost of Tenant (if any), and Landlord and Tenant shall be relieved of any further obligations hereunder.

The Use Restriction does not apply to the following tenant, Food Lion, or (a) any existing tenant that carries, in the aggregate, less than 20 lineal feet of Restricted Items (each spinner rack containing any Restricted Item shall be equal to six lineal feet); or (b) Hallmark Cards, Inc., or any of its subsidiaries or affiliates, or any licensee approved to sell Hallmark products by Hallmark Cards, Inc. or any of its subsidiaries or affiliates.

**15.  RELOCATION:**  The size and/or location of the Premises may not be changed.

**16.  PAD BUILDINGS / KIOSKS: Landlord** will not construct any additional freestanding or pad buildings that are not shown on the Shopping Center site plan attached to the Lease. Landlord will not install any permanent or temporary kiosk or other obstruction within 30 feet of the Premises unless such kiosk or obstruction is shown on the Shopping Center site plan attached to the Lease.

**17.  LANDLORD'S SECURITY:**

A.   No security deposit is required of Tenant.

B.   No personal guarantee of the Lease is required.

**18.  RADIUS RESTRICTION:** No radius or any other restriction which prohibits, limits or penalizes the operation of other businesses by the Tenant or Hallmark Cards, Incorporated, or either of their

Page 6

Village Marketplace S/C, Midlothian, VA
Construction Exhibit Add-1
VillageMktplclean2.doc

subsidiaries, affiliate, successors, heirs or assigns is enforceable against Tenant pursuant to the terms of this Lease.

**19. SUBLEASE OR ASSIGNMENT:** Tenant, or its permitted assigns, may assign the Lease or sublet the Premises without Landlord's consent to Hallmark Cards, Incorporated, or any other corporation or partnership owned or controlled by Hallmark Cards to a person or entity approved as a Hallmark licensee by Hallmark Cards, Incorporated without any fee or proceeds due Landlord and in such event, Tenant shall be relieved of any further liability under the Lease. Any option(s) to extend the Lease Term shall remain in full force and effect as to any permitted assignee or subtenant. Landlord may not unreasonably withhold or delay its consent to any other transfer, assignment or subletting, when such consent is required

**20. HAZARDOUS MATERIALS:** Landlord shall be responsible for any hazardous materials <u>not installed by Tenant</u> and indemnify and defend Tenant, its subtenants and assignees and their respective agents, employees, officers and directors from and against any and all claims, damages, actions, awards, fines, clean-up costs, expenses, attorneys' fees and court costs which arise as a result of any claim or finding that hazardous materials are present within, upon or beneath the Shopping Center or Premises.

**21. SIGNAGE:** Subject to the restrictions of the local governmental authorities, Landlord shall permit the use of the Hallmark Gold Crown signage, containing the colors and design on the attached Exhibit, or at Tenant's sole option, such other signage as may be consistent with Tenant's trade name, as provided in the Lease. The length of such sign may be up to 80% of the width of the storefront of the Premises. If the Landlord's exterior sign criteria specifies a letter height of less than two feet, Landlord shall permit the upper case "H" and lower case "k" in the word "Hallmark" on Tenant's sign to be of a height in excess of the specified letter height. If Landlord permits any Shopping Center tenant occupying premises which are equal to or less than the area of the Premises to place its name and/or logo on the Shopping Center pylon sign or pole structure, Tenant shall also have the right to place on such Shopping Center pylon sign or pole structure, or on one which may be constructed by Landlord, either the Hallmark Gold Crown signage, or signage consistent with Tenant's trade name on a double-faced panel. In addition, Tenant shall have the right to erect temporary seasonal banners advertising such events as grand openings and holidays on the exterior of the Premises (including the facade), provided such banners shall not be erected on more than five holiday drive periods during any Lease Year, and in no event for a period in excess of seven days on each such occasion.

**22. HOLD OVER:** Tenant shall not require Landlord's consent to hold over if Tenant and Landlord are negotiating in good faith for a renewal or extension of this Lease, in which case the amount of rent shall be the same as the last month of the term of this Lease. If such negotiations are terminated without the execution of a new lease or extension of this Lease, Tenant shall vacate the premises within sixty days after the negotiations are terminated.

**23. LEASEHOLD IMPROVEMENTS:**

   A. Landlord shall construct the Premises in accordance with Tenant's plans and specifications and the attached Exhibit "C."

   B. Landlord shall deliver the Premises in compliance with all-applicable laws, codes, regulations and insurance requirements.

Page 7

Village Marketplace S/C, Midlothian, VA
Construction Exhibit Add-1
VillageMktplclean2.doc

C.  Landlord may not install any conduits, pipes, utility lines, columns, vents, ducts, flues, sprinkler mains or valves, support walls or expansion joints or other utility equipment or apparatus within the Premises, other than those presently existing or shown on Tenant's plans and specifications, except that Landlord may install or construct such items above the ceiling, below the floor or behind existing demising walls so long as Landlord promptly, at Landlord's expense, restores any damage to the Premises caused thereby and does not unreasonably interfere with Tenant in the conduct of Tenant's business.  During any period of unreasonable interference with Tenant's ability to conduct business in the Premises, Tenant's rental obligations shall abate in their entirety.

