IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-378-ELG |
| | ) | (Chapter 11) |
| Banners of Abingdon, LLC, *et al.*[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING; (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING ADEQUATE**

---

[1] The Debtors in these cases are Banners of Abingdon, LLC; Banners of Reston, Inc.; Banner's of Dulles Town, Inc.; Banner's of Fair Oaks, LLC; Banner's Of Ashburn, LLC; Banner's of Gainesville, LLC; Banner's of Warrenton, LLC; Banner's of South Riding, LLC; Banner's of Stafford, LLC; Banner's of Oakton, LLC; Banner's of Bradlee Center, LLC; Banners of Fair Lakes, LLC; Banners of Woodbridge LLC; Banners of Williamsburg LLC; Banners of Newport News LLC; Banners of Commonwealth Midlothian LLC; Banners of Village Market Place Midlothian LLC; Banners of Fairfield Virginia Beach LLC; Banners of Hilltop Virginia Beach LLC; Banners of Central Park Fredericksburg LLC; Banners of Cosner's Corner Fredericksburg LLC; Banners of York River LLC; Banners of Lynchburg, LLC; Banners of Harrisonburg VA LLC; Banners of Winchester LLC; Banners of Christiansburg VA LLC; Banners of Chesapeake VA LLC; Banners of Columbus Village VA Beach LLC; Banner's of Burke, LLC; Banner's of Kamp Washington, LLC; Banners of Suffolk II LLC; Banners of Suffolk LLC; Banners of Henrico LLC; Banners Of Waynesboro LLC; Banners of Roanoke LLC; Banners of Rocky Mount VA, LLC; Banners of Manassas II LLC; Banners of Charlottesville LLC; Banners of Kingstowne LLC; Banners of Leesburg, LLC; and LBPO Management, LLC.

1

**PROTECTION TO THE PREPETITION SECURED PARTIES; (IV) MODIFYING THE
AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Upon consideration of the Motion for Leave to Incur Post-Petition Debts and Use Cash

Collateral (the "Motion"), DE #6, dated September 15, 2025, of the above-captioned debtors and

debtors in possession (each, a "Debtor" and collectively, the "Debtors") in these chapter 11 cases

(the "Chapter 11 Cases"), seeking entry of this final order (this "Final Order") among other things:

(i)     authorizing the Debtors, as borrowers (each, a "Borrower" and collectively, the
"Borrowers"), to obtain, on a joint and several basis, the obligations under a
priming senior secured, superpriority debtor-in-possession term loan facility, as set
forth below, in the aggregate principal amount (exclusive of capitalized DIP Fees
(as defined below) and interest) of up to $10,720,562 (the "DIP Facility" and the
commitments thereunder, the "DIP Commitments," and the term loans advanced
(or deemed advanced) thereunder, the "DIP Loans") under that certain Senior
Secured Superpriority Debtor In Possession Credit and Security Agreement among
the Borrowers and Hallmark Marketing Company, LLC, a Kansas limited liability
company ("Hallmark") and/or its affiliates, successors, and assigns (each a
"Lender" and together the "Lenders"), which is attached hereto as Exhibit A (as the
same may be amended, restated, amended and restated, supplemented or otherwise
modified from time to time pursuant to the terms thereof, the "DIP Credit
Agreement" and, together with all documents executed in conjunction therewith or
pursuant thereto, collectively, the "DIP Loan Documents"), comprised of:

    (1)     a "new money" multiple draw term loan facility in an aggregate principal
amount (exclusive of capitalized DIP Fees and interest) of $4,300,000, of
which (A) an initial amount of up to $3,200,000 (the "Initial New Money
Loan") was made available to be drawn upon entry of the Interim Order (as
defined below) and satisfaction of the other applicable conditions to the
Initial New Money Loan set forth in the DIP Term Sheet (as defined below)
(such initial draw, the "Initial Draw"), and (B) an additional amount of
$1,100,000 (the "Delayed-Draw New Money Loan" and, together with the
Initial New Money Loan, the "New Money DIP Loans") will be made
available to be drawn in a single drawing upon entry of this Final Order and
satisfaction of the other applicable conditions to the Delayed-Draw New
Money Loan set forth in the DIP Loan Documents (the "Delayed Draw");
plus

    (2)     "roll-up" loans in an aggregate principal among (exclusive of capitalized
interest) of up to $6,420,562 consisting of:

(a)     Upon entry of the Interim Order (defined below) and funding of the Initial Draw, a roll-up in the amount of $3,210,281 (the "Initial Roll-Up Amount") representing half of the outstanding principal amount of the amounts owing under the Prepetition Agreements held by the Lenders; and

(b)     Upon entry of the Final Order and funding of the Delayed Draw, a second roll-up in the amount of $3,210,281 (the "Delayed-Draw Roll-Up Amount" and, together with the Initial Roll-Up Amount, collectively the "Roll-Up Amounts" or the "Roll-Up Loans") consisting of the other half of the outstanding principal amount of the amounts owing under the Prepetition Agreements held by the Lenders.

(ii)    authorizing the Debtors, to (a) enter into the DIP Credit Agreement and the other DIP Loan Documents, and (b) to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Credit Agreement and the other DIP Loan Documents or the DIP Facility;

(iii)   granting the Lenders, on a final basis, allowed superpriority administrative expense claims in each of the Debtors' chapter 11 cases and any successor cases, including any chapter 7 cases, with respect to the New Money DIP Loans and the Roll-Up Loans, subject to the priorities set forth herein;

(iv)    granting the Lenders, on a final basis, automatically perfected priming security interests in, and liens on, with respect to the DIP Loans and including, for the avoidance of doubt, the Roll-Up Loans, all of the DIP Collateral (as defined below), including but not limited to, Cash Collateral (as defined below) and the Prepetition Collateral (as defined below), in each case, to secure the DIP Loans and the other Obligations (as defined in the DIP Credit Agreement), subject only to the Carve Out (as defined below) and the terms and priorities set forth herein;

(v)     authorizing the Debtors, subject to and pursuant to the terms and conditions set forth in this Final Order and the Cash Collateral Order (defined below), to continue to (a) use cash collateral ("Cash Collateral") and (b) provide adequate protection on account of any diminution in the value of the Prepetition Collateral, including Cash Collateral, as a consequence of the Debtors' use, sale, or lease of the Prepetition Collateral, including any Cash Collateral, the imposition of the automatic stay pursuant to Bankruptcy Code section 362, the Debtors' incurrence of the Obligations and the Indebtedness (as defined in the DIP Credit Agreement) under the DIP Credit Agreement and the priming of the liens and security interests of the Prepetition Secured Parties (as defined below) by liens and security interests granted by the DIP Credit Agreement and the other DIP Loan Documents

3

(including this Final Order), and any other basis consistent with section 361 of the Bankruptcy Code to the Prepetition Secured Parties;

(vi)     authorizing the Debtors to pay, on the terms set forth herein and in the DIP Loan Documents, on a final and irrevocable basis, the principal, interest, reasonable and documented fees, expenses, and other amounts payable under the DIP Credit Agreement and the other DIP Loan Documents as such amounts become earned, due and payable, including, without limitation, the DIP Commitment Premium, the Closing Fee on account of the Initial New Money Loans, the Exit Fee (if applicable), appraisal fees, valuation fees, agent fees, and reasonable fees and disbursements of the Lenders' attorneys, accountants, and other necessary consultants, all to the extent provided in, and in accordance with, the DIP Credit Agreement and the other DIP Loan Documents;

(vii)    waiving (i) the Debtors' and their estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, and (iii) the "equities of the case" exception under Bankruptcy Code section 552(b), each effective as of the Petition Date;

(viii)   authorizing the Lenders to exercise remedies under the DIP Credit Agreement and the other DIP Loan Documents on the terms described herein and therein upon the occurrence and during the continuation of a DIP Termination Event (as defined below);

(ix)     modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Final Order; and

(x)      waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Final Order.