D.  To the extent that the heating, venting and air conditioning ("HVAC"), mechanical and electrical systems servicing the Premises are not warranted for at least the initial Lease Term, Landlord warrants the major components of the HVAC system (i.e. motors, condensers, etc.) for the initial Lease Term against defect or failure and shall replace or repair the same at Landlord's sole cost and expense. Tenant will be responsible for no more than five hundred ($500.00) on an annual basis for the repair or replacement of the HVAC. Any remaining HVAC on an annual basis to be the responsibility of the Landlord.

Please be advised that until such time as fully executed counterparts of the lease document have been delivered by and between the parties, there can not and shall not be any lease agreement or obligation upon which either party may rely.

If all is acceptable approve by signing this letter and returning. After approval by Hallmark Retail Real Estate, You may prepare an addendum. If you need additional information or have any comments please advise.

Time is of the essence in completing our discussions. My company's time line is to complete our discussions within the next week.

Please be advised that until such time as fully executed counterparts of the lease document have been delivered by and between the parties, there can not and shall not be any lease agreement or obligation upon which either party may rely.

Sincerely,

Lizanne Kile
**Hallmark Marketing Corporation**
Retail Real Estate

Acknowledged and Accepted

this _ZA_ day of _September_, 2001,

by _____ VILLAGE VILLAGE ASSOCIATES
L.L.C.

Attachment:  Construction Exhibit C-1
Sign Exhibit

**Page 8**

Village Marketplace S/C, Midlothian, VA
Construction Exhibit Add-1
VillageMktplclean2.doc

cc: Phil Maxwell
    Rhonda Wydeven
    Steve Barnett

## Construction Exhibit C

## DEFINITION OF LANDLORD'S WORK AND TENANT'S WORK

Landlord shall construct within the Premises the improvements set forth in this Exhibit C. The responsibilities and obligations as between Landlord and Tenant shall be as hereinafter set forth. Landlord will deliver the Premises to Tenant for Tenant's work by giving Tenant no less than fifteen (15) days prior written notice of the date that Landlord expects to substantially complete Landlord's work. Tenant shall complete Tenant's final inspection of the Premises within 14 days after the completion of Landlord's work. Tenant shall submit a punchlist to Landlord within said 14 day period, which punchlist shall set forth (i) items that require additional Landlord work, (ii) defective work by Landlord or (iii) any other matters requiring Landlord's attention. Landlord shall complete, correct and/or repair the items set forth on the punchlist within 7 days of receipt thereof.

All work designated as Landlord's work shall be completed by Landlord within sixty (60) days from the later of (i) the date Landlord receives Tenant's Plans or (ii) the date of execution and delivery of the Lease by both parties. Tenant shall submit Tenant's Plans within sixty (60) days of the later of (i) full lease execution or (ii) receipt of Landlord's floor plans for the Premises. Landlord shall submit to Tenant a "Work Schedule" setting forth the dates Landlord anticipates to (i) commence Landlord's Work, (ii) complete each of the major portion of the items set forth under this Exhibit, and (iii) complete and deliver the Premises to Tenant pursuant to the Lease and this Exhibit. Landlord's Work Schedule shall be delivered to Tenant at least 7 days prior to the anticipated construction start date. Landlord shall notify Tenant of any variance from such schedule. If Landlord fails to complete Landlord's Work and deliver the Premises to Tenant within the time period set forth in Landlord's Work Schedule, as the same may, from time to time, be modified, Tenant shall be entitled, as liquidated damages for the losses and additional expenses incurred by Tenant due to such failure by landlord, to the following abatements of Minimum Rent: (i) for the first 30 days past the date set forth in Landlord's Work Schedule, Tenant shall be entitled to one (1) day's abatement of Minimum Rent for each day past the date set forth in Landlord's Work Schedule that  Landlord fails to deliver the Premises as required hereunder and (ii) after the 31st day and each subsequent day past the date set forth in Landlord's Work Schedule, Tenant shall be entitled to two (2) day's abatement of Minimum Rent for each day from and after the eighth day past the date set forth in Landlord's Work Schedule that Landlord fails to deliver the Premises as required hereunder. Due to the difficulty in ascertaining the extent and value of Tenant's damages and losses, the parties agree that the foregoing liquidated damages are fair and reasonable. To be effective, notice of any Landlord revisions of the Work Schedule must be given to Tenant at least 7 days prior to the date Landlord originally anticipated completion of Landlord's Work.

NOTE: Tenant's prototype plans are generic in nature, not site specific. Tenant's prototype plans show the kind of construction and amount of construction typically required.  Tenant's Plans

**Page 9**

show the store for Landlord's specific location. The exact amount Landlord's work vary from store to store. The two sets of plans are different and were developed for different purposes. Landlord's work for Tenant shall be done in accordance with the Tenant's Plans and the quality and detail shown on Tenant's prototype plans.

## LANDLORD'S WORK

Landlord shall, at Landlord's sole cost and expense, complete the construction, installation and erection of the following fixtures and/or improvements in and upon the Premises.