This Court having considered the relief requested in the Motion, the evidence submitted, and arguments of counsel made at the initial hearing on the Motion on September 23-24, 2025 (the "Interim DIP Hearing"); and the Court having entered the order granting the Motion on an Interim basis, DE #48, dated September 25, 2025 (the "Interim Order"); and the Court having held a hearing on October 9, 2025 and October 30, 2025 (the "Final Hearing" and together with the Interim DIP Hearing, collectively, the "DIP Hearings") to consider entry of this Final Order; and notice of the Motion, the Final Hearing and this Final Order having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and all applicable Bankruptcy Local Rules,

and it appearing that no other or further notice is necessary; and the Final Hearing to consider the

relief requested in the Motion having been held and concluded; and all objections and reservations

of rights, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled

on the merits by this Court; and based upon the representations made by counsel to the Debtors,

and Lenders on the record of the Final Hearing; and it appearing that the Debtors' performance

with respect to the DIP Credit Agreement and entry into the other DIP Loan Documents is a sound

and prudent exercise of the Debtors' business judgment; and after due deliberation and

consideration, and good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE HEARING, THIS COURT
MAKES THE FOLLOWING PRELIMINARY FINDINGS OF FACT AND
CONCLUSIONS OF LAW:[2]**

A.    <u>Petition Date</u>. On September 14, 15, and 16, 2025 (collectively, the "<u>Petition
Date</u>"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy

Code with the United States Bankruptcy Court for the District of Columbia (this "<u>Court</u>").

B.    <u>Debtors in Possession</u>. The Debtors are operating their businesses and properties as

debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. As of the date hereof,

no trustee, examiner or official committee of unsecured creditors (the "<u>Committee</u>") has been

appointed in any of the Chapter 11 Cases.

C.    <u>Jurisdiction and Venue</u>. This Court has jurisdiction over the Chapter 11 Cases, the

Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. This

Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[2] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant
to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that
any of the following findings of fact constitute conclusions of law, they are adopted as such.

This Court may enter a final order consistent with Article III of the United States Constitution. As of the date hereof, the Court finds that venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     <u>Notice</u>. Notice of the Motion and the relief requested thereby and granted in this Final Order has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and was appropriate under the circumstances. No other or further notice of the Motion or entry of this Final Order is required.

E.     <u>Prepetition Secured Debt</u>. Subject to the limitations thereon contained in paragraphs 23 and 24 of this Final Order, the Debtors represent, admit, stipulate and agree as follows as to each of (i) through (viii) below:

(i)     <u>Prepetition Revolving Credit Facility</u>. Pursuant to that certain Amended and Restated Loan and Security Agreement and Release, dated as of January 1, 2020, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Credit Agreement</u>" and together with the other Credit Documents (as defined in the Prepetition Credit Agreement) as each may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Credit Documents</u>"), among the Debtors and Hallmark, Hallmark provided products to the Debtors on a secured basis in the principal amount, as of November 19, 2019, of $5,658,541.43 (the "<u>Prepetition Revolving Credit Facility</u>").

(ii)     <u>Prepetition Term Facility</u>. Pursuant to that certain Secured Promissory Note, dated as of May 31, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Term Note</u>"), among Hallmark and LBPO Management,

LLC, Hallmark provided a secured term loan to LBPO Management, LLC in the original principal amount of $2,250,000.00 (the "Prepetition Term Facility").

(iii)    Prepetition Credit Obligations. As of the Petition Date, the Debtors were jointly and severally indebted and liable to Hallmark under the Prepetition Credit Documents and the Prepetition Secured Note in the aggregate amount of not less than $6,420,562.00, which consists of (x) approximately $4,695,562.00 in principal amount advanced under the Prepetition Credit Agreement, and (y) approximately $1,725,000.00 in principal amount of Prepetition Term Note advanced under the Prepetition Term Facility, *plus* accrued and unpaid interest and all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, additional interest, any other "Obligations" (as defined in the Prepetition Credit Documents and the Prepetition Term Note), and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Credit Documents (collectively, the "Prepetition Credit Obligations"). The Prepetition Credit Obligations constitute legal, valid, binding, enforceable and non-avoidable obligations against each of the Debtors which are party to the Prepetition Credit Documents and Prepetition Term Note. The Prepetition Credit Obligations constitute an allowed secured claim within the meaning of Section 502 and 506 of the Bankruptcy Code.

(iv)    Prepetition Liens. Pursuant to (i) the Prepetition Credit Documents and Prepetition Secured Note; and (ii) the other Security Documents (as defined in the Prepetition Credit Agreement) (together with the Prepetition Credit Documents, the "Prepetition Security Documents"), prior to the Petition Date, the Debtors granted to Hallmark valid, binding, perfected and enforceable liens and security interests (the "Prepetition Liens") in the Collateral (as defined in the Prepetition Security Documents, the "Prepetition Collateral"). As of the Petition Date: (a)

the Prepetition Liens were legal, valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, Hallmark for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; (b) except as set forth in the Motion, the Interim Order, and this Final Order, the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral; (c) no portion of the Prepetition Liens or Prepetition Credit Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (d) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Credit Obligations, the priority of the applicable Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Liens securing the Prepetition Credit Obligations.

(v)     _Cash Collateral_. The Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, existing as of the Petition Date, and any amounts generated by the collection of accounts receivable or other disposition of the Collateral, existing as of the Petition Date, and the proceeds of any of the foregoing, wherever located is Hallmark's cash collateral within the meaning of Bankruptcy Code section 363(a) (the "_Cash Collateral_").

(vi)     _No Control_. As of the Petition Date, Hallmark does not control the Debtors or their properties or operations, have no authority to determine the manner in which any Debtors' operations are conducted, and are not control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from this Final Order,

the DIP Term Facility, the DIP Credit Agreement, the DIP Loan Documents, or the Prepetition
Credit Documents.

(vii)   Superpriority Claims. There are no other superpriority claims other than the
DIP Superpriority Claims and the Adequate Protection Claims.

(viii)   Credit Bidding. In the event that the Debtors file a motion (the "Bid
Procedures Motion") to, among other things, establish bidding procedures for a sale of all or
substantially all of the Debtors' assets (a "363 Sale"), no Debtor, or Debtor controlled affiliate, or
successor to any of the foregoing, shall object to Hallmark's right to credit bid up to the full amount
of its DIP Obligations, Prepetition Secured Obligations and/or Adequate Protection Obligations
(as defined below), in each case including, without limitation, any accrued interest and expenses,
in any sale, as applicable, whether such sale is effectuated through Bankruptcy Code section 363,
in a chapter 11 or chapter 7 proceeding, under Bankruptcy Code section 1129, by a chapter 7 or
chapter 11 trustee, or otherwise.

F.   Findings Regarding the DIP Facility and Use of Cash Collateral.

(i)   Good and sufficient cause has been shown for the entry of this Final Order
and for authorizing the Debtors to obtain financing pursuant to the DIP Credit Agreement and to
use the Cash Collateral of Hallmark.

(ii)   As established at the Hearings, the Debtors have an ongoing and immediate
need to continue the use of Cash Collateral, and the need to obtain credit pursuant to the DIP Facility
for working capital and general corporate purposes of the Debtors. Absent granting the relief set
forth in this Final Order, the Debtors' estates and their businesses will be irreparably harmed.

(iii)   As established at the Hearings, the Debtors are unable to obtain financing and
other financial accommodations on more favorable terms under the circumstances from sources other

than from Hallmark under the DIP Credit Agreement and the DIP Loan Documents and are unable to obtain satisfactory unsecured credit allowable under Bankruptcy Code section 503(b)(1). The Debtors are also unable to obtain secured credit with liens equal or junior to existing liens and therefore must grant priming liens under Bankruptcy Code section 364(d)(1) and a DIP Superpriority Claim (as defined below) on the terms and conditions set forth in this Final Order, the Final Order and the DIP Credit Agreement. The Roll-Up Loans, as provided for under the DIP Facility, the Final Order and this Final Order, are appropriate because Hallmark would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loans within the DIP Facility.

(iv)     Based on the record presented to the Court at the Hearings, the terms of the DIP Credit Agreement and DIP Loan Documents, and the terms of the adequate protection granted to Hallmark as provided in the Final Order and this Final Order are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and provide the Debtors reasonably equivalent value and fair consideration.