1. **GENERAL REQUIREMENTS.**  All work shall be in accordance with all building codes, and/or requirements of organizations having jurisdictional authority.  All work shall be completed in professional and workmanlike manner.  If required for Landlord to complete Landlord's Work, Landlord shall obtain all architectural and engineering drawings, calculations, and specifications required to build out Tenant's space as described below.

2. **BUILDING SHELL.** Building shell shall include but not limited to the following:
   a. Complete structural building system with columns, beams, joists, (exposed construction) with all required fireproofing and recommended insulation as required by location.
   b. Complete waterproof roof and drainage system.
   c. Finished building exterior with flat functional concrete walk.
   d. Metal back door with frame, dead bolt lock, hardware and ramp for disabled persons.
   e. Storefront, including glazing must be acceptable to tenant. Storefront shall be comprised of fixed glass with aluminum frame and a double door as shown on Tenant's Plans.
   f. Minimum 4" thick, level, without holes, concrete floor slab.
   g. Demolition of all previous tenant improvements which will not be used by Tenant.
   h. Fire extinguisher(s) and/or smoke detector(s) as required by codes.

3. **ELECTRICITY AND NATURAL GAS.**  All electricity and gas (if needed for store heating) stubbed to Premises, connected to all meters and all hook-up, turn-on and/or tap fees required to initiate service shall be paid in full.  Service to be on individual meters.

4. **WALLS & DOORS.** All walls partitions shall be covered with 5/8" gypsum wallboard taped, spackled, sanded and ready for finished.  Interior walls shall not have protrusions.
   a. Finish all perimeter walls to the underside of roof for 1-hour fire rating or per code.
   b. Locate and finish all partitions, including stockroom wall, columns and cashwrap wall, as shown on Tenant's Plans.  All walls shall be painted/ except where covered by Tenant's wall fixtures.
   d. Construct fire corridors as required by code.
   e. Interior doors shall be wood with wood frames

5. **CEILING.**  Suspended acoustical tile ceiling at Nine (9) feet, four (4") inches) or as shown on Tenant's site-specific plans.  Suspended T-Bar ceiling grid using acceptable quality ceiling tile. Ceiling to have a 2x4-foot grid.

**Page 10**

6. PLUMBING & WATER. Water and sewer service stubbed to premises and connected to meter, if required.
   a. Hot and cold toilet room facilities, as per code. with mirror, one paper towel dispenser and one toilet paper holder. All fixtures and floor drain per code.
   b. Painted, smooth finished gypsum board walls and ceiling or as required by code.
   c. A switched exhaust fan.
   d. A two foot fluorescent light fixture with cover and one duplex receptacle.
   e. All fixtures required to accommodate individuals with disabilities.

7. FIRE SPRINKLER. Install complete system, as required by code.

8. HVAC. An air conditioning/heating system with all ductwork will be provided:
   a. Air conditioning for Tenant's floor area shall be sufficient quantity and size to comply with ASHRAE design standards for the Premises location. (In most locations, the rate of one ton for each 400 square feet of floor space is sufficient.)
   b. Heating as required maintaining a 70-degree temperature throughout the Premises.
   c. Provide programmable set back thermostat for HVAC equipment.

9. ELECTRICAL. Electrical service connected to an individual meter and shall include:
   a. Electrical service and panel(s) at a Tenant approved location with a min. 200 amps for 277/480 Volts (or min. 400 amps 120/208 3 phase, 4 wire for stores of 4500 sq. ft. or more) 3 phase, 4 wire, with a sufficient number of circuit breakers (minimum 72) to satisfy the requirements of the Tenant.
   b. If electrical service is 277/480 volt, then provide a (min. 30 KVA) dry type transformer, with a sufficient number of circuit breakers (minimum 72) to satisfy the requirements of the Tenant. In no event shall the amount of power provided by the Landlord be less than as required by the National Electric Code.
   c. Provide three lamp recessed Lithonia lighting fixtures or equal with electronic ballast. Typically, one Three (3) tube fixture is required (or at Retailer's option 4 tube Prismatic) one per (approximately) 64 square feet with 34 watt, 4100 Kelvin temperature lamps as shown on Tenant's site specific plans or provide credit for such.
   d. Provide code required emergency and exit lights which do not interfere with Tenant's wall fixtures.
   e. Provide conduit, wiring as required to the exterior signband for exterior storefront sign and/or canopy sign.
   f. Install wall duplex receptacles per Tenant's Plans in sales area & 4 outlets in stockroom area.
   g. Electrical requirements of store fixturing as shown on Tenant's Plans. The fixturing will require one of the following: (A) Install one (1) Reloc Conversion Module #CM-120-E21 in handy box at 89" from finished floor per 120 continual feet of wall (Two (2) twenty amp circuits are required per Conversion Module), or (B) Install a duplex outlet every 8 feet on wall at height shown on Tenant's site specific plans.
   i. Provide a 7-day time clock for storefront sign and lighting control.
   j. Telephone service conduit to premises. Landlord shall provide sufficient telephone lines to the Shopping Center. A minimum of four lines shall be reserved for the Tenant.
   k. If Tenant's Preliminary Plans show an island cashwrap, then Landlord shall provide recessed isolated ground floor duplex receptacles in the sales area as shown on Tenant's