(v)     Hallmark has consented to, upon entry of this Final Order, the Debtors' entry into the DIP Facility, including the granting of priming liens and claims in connection therewith, and the continued use of Cash Collateral, on the terms and conditions set forth in this Final Order.

(vi)     The DIP Facility and the Debtors' continued use of Prepetition Collateral (including Cash Collateral), to fund the administration of the Debtors' estates, the continued operation of their businesses, and the incurrence and payment of any Adequate Protection Obligations (as defined below), including the granting of Adequate Protection Liens (as defined below), in accordance with the terms hereof and the Adequate Protection Claims (as defined below),

to Hallmark (and its successors and assigns) pursuant to this Final Order, the DIP Credit Agreement and the DIP Loan Documents, have been negotiated in good faith and at arm's-length among the Debtors and Hallmark, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility, the DIP Credit Agreement and the DIP Loan Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Credit Agreement and the DIP Loan Documents, and any DIP Obligations shall be deemed to have been extended by Hallmark in good faith, as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and Hallmark (and its successors and assigns) shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Final Order or any provision hereof is vacated, reversed, or modified, on appeal. Hallmark has agreed to the use of Cash Collateral in good faith and shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Final Order or any provision hereof is reversed or modified on appeal.

G.    <u>Permitted Prior Liens; Continuation of Prepetition Liens</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien (defined below) is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing herein shall prejudice any rights of any party in interest, including, but not limited to, any of the Debtors or Hallmark to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien or security interest. The right of a seller of goods to reclaim goods under Bankruptcy Code section 546(c) is not a Permitted Prior Lien and is expressly subject and subordinate to the DIP Liens.

H.    <u>Sections 506(c) and 552(b)</u>. The Debtors and Hallmark have agreed as a condition to the Debtors obtaining financing under the DIP Facility, as a material inducement to Hallmark to agree

to provide the DIP Facility, and in exchange for (a) Hallmark's willingness to provide the DIP Facility

to the extent set forth herein, (b) Hallmark's agreement to subordinate their liens and superpriority

claims to the Carve Out, (c) Hallmark's agreement to subordinate their liens and Adequate Protection

Claims to the DIP Obligations, and (d) the consensual use of Cash Collateral consistent with the

Approved DIP Budget (as defined below) and the terms of this Final Order, Hallmark is hereby

granted by each of the Debtors, (1) a waiver of any equities of the case exceptions or claims under

Bankruptcy Code section 552(b) and a waiver of unjust enrichment and similar equitable relief as

set forth below, and (2) a waiver of the provisions of Bankruptcy Code section 506(c) subject to

the terms hereof.

       I.     <u>Immediate Entry</u>. Good and sufficient cause exists for immediate entry of this Final

Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2). Consummation of the DIP Facility and

the use of Cash Collateral in accordance with this Final Order, the DIP Credit Agreement and the

DIP Loan Documents is in the best interests of the Debtors' estates and consistent with the Debtors'

exercise of their fiduciary duties. Based upon the foregoing findings and conclusions, the Motion

and the record before this Court with respect to the Motion, and after due consideration and good

and sufficient cause appearing thereof:

      **IT IS HEREBY ORDERED THAT**:

     <u>1.</u>    <u>Motion Granted</u>. The relief sought in the Motion is granted to the extent set forth

herein. Any and all objections to this Final Order, to the extent not withdrawn, waived, settled, or

otherwise resolved, and all reservations of rights included therein, are hereby overruled on the

merits.

     <u>2.</u>    <u>Authorization of the DIP Facility and the DIP Loan Documents</u>.

(a)    The Debtors are hereby expressly authorized and directed to enter into and perform under the DIP Credit Agreement and the other DIP Loan Documents, which are hereby approved.

(b)    Upon entry of this Final Order, the Debtors are immediately authorized, subject to the terms and conditions of this Final Order, the DIP Credit Agreement and the other DIP Loan Documents (any limitations on availability or borrowing under the DIP Credit Agreement and the other DIP Loan Documents), to borrow up to an aggregate principal amount of $4,300,000.00 of New Money DIP Loans, to borrow "roll-up" loans in an aggregate principal amount (exclusive of capitalized interest) of up to $6,420,562.00 on a cashless basis (effective upon the Initial Draw) pursuant to the terms and provisions of the DIP Credit Agreement, the other DIP Loan Documents, and this Final Order, and to incur and pay the principal, interest, premium, fees (including the DIP Fees (as defined below), indemnities, expenses and other amounts provided for in the DIP Credit Agreement, the other DIP Loan Documents, and this Final Order, subject to any limitations on availability or borrowing under the DIP Credit Agreement and the other DIP Loan Documents, which shall be used for all purposes as permitted under the DIP Credit Agreement, the other DIP Loan Documents, and this Final Order (including pursuant to the Approved DIP Budget). Upon entry of this Final Order, without any further action by the Debtors or any other party, the Debtors shall be authorized and deemed to have borrowed the full amount of the Roll-Up Loans, subject to the conditions set forth in the DIP Credit Agreement, the other DIP Loan Documents, and this Final Order.

(c)    In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized and directed to perform all acts, to make, execute, and deliver all instruments, certificates, agreements and documents (including, without limitation, the execution

or recordation of pledge and security agreements, financing statements, and other similar

documents) and to pay all reasonable and actual fees and expenses in connection with or that may

be reasonably required, appropriate or desirable for the Debtors' performance of their obligations

under or related to the DIP Facility, including, without limitation:

(i) the execution and delivery of, and performance under, each of the DIP Credit Agreement and the other DIP Loan Documents and any collateral documents reasonably contemplated thereby;

(ii) the non-refundable and irrevocable payment to Hallmark of all reasonable and documented fees and expenses, including the DIP Fees (as defined below) (which fees and expenses, in each case, were deemed to have been approved upon entry of this Final Order, whether or not the fees and expenses arose before or after the Petition Date, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise), and any amounts due (or that may become due) in respect of the indemnification and expense reimbursement obligations, in each case referred to in the DIP Credit Agreement or the other DIP Loan Documents;

(iii) the granting of all liens and claims with respect to, and the making of any payments in respect of the Adequate Protection Obligations (as defined below) to the extent provided for in this Final Order; and

(iv) the performance of all other acts required under or in connection with the DIP Credit Agreement and the DIP Loan Documents.

3.     DIP Obligations. Upon execution and delivery of the DIP Loan Documents, the DIP

Loan Documents shall constitute legal, valid, binding, and non-avoidable obligations of the Debtors,

enforceable in accordance with the terms of this Final Order, the DIP Credit Agreement and the other

DIP Loan Documents, against the Debtors and their estates and any successors thereto, including

any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code

upon the conversion of any of the Chapter 11 Cases or any other chapter of the Bankruptcy Code, or

in any other proceedings superseding or related to any of the foregoing. On the Termination

Declaration Date (as defined below) or the occurrence of any event or condition set forth in paragraph

17 of this Final Order, the DIP Obligations shall be due and payable without notice or demand, and

the Debtors' authorization to use Cash Collateral shall cease; *provided, however*, that the Debtors

may utilize Cash Collateral for up to five (5) additional business days in amounts not to exceed the

Approved DIP Budget pending a hearing solely for the purpose of making payroll of the Debtors

and to fund critical expenses of the Debtors necessary to avoid immediate and irreparable harm to

the Debtors' estates; *provided, further*, that other than as permitted in the preceding proviso, during

such period, the Debtors shall not utilize any Cash Collateral to contest or interfere with Hallmark's

enforcement of any rights provided under this Final Order. Except as permitted by this Final Order,

no obligation, payment, transfer, or grant of security hereunder or under the DIP Credit Agreement

or the other DIP Loan Documents to Hallmark shall be stayed, restrained, voidable, avoidable, or

recoverable, under the Bankruptcy Code or under applicable law (including, without limitation,

under Bankruptcy Code sections 502(d), 544, and 547 to 550 or under any applicable state Uniform

Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance

Act, or similar statute or common law).