**Page 11**

Preliminary Plans with circuit locks if allowed by code. Landlord shall provide a minimum 3/4 inch conduit from administrative POS cash register to each of the other POS cash registers as shown on Tenant's Preliminary Plans.  Landlord shall provide a 1-½ inch conduit from the administrative POS cash register to the backroom PC location as shown on Tenant's Preliminary Plans. Landlord shall leave pull strings in conduits and diagram of how conduits are run.  The conduit shall be a straight run in the slab from administrative location to each of the other locations.

l.    If tenant's plans show a wall cashwrap, then Landlord shall provide a minimum 1-1/2 inch conduit from the location on the wall next to the administrative POS cash register to the backroom PC location as shown on Tenant's Preliminary Plans. Landlord shall leave pull strings in conduits and diagram of how conduits are run

m.   Landlord shall provide four- (4) foot white chain hung commercial striplite fixtures in the stockroom.

10.   Subject to approval by Chesterfield County, Landlord will install fabric awning on the exterior of the store front.

**Page 12**

Village Marketplace S/C, Midlothian, VA
Construction Exhibit Add-1
VillageMktplclean2.doc

## SECOND LEASE MODIFICATION AGREEMENT

THIS SECOND LEASE MODIFICATON AGREEMENT is made on this _13th_ day of ___August___, 2014 (the "Effective Date"), by and between **VILLAGE ASSOCIATES, L.L.C.**, a Virginia limited liability company, (the "Landlord"), having a business address of 4901 Dickens Road, Suite 100, Richmond, VA 23230-1952, and **BECKY'S CARDS & GIFTS, INC.**, a Virginia corporation, (the "Tenant") having a business address of 221 McLaws Circle, Williamsburg, VA 23185-5649:

WITNESSETH:

WHEREAS, Landlord and Tenant, as successor in interest to Cloverleaf Card Corporation, entered into that certain Lease dated October 11, 2001, as amended by that certain Assignment and Assumption of Lease and Lease Modification Agreement dated September 13, 2011 (collectively, the "Lease"), Landlord leased to Tenant certain premises being identified in said Lease as Store #5 containing approximately 4,800 square feet in the Village Marketplace (the "Premises"), located in Midlothian, Virginia (the "Shopping Center"), and

WHEREAS, Landlord and Tenant now desire to amend and modify the Lease in certain respects.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and in the Lease as amended and modified hereby, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, it is hereby mutually agreed as follows:

1.  The term of the Lease is hereby extended for an additional five (5) years commencing upon March 1, 2015 and continuing through February 29, 2020 (hereinafter the "Extended Term").

2.  The option to extend the Lease Term set forth in Section 11 of the Assignment and Assumption of Lease and Lease Modification Agreement is hereby deleted and of no further force or effect.

3.  Commencing March 1, 2015, Tenant shall pay Annual Minimum Rent and Percentage Rent in accordance with the following:

| Rent Payment Schedule | Annual Minimum Rent per square foot | Annual Minimum Rent | Monthly Rental Amount | Percentage Rent Rate | Natural Breakpoint |
|---|---|---|---|---|---|
| 03/01/15 - 02/29/16 | $10.50 | $50,400.00 | $4,200.00 | 6% | $840,000.00 |
| 03/01/16 - 02/28/17 | $11.00 | $52,800.00 | $4,400.00 | 6% | $880,000.00 |
| 03/01/17 - 02/28/18 | $11.50 | $55,200.00 | $4,600.00 | 6% | $920,000.00 |
| 03/01/18 - 02/28/19 | $12.00 | $57,600.00 | $4,800.00 | 6% | $960,000.00 |
| 03/01/19 - 02/29/20 | $12.50 | $60,000.00 | $5,000.00 | 6% | $1,000,000.00 |

4.  Tenant may extend the Lease Term for one (1) additional term of five (5) years which would commence on March 1, 2020 and expire on February 28, 2025 ("Option Term") at the Annual Minimum Rent (or Substitute Rent, if applicable) set forth herein.  Tenant shall notify Landlord in writing of Tenant's intent to exercise said option at least six (6) months prior to the expiration of the then current Lease Term.

| Option Term Rent Payment Schedule | Annual Minimum Rent per square foot | Annual Minimum Annual Rent | Monthly Rental Amount | Percentage Rent Rate | Natural Breakpoint |
|---|---|---|---|---|---|
| 03/01/20 - 02/28/22 | $14.50 | $69,600.00 | $5,800.00 | 6% | $1,160,000.00 |
| 03/01/22 - 02/28/25 | $15.50 | $74,400.00 | $6,200.00 | 6% | $1,240,000.00 |

5.  There shall be no increases in Annual Minimum Rent except as specifically set forth herein. If at any time during the Lease Term an increase in Minimum Rent is permitted, then for the purpose of calculating Percentage Rent, the Natural Breakpoint set forth shall be increased proportionately to the increase in Annual Minimum Rent.

6.  Landlord shall permit a second Hallmark Gold Crown sign on the back of the Premises at Tenant's sole option subject to restrictions of the local laws and ordinances.