      4.      <u>DIP Liens</u>. Subject to the provisions set forth in this paragraph 4 effective

immediately upon entry of this Final Order, the DIP Obligations shall be secured by valid, binding,

continuing enforceable, fully-perfected, non-avoidable, automatically and properly perfected liens

on, and security interests in (such liens and security interests, the "<u>DIP Liens</u>"), subject only to the

Carve Out, all assets (whether tangible, intangible, real, personal or mixed) of the Debtors (and their

bankruptcy estates) of any nature whatsoever and wherever located, whether first arising prior to or

following the Petition Date (including the Prepetition Collateral), now owned or hereafter acquired,

including all accounts, chattel paper, claims and causes of action (including any proceeds or property

recovered, unencumbered, or otherwise, from claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code whether pursuant to federal law or applicable state law (collectively, the "Avoidance Actions"), whether by judgment, settlement or otherwise), commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods (including fixtures), instruments, inventory, investment property, money, cash, cash equivalents, and all deposit accounts, securities accounts, commodities accounts and lockboxes together with all money, cash, securities and other investment property on deposit from time to time therein, letters of credit, letter-of-credit rights and other supporting obligations, real property, books and records, and to the extent not otherwise included, all substitutions, replacements, accessions, products and other proceeds and products (whether tangible or intangible and including, without limitation, insurance proceeds (including all proceeds from any directors'/officers' liability insurance policies), licenses, royalties, income, payments, claims, damages and proceeds of suit) of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing, the right, title or interest in any capital stock, investment property, partnership, membership or other equity or similar interests in any entity (whether or not such entity is a Debtor), including all capital stock, securities accounts, investment property, partnership, and membership, other equity or similar interests (and including all rights, beneficial interests, causes of action and choses of action related thereto) of the Debtors, whether existing as of the Petition Date or after acquired (all such property, the "DIP Collateral"); *provided*, that Hallmark shall have a security interest in any residual cash balance remaining in the Carve Out Reserves after all obligations benefitting from the Carve Out have been indefeasibly paid in full in cash pursuant to a final non-appealable order of this Court (or such other Court of competent jurisdiction), which residual balance shall be paid to Hallmark for

application in accordance with the DIP Credit Agreement and the other DIP Loan Documents, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated (such security interest on residual cash balances, in accordance with this proviso, the "Carve Out Security Interest"). The DIP Liens will otherwise have the following priorities:

(a)     Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first-priority senior security interest in and lien upon all of the DIP Collateral, including, without limitation, all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to Prepetition Liens or any other valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), subject to and subordinate in all respects to the Carve Out and as to the Carve Out Reserves and funds therein, to the extent of any Carve Out Security Interest;

(b)     Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected junior priority security interest in and lien upon all of the DIP Collateral, including, without limitation, all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter created, acquired or arising or wherever located, that, on or as of the Petition Date is subject to (i) Prepetition Liens or (ii) any other valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)) (such liens in the preceding clause (ii), the "Permitted Prior Liens"), subject to and subordinate in all respects to the Carve Out and as to the Carve Out Reserves and funds therein, to the extent of any Carve Out Security Interest; and

(c)    Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully perfected first-priority priming security interest and lien (the "Priming Liens") on all DIP Collateral, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, to the extent that such DIP Collateral is subject to any of the Prepetition Liens, subject to and subordinate in all respects to the Carve Out and as to the Carve Out Reserves, and funds therein, to the extent of any Carve Out Security Interest. The Priming Liens shall prime in all respects the liens and security interests of the Prepetition Secured Parties, with respect to the Prepetition Collateral (including, without limitation, the Prepetition Liens, the Adequate Protection Liens granted to the Prepetition Secured Parties, and any purported prepetition liens (the "Primed Liens"). Notwithstanding anything herein to the contrary, the Priming Liens (w) shall be subject to and subordinate in all respects to the Carve Out and will have no recourse to the Carve Out Reserves, or the funds therein (other than to the extent of the Carve Out Security Interest on the terms therein), and (x) shall be subject and junior to the Permitted Prior Liens in all respects and (y) shall be senior in all respects to the Primed Liens, and (z) shall also be senior to the Adequate Protection Liens.

(d)    Notwithstanding anything to the contrary in this Order, any liens granted in favor of Hallmark that encumber the DIP Collateral shall not include (i) leasehold interests of non-residential real property unless the applicable lease permits the granting of such liens (but shall include the proceeds of the sale or disposition of such leases), and (ii) any security deposits (in possession of the landlord) or the Debtors' interests, if any, in pre-paid rent, unless liens on such security deposits or pre-paid rent are expressly permitted pursuant to the underlying lease documents; *provided*, *however*, that any liens granted in favor of the Hallmark shall extend to any such security deposits or pre-paid rent upon reversion thereof to the Debtors; and except as subject

to the terms of the Debtors' nonresidential real property leases and otherwise to the fullest extent provided by applicable law, any rights granted herein shall not interfere with any rights held by a landlord to insurance proceeds for damage to a landlord's property.

(e)     Notwithstanding anything to the contrary in this Final Order, (i) the DIP Liens will prime the prepetition lien on PNC Bank up to the amount of the New Money DIP Loans, (ii) the DIP Liens with respect to the Roll-Up Loans will not prime the prepetition lien of PNC Bank in an amount not to exceed $543,000.00 (the "PNC Senior Lien Amount"), (iii) the prepetition lien on PNC Bank shall be subordinate to the DIP Liens with respect to both the New Money DIP Loans and the Roll-Up Loans to the extent that the amount of the PNC prepetition obligations exceeds the PNC Senior Lien Amount, (iv) with respect to any prepetition liens on the collateral subject to PNC Bank's prepetition lien, PNC Bank will retain any lien it may have to the same extent, validity, and priority of their lien position as of the Petition Date, (v) all rights of creditors and parties-in-interest, including Hallmark, to investigate or object to the lien of PNC Bank will be preserved.

5.     DIP Superpriority Claims. Subject in all respects to the Carve Out, pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b) and any and all administrative expenses or other claims ("Administrative Expense Claims") arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 (including the Adequate Protection Obligations (as defined below)), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which

allowed claims (the "DIP Superpriority Claims") shall for purposes of Bankruptcy Code section

1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b),

and which DIP Superpriority Claims shall be payable from and have recourse to all of the DIP

Collateral and all proceeds thereof in accordance with the DIP Credit Agreement and the other DIP

Loan Documents, subject only to payment of the Carve Out and provided that the DIP Superpriority

Claims will have no recourse to the Carve Out Reserves, or the funds therein except to the extent of

any Carve Out Security Interest on the terms therein. The DIP Superpriority Claims shall be entitled

to the full protection of Bankruptcy Code section 364(e) if this Final Order or any provision hereof is

vacated, reversed, or modified on appeal.

   6. DIP Budget Compliance and Reporting.

   (a) Attached to this Final Order as Exhibit B is (i) a 13-week cash forecast in form

and substance satisfactory to Hallmark, which shall consist of forecasted receipts and disbursements

(including, without limitation, professional fees) of the Debtors for the 13 weeks commencing on the

Petition Date (the "Initial DIP Budget"). The Debtors shall deliver an updated 13-week cash forecast

on a consolidated basis in form and substance reasonably satisfactory to Hallmark (an "Updated DIP

Budget", and upon the written approval (email being sufficient) by Hallmark or its advisors, and

together with the Initial DIP Budget, collectively, the "Approved DIP Budget"), which proposed

Updated DIP Budget shall be delivered to Hallmark every four weeks no later than five calendar days

prior to the Monday of the first week covered on such proposed Updated DIP Budget. Any

amendments, supplements or modifications to the Approved DIP Budget or Variance Report (as

defined below) shall be subject to the prior written approval (email being sufficient) of Hallmark

in its reasonable discretion prior to the implementation thereof. If Hallmark has not approved in

writing (email being sufficient) a proposed Updated DIP Budget within five (5) business days of

receipt of such proposed Updated DIP Budget, the then-current Approved DIP Budget shall continue to be the Approved DIP Budget. Until any such updated budget, amendment, supplement or modification has been approved by Hallmark in its reasonable discretion, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect.