7.  Capitalized terms utilized herein and not otherwise defined shall have the meanings ascribed to them in the Lease.

8.  Except as modified herein, all of the other terms, covenants and conditions of the Lease shall remain in full force and effect.

9.  This Second Lease Modification Agreement shall bind and inure to the benefit of not only the parties hereto, but also their successors and assigns.

{Signatures appear on the following page}

Village Marketplace
Midlothian, VA

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease Amendment Agreement as of the day and year first above written.

**Landlord:**

**VILLAGE ASSOCIATES, L.L.C.,**
a Virginia limited liability company

By: _____

Print Name: Thomas S. Folloson

Its: President

**Tenant:**

**BECKY'S CARDS & GIFTS, INC.,**
a Virginia corporation

By: _____

Print Name: FRANCIS P. NORSWORTHY JR

Its: President

## ASSIGNMENT AND ASSUMPTION OF LEASE
### and
### THIRD LEASE  MODIFICATION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF LEASE and THIRD LEASE MODIFICATION AGREEMENT (this "Agreement") made and entered into this 28 day of August , 2019, by and between **VILLAGE ASSOCIATES, L.L.C.** ("Landlord"), **BANNERS OF VILLAGE MARKETPLACE MIDLOTHIAN LLC** ("Assignee"), **A&S, INC.** ("Guarantor") and **BECKY'S CARDS & GIFTS, INC.** ("Assignor").

WHEREAS, Landlord is the lessor and Assignor is the lessee of those premises designated as Store #5 containing four thousand eight hundred (4,800) square feet of floor area located in Village Marketplace, Midlothian, Virginia (the "Premises") pursuant to a lease agreement dated October 11, 2001, as amended by Assignment and Assumption of Lease and Lease Modification Agreement dated September 13, 2011 and Second Lease Modification Agreement dated August 13, 2014  (hereinafter referred to as the "Lease"); and,

WHEREAS, Assignor desires to assign the Lease to Assignee and Assignee desires to accept such assignment and to assume Assignor's obligations as lessee thereunder subject to the terms and conditions hereof;

WHEREAS, Guarantor desires to guarantee unto Landlord Assignee's performance under the Lease, and,

WHEREAS, Landlord, Assignee and Guarantor desire to modify and amend the Lease effective as of the "Effective Date" hereof.

NOW, THEREFORE, in consideration of the mutual terms, covenants and conditions contained herein and other good and valuable consideration, the parties do hereby covenant and agree:

1.      Assignor hereby assigns all of Assignor's right, title and interest in and to the Lease and the Premises described therein unto Assignee as of the "Effective Date" of this Agreement, which Effective Date shall be the date on which the last of the following three contingencies occurs: (i) delivery of the Premises from Assignor to Assignee, (ii) full execution of this Agreement by all parties hereto, and (iii) consummation of the proposed purchase by A&S, Inc. of the assets of Assignor In the event all three of the forgoing contingencies have not occurred prior to January 1, 2020, this Agreement shall be null and void without further action on the part of any of the parties hereto.

2.      Landlord hereby consents to the assignment of Assignor's rights and interests in the Lease unto the Assignee and hereby releases and forever discharges Assignor and Assignor's guarantor (if any) from any of Assignor's or such guarantor's obligations as lessee under or guarantor of the Lease, as applicable, accruing from and after the Effective Date.  Landlord acknowledges and warrants that, as of the date hereof, the Lease is in full force and effect and constitutes the entire agreement between Assignor and Landlord with respect to the Premises, that the Lease has not been modified, changed or amended except as set forth hereinabove, that the Assignor is not currently in default under the Lease, that the Commencement Date of the Lease was November 7, 2001 and the current term of the Lease expires on February 29, 2020 (unless sooner terminated or extended as may be provided for in the Lease), that the Lease contains an unexercised option to extend for one (1) additional term, which option period, if exercised, would commence on March 1, 2020 and expire on February 28, 2025 (the "Option") and Landlord has the authority and right to consent to the assignment of and modification to the Lease as set forth herein.

3.      Assignee hereby assumes and agrees to perform and observe all of the covenants and conditions on the Assignor's part to be performed and observed under the Lease which shall accrue from and after the Effective Date.  Landlord hereby acknowledges and agrees that Assignee shall have no obligation under the Lease for any rent or performance due prior to the Effective Date of this agreement.

4      Assignee may, at Assignee's sole cost and expense, install new signage identifying Assignee's desired trade name in the place of all Assignor's existing signage on or at the Premises, provided such signage does not exceed the dimensions of the existing signage, the

removal of the existing signage and installation of the new signage is performed in a workmanlike manner and in compliance with any and all applicable codes and/or ordinances, such signage complies with Landlord's current Shopping Center sign criteria and Tenant obtains Landlord's prior written approval of the sign, such approval not to be unreasonably withheld.

5.     From and after the Effective Date, all notices and other communications required or permitted under the Lease to be given shall be directed to Assignee and Guarantor at: 443 North Frederick Avenue, Gaithersburg, MD 20877 and to Landlord at: 4901 Dickens Road, Suite 100, Richmond, VA 23230-1952.  The parties acknowledge and agree that notice may also be given via a nationally recognized overnight courier service such as UPS or FedEx.