(b)    Variance Reports. The Debtors shall at all times comply with the Approved DIP Budget, subject to the Prohibited Variances (as defined below). Commencing on Thursday (or the immediately subsequent business day if such Thursday is not a business day) of the third full calendar week after the date of entry of the Final Order by no later than 5:00 p.m. (prevailing Eastern Time) (the "Initial Variance Report Date"), and on each Thursday (or the immediately subsequent business day if such Thursday is not a business day) thereafter, by no later than 5:00 p.m. (prevailing Eastern time) (together with the Initial Variance Report Date, a "Variance Report Date"), the Debtors or their advisors shall deliver by email to Hallmark and its advisors, a variance report (each, a "Variance Report") for the immediately preceding Variance Test Period (as defined below) (i) setting forth, in reasonable detail, "receipts" and "disbursements" of the Debtors and any variances between the actual amounts and those set forth in each corresponding cumulative two-week period in the then in-effect Approved DIP Budget for such Variance Test Period and (ii) describing any material variances. "Variance Test Period" shall mean, beginning after the first full cumulative two-week period after the Petition Date, which shall be covered by the first Variance Report to be delivered hereunder (the "Initial Variance Test Period"), each successive cumulative two-week which shall be covered by each successive Variance Report to be delivered hereunder with respect to the then-in-effect Approved DIP Budget.

(c)    Except as otherwise agreed to by Hallmark, or as expressly permitted herein or in the DIP Credit Agreement or the other DIP Loan Documents, the Debtors' use of the DIP Loans

and Cash Collateral shall only be permitted pursuant to the terms of, and in accordance with, the

Approved DIP Budget. Hallmark shall have no obligation with respect to the Debtors' use of the DIP

Loans and Cash Collateral, and shall not be obligated to ensure or monitor the Debtors' compliance

with the Approved DIP Budget or to pay (directly or indirectly from the DIP Loans or Cash Collateral)

any expenses incurred or authorized to be incurred pursuant to the Approved DIP Budget. The consent

of Hallmark to the use of DIP Loans or Cash Collateral pursuant to this Final Order and the DIP Credit

Agreement shall not be construed as consent to the use of any DIP Loans or Cash Collateral after the

occurrence of an Event of Default (as defined in the DIP Credit Agreement) (other than funding the

Carve Out as set forth herein), regardless of whether the aggregate funds shown on the Approved DIP

Budget have been expended. In addition to, and without limiting, whatever rights to access Hallmark

has under the DIP Credit Agreement or the other DIP Loan Documents, upon reasonable notice,

at reasonable times during normal business hours, the Debtors shall permit representatives,

advisors, agents, and employees of Hallmark to: (i) have access to and inspect the Debtors' book

and records; and (ii) discuss the Debtors' affairs, finances, and condition with the Debtors'

attorneys and financial advisors.

    7.   <u>Carve Out</u>.

    (a)   <u>Carve Out</u>. As used in this Final Order, the "<u>Carve Out</u>" means the sum of (i)

allowed administrative expenses for (A) statutory fees and interest payable to the Office of the U.S.

Trustee (pursuant to 28 U.S.C. § 1930(a)(6) and 31 U.S.C. § 3717, respectively), as determined by

agreement of the U.S. Trustee or by final order of this Court, and (B) fees required to be paid to the

Clerk of the Bankruptcy Court (pursuant to 28 U.S.C. § 156(c)); (ii) accrued and unpaid fees,

disbursements, costs and expenses, allowed at any time by the Bankruptcy Court and incurred by

professionals retained by the Debtors or a statutory committee, if any, (the "<u>Case Professionals</u>"), up

to and as limited by the respective Approved Budget amounts for each Case Professional or category of Case Professional, less the amount of pre-petition retainers received by such Case Professionals and not previously applied to fees and expenses (with said retainers expressly not being subject to the DIP Lien);  (iii) accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals from and after the date of service of a Carve Out Trigger Notice, which means a notice sent by the DIP Lender to Debtors and each other applicable interested party in the Cases that the Post-Trigger Carve Out Cap (as defined below) has been invoked, to the extent allowed at any time, in an aggregate amount not to exceed $30,000.00 (the "Post-Trigger Carve Out Cap"), less the amount of pre-petition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (ii) above.  The Post-Trigger Carve Out Cap shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve Out Trigger Notice in respect of fees and expenses incurred after delivery of the Carve Out Trigger Notice; and (iv) an amount for unsecured creditors equal to the lesser of (a) two percent (2%) of the aggregate value any liens and claims of the DIP Lenders which are avoided or otherwise disallowed in the Chapter 11 Cases and (b) $100,000.00.

(b)    Investigation/Challenge Budget.  The amount of fees and expenses for investigation of the pre-petition liens and claims against Hallmark under any Prepetition Agreement shall not exceed $25,000.00. No portion of the proceeds of the DIP Credit Facility or the Carve Out shall be used for the payment of fees or expenses of any person challenging the pre-petition liens and/or claims of Hallmark under any Prepetition Agreement or pursuing or prosecuting any claims or actions against Hallmark under the Prepetition Agreements, including any claim under Chapter 5 of the Bankruptcy Code in respect of any Prepetition Agreement.

(c)   <u>Carve Out Priority</u>. For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order, the terms of the DIP Facility, or in any prepetition secured facilities, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Credit Obligations. Notwithstanding the payment of any amounts contained in the Carve Out Reserves (including any residual amounts contained therein) to Hallmark as contemplated by this paragraph 7, all parties' rights with respect to any such payments solely to the Prepetition Secured Parties are expressly preserved.

(d)   <u>Payment of Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees, or on or following the Termination Declaration Date if on account of Allowed Professional Fees incurred on or prior to the Termination Declaration Date, shall not reduce the Carve Out except to the extent of a diminution of the retainer constituting a part of the Carve Out.

(e)   <u>No Direct Obligation to Pay Allowed Professional Fees</u>. Hallmark shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Final Order or otherwise shall be construed to obligate Hallmark, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)   <u>Payment of Carve Out On or After the Carve Out Trigger Notice.</u> Any payment or reimbursement made on or after the occurrence of the Carve Out Trigger Notice in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Final Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

(g)   Notwithstanding anything to the contrary in this Final Order, the Debtors' obligations to the DIP Secured Parties and Prepetition Secured Parties and the liens, security interests, and superpriority claims granted herein, under the DIP Loan Documents, and/or under the Prepetition Credit Documents, including, without limitation, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Prepetition Liens, the Adequate Protection Obligations, and the Prepetition Secured Obligations, shall be subject in all respects and subordinate to the Carve Out.

8.   <u>Limitation on Charging Expenses against Collateral</u>. Effective as of the Petition Date, in light of the agreement of Hallmark to allow (i) the Debtors to use Cash Collateral as provided for herein, and (ii) the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out) pursuant to Bankruptcy Code section 506(c) or any similar principle of law, without the prior written consent of Hallmark and no such consent shall be implied from any other action, inaction, or acquiescence.

9.   <u>No Marshaling/Application of Proceeds</u>. Effective as of the Petition Date, Hallmark shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition

Collateral in accordance with the provisions of the Final Order, the DIP Credit Agreement, the other DIP Loan Documents, and the Prepetition Credit Documents, as applicable, and in no event shall Hallmark be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, as applicable.

10. <u>Equities of the Case</u>. Effective as of the Petition Date, in light of, among other things, the agreement of Hallmark to allow the Debtors to use Cash Collateral on the terms set forth herein (i) Hallmark shall be entitled to the rights and benefits of Bankruptcy Code section 552(b), if any, and (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to such parties with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable.

11. <u>Payments Free and Clear</u>. Any and all payments or proceeds remitted to Hallmark pursuant to the provisions of this Final Order, the DIP Credit Agreement and any other DIP Loan Document or any subsequent order of this Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including, without limitation, any claim or charge arising out of or based on, directly or indirectly, Bankruptcy Code sections 506(c) or 552(b), whether asserted or assessed by, through or on behalf of the Debtors.