6.     Notwithstanding any provisions to the contrary which may be contained in the Lease, Landlord agrees that Assignee shall not be required to renovate or remodel the Premises during the initial term of the Lease or any extension thereof unless such renovation or remodel is a result of damage to the Premises caused by the negligence or willful misconduct of Assignee, Assignee's subtenants or assignees, or their respective agents, employees or contractors.

7.     Landlord agrees to indemnify, defend and hold harmless Assignee, its subtenants and assignees and their respective agents, employees, officers and directors from and against any and all claims, damages, actions, awards, fines, clean-up costs, expenses, attorneys' fees and court costs which may arise as a result of any claim of finding that Hazardous Materials are present within, upon or beneath the Shopping Center and Premises, and Landlord will, at its sole cost, properly remedy, remove and abate such Hazardous Materials in accordance with all applicable laws, rules, regulation and ordinances, except in each case to the extent such Hazardous Materials are present as a result of the acts of Assignee, its subtenants or assignees or their respective agents, employees or contractors or the Assignor.

8.     Landlord acknowledges and agrees that in no event shall Assignee be required to pay any security deposit or assignment fee.

9.     (a) Notwithstanding any provision of the Lease to the contrary, if the assignment set forth in this Agreement becomes effective pursuant to the provisions of numbered section 1 herein, Assignee acknowledges and agrees it shall be deemed to have automatically exercised the Option Term set forth in numbered section 4 of the Second Lease Modification Agreement dated August 13, 2014 subject to all the terms and conditions of such section 4 excluding and excepting the last sentence of the first paragraph in such section 4 with respect to the notification period.

       (b)     In the event the consummation of the proposed purchase by A&S, Inc. of the assets of Assignor does not close, Assignor's option to renew the Lease for Option Term referenced above shall remain in place, except that Landlord hereby agrees that the date by which Assignor shall exercise said option is hereby extended to January 20, 2020. In the event that this Agreement is rendered null and void as outlined in Section 1 of this Agreement, this Section 9(b) shall survive this Agreement and be fully effective and enforceable.

10.    Except as otherwise provided in this Agreement, the terms, conditions and agreements contained in the Lease shall continue in full force and affect and shall bind the parties.

11.    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto, their heirs, successors and assigns.

In witness whereof, the parties have caused this Agreement to executed on the date first above written.

SIGNATURE PAGE IMMEDIATELY FOLLOWING

Landlord:

**VILLAGE ASSOCIATES, L.L.C.**

Print Name:  F. R. Ellsworth, Jr.
Its:  Vice President

Assignee:

**BANNERS OF VILLAGE MARKETPLACE MIDLOTHIAN LLC**

By: 

Its:  Leonard Banner, Manager_____

Guarantor:

**A&S, INC.**

By: 

Print Name: Leonard Banner_____

Title: President_____

Assignor:

**BECKY'S CARDS & GIFTS, INC.**

By: _Fms P. Nusworth J._

Print Name: FRANCIS R. NORSWORTH JR

Title: PRESIDENT_____

DocuSign Envelope ID: E93F5663-8FAD-426E-A175-93B735B3F7F3

# FOURTH LEASE  MODIFICATION AGREEMENT

THIS FOURTH LEASE MODIFICATION AMENDMENT (this "Amendment") made and entered into this _____12/13/2022_____ , ("Effective Date") by and between **RED DOG CAPITAL LLC** successor-in-interest to **VILLAGE ASSOCIATES, L.L.C.** ("Landlord"), and **BANNERS OF VILLAGE MARKETPLACE MIDLOTHIAN LLC**, a Virginia limited liability company ("Tenant"), and **A&S, INC.** ("Guarantor").

WHEREAS, Landlord is the lessor and Tenant is the lessee of those premises designated as 13112 Midlothian Turnpike, Midlothian, Virginia 23113 containing four thousand eight hundred (4,800) square feet of floor area ("Original Premises") located in Village Marketplace, Midlothian, Virginia, pursuant to a lease agreement dated October 11, 2001, as amended by Assignment and Assumption of Lease and Lease Modification Agreement dated September 13, 2011, as amended by Second Lease Modification Agreement dated August 13, 2014, as amended by Assignment and Assumption of Lease and Third Lease Modification Agreement dated August 28, 2019, and that certain Letter Agreement dated April 23, 2020 deferred rent (hereinafter referred to as the "Lease"); and,

WHEREAS, Tenant desires to extend the term of the lease and expand the Premises subject to the terms and conditions hereof;

WHEREAS, Landlord,  and Tenant desire to modify and amend the Lease effective as of the "Effective Date" hereof.

NOW, THEREFORE, in consideration of the mutual terms, covenants and conditions contained herein and other good and valuable consideration, the parties do hereby covenant and agree:

1.      Capitalized terms used herein, but not defined herein, shall have the respective meanings ascribed to them in the Lease.

2.      **Expansion Premises**

        (a)      Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the additional space adjacent to the Original Premises, being the space known as 13114 Midlothian Turnpike, Midlothian, Virginia 23113 (formerly known as Space #9) in the Shopping Center (the "**Expansion Premises**"), said Expansion Premises containing approximately 900 square feet of floor area and together with the Original Premises containing in the aggregate approximately 5,700 square feet of floor area, and which Expansion Premises are depicted as the "Premises" on Exhibit A attached hereto.