12. <u>Use of Cash Collateral</u>. The Debtors are hereby authorized to use all Cash Collateral in accordance with this Final Order, the DIP Credit Agreement, and the other DIP Loan Documents, to the extent set forth in the Approved DIP Budget. Except as pursuant to the Approved DIP Budget, or on the terms and conditions of this Final Order, or an order of the Court, or as otherwise agreed to by Hallmark, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

13.     <u>Adequate Protection for the Prepetition Secured Parties</u>. Subject in all respects to the Carve Out and the terms of this Final Order, pursuant to Bankruptcy Code sections 361, 363(e) and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for any postpetition diminution in value of such interests (such diminution, a "<u>Diminution in Value</u>"), resulting from the imposition of the DIP Liens on the Prepetition Collateral, the Carve Out, the sale, lease or use of the Prepetition Collateral (including Cash Collateral), and any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Secured Parties, are hereby granted the following (collectively, the "<u>Adequate Protection Obligations</u>"); *provided* that the Prepetition Secured Parties shall have no recourse to the Carve Out Reserves except to the extent of the Carve Out Security Interests on the terms herein, and the adequate protection will otherwise include:

(a)     <u>Adequate Protection Liens</u>. As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable, non-avoidable, effective and automatically perfected upon the Petition Date additional and replacement liens on, and security interest in the DIP Collateral, (the "<u>Adequate Protection Liens</u>"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents. The Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any lien or security interest arising after the Petition Date, except as expressly provided for in this Final Order.

(b)     Adequate Protection Claims. As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed Administrative Expense Claim in the Chapter 11 Cases of each of the Debtors to the extent of any postpetition Diminution in Value (the "Adequate Protection Claims"). The Adequate Protection Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof. The Adequate Protection Claims shall have the same relative priorities as the Adequate Protection Liens and be subject to the Carve Out and the DIP Superpriority Claims in all respects. Except as set forth in this Final Order, the Adequate Protection Claims will not be junior or *pari passu* to any other claims and shall have priority over all Administrative Expense Claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation and to the extent permitted by law, Administrative Expense Claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 506(c) (subject to entry of the Final Order to the extent provided for therein), 507(a), 507(b), 546(d) (subject to entry of the Final Order to the extent provided for therein), 726, 1113 and 1114. The Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Claims from the Debtors under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or as otherwise provided in the DIP Credit Agreement or the DIP Loan Documents.

14.     Perfection of DIP Liens.

(a)     Hallmark is hereby authorized, but not required, to file or record security agreements, pledge agreements, financing statements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the DIP Liens. Whether or not Hallmark shall, in its sole discretion, choose to file such financing statements, intellectual property filings, notices of

lien, or similar instruments, such DIP Liens shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Final Order), at the time and on the date of this Final Order. Upon the request of Hallmark, the Debtors, without any further consent of any party, are authorized to take, execute, deliver, and file such instruments to Hallmark to further validate, perfect, preserve and enforce the DIP Liens and the applicable Adequate Protection Liens, respectively. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A copy of this Final Order may, in the discretion of Hallmark, be filed with or recorded in filing or recording offices in addition to or in lieu of such security agreements, pledge agreements, financing statements, intellectual property filings, depository account control agreements, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording.

15.     DIP Termination Event. Subject to any applicable notice periods and other terms set forth in paragraph 17, solely to the extent the DIP Obligations have not been indefeasibly paid in full in cash or satisfied in connection with one or more sales of substantially all of the Debtors' assets, then the DIP Obligations shall accelerate and become due and payable in full and the DIP Commitments and use of Cash Collateral will terminate, in each case, without further notice or action by the Court following the earliest to occur of any of the following (each a "DIP Termination Event"): (i) the occurrence and continuation of any Event of Default (as defined in the DIP Credit Agreement), which Events of Default are explicitly incorporated by reference into this Final Order; (ii) the Debtors' failure to comply with any material provision of this Final Order; (iii) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement); (iv) the entry of an order authorizing the use of Cash Collateral of the DIP Lenders on a non-consensual basis or financing under

Bankruptcy Code section 364 that is *pari passu* or senior to the DIP Loans or the Prepetition Loans or the filing by the Debtors of a motion seeking such authority, excepting the financing furnished by Michael Postal pursuant to the Motion and being approved by separate order of this Court; and (v) unless otherwise agreed to in writing by Hallmark in its sole discretion, the consummation of a sale or disposition of any material assets of the Debtors other than a sale or disposition in the ordinary course of business.

16.    <u>Leased Premises Access</u>. Notwithstanding anything to the contrary in this Order, in the Event of a Default, Hallmark shall only be permitted to enter upon or access the leased premises subject to an unexpired nonresidential real property lease of a Debtor: (i) with the written consent of the landlord counterparty pursuant to a separate written agreement by and between the landlord counterparty and Hallmark; (ii) in accordance with any rights or remedies Hallmark has under applicable non-bankruptcy law; or (iii) permission of the Bankruptcy Court pursuant to the entry of an order upon motion and adequate notice.

17.    <u>Remedies Upon a DIP Termination Event</u>. The Debtors shall promptly provide notice to counsel to Hallmark of the occurrence of any DIP Termination Event. Upon the occurrence of a DIP Termination Event (regardless of whether the Debtors have given the notice described in the previous sentence), and following five (5) days' written notice (email being sufficient) by Hallmark to lead restructuring counsel to the Debtors and the U.S. Trustee, may take any or all of the following actions, unless the Court orders otherwise prior to the expiration of such five (5) day notice period: (i) the Debtors shall be charged the default interest rate set forth in the DIP Credit Agreement; (ii) the commitment of each DIP Lender to make DIP Loans will be terminated (to the extent any such commitment remains under the DIP Facility) and all obligations under the DIP Facility shall become due and payable; (iii) the Debtors' authority to use Cash Collateral shall immediately terminate,

except that the Debtors may use Cash Collateral to (a) fund the Carve Out and (b) make payroll of the Debtors and fund critical expenses of the Debtors necessary to avoid immediate and irreparable harm to the Debtors' estates, in each case in accordance with the terms of the Approved DIP Budget; and (iv) Hallmark is hereby granted relief from the automatic stay without further notice or a hearing to exercise its rights and remedies against the DIP Collateral available to it under the DIP Credit Agreement and Prepetition Credit Obligations, and applicable non-bankruptcy law.

18.     <u>Joint and Several</u>. The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder.

19.     <u>No Waiver for Failure to Seek Relief</u>. The failure or delay of the Debtors or Hallmark to exercise rights and remedies under this Final Order, the DIP Credit Agreement, the other DIP Loan Documents, the Prepetition Credit Obligations, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

20.     <u>Preservation of Rights Granted Under this Final Order</u>.

(a)     Subject to the Carve Out, and other than as set forth in this Final Order, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(b)     In the event this Final Order or any provision hereof is reversed or modified on appeal, the validity and priority of any liens or claims granted to Hallmark hereunder arising prior to the effective date of any such reversal or modification of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights,

remedies, privileges, and benefits granted herein, and the Prepetition Secured Parties shall be entitled to the protections afforded in Bankruptcy Code section 364(e).

(c)     Subject to the Carve Out, unless and until all DIP Obligations, Prepetition Secured Obligations, and Adequate Protection Obligations are indefeasibly paid in full, in cash, or all commitments under the DIP Credit Agreement are otherwise terminated in accordance with the terms thereof, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (i) except as permitted under the DIP Credit Agreement or the other DIP Loan Documents, or with the prior written consent of Hallmark (x) any modification, stay, vacatur, or amendment of this Final Order, (y) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a), or 507(b)) in any of the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims, the Adequate Protection Claims, and the Prepetition Secured Obligations (or the liens and security interests secured by such claims and obligations), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Credit Agreement and the other DIP Loan Documents, any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens, or the Prepetition Liens, as the case may be; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Credit Agreement, the other DIP Loan Documents and this Final Order (including compliance with the Approved DIP Budget); (iv) an order converting or dismissing any of the Chapter 11 Cases; (v) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vi) an order appointing an examiner with expanded powers in any of the Chapter 11 Cases.