        (b)      The term of the Lease with respect to the Expansion Premises (the "**Expansion Premises Term Commencement Date**") and Tenant's obligations to pay rents and charges under this Amendment for the Expansion Premises shall commence on the earlier of (1) the date Tenant opens the Expansion Premises for business to the public, or (2) one hundred twenty (120) days after the last to occur of:  (i) Landlord's delivery of the Expansion Premises to Tenant; and (ii) the waiver or satisfaction of the Permit Contingency (as hereinafter defined). Tenant will

accept the Expansion Premises in its AS-IS WHERE-IS condition, subject to the following representations and warranties by Landlord (collectively, the "**Delivery Condition**"): Landlord represents and warrants to Tenant that, when Landlord delivers possession of the Expansion Premises to Tenant, (i) the Expansion Premises will be broom clean, water tight and free of all tenancies, and (ii) to Landlord's actual current knowledge, without investigation, the Expansion Premises will be free of all asbestos and other Hazardous Materials or Substances (as defined in the Lease). In addition, nothing contained in this Section 2 shall be deemed to relieve Landlord of its obligations to perform its maintenance, repair and replacement obligations under the Lease with respect to the Expansion Premises of the Lease

(c)    Tenant's Plans. Within thirty (30) days after the Effective Date of this Amendment, Tenant shall provide Landlord with a copy of Tenant's plans and specifications for Tenant's Work (collectively, "**Tenant's Plans**") for Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed. Landlord shall approve or reject Tenant's Plans within fifteen (15) days after receipt of Tenant's Plans. If Landlord rejects Tenant's Plans, it shall specifically state (i) the reasons for such rejection and (ii) the changes required by Tenant thereto, and Tenant shall thereafter within the following ten (10) days modify and resubmit Tenant's Plans. If Landlord fails to approve or reject Tenant's Plans within fifteen (15) days after the initial or any subsequent submittal by Tenant, then Landlord shall be deemed to have approved Tenant's Plans as submitted by Tenant.

(d)    Tenant's Permit Contingency. Tenant shall apply for all "**Permits**", as defined below, within fifteen (15) days after Landlord's written approval of Tenant's Plans, and shall diligently and in good faith pursue the issuance of the Permits. Provided Tenant has complied with the express time lines and deadlines set forth in this Amendment with respect to Tenant's Plans and the Permits (as defined herein), to the extent Permits have not been issued (excepting paying fees and pick up of such Permits), by no later than 150 days from the Effective Date of this Amendment (the "**Permitting Period**"), then either Landlord or Tenant may terminate this Lease upon notice to the other. The Permit contingency set forth in this Section 3 may be referred to as the "**Permit Contingency**." If Tenant is not successful in obtaining the Permits, either party may terminate this Amendment upon notice to the other within ten (10) business days following expiration of such Permitting Period. The term "**Permits**" shall mean all construction permits and approvals required by Tenant to be obtained from applicable governmental authorities to perform Tenant's Work in accordance with Tenant's Plans.

3.    **Tenant's Work/Tenant Improvement Allowance.** Tenant agrees, at its sole cost and expense (subject to the Tenant Improvement Allowance), to design, obtain all necessary Permits and approvals, contract and oversee, the construction of the work to be performed by Tenant under Tenant's Plans as approved by Landlord within the Expansion Premises ("**Tenant's Work**"). In consideration of Tenant's Work, Landlord shall pay Tenant an "**Allowance**" of $10.52 per square foot ($60,000.00) for the purpose of constructing or improving the leasehold improvements in Tenant's retail space, or any other purposes deemed necessary by Tenant, for use in Tenant's trade or business at the Shopping Center, including floor covering and exterior sign. Said Allowance to be paid as follows:  One half of said Allowance will be paid within ten (10) days after the Effective Date of this Amendment and the remaining balance within 30 days of the last to occur of: (i) Tenant's opening for business at the Expansion Premises; or (ii) Tenant's delivery of final lien waiver from Tenant's General Contractor.  If Landlord fails to pay said sum within 30 days of the satisfaction of the foregoing conditions, Tenant may deduct such

amount from any future installments of Minimum Rent and Ancillary Rents, together with interest at the rate of 4% over the prime lending rate quoted by the Chase Manhattan Bank of New York to its most creditworthy customers until Tenant has recovered the full "Allowance".

4.     **The Premises**.  As of the Expansion Premises Term Commencement Date, all references in the Lease to the Premises or the Leased Premises shall be deemed to mean collectively the Original Premises and the Expansion Premises located within 13112 and 13114 Midlothian Turnpike, Midlothian, Virginia of the Shopping Center, as depicted in Exhibit A hereto, containing approximately 5,700 square feet of floor area.

5.     **Tenant's Proportionate Share**.  Effective as of the Expansion Premises Term Commencement Date, for all purposes under the Lease, including without limitation Tenant's payment of Real Estate Taxes and Common Charges, Tenant's proportionate share be calculated based on the Expansion Premises and the Original Premises collectively containing 5,700 square feet of floor area.