(d)      Notwithstanding any order dismissing the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and the other administrative claims granted pursuant to this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Claims, and other administrative claims granted pursuant to this Final Order, shall notwithstanding such dismissal, remain binding on all parties in interest); and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(e)      Except as expressly provided in this Final Order, the DIP Credit Agreement or in the other DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and all other rights and remedies of Hallmark granted by the provisions of this Final Order, the DIP Credit Agreement and the DIP Loan Documents shall survive, shall maintain their priority as provided in this Final Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of the Chapter 11 Cases or by any other act or omission, or (ii) the entry of an order confirming a plan in any of the Chapter 11 Cases. The terms and provisions of this Final Order, the DIP Credit Agreement and the DIP Loan Documents shall continue in the Chapter 11 Cases, in any successor cases under any chapter of the Bankruptcy Code, if the Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code. The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection

Claims and all other rights and remedies of Hallmark granted by the provisions of this Final Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the DIP Lenders). Notwithstanding anything to the contrary in this Final Order, the DIP Credit Agreement or the DIP Loan Documents, nothing in this Final Order, the DIP Credit Agreement or the DIP Loan Documents shall affect any right of Hallmark to object to any sale of the Debtors' assets or chapter 11 plan that is not acceptable to Hallmark in its reasonable discretion, and all such rights are expressly preserved.

21.     <u>Good Faith Under Bankruptcy Code Section 364(e); No Modification or Stay of this Final Order</u>. Hallmark has acted in good faith in connection with this Final Order and is entitled to rely upon the protections granted herein and by Bankruptcy Code section 364(e). Based on the findings set forth in this Final Order and the record made during the Hearings, and in accordance with Bankruptcy Code section 364(e), in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, Hallmark is entitled to the protections provided in Bankruptcy Code section 364(e). Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.

22.     <u>Expenses and Indemnification</u>.

(a)     The Debtors are authorized and directed to pay, without further Court order but no more promptly than provided for in the DIP Loan Documents, the reasonable and documented fees and expenses whether incurred before or after the Petition Date, by professionals or consultants retained by Hallmark, including the fees and expenses of Stinson LLP, in its capacity as lead counsel to Hallmark (the "<u>DIP Professionals</u>"), incurred in connection with the Chapter 11 Cases (in any

capacity) and the DIP Facility, including the reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Professionals) of Hallmark, for enforcement costs and documentary taxes associated with the DIP Facility and the transactions contemplated thereby (collectively, the "DIP Professional Fees"). The DIP Professionals shall not be required to file motions or applications with respect to the DIP Professional Fees; *provided*, *however* that any time the DIP Professionals seek payment of fees and expenses from the Debtors, each DIP Professional shall provide summary copies of its fee and expense statements or invoices (which shall be required to contain time entries but which may be redacted or modified to the extent necessary to protect any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the Debtors and the U.S. Trustee. If no objection to payment of the requested DIP Professional Fees and expenses is made, in writing, by Hallmark or the U.S Trustee within fourteen (14) days of receipt of an invoice for DIP Professional Fees, then such invoice shall be promptly paid, without further order of, or application to, the Court or notice to any other party, and, in any case, within five (5) calendar days following the expiration of the Fee Objection Period and shall not be subject to any further review, challenge, or disgorgement. For the avoidance of doubt, the provisions of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine. If within the Fee Objection Period, a Fee Notice Party sends to the affected professional and files with the Court a written objection to such invoice, then only the disputed portion of such DIP Professional Fees shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and any

undisputed portion shall be paid within five (5) calendar days following the expiration of the Fee Objection Period.

(b)    As set forth in the DIP Credit Agreement, the Debtors will, jointly and severally, indemnify Hallmark and its affiliates, successors and assigns and the officers, directors, employees, agents, advisors, counsel, controlling persons, and members of each of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the execution or delivery of the DIP Credit Agreement and the DIP Loan Documents, transactions contemplated hereby and thereby, and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with the terms of the DIP Credit Agreement; *provided* that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of gross negligence or willful misconduct of such person (or their related persons). No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct.

23.    Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral. Subject to paragraph 24, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve Out may be used: (i) to investigate, initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action,

suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type (a) against Hallmark under the DIP Loan Documents, this Final Order, the DIP Credit Agreement or the Prepetition Credit Obligations, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any official committee of unsecured creditors in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of Hallmark to recover on the DIP Collateral or the Prepetition Collateral, or seeking affirmative relief against Hallmark related to the DIP Obligations, or the Prepetition Credit Obligations, (b) seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Superpriority Claims, or Hallmark's liens or security interests in the DIP Collateral or the Prepetition Credit Obligations or the Prepetition Liens in the Prepetition Collateral or (c) for monetary, injunctive, or other affirmative relief against Hallmark or its liens on or security interests in the DIP Collateral or the Prepetition Collateral, or the DIP Superpriority Claims, that would impair the ability of Hallmark to assert or enforce any lien, claim, right or security interest or to realize or recover on the DIP Obligations or the Prepetition Credit Obligations to the extent permitted or provided hereunder; (ii) for objecting to or challenging in any way the legality, validity, extent, priority, perfection or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of Hallmark related to the Prepetition Credit Obligations or by or on behalf of Hallmark related to the DIP Obligations; (iii) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Credit Obligations, or the Prepetition Liens; and (iv) for prosecuting

an objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of: (x) any of the DIP Liens, the DIP Superpriority Claims or any other rights or interests of Hallmark related to the DIP Obligations or the DIP Liens or (y) any of the Prepetition Liens or any other rights or interests of Hallmark related to the Prepetition Credit Obligations; *provided* that up to $25,000 of aggregate proceeds of the DIP Facility, the DIP Collateral or the Prepetition Collateral, including the Cash Collateral, may be used by any official committee of unsecured creditors to investigate the foregoing matters solely with respect to Hallmark, the Prepetition Credit Obligations and the Prepetition Liens within the Challenge Period (such proceeds, the "Investigation Budget").

24.     Effect of Stipulations on Third Parties.

(a)     The acknowledgments, stipulations, admissions, waivers and releases contained in this Final Order shall be binding upon the Debtors (including their representatives) and any successor or assigns thereto upon entry of this Final Order. The acknowledgments, stipulations, admissions, waivers and releases contained in this Final Order shall also be binding upon all other parties in interest, including any official committee of unsecured creditors, or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless (i) such party with requisite standing granted by an order of this Court (or such other court of competent jurisdiction), has duly filed a proceeding challenging the validity, perfection, priority, extent, or enforceability of the Prepetition Liens, or the Prepetition Credit Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests, or defenses (each such proceeding or contested matter, a "Challenge") against Hallmark or its affiliates or representatives in connection with any matter related to the Prepetition Credit Obligations, the Prepetition Collateral, or the Prepetition Liens by any creditors' committee and all other parties in

interest by the date that is 45 days after the date of entry of this Final Order subject to further extension

by written agreement (which writing may be in the form of e-mail by counsel) of the Debtors and

Hallmark each in their sole discretion, the "Challenge Period"); *provided* that in the event that, prior

to the expiration of the Challenge Period, (x) the Chapter 11 Cases are converted to cases under

chapter 7 of the Bankruptcy Code or (y) a chapter 11 trustee is appointed in the Chapter 11 Cases,

then in each such case, the Challenge Period shall be extended for a period of 10 calendar days

solely with respect to any Trustee, commencing on the occurrence of either of the events described

in the foregoing clauses (x) and (y); and (ii) an order is entered by a court of competent jurisdiction

and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge or

claim in any such duly filed adversary proceeding. If no such adversary proceeding is timely filed

prior to the expiration of the Challenge Period, without further order of this Court: (x) the

Prepetition Credit Obligations shall constitute allowed claims, not subject to any Challenge,

impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any

kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in the

Chapter 11 Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition Liens shall be

deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority

specified in this Final Order, not subject to disallowance or  recharacterization; and (z) the

Prepetition Credit Obligations, the Prepetition Liens on the Prepetition Collateral and Hallmark

shall not be subject to any other or further challenge and any party in interest shall be forever

enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such

action, including any successor thereto (including any estate representative or a Trustee, whether

such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).