6.     **Extension Term**.  The term of the Lease is hereby extended for an additional seven (7) years commencing upon March 1, 2025 and continuing through February 29, 2032 (hereinafter the "Extended Term").  During the Extended Term, Tenant shall pay Annual Minimum Rent and Percentage Rent per the following:

| Rent Payment Schedule | Annual Minimum Rent PSF | Annual Minimum Rent | Monthly Rental Amount | % Rent Rate | Natural Breakpoint |
|---|---|---|---|---|---|
| March 1, 2025 – February 29, 2032 | $17.00 | $96,900.00 | $8,075.00 | 4% | $2,422,500.00 |

7.     **Additional Extension Term**.  Provided Tenant is not in default beyond any applicable grace period in the performance of any term of the Lease, as amended hereby, Tenant shall have the option, exercised by written notice to Landlord, given not less than six (6) months prior to the expiration of the Extended Term, time being of the essence, to extend the term of the Lease for one (1) additional period of five (5) years, under the same terms and conditions of the Lease, as amended hereby, except that the Annual Minimum Rent and Percentage Rent  for the Additional Extension Term shall be per the following:

| Rent Payment Schedule | Annual Minimum Rent PSF | Annual Minimum Rent | Monthly Rental Amount | % Rent Rate | Natural Breakpoint |
|---|---|---|---|---|---|
| March 1, 2032 – February 28, 2037 | $18.70 | $106,590.00 | $8,882.50 | 4% | $2,664,750.00 |

8.     Landlord agrees to indemnify, defend and hold harmless Assignee, its subtenants and assignees and their respective agents, employees, officers and directors from and against any and all claims, damages, actions, awards, fines, clean-up costs, expenses, attorneys' fees and court costs which may arise as a result of any claim of finding that Hazardous Materials are present within, upon or beneath  the Shopping Center and Premises, and Landlord will, at its sole cost, properly remedy, remove and abate such Hazardous Materials in accordance with all applicable laws, rules, regulation and ordinances, except in each case to the extent such Hazardous

DocuSign Envelope ID: E92FD6639FAD-426F-A175-93B735B357F3

Materials are present as a result of the acts of Assignee, its subtenants or assignees or their respective agents, employees or contractors or the Assignor.

9.      This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including portable document format (PDF) or any electronic signature  (e.g. DocuSign) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

10.     Except as otherwise provided in this Amendment, the terms, conditions and agreements contained in the Lease shall continue in full force and affect and shall bind the parties.

11.     The provisions of this Amendment shall be binding upon and inure to the benefit of the parties hereto, their heirs, successors and assigns.

In witness whereof, the parties have caused this Amendmentto executed on the date first above written.

SIGNATURE PAGE IMMEDIATELY FOLLOWING

Landlord:

**RED DOG CAPITAL, L.L.C.**

*B. Hunt Gunter*
609AC966CB744B3...

Print Name:  B. Hunt Gunter
Its:  Managing Member


Assignee:

**BANNERS OF VILLAGE MARKETPLACE MIDLOTHIAN LLC**

*Michael Postal*
8D74A9CAC7D0424...

By:  Michael Postal

Its:   Manager


Guarantor:

A&S, INC.

By: *Michael Postal*
8D74A9CAC7D0424...

Print Name: Michael Postal

Title: Chief Financial Officer

## EXHIBIT A



8/3/22, 9:12 AM

Village Marketplace Shopping Center

**Village Marketplace Shopping Center**

13100-13150 Midlothian Turnpike, Midlothian, VA 23113

1. Mariner Finance
2. Jim Boorie Jr. Agency
3. Kidtopia Salon
4. Poe Realty
5. The Lazy Daisy Gift Store
6. The Lazy Daisy Gift Store
7. The Lazy Daisy Gift Store
8. Hallmark Cards & Gifts
9. Robokai
10. Food Lion
11. My Taekwondo
12. Siam Paragon
13. Pescado's
14. 13128 Midlothian Tnpk
15. Peking Gourmet
16. H&R Block
17. Kultivate Wellness
18. Subway
19. FOR LEASE
20. Compass Chiropractic
21. Prairie Grain Bread Co.

22. Buckingham Antique Mall
23. 13152 Midlothian Tnpk
24. 13154 Midlothian Tnpk
25. Solomon Eye Associates
26. Kabuto Japanese
27. Lucky Gypsy Tattoo
28. Battle Grounds
29. Battle Grounds
30. Battle Grounds
31. Diamond Billiards
32. Diamond Billiards
33. Top Nails & Day Spa
34. Top Nails & Day Spa
35. Midlothian Book Exchange
36. 13208 Midlothian Tnpk
37. 13212 Midlothian Tnpk
38. FOR LEASE
39. Cigarettes Plus
40. 13218 Midlothian Tnpk
41. Elim Tailor & Shoe Repair
42. 13224 Midlothian Tnpk
43. Faust Salon
44. Art Collector's Gallery

NOTE: No warranty or representation is made as to the accuracy of the foregoing information. Terms of sale and/or lease and availability are subject to change or withdrawal without notice.

© Copyright 2004-2011 The Wilton Companies - Richmond, Virginia