If any proceeding is timely filed by a party that has been granted standing as provided above prior

to the expiration of the Challenge Period, (i) the stipulations and admissions contained in this Final

Order shall nonetheless remain binding and preclusive on all other parties in interest, including any

Trustee, except with respect to any party that timely files a Challenge and solely as to any stipulations

or admissions that are specifically and expressly challenged in such adversary proceeding; *provided*

that the filing of a motion by any official committee of unsecured creditors or any other party in

interest seeking standing with respect to a Challenge, attaching a draft of the complaint setting forth

such Challenge, shall toll any such committee's or party's Challenge Period in respect of such

Challenge, solely as to any stipulations or admissions that are specifically and expressly challenged

in such adversary proceeding, until the date that is one business day after the entry of a final order

of the Court (which order, on request of any party, will be issued within 7 days of the filing of the

Motion) ruling on such standing motion with respect to such Challenge (or to such later date as

agreed by the challenging party and Hallmark); and (ii) any Challenge not brought in such adversary

proceeding shall be forever barred; *provided* that, if and to the extent any challenges to a particular

stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such

stipulation also shall be binding on the Debtors' estates and all parties in interest. For the avoidance

of doubt, none of the DIP Collateral (including any proceeds thereof) shall be used to fund any

professional fees or expenses of any party in connection with any Challenge (other than such fees

and expenses of the Committee Professionals which subject to entry of the Final Order to the extent

provided therein shall not exceed the Investigation Budget) whether pursuant to this Final Order or

otherwise.

(b)      Nothing in this Final Order vests or confers on any person (as defined in the

Bankruptcy Code), including any official committee of unsecured creditors, standing or authority

to pursue any claims or causes of action belonging to the Debtors or their estates, including,

without limitation, any challenge with respect to the Prepetition Credit Documents, the Prepetition Liens or the Prepetition Secured Obligations.

25.    <u>Release</u>. Effective upon entry of this Final Order, subject to the rights of parties in interest, other than the Debtors, pursuant to paragraphs 23 and 24 of this Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally, and irrevocably releases and forever discharges and acquits Hallmark, its affiliates and each of its respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, solely in their capacities as such (collectively, the "<u>Released Parties</u>"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract tort or under any state or federal law or otherwise, arising out of or related to the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Credit Agreement, the other DIP Loan Documents, the Prepetition Credit Obligations, the Prepetition Liens, the obligations owing and the financial obligations made thereunder, and the negotiation of any of the foregoing and the deal reflected thereby; *provided*, that nothing herein shall relieve the Released Parties from fulfilling their obligations under the DIP Credit Agreement, the other DIP Loan Documents, and this Final Order.

26.   <u>Insurance</u>. At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date. Upon entry of this Final Order, Hallmark is, and will be deemed to be, without any further action or notice, named as an additional insured and lender's loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

27.   <u>Credit Bidding</u>. Hallmark shall have the unqualified and unconditional right to credit bid up to (X) the full amount of any DIP Obligations with respect to the New Money DIP Loans, and (Y) the full amount of any DIP Obligations with respect to the Roll-Up Loans in any sale of any of the Debtors' assets, including pursuant to (a) Bankruptcy Code section 363, (b) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (c) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725, in all cases subject to section 363(k) of the Bankruptcy Code.  Hallmark shall have the absolute right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid to any acquisition entity or joint venture formed in connection with such bid.

28.   <u>No Obligation to Extend Credit</u>. Hallmark shall have no obligation to make any loan or advance under the relevant DIP Loan Documents or the DIP Credit Agreement unless all of the conditions precedent under the DIP Credit Agreement, the DIP Loan Documents and this Final Order have been satisfied in full or waived by the DIP Lenders and in accordance with the terms of the applicable DIP Loan Documents.

29.   <u>Restrictions on Transfer of DIP Collateral or Prepetition Collateral to Non-Debtor Affiliates</u>. Except to the extent permitted pursuant to any order entered by the Court in connection with the "first day" relief and the Approved DIP Budget, the Debtors shall not transfer or use any

DIP Collateral or Prepetition Collateral, including Cash Collateral, to or for the benefit of any direct or indirect non-debtor affiliate or subsidiary of the Debtor absent the express written consent of Hallmark.

30.     Binding Effect; Successors and Assigns. The DIP Credit Agreement, the other DIP Loan Documents, and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, Hallmark, any official committee of unsecured creditors, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of Hallmark; *provided* that Hallmark shall have no obligation to permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) or to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

31.     Limitation of Liability. Solely in determining to make any loan under the DIP Credit Agreement and the other DIP Loan Documents, permitting the use of Cash Collateral, or exercising any rights or remedies (excluding any actions taken after an exercise of remedies) as and when permitted pursuant to this Final Order, the DIP Loan Documents, the Prepetition Credit Obligations, Hallmark shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business, nor shall it owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors. Furthermore, nothing in this Final Order, the DIP Credit Agreement, the other DIP Loan

Documents or the Prepetition Credit Obligations shall in any way be construed or interpreted to impose or allow the imposition upon Hallmark of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

32.     Amendment of the DIP Credit Agreement and Other DIP Loan Documents. The DIP Credit Agreement and the other DIP Loan Documents may from time to time be amended, restated, waived, modified, or supplemented by the Debtors and Hallmark in accordance with the terms and conditions of this Final Order, the DIP Credit Agreement or other DIP Loan Document without further order of the Court, if the amendment, restatement, waiver, modification, or supplement does not (a) shorten the original stated maturity of the DIP Loans, (b) increase the aggregate commitments or the rate of interest payable thereunder or (c) amend the Events of Default or covenants under the DIP Credit Agreement or the other DIP Loan Documents to be materially more restrictive to the Debtors (taken as a whole) than the Events of Default as originally attached to this Final Order (and such amendment, restatement, waiver, modification or supplement, an "Approved Modification"); *provided that*, for the avoidance of doubt, other than as explicitly set forth in the DIP Credit Agreement or another DIP Loan Document, updates and supplements to the Approved DIP Budget required to be delivered by the Debtors under the DIP Credit Agreement or this Final Order shall not require further order of the Court. In the case of an amendment, restatement, waiver, supplement or other modification of the DIP Credit Agreement or any other DIP Loan Documents that is not an Approved Modification, the Debtors shall (a) provide notice (which may be provided through e-mail) to the U.S. Trustee, and (b) obtain approval of the Court.

33.     Proofs of Claim. Hallmark shall not be required to file proofs of claim in any of the Chapter 11 Cases or any successor cases for any claim allowed herein, and the stipulations in this

Final Order shall be deemed to constitute a timely filed proof of claim with respect to the Prepetition

Secured Obligations against each of the applicable Debtors in the Chapter 11 Cases.

34.     <u>Automatic Stay Modified</u>. The automatic stay under Bankruptcy Code section 362

shall be modified and lifted to the extent necessary to allow Hallmark to provide any notices to the

Debtors or take any other action as contemplated by and in accordance with this Final Order.

35.     <u>Necessary Action</u>. The Debtors are authorized to take all such actions as are

necessary or appropriate to implement the terms and conditions of this Final Order.

36.     <u>Right to Seek Additional Adequate Protection</u>. This Final Order is without prejudice

to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured

Parties to request additional forms of adequate protection at any time, subject to the consent of

Hallmark and any party in interest's right to object thereto. Nothing herein shall be deemed a

finding by the Court or an acknowledgment by the Prepetition Secured Parties that the adequate

protection granted herein does in fact adequately protect the Prepetition Secured Parties against

any Diminution in Value.

37.     <u>Effectiveness</u>. This Final Order shall constitute findings of fact and conclusions of

law and shall take effect as of the Petition Date immediately upon entry hereof. Notwithstanding

Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule or Local

Rule, this Final Order shall be immediately effective and enforceable upon its entry and there shall

be no stay of execution or effectiveness of this Final Order.

38.     <u>Final Order Governs</u>. In the event of any inconsistency between the provisions of

the DIP Credit Agreement, the other DIP Loan Documents and this Final Order, the provisions of

this Final Order shall govern.

39.     <u>Bankruptcy Rules</u>. The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

40.     <u>Retention of Jurisdiction</u>.   The Court shall retain exclusive jurisdiction to resolve any and all disputes arising under or related to the DIP Obligations, the DIP Credit Agreement, the DIP Loan Documents or the provisions of this Final Order, and to enforce all of the conditions of the DIP Loan Documents and this Final Order.

**[END OF ORDER]**

CORE/0500971.0226/233119855.8