The order below is hereby signed.

Signed: November 24 2025

Elizabeth L. Gunn
U.S. Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-378-ELG |
| | ) | (Chapter 11) |
| Banners of Abingdon, LLC, *et al.*[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING ADEQUATE**

---

[1] The Debtors in these cases are Banners of Abingdon, LLC; Banners of Reston, Inc.; Banner's of Dulles Town, Inc.; Banner's of Fair Oaks, LLC; Banner's Of Ashburn, LLC; Banner's of Gainesville, LLC; Banner's of Warrenton, LLC; Banner's of South Riding, LLC; Banner's of Stafford, LLC; Banner's of Oakton, LLC; Banner's of Bradlee Center, LLC; Banners of Fair Lakes, LLC; Banners of Woodbridge LLC; Banners of Williamsburg LLC; Banners of Newport News LLC; Banners of Commonwealth Midlothian LLC; Banners of Village Market Place Midlothian LLC; Banners of Fairfield Virginia Beach LLC; Banners of Hilltop Virginia Beach LLC; Banners of Central Park Fredericksburg LLC; Banners of Cosner's Corner Fredericksburg LLC; Banners of York River LLC; Banners of Lynchburg, LLC; Banners of Harrisonburg VA LLC; Banners of Winchester LLC; Banners of Christiansburg VA LLC; Banners of Chesapeake VA LLC; Banners of Columbus Village VA Beach LLC; Banner's of Burke, LLC; Banner's of Kamp Washington, LLC; Banners of Suffolk II LLC; Banners of Suffolk LLC; Banners of Henrico LLC; Banners Of Waynesboro LLC; Banners of Roanoke LLC; Banners of Rocky Mount VA, LLC; Banners of Manassas II LLC; Banners of Charlottesville LLC; Banners of Kingstowne LLC; Banners of Leesburg, LLC; and LBPO Management, LLC.

1

**PROTECTION TO THE PREPETITION SECURED PARTIES; (IV) MODIFYING THE
AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

Upon consideration of the Motion for Leave to Incur Post-Petition Debts and Use Cash

Collateral (the "Motion"), DE #6, dated September 15, 2025, of the above-captioned debtors and

debtors in possession (each, a "Debtor" and collectively, the "Debtors") in these chapter 11 cases

(the "Chapter 11 Cases"), seeking entry of this final order (this "Final Order") among other things:

(i)      authorizing the Debtors, as borrowers (each, a "Borrower" and collectively, the
         "Borrowers"), to obtain, on a joint and several basis, the obligations under a
         priming senior secured, superpriority debtor-in-possession term loan facility, as set
         forth below, in the aggregate principal amount (exclusive of capitalized DIP Fees
         (as defined below) and interest) of up to $10,720,562 (the "DIP Facility" and the
         commitments thereunder, the "DIP Commitments," and the term loans advanced
         (or deemed advanced) thereunder, the "DIP Loans") under that certain Senior
         Secured Superpriority Debtor In Possession Credit and Security Agreement among
         the Borrowers and Hallmark Marketing Company, LLC, a Kansas limited liability
         company ("Hallmark") and/or its affiliates, successors, and assigns (each a
         "Lender" and together the "Lenders"), which is attached hereto as Exhibit A (as the
         same may be amended, restated, amended and restated, supplemented or otherwise
         modified from time to time pursuant to the terms thereof, the "DIP Credit
         Agreement" and, together with all documents executed in conjunction therewith or
         pursuant thereto, collectively, the "DIP Loan Documents"), comprised of:

         (1)      a "new money" multiple draw term loan facility in an aggregate principal
                  amount (exclusive of capitalized DIP Fees and interest) of $4,300,000, of
                  which (A) an initial amount of up to $3,200,000 (the "Initial New Money
                  Loan") was made available to be drawn upon entry of the Interim Order (as
                  defined below) and satisfaction of the other applicable conditions to the
                  Initial New Money Loan set forth in the DIP Term Sheet (as defined below)
                  (such initial draw, the "Initial Draw"), and (B) an additional amount of
                  $1,100,000 (the "Delayed-Draw New Money Loan" and, together with the
                  Initial New Money Loan, the "New Money DIP Loans") will be made
                  available to be drawn in a single drawing upon entry of this Final Order and
                  satisfaction of the other applicable conditions to the Delayed-Draw New
                  Money Loan set forth in the DIP Loan Documents (the "Delayed Draw");
                  plus

         (2)      "roll-up" loans in an aggregate principal among (exclusive of capitalized
                  interest) of up to $6,420,562 consisting of:

2

(a)     Upon entry of the Interim Order (defined below) and funding of the Initial Draw, a roll-up in the amount of $3,210,281 (the "Initial Roll-Up Amount") representing half of the outstanding principal amount of the amounts owing under the Prepetition Agreements held by the Lenders; and

(b)     Upon entry of the Final Order and funding of the Delayed Draw, a second roll-up in the amount of $3,210,281 (the "Delayed-Draw Roll-Up Amount" and, together with the Initial Roll-Up Amount, collectively the "Roll-Up Amounts" or the "Roll-Up Loans") consisting of the other half of the outstanding principal amount of the amounts owing under the Prepetition Agreements held by the Lenders.

(ii)     authorizing the Debtors, to (a) enter into the DIP Credit Agreement and the other DIP Loan Documents, and (b) to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Credit Agreement and the other DIP Loan Documents or the DIP Facility;

(iii)    granting the Lenders, on a final basis, allowed superpriority administrative expense claims in each of the Debtors' chapter 11 cases and any successor cases, including any chapter 7 cases, with respect to the New Money DIP Loans and the Roll-Up Loans, subject to the priorities set forth herein;

(iv)     granting the Lenders, on a final basis, automatically perfected priming security interests in, and liens on, with respect to the DIP Loans and including, for the avoidance of doubt, the Roll-Up Loans, all of the DIP Collateral (as defined below), including but not limited to, Cash Collateral (as defined below) and the Prepetition Collateral (as defined below), in each case, to secure the DIP Loans and the other Obligations (as defined in the DIP Credit Agreement), subject only to the Carve Out (as defined below) and the terms and priorities set forth herein;

(v)      authorizing the Debtors, subject to and pursuant to the terms and conditions set forth in this Final Order and the Cash Collateral Order (defined below), to continue to (a) use cash collateral ("Cash Collateral") and (b) provide adequate protection on account of any diminution in the value of the Prepetition Collateral, including Cash Collateral, as a consequence of the Debtors' use, sale, or lease of the Prepetition Collateral, including any Cash Collateral, the imposition of the automatic stay pursuant to Bankruptcy Code section 362, the Debtors' incurrence of the Obligations and the Indebtedness (as defined in the DIP Credit Agreement) under the DIP Credit Agreement and the priming of the liens and security interests of the Prepetition Secured Parties (as defined below) by liens and security interests granted by the DIP Credit Agreement and the other DIP Loan Documents

3

(including this Final Order), and any other basis consistent with section 361 of the Bankruptcy Code to the Prepetition Secured Parties;

(vi)     authorizing the Debtors to pay, on the terms set forth herein and in the DIP Loan Documents, on a final and irrevocable basis, the principal, interest, reasonable and documented fees, expenses, and other amounts payable under the DIP Credit Agreement and the other DIP Loan Documents as such amounts become earned, due and payable, including, without limitation, the DIP Commitment Premium, the Closing Fee on account of the Initial New Money Loans, the Exit Fee (if applicable), appraisal fees, valuation fees, agent fees, and reasonable fees and disbursements of the Lenders' attorneys, accountants, and other necessary consultants, all to the extent provided in, and in accordance with, the DIP Credit Agreement and the other DIP Loan Documents;

(vii)    waiving (i) the Debtors' and their estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, and (iii) the "equities of the case" exception under Bankruptcy Code section 552(b), each effective as of the Petition Date;

(viii)   authorizing the Lenders to exercise remedies under the DIP Credit Agreement and the other DIP Loan Documents on the terms described herein and therein upon the occurrence and during the continuation of a DIP Termination Event (as defined below);

(ix)     modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Final Order; and

(x)      waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Final Order.

This Court having considered the relief requested in the Motion, the evidence submitted, and arguments of counsel made at the initial hearing on the Motion on September 23-24, 2025 (the "Interim DIP Hearing"); and the Court having entered the order granting the Motion on an Interim basis, DE #48, dated September 25, 2025 (the "Interim Order"); and the Court having held a hearing on October 9, 2025 and October 30, 2025 (the "Final Hearing" and together with the Interim DIP Hearing, collectively, the "DIP Hearings") to consider entry of this Final Order; and notice of the Motion, the Final Hearing and this Final Order having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and all applicable Bankruptcy Local Rules,

and it appearing that no other or further notice is necessary; and the Final Hearing to consider the

relief requested in the Motion having been held and concluded; and all objections and reservations

of rights, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled

on the merits by this Court; and based upon the representations made by counsel to the Debtors,

and Lenders on the record of the Final Hearing; and it appearing that the Debtors' performance

with respect to the DIP Credit Agreement and entry into the other DIP Loan Documents is a sound

and prudent exercise of the Debtors' business judgment; and after due deliberation and

consideration, and good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE HEARING, THIS COURT**

**MAKES THE FOLLOWING PRELIMINARY FINDINGS OF FACT AND**

**CONCLUSIONS OF LAW:[2]**

A.    <u>Petition Date</u>. On September 14, 15, and 16, 2025 (collectively, the "<u>Petition</u>

<u>Date</u>"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy

Code with the United States Bankruptcy Court for the District of Columbia (this "<u>Court</u>").

B.    <u>Debtors in Possession</u>. The Debtors are operating their businesses and properties as

debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108. As of the date hereof,

no trustee, examiner or official committee of unsecured creditors (the "<u>Committee</u>") has been

appointed in any of the Chapter 11 Cases.

C.    <u>Jurisdiction and Venue</u>. This Court has jurisdiction over the Chapter 11 Cases, the

Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. This

Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[2] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant
to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that
any of the following findings of fact constitute conclusions of law, they are adopted as such.

This Court may enter a final order consistent with Article III of the United States Constitution. As of the date hereof, the Court finds that venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      <u>Notice</u>. Notice of the Motion and the relief requested thereby and granted in this Final Order has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and was appropriate under the circumstances. No other or further notice of the Motion or entry of this Final Order is required.

E.      <u>Prepetition Secured Debt</u>. Subject to the limitations thereon contained in paragraphs 23 and 24 of this Final Order, the Debtors represent, admit, stipulate and agree as follows as to each of (i) through (viii) below:

(i)      <u>Prepetition Revolving Credit Facility</u>. Pursuant to that certain Amended and Restated Loan and Security Agreement and Release, dated as of January 1, 2020, (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Credit Agreement</u>" and together with the other Credit Documents (as defined in the Prepetition Credit Agreement) as each may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Credit Documents</u>"), among the Debtors and Hallmark, Hallmark provided products to the Debtors on a secured basis in the principal amount, as of November 19, 2019, of $5,658,541.43 (the "<u>Prepetition Revolving Credit Facility</u>").

(ii)      <u>Prepetition Term Facility</u>. Pursuant to that certain Secured Promissory Note, dated as of May 31, 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Term Note</u>"), among Hallmark and LBPO Management,

LLC, Hallmark provided a secured term loan to LBPO Management, LLC in the original principal amount of $2,250,000.00 (the "Prepetition Term Facility").

(iii)    Prepetition Credit Obligations. As of the Petition Date, the Debtors were jointly and severally indebted and liable to Hallmark under the Prepetition Credit Documents and the Prepetition Secured Note in the aggregate amount of not less than $6,420,562.00, which consists of (x) approximately $4,695,562.00 in principal amount advanced under the Prepetition Credit Agreement, and (y) approximately $1,725,000.00 in principal amount of Prepetition Term Note advanced under the Prepetition Term Facility, *plus* accrued and unpaid interest and all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, additional interest, any other "Obligations" (as defined in the Prepetition Credit Documents and the Prepetition Term Note), and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Credit Documents (collectively, the "Prepetition Credit Obligations"). The Prepetition Credit Obligations constitute legal, valid, binding, enforceable and non-avoidable obligations against each of the Debtors which are party to the Prepetition Credit Documents and Prepetition Term Note. The Prepetition Credit Obligations constitute an allowed secured claim within the meaning of Section 502 and 506 of the Bankruptcy Code.

(iv)    Prepetition Liens. Pursuant to (i) the Prepetition Credit Documents and Prepetition Secured Note; and (ii) the other Security Documents (as defined in the Prepetition Credit Agreement) (together with the Prepetition Credit Documents, the "Prepetition Security Documents"), prior to the Petition Date, the Debtors granted to Hallmark valid, binding, perfected and enforceable liens and security interests (the "Prepetition Liens") in the Collateral (as defined in the Prepetition Security Documents, the "Prepetition Collateral"). As of the Petition Date: (a)

the Prepetition Liens were legal, valid, binding, enforceable, non-avoidable, and properly

perfected and were granted to, or for the benefit of, Hallmark for fair consideration and reasonably

equivalent value and were granted contemporaneously with, or covenanted to be provided as an

inducement for, the making of the loans and/or commitments and other financial accommodations

secured thereby; (b) except as set forth in the Motion, the Interim Order, and this Final Order, the

Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral;

(c) no portion of the Prepetition Liens or Prepetition Credit Obligations is subject to any challenge

or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination

(equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and

(d) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Credit

Obligations, the priority of the applicable Debtors' obligations thereunder, and the validity, extent,

and priority of the Prepetition Liens securing the Prepetition Credit Obligations.

   (v) <u>Cash Collateral</u>. The Debtors' cash, including cash and other amounts on

deposit or maintained in any account or accounts by the Debtors, existing as of the Petition Date,

and any amounts generated by the collection of accounts receivable or other disposition of the

Collateral, existing as of the Petition Date, and the proceeds of any of the foregoing, wherever

located is Hallmark's cash collateral within the meaning of Bankruptcy Code section 363(a) (the

"<u>Cash Collateral</u>").

   (vi) <u>No Control</u>. As of the Petition Date, Hallmark does not control the Debtors

or their properties or operations, have no authority to determine the manner in which any Debtors'

operations are conducted, and are not control persons or insiders of the Debtors by virtue of any

of the actions taken with respect to, in connection with, related to or arising from this Final Order,

the DIP Term Facility, the DIP Credit Agreement, the DIP Loan Documents, or the Prepetition Credit Documents.

(vii)    Superpriority Claims. There are no other superpriority claims other than the DIP Superpriority Claims and the Adequate Protection Claims.

(viii)    Credit Bidding. In the event that the Debtors file a motion (the "Bid Procedures Motion") to, among other things, establish bidding procedures for a sale of all or substantially all of the Debtors' assets (a "363 Sale"), no Debtor, or Debtor controlled affiliate, or successor to any of the foregoing, shall object to Hallmark's right to credit bid up to the full amount of its DIP Obligations, Prepetition Secured Obligations and/or Adequate Protection Obligations (as defined below), in each case including, without limitation, any accrued interest and expenses, in any sale, as applicable, whether such sale is effectuated through Bankruptcy Code section 363, in a chapter 11 or chapter 7 proceeding, under Bankruptcy Code section 1129, by a chapter 7 or chapter 11 trustee, or otherwise.

F.    Findings Regarding the DIP Facility and Use of Cash Collateral.

(i)    Good and sufficient cause has been shown for the entry of this Final Order and for authorizing the Debtors to obtain financing pursuant to the DIP Credit Agreement and to use the Cash Collateral of Hallmark.

(ii)    As established at the Hearings, the Debtors have an ongoing and immediate need to continue the use of Cash Collateral, and the need to obtain credit pursuant to the DIP Facility for working capital and general corporate purposes of the Debtors. Absent granting the relief set forth in this Final Order, the Debtors' estates and their businesses will be irreparably harmed.

(iii)    As established at the Hearings, the Debtors are unable to obtain financing and other financial accommodations on more favorable terms under the circumstances from sources other

than from Hallmark under the DIP Credit Agreement and the DIP Loan Documents and are unable to obtain satisfactory unsecured credit allowable under Bankruptcy Code section 503(b)(1). The Debtors are also unable to obtain secured credit with liens equal or junior to existing liens and therefore must grant priming liens under Bankruptcy Code section 364(d)(1) and a DIP Superpriority Claim (as defined below) on the terms and conditions set forth in this Final Order, the Final Order and the DIP Credit Agreement. The Roll-Up Loans, as provided for under the DIP Facility, the Final Order and this Final Order, are appropriate because Hallmark would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loans within the DIP Facility.

(iv)    Based on the record presented to the Court at the Hearings, the terms of the DIP Credit Agreement and DIP Loan Documents, and the terms of the adequate protection granted to Hallmark as provided in the Final Order and this Final Order are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and provide the Debtors reasonably equivalent value and fair consideration.

(v)    Hallmark has consented to, upon entry of this Final Order, the Debtors' entry into the DIP Facility, including the granting of priming liens and claims in connection therewith, and the continued use of Cash Collateral, on the terms and conditions set forth in this Final Order.

(vi)    The DIP Facility and the Debtors' continued use of Prepetition Collateral (including Cash Collateral), to fund the administration of the Debtors' estates, the continued operation of their businesses, and the incurrence and payment of any Adequate Protection Obligations (as defined below), including the granting of Adequate Protection Liens (as defined below), in accordance with the terms hereof and the Adequate Protection Claims (as defined below),

10

to Hallmark (and its successors and assigns) pursuant to this Final Order, the DIP Credit Agreement and the DIP Loan Documents, have been negotiated in good faith and at arm's-length among the Debtors and Hallmark, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility, the DIP Credit Agreement and the DIP Loan Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Credit Agreement and the DIP Loan Documents, and any DIP Obligations shall be deemed to have been extended by Hallmark in good faith, as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and Hallmark (and its successors and assigns) shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Final Order or any provision hereof is vacated, reversed, or modified, on appeal. Hallmark has agreed to the use of Cash Collateral in good faith and shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Final Order or any provision hereof is reversed or modified on appeal.

G. <u>Permitted Prior Liens; Continuation of Prepetition Liens</u>. Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien (defined below) is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing herein shall prejudice any rights of any party in interest, including, but not limited to, any of the Debtors or Hallmark to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien or security interest. The right of a seller of goods to reclaim goods under Bankruptcy Code section 546(c) is not a Permitted Prior Lien and is expressly subject and subordinate to the DIP Liens.

H. <u>Sections 506(c) and 552(b)</u>. The Debtors and Hallmark have agreed as a condition to the Debtors obtaining financing under the DIP Facility, as a material inducement to Hallmark to agree

to provide the DIP Facility, and in exchange for (a) Hallmark's willingness to provide the DIP Facility to the extent set forth herein, (b) Hallmark's agreement to subordinate their liens and superpriority claims to the Carve Out, (c) Hallmark's agreement to subordinate their liens and Adequate Protection Claims to the DIP Obligations, and (d) the consensual use of Cash Collateral consistent with the Approved DIP Budget (as defined below) and the terms of this Final Order, Hallmark is hereby granted by each of the Debtors, (1) a waiver of any equities of the case exceptions or claims under Bankruptcy Code section 552(b) and a waiver of unjust enrichment and similar equitable relief as set forth below, and (2) a waiver of the provisions of Bankruptcy Code section 506(c) subject to the terms hereof.

I.   <u>Immediate Entry</u>. Good and sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2). Consummation of the DIP Facility and the use of Cash Collateral in accordance with this Final Order, the DIP Credit Agreement and the DIP Loan Documents is in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties. Based upon the foregoing findings and conclusions, the Motion and the record before this Court with respect to the Motion, and after due consideration and good and sufficient cause appearing thereof:

**IT IS HEREBY ORDERED THAT**:

<u>1.</u>   <u>Motion Granted</u>. The relief sought in the Motion is granted to the extent set forth herein. Any and all objections to this Final Order, to the extent not withdrawn, waived, settled, or otherwise resolved, and all reservations of rights included therein, are hereby overruled on the merits.

<u>2.</u>   <u>Authorization of the DIP Facility and the DIP Loan Documents</u>.

(a)    The Debtors are hereby expressly authorized and directed to enter into and perform under the DIP Credit Agreement and the other DIP Loan Documents, which are hereby approved.

(b)    Upon entry of this Final Order, the Debtors are immediately authorized, subject to the terms and conditions of this Final Order, the DIP Credit Agreement and the other DIP Loan Documents (any limitations on availability or borrowing under the DIP Credit Agreement and the other DIP Loan Documents), to borrow up to an aggregate principal amount of $4,300,000.00 of New Money DIP Loans, to borrow "roll-up" loans in an aggregate principal amount (exclusive of capitalized interest) of up to $6,420,562.00 on a cashless basis (effective upon the Initial Draw) pursuant to the terms and provisions of the DIP Credit Agreement, the other DIP Loan Documents, and this Final Order, and to incur and pay the principal, interest, premium, fees (including the DIP Fees (as defined below), indemnities, expenses and other amounts provided for in the DIP Credit Agreement, the other DIP Loan Documents, and this Final Order, subject to any limitations on availability or borrowing under the DIP Credit Agreement and the other DIP Loan Documents, which shall be used for all purposes as permitted under the DIP Credit Agreement, the other DIP Loan Documents, and this Final Order (including pursuant to the Approved DIP Budget). Upon entry of this Final Order, without any further action by the Debtors or any other party, the Debtors shall be authorized and deemed to have borrowed the full amount of the Roll-Up Loans, subject to the conditions set forth in the DIP Credit Agreement, the other DIP Loan Documents, and this Final Order.

(c)    In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized and directed to perform all acts, to make, execute, and deliver all instruments, certificates, agreements and documents (including, without limitation, the execution

or recordation of pledge and security agreements, financing statements, and other similar documents) and to pay all reasonable and actual fees and expenses in connection with or that may be reasonably required, appropriate or desirable for the Debtors' performance of their obligations under or related to the DIP Facility, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Credit Agreement and the other DIP Loan Documents and any collateral documents reasonably contemplated thereby;

(ii)    the non-refundable and irrevocable payment to Hallmark of all reasonable and documented fees and expenses, including the DIP Fees (as defined below) (which fees and expenses, in each case, were deemed to have been approved upon entry of this Final Order, whether or not the fees and expenses arose before or after the Petition Date, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise), and any amounts due (or that may become due) in respect of the indemnification and expense reimbursement obligations, in each case referred to in the DIP Credit Agreement or the other DIP Loan Documents;

(iii)   the granting of all liens and claims with respect to, and the making of any payments in respect of the Adequate Protection Obligations (as defined below) to the extent provided for in this Final Order; and

(iv)    the performance of all other acts required under or in connection with the DIP Credit Agreement and the DIP Loan Documents.

3.      <u>DIP Obligations</u>. Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute legal, valid, binding, and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of this Final Order, the DIP Credit Agreement and the other DIP Loan Documents, against the Debtors and their estates and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases or any other chapter of the Bankruptcy Code, or in any other proceedings superseding or related to any of the foregoing. On the Termination

14

Declaration Date (as defined below) or the occurrence of any event or condition set forth in paragraph 17 of this Final Order, the DIP Obligations shall be due and payable without notice or demand, and the Debtors' authorization to use Cash Collateral shall cease; *provided, however*, that the Debtors may utilize Cash Collateral for up to five (5) additional business days in amounts not to exceed the Approved DIP Budget pending a hearing solely for the purpose of making payroll of the Debtors and to fund critical expenses of the Debtors necessary to avoid immediate and irreparable harm to the Debtors' estates; *provided, further*, that other than as permitted in the preceding proviso, during such period, the Debtors shall not utilize any Cash Collateral to contest or interfere with Hallmark's enforcement of any rights provided under this Final Order. Except as permitted by this Final Order, no obligation, payment, transfer, or grant of security hereunder or under the DIP Credit Agreement or the other DIP Loan Documents to Hallmark shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under applicable law (including, without limitation, under Bankruptcy Code sections 502(d), 544, and 547 to 550 or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law).

4.    <u>DIP Liens</u>. Subject to the provisions set forth in this paragraph 4 effective immediately upon entry of this Final Order, the DIP Obligations shall be secured by valid, binding, continuing enforceable, fully-perfected, non-avoidable, automatically and properly perfected liens on, and security interests in (such liens and security interests, the "<u>DIP Liens</u>"), subject only to the Carve Out, all assets (whether tangible, intangible, real, personal or mixed) of the Debtors (and their bankruptcy estates) of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date (including the Prepetition Collateral), now owned or hereafter acquired, including all accounts, chattel paper, claims and causes of action (including any proceeds or property

recovered, unencumbered, or otherwise, from claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code whether pursuant to federal law or applicable state law (collectively, the "Avoidance Actions"), whether by judgment, settlement or otherwise), commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods (including fixtures), instruments, inventory, investment property, money, cash, cash equivalents, and all deposit accounts, securities accounts, commodities accounts and lockboxes together with all money, cash, securities and other investment property on deposit from time to time therein, letters of credit, letter-of-credit rights and other supporting obligations, real property, books and records, and to the extent not otherwise included, all substitutions, replacements, accessions, products and other proceeds and products (whether tangible or intangible and including, without limitation, insurance proceeds (including all proceeds from any directors'/officers' liability insurance policies), licenses, royalties, income, payments, claims, damages and proceeds of suit) of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing, the right, title or interest in any capital stock, investment property, partnership, membership or other equity or similar interests in any entity (whether or not such entity is a Debtor), including all capital stock, securities accounts, investment property, partnership, and membership, other equity or similar interests (and including all rights, beneficial interests, causes of action and choses of action related thereto) of the Debtors, whether existing as of the Petition Date or after acquired (all such property, the "DIP Collateral"); *provided*, that Hallmark shall have a security interest in any residual cash balance remaining in the Carve Out Reserves after all obligations benefitting from the Carve Out have been indefeasibly paid in full in cash pursuant to a final non-appealable order of this Court (or such other Court of competent jurisdiction), which residual balance shall be paid to Hallmark for

16

application in accordance with the DIP Credit Agreement and the other DIP Loan Documents, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all commitments under the DIP Facility have been terminated (such security interest on residual cash balances, in accordance with this proviso, the "Carve Out Security Interest"). The DIP Liens will otherwise have the following priorities:

(a)    Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first-priority senior security interest in and lien upon all of the DIP Collateral, including, without limitation, all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to Prepetition Liens or any other valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), subject to and subordinate in all respects to the Carve Out and as to the Carve Out Reserves and funds therein, to the extent of any Carve Out Security Interest;

(b)    Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected junior priority security interest in and lien upon all of the DIP Collateral, including, without limitation, all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter created, acquired or arising or wherever located, that, on or as of the Petition Date is subject to (i) Prepetition Liens or (ii) any other valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)) (such liens in the preceding clause (ii), the "Permitted Prior Liens"), subject to and subordinate in all respects to the Carve Out and as to the Carve Out Reserves and funds therein, to the extent of any Carve Out Security Interest; and

17

(c)      Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully perfected first-priority priming security interest and lien (the "Priming Liens") on all DIP Collateral, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, to the extent that such DIP Collateral is subject to any of the Prepetition Liens, subject to and subordinate in all respects to the Carve Out and as to the Carve Out Reserves, and funds therein, to the extent of any Carve Out Security Interest. The Priming Liens shall prime in all respects the liens and security interests of the Prepetition Secured Parties, with respect to the Prepetition Collateral (including, without limitation, the Prepetition Liens, the Adequate Protection Liens granted to the Prepetition Secured Parties, and any purported prepetition liens (the "Primed Liens"). Notwithstanding anything herein to the contrary, the Priming Liens (w) shall be subject to and subordinate in all respects to the Carve Out and will have no recourse to the Carve Out Reserves, or the funds therein (other than to the extent of the Carve Out Security Interest on the terms therein), and (x) shall be subject and junior to the Permitted Prior Liens in all respects and (y) shall be senior in all respects to the Primed Liens, and (z) shall also be senior to the Adequate Protection Liens.

(d)      Notwithstanding anything to the contrary in this Order, any liens granted in favor of Hallmark that encumber the DIP Collateral shall not include (i) leasehold interests of non-residential real property unless the applicable lease permits the granting of such liens (but shall include the proceeds of the sale or disposition of such leases), and (ii) any security deposits (in possession of the landlord) or the Debtors' interests, if any, in pre-paid rent, unless liens on such security deposits or pre-paid rent are expressly permitted pursuant to the underlying lease documents; *provided*, *however*, that any liens granted in favor of the Hallmark shall extend to any such security deposits or pre-paid rent upon reversion thereof to the Debtors; and except as subject

18

to the terms of the Debtors' nonresidential real property leases and otherwise to the fullest extent provided by applicable law, any rights granted herein shall not interfere with any rights held by a landlord to insurance proceeds for damage to a landlord's property.

(e)     Notwithstanding anything to the contrary in this Final Order, (i) the DIP Liens will prime the prepetition lien on PNC Bank up to the amount of the New Money DIP Loans, (ii) the DIP Liens with respect to the Roll-Up Loans will not prime the prepetition lien of PNC Bank in an amount not to exceed $543,000.00 (the "PNC Senior Lien Amount"), (iii) the prepetition lien on PNC Bank shall be subordinate to the DIP Liens with respect to both the New Money DIP Loans and the Roll-Up Loans to the extent that the amount of the PNC prepetition obligations exceeds the PNC Senior Lien Amount, (iv) with respect to any prepetition liens on the collateral subject to PNC Bank's prepetition lien, PNC Bank will retain any lien it may have to the same extent, validity, and priority of their lien position as of the Petition Date, (v) all rights of creditors and parties-in-interest, including Hallmark, to investigate or object to the lien of PNC Bank will be preserved.

5.     DIP Superpriority Claims. Subject in all respects to the Carve Out, pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b) and any and all administrative expenses or other claims ("Administrative Expense Claims") arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 (including the Adequate Protection Obligations (as defined below)), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which

allowed claims (the "DIP Superpriority Claims") shall for purposes of Bankruptcy Code section

1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b),

and which DIP Superpriority Claims shall be payable from and have recourse to all of the DIP

Collateral and all proceeds thereof in accordance with the DIP Credit Agreement and the other DIP

Loan Documents, subject only to payment of the Carve Out and provided that the DIP Superpriority

Claims will have no recourse to the Carve Out Reserves, or the funds therein except to the extent of

any Carve Out Security Interest on the terms therein. The DIP Superpriority Claims shall be entitled

to the full protection of Bankruptcy Code section 364(e) if this Final Order or any provision hereof is

vacated, reversed, or modified on appeal.

   6. DIP Budget Compliance and Reporting.

   (a) Attached to this Final Order as Exhibit B is (i) a 13-week cash forecast in form

and substance satisfactory to Hallmark, which shall consist of forecasted receipts and disbursements

(including, without limitation, professional fees) of the Debtors for the 13 weeks commencing on the

Petition Date (the "Initial DIP Budget"). The Debtors shall deliver an updated 13-week cash forecast

on a consolidated basis in form and substance reasonably satisfactory to Hallmark (an "Updated DIP

Budget", and upon the written approval (email being sufficient) by Hallmark or its advisors, and

together with the Initial DIP Budget, collectively, the "Approved DIP Budget"), which proposed

Updated DIP Budget shall be delivered to Hallmark every four weeks no later than five calendar days

prior to the Monday of the first week covered on such proposed Updated DIP Budget. Any

amendments, supplements or modifications to the Approved DIP Budget or Variance Report (as

defined below) shall be subject to the prior written approval (email being sufficient) of Hallmark

in its reasonable discretion prior to the implementation thereof. If Hallmark has not approved in

writing (email being sufficient) a proposed Updated DIP Budget within five (5) business days of

receipt of such proposed Updated DIP Budget, the then-current Approved DIP Budget shall continue to be the Approved DIP Budget. Until any such updated budget, amendment, supplement or modification has been approved by Hallmark in its reasonable discretion, the Debtors shall be subject to and be governed by the terms of the Approved DIP Budget then in effect.

(b) <u>Variance Reports</u>. The Debtors shall at all times comply with the Approved DIP Budget, subject to the Prohibited Variances (as defined below). Commencing on Thursday (or the immediately subsequent business day if such Thursday is not a business day) of the third full calendar week after the date of entry of the Final Order by no later than 5:00 p.m. (prevailing Eastern Time) (the "<u>Initial Variance Report Date</u>"), and on each Thursday (or the immediately subsequent business day if such Thursday is not a business day) thereafter, by no later than 5:00 p.m. (prevailing Eastern time) (together with the Initial Variance Report Date, a "<u>Variance Report Date</u>"), the Debtors or their advisors shall deliver by email to Hallmark and its advisors, a variance report (each, a "<u>Variance Report</u>") for the immediately preceding Variance Test Period (as defined below) (i) setting forth, in reasonable detail, "receipts" and "disbursements" of the Debtors and any variances between the actual amounts and those set forth in each corresponding cumulative two-week period in the then in-effect Approved DIP Budget for such Variance Test Period and (ii) describing any material variances. "<u>Variance Test Period</u>" shall mean, beginning after the first full cumulative two-week period after the Petition Date, which shall be covered by the first Variance Report to be delivered hereunder (the "<u>Initial Variance Test Period</u>"), each successive cumulative two-week which shall be covered by each successive Variance Report to be delivered hereunder with respect to the then-in-effect Approved DIP Budget.

(c) Except as otherwise agreed to by Hallmark, or as expressly permitted herein or in the DIP Credit Agreement or the other DIP Loan Documents, the Debtors' use of the DIP Loans

and Cash Collateral shall only be permitted pursuant to the terms of, and in accordance with, the Approved DIP Budget, subject to allowed variances and requirements set forth in Section 6.14(b) of the DIP Credit Agreement. Hallmark shall have no obligation with respect to the Debtors' use of the DIP Loans and Cash Collateral, and shall not be obligated to ensure or monitor the Debtors' compliance with the Approved DIP Budget or to pay (directly or indirectly from the DIP Loans or Cash Collateral) any expenses incurred or authorized to be incurred pursuant to the Approved DIP Budget. The consent of Hallmark to the use of DIP Loans or Cash Collateral pursuant to this Final Order and the DIP Credit Agreement shall not be construed as consent to the use of any DIP Loans or Cash Collateral after the occurrence of an Event of Default (as defined in the DIP Credit Agreement) (other than funding the Carve Out as set forth herein), regardless of whether the aggregate funds shown on the Approved DIP Budget have been expended. In addition to, and without limiting, whatever rights to access Hallmark has under the DIP Credit Agreement or the other DIP Loan Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, advisors, agents, and employees of Hallmark to: (i) have access to and inspect the Debtors' book and records; and (ii) discuss the Debtors' affairs, finances, and condition with the Debtors' attorneys and financial advisors.

     7.   <u>Carve Out</u>.

     (a)   <u>Carve Out</u>. As used in this Final Order, the "<u>Carve Out</u>" means the sum of (i) allowed administrative expenses for (A) statutory fees and interest payable to the Office of the U.S. Trustee (pursuant to 28 U.S.C. § 1930(a)(6) and 31 U.S.C. § 3717, respectively), as determined by agreement of the U.S. Trustee or by final order of this Court, and (B) fees required to be paid to the Clerk of the Bankruptcy Court (pursuant to 28 U.S.C. § 156(c)); (ii) accrued and unpaid fees, disbursements, costs and expenses, allowed at any time by the Bankruptcy Court and incurred by

professionals retained by the Debtors or a statutory committee, if any, (the "Case Professionals"), up to and as limited by the respective Approved Budget amounts for each Case Professional or category of Case Professional, less the amount of pre-petition retainers received by such Case Professionals and not previously applied to fees and expenses (with said retainers expressly not being subject to the DIP Lien); (iii) accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals from and after the date of service of a Carve Out Trigger Notice, which means a notice sent by the DIP Lender to Debtors and each other applicable interested party in the Cases that the Post-Trigger Carve Out Cap (as defined below) has been invoked, to the extent allowed at any time, in an aggregate amount not to exceed $30,000.00 (the "Post-Trigger Carve Out Cap"), less the amount of pre-petition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (ii) above. The Post-Trigger Carve Out Cap shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve Out Trigger Notice in respect of fees and expenses incurred after delivery of the Carve Out Trigger Notice; and (iv) an amount for unsecured creditors equal to the lesser of (a) two percent (2%) of the aggregate value any liens and claims of the DIP Lenders which are avoided or otherwise disallowed in the Chapter 11 Cases and (b) $100,000.00.

(b)    Investigation/Challenge Budget. The amount of fees and expenses for investigation of the pre-petition liens and claims against Hallmark under any Prepetition Agreement shall not exceed $25,000.00. No portion of the proceeds of the DIP Credit Facility or the Carve Out shall be used for the payment of fees or expenses of any person challenging the pre-petition liens and/or claims of Hallmark under any Prepetition Agreement or pursuing or prosecuting any claims or actions against Hallmark under the Prepetition Agreements, including any claim under Chapter 5 of the Bankruptcy Code in respect of any Prepetition Agreement.

(c)     Carve Out Priority. For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order, the terms of the DIP Facility, or in any prepetition secured facilities, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Credit Obligations. Notwithstanding the payment of any amounts contained in the Carve Out Reserves (including any residual amounts contained therein) to Hallmark as contemplated by this paragraph 7, all parties' rights with respect to any such payments solely to the Prepetition Secured Parties are expressly preserved.

(d)     Payment of Professional Fees Prior to the Termination Declaration Date. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees, or on or following the Termination Declaration Date if on account of Allowed Professional Fees incurred on or prior to the Termination Declaration Date, shall not reduce the Carve Out except to the extent of a diminution of the retainer constituting a part of the Carve Out.

(e)     No Direct Obligation to Pay Allowed Professional Fees. Hallmark shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Final Order or otherwise shall be construed to obligate Hallmark, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)       Payment of Carve Out On or After the Carve Out Trigger Notice. Any payment or reimbursement made on or after the occurrence of the Carve Out Trigger Notice in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Final Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

(g)       Notwithstanding anything to the contrary in this Final Order, the Debtors' obligations to the DIP Secured Parties and Prepetition Secured Parties and the liens, security interests, and superpriority claims granted herein, under the DIP Loan Documents, and/or under the Prepetition Credit Documents, including, without limitation, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Prepetition Liens, the Adequate Protection Obligations, and the Prepetition Secured Obligations, shall be subject in all respects and subordinate to the Carve Out.

8.       Limitation on Charging Expenses against Collateral. Effective as of the Petition Date, in light of the agreement of Hallmark to allow (i) the Debtors to use Cash Collateral as provided for herein, and (ii) the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out) pursuant to Bankruptcy Code section 506(c) or any similar principle of law, without the prior written consent of Hallmark and no such consent shall be implied from any other action, inaction, or acquiescence.

9.       No Marshaling/Application of Proceeds. Effective as of the Petition Date, Hallmark shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition

Collateral in accordance with the provisions of the Final Order, the DIP Credit Agreement, the other

DIP Loan Documents, and the Prepetition Credit Documents, as applicable, and in no event shall

Hallmark be subject to the equitable doctrine of "marshaling" or any other similar doctrine with

respect to any of the DIP Collateral or Prepetition Collateral, as applicable.

10.     <u>Equities of the Case</u>. Effective as of the Petition Date, in light of, among other

things, the agreement of Hallmark to allow the Debtors to use Cash Collateral on the terms set

forth herein (i) Hallmark shall be entitled to the rights and benefits of Bankruptcy Code section

552(b), if any, and (ii) the "equities of the case" exception under Bankruptcy Code section 552(b)

shall not apply to such parties with respect to the proceeds, products, offspring, or profits of any

of the Prepetition Collateral or the DIP Collateral, as applicable.

11.     <u>Payments Free and Clear</u>. Any and all payments or proceeds remitted to Hallmark

pursuant to the provisions of this Final Order, the DIP Credit Agreement and any other DIP Loan

Document or any subsequent order of this Court shall be irrevocable, received free and clear of any

claim, charge, assessment or other liability, including, without limitation, any claim or charge arising

out of or based on, directly or indirectly, Bankruptcy Code sections 506(c) or 552(b), whether

asserted or assessed by, through or on behalf of the Debtors.

12.     <u>Use of Cash Collateral</u>. The Debtors are hereby authorized to use all Cash Collateral

in accordance with this Final Order, the DIP Credit Agreement, and the other DIP Loan Documents,

to the extent set forth in the Approved DIP Budget. Except as pursuant to the Approved DIP Budget,

or on the terms and conditions of this Final Order, or an order of the Court, or as otherwise agreed

to by Hallmark, the Debtors shall be enjoined and prohibited from at any time using the Cash

Collateral.

13. <u>Adequate Protection for the Prepetition Secured Parties</u>. Subject in all respects to the Carve Out and the terms of this Final Order, pursuant to Bankruptcy Code sections 361, 363(e) and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for any postpetition diminution in value of such interests (such diminution, a "<u>Diminution in Value</u>"), resulting from the imposition of the DIP Liens on the Prepetition Collateral, the Carve Out, the sale, lease or use of the Prepetition Collateral (including Cash Collateral), and any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Secured Parties, are hereby granted the following (collectively, the "<u>Adequate Protection Obligations</u>"); *provided* that the Prepetition Secured Parties shall have no recourse to the Carve Out Reserves except to the extent of the Carve Out Security Interests on the terms herein, and the adequate protection will otherwise include:

(a)    <u>Adequate Protection Liens</u>. As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable, non-avoidable, effective and automatically perfected upon the Petition Date additional and replacement liens on, and security interest in the DIP Collateral, (the "<u>Adequate Protection Liens</u>"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents. The Adequate Protection Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any lien or security interest arising after the Petition Date, except as expressly provided for in this Final Order.

27

(b)    <u>Adequate Protection Claims</u>. As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed Administrative Expense Claim in the Chapter 11 Cases of each of the Debtors to the extent of any postpetition Diminution in Value (the "<u>Adequate Protection Claims</u>"). The Adequate Protection Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof. The Adequate Protection Claims shall have the same relative priorities as the Adequate Protection Liens and be subject to the Carve Out and the DIP Superpriority Claims in all respects. Except as set forth in this Final Order, the Adequate Protection Claims will not be junior or *pari passu* to any other claims and shall have priority over all Administrative Expense Claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation and to the extent permitted by law, Administrative Expense Claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 506(c) (subject to entry of the Final Order to the extent provided for therein), 507(a), 507(b), 546(d) (subject to entry of the Final Order to the extent provided for therein), 726, 1113 and 1114. The Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Claims from the Debtors under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or as otherwise provided in the DIP Credit Agreement or the DIP Loan Documents.

14.    <u>Perfection of DIP Liens</u>.

(a)    Hallmark is hereby authorized, but not required, to file or record security agreements, pledge agreements, financing statements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the DIP Liens. Whether or not Hallmark shall, in its sole discretion, choose to file such financing statements, intellectual property filings, notices of

lien, or similar instruments, such DIP Liens shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Final Order), at the time and on the date of this Final Order. Upon the request of Hallmark, the Debtors, without any further consent of any party, are authorized to take, execute, deliver, and file such instruments to Hallmark to further validate, perfect, preserve and enforce the DIP Liens and the applicable Adequate Protection Liens, respectively. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A copy of this Final Order may, in the discretion of Hallmark, be filed with or recorded in filing or recording offices in addition to or in lieu of such security agreements, pledge agreements, financing statements, intellectual property filings, depository account control agreements, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording.

15.    <u>DIP Termination Event</u>. Subject to any applicable notice periods and other terms set forth in paragraph 17, solely to the extent the DIP Obligations have not been indefeasibly paid in full in cash or satisfied in connection with one or more sales of substantially all of the Debtors' assets, then the DIP Obligations shall accelerate and become due and payable in full and the DIP Commitments and use of Cash Collateral will terminate, in each case, without further notice or action by the Court following the earliest to occur of any of the following (each a "<u>DIP Termination Event</u>"): (i) the occurrence and continuation of any Event of Default (as defined in the DIP Credit Agreement), which Events of Default are explicitly incorporated by reference into this Final Order; (ii) the Debtors' failure to comply with any material provision of this Final Order; (iii) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement); (iv) the entry of an order authorizing the use of Cash Collateral of the DIP Lenders on a non-consensual basis or financing under

Bankruptcy Code section 364 that is *pari passu* or senior to the DIP Loans or the Prepetition Loans or the filing by the Debtors of a motion seeking such authority, excepting the financing furnished by Michael Postal pursuant to the Motion and being approved by separate order of this Court; and (v) unless otherwise agreed to in writing by Hallmark in its sole discretion, the consummation of a sale or disposition of any material assets of the Debtors other than a sale or disposition in the ordinary course of business.

16.    <u>Leased Premises Access</u>. Notwithstanding anything to the contrary in this Order, in the Event of a Default, Hallmark shall only be permitted to enter upon or access the leased premises subject to an unexpired nonresidential real property lease of a Debtor: (i) with the written consent of the landlord counterparty pursuant to a separate written agreement by and between the landlord counterparty and Hallmark; (ii) in accordance with any rights or remedies Hallmark has under applicable non-bankruptcy law; or (iii) permission of the Bankruptcy Court pursuant to the entry of an order upon motion and adequate notice.

17.    <u>Remedies Upon a DIP Termination Event</u>. The Debtors shall promptly provide notice to counsel to Hallmark of the occurrence of any DIP Termination Event. Upon the occurrence of a DIP Termination Event (regardless of whether the Debtors have given the notice described in the previous sentence), and following five (5) days' written notice (email being sufficient) by Hallmark to lead restructuring counsel to the Debtors and the U.S. Trustee, may take any or all of the following actions, unless the Court orders otherwise prior to the expiration of such five (5) day notice period: (i) the Debtors shall be charged the default interest rate set forth in the DIP Credit Agreement; (ii) the commitment of each DIP Lender to make DIP Loans will be terminated (to the extent any such commitment remains under the DIP Facility) and all obligations under the DIP Facility shall become due and payable; (iii) the Debtors' authority to use Cash Collateral shall immediately terminate,

except that the Debtors may use Cash Collateral to (a) fund the Carve Out and (b) make payroll of the Debtors and fund critical expenses of the Debtors necessary to avoid immediate and irreparable harm to the Debtors' estates, in each case in accordance with the terms of the Approved DIP Budget; and (iv) Hallmark is hereby granted relief from the automatic stay without further notice or a hearing to exercise its rights and remedies against the DIP Collateral available to it under the DIP Credit Agreement and Prepetition Credit Obligations, and applicable non-bankruptcy law.

18.    <u>Joint and Several</u>. The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder.

19.    <u>No Waiver for Failure to Seek Relief</u>. The failure or delay of the Debtors or Hallmark to exercise rights and remedies under this Final Order, the DIP Credit Agreement, the other DIP Loan Documents, the Prepetition Credit Obligations, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

20.    <u>Preservation of Rights Granted Under this Final Order</u>.

(a)    Subject to the Carve Out, and other than as set forth in this Final Order, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(b)    In the event this Final Order or any provision hereof is reversed or modified on appeal, the validity and priority of any liens or claims granted to Hallmark hereunder arising prior to the effective date of any such reversal or modification of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights,

remedies, privileges, and benefits granted herein, and the Prepetition Secured Parties shall be entitled to the protections afforded in Bankruptcy Code section 364(e).

(c)     Subject to the Carve Out, unless and until all DIP Obligations, Prepetition Secured Obligations, and Adequate Protection Obligations are indefeasibly paid in full, in cash, or all commitments under the DIP Credit Agreement are otherwise terminated in accordance with the terms thereof, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (i) except as permitted under the DIP Credit Agreement or the other DIP Loan Documents, or with the prior written consent of Hallmark (x) any modification, stay, vacatur, or amendment of this Final Order, (y) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a), or 507(b)) in any of the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims, the Adequate Protection Claims, and the Prepetition Secured Obligations (or the liens and security interests secured by such claims and obligations), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Credit Agreement and the other DIP Loan Documents, any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens, or the Prepetition Liens, as the case may be; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Credit Agreement, the other DIP Loan Documents and this Final Order (including compliance with the Approved DIP Budget); (iv) an order converting or dismissing any of the Chapter 11 Cases; (v) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vi) an order appointing an examiner with expanded powers in any of the Chapter 11 Cases.

(d)     Notwithstanding any order dismissing the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and the other administrative claims granted pursuant to this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Claims, and other administrative claims granted pursuant to this Final Order, shall notwithstanding such dismissal, remain binding on all parties in interest); and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(e)     Except as expressly provided in this Final Order, the DIP Credit Agreement or in the other DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims and all other rights and remedies of Hallmark granted by the provisions of this Final Order, the DIP Credit Agreement and the DIP Loan Documents shall survive, shall maintain their priority as provided in this Final Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of the Chapter 11 Cases or by any other act or omission, or (ii) the entry of an order confirming a plan in any of the Chapter 11 Cases. The terms and provisions of this Final Order, the DIP Credit Agreement and the DIP Loan Documents shall continue in the Chapter 11 Cases, in any successor cases under any chapter of the Bankruptcy Code, if the Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code. The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and the Adequate Protection

Claims and all other rights and remedies of Hallmark granted by the provisions of this Final Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the DIP Lenders). Notwithstanding anything to the contrary in this Final Order, the DIP Credit Agreement or the DIP Loan Documents, nothing in this Final Order, the DIP Credit Agreement or the DIP Loan Documents shall affect any right of Hallmark to object to any sale of the Debtors' assets or chapter 11 plan that is not acceptable to Hallmark in its reasonable discretion, and all such rights are expressly preserved.

21.     <u>Good Faith Under Bankruptcy Code Section 364(e); No Modification or Stay of this Final Order</u>. Hallmark has acted in good faith in connection with this Final Order and is entitled to rely upon the protections granted herein and by Bankruptcy Code section 364(e). Based on the findings set forth in this Final Order and the record made during the Hearings, and in accordance with Bankruptcy Code section 364(e), in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, Hallmark is entitled to the protections provided in Bankruptcy Code section 364(e). Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby.

22.     <u>Expenses and Indemnification</u>.

(a)     The Debtors are authorized and directed to pay, without further Court order but no more promptly than provided for in the DIP Loan Documents, the reasonable and documented fees and expenses whether incurred before or after the Petition Date, by professionals or consultants retained by Hallmark, including the fees and expenses of Stinson LLP, in its capacity as lead counsel to Hallmark (the "<u>DIP Professionals</u>"), incurred in connection with the Chapter 11 Cases (in any

capacity) and the DIP Facility, including the reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Professionals) of Hallmark, for enforcement costs and documentary taxes associated with the DIP Facility and the transactions contemplated thereby (collectively, the "DIP Professional Fees"). The DIP Professionals shall not be required to file motions or applications with respect to the DIP Professional Fees; *provided*, *however* that any time the DIP Professionals seek payment of fees and expenses from the Debtors, each DIP Professional shall provide summary copies of its fee and expense statements or invoices (which shall be required to contain time entries but which may be redacted or modified to the extent necessary to protect any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the Debtors and the U.S. Trustee. If no objection to payment of the requested DIP Professional Fees and expenses is made, in writing, by Hallmark or the U.S Trustee within fourteen (14) days of receipt of an invoice for DIP Professional Fees, then such invoice shall be promptly paid, without further order of, or application to, the Court or notice to any other party, and, in any case, within five (5) calendar days following the expiration of the Fee Objection Period and shall not be subject to any further review, challenge, or disgorgement. For the avoidance of doubt, the provisions of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine. If within the Fee Objection Period, a Fee Notice Party sends to the affected professional and files with the Court a written objection to such invoice, then only the disputed portion of such DIP Professional Fees shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and any

undisputed portion shall be paid within five (5) calendar days following the expiration of the Fee Objection Period.

(b)    As set forth in the DIP Credit Agreement, the Debtors will, jointly and severally, indemnify Hallmark and its affiliates, successors and assigns and the officers, directors, employees, agents, advisors, counsel, controlling persons, and members of each of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the execution or delivery of the DIP Credit Agreement and the DIP Loan Documents, transactions contemplated hereby and thereby, and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with the terms of the DIP Credit Agreement; *provided* that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of gross negligence or willful misconduct of such person (or their related persons). No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct.

23.    Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral. Subject to paragraph 24, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve Out may be used: (i) to investigate, initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action,

suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type (a) against Hallmark under the DIP Loan Documents, this Final Order, the DIP Credit Agreement or the Prepetition Credit Obligations, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any official committee of unsecured creditors in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of Hallmark to recover on the DIP Collateral or the Prepetition Collateral, or seeking affirmative relief against Hallmark related to the DIP Obligations, or the Prepetition Credit Obligations, (b) seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Superpriority Claims, or Hallmark's liens or security interests in the DIP Collateral or the Prepetition Credit Obligations or the Prepetition Liens in the Prepetition Collateral or (c) for monetary, injunctive, or other affirmative relief against Hallmark or its liens on or security interests in the DIP Collateral or the Prepetition Collateral, or the DIP Superpriority Claims, that would impair the ability of Hallmark to assert or enforce any lien, claim, right or security interest or to realize or recover on the DIP Obligations or the Prepetition Credit Obligations to the extent permitted or provided hereunder; (ii) for objecting to or challenging in any way the legality, validity, extent, priority, perfection or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of Hallmark related to the Prepetition Credit Obligations or by or on behalf of Hallmark related to the DIP Obligations; (iii) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Credit Obligations, or the Prepetition Liens; and (iv) for prosecuting

an objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of: (x) any of the DIP Liens, the DIP Superpriority Claims or any other rights or interests of Hallmark related to the DIP Obligations or the DIP Liens or (y) any of the Prepetition Liens or any other rights or interests of Hallmark related to the Prepetition Credit Obligations; *provided* that up to $25,000 of aggregate proceeds of the DIP Facility, the DIP Collateral or the Prepetition Collateral, including the Cash Collateral, may be used by any official committee of unsecured creditors to investigate the foregoing matters solely with respect to Hallmark, the Prepetition Credit Obligations and the Prepetition Liens within the Challenge Period (such proceeds, the "Investigation Budget").

    24.    <u>Effect of Stipulations on Third Parties</u>.

    (a)    The acknowledgments, stipulations, admissions, waivers and releases contained in this Final Order shall be binding upon the Debtors (including their representatives) and any successor or assigns thereto upon entry of this Final Order. The acknowledgments, stipulations, admissions, waivers and releases contained in this Final Order shall also be binding upon all other parties in interest, including any official committee of unsecured creditors, or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "<u>Trustee</u>"), unless (i) such party with requisite standing granted by an order of this Court (or such other court of competent jurisdiction), has duly filed a proceeding challenging the validity, perfection, priority, extent, or enforceability of the Prepetition Liens, or the Prepetition Credit Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests, or defenses (each such proceeding or contested matter, a "<u>Challenge</u>") against Hallmark or its affiliates or representatives in connection with any matter related to the Prepetition Credit Obligations, the Prepetition Collateral, or the Prepetition Liens by any creditors' committee and all other parties in

interest by the date that is 45 days after the date of entry of this Final Order subject to further extension by written agreement (which writing may be in the form of e-mail by counsel) of the Debtors and Hallmark each in their sole discretion, the "Challenge Period"); *provided* that in the event that, prior to the expiration of the Challenge Period, (x) the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code or (y) a chapter 11 trustee is appointed in the Chapter 11 Cases, then in each such case, the Challenge Period shall be extended for a period of 10 calendar days solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge or claim in any such duly filed adversary proceeding. If no such adversary proceeding is timely filed prior to the expiration of the Challenge Period, without further order of this Court: (x) the Prepetition Credit Obligations shall constitute allowed claims, not subject to any Challenge, impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in the Chapter 11 Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in this Final Order, not subject to disallowance or   recharacterization; and (z) the Prepetition Credit Obligations, the Prepetition Liens on the Prepetition Collateral and Hallmark shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period). If any proceeding is timely filed by a party that has been granted standing as provided above prior

to the expiration of the Challenge Period, (i) the stipulations and admissions contained in this Final

Order shall nonetheless remain binding and preclusive on all other parties in interest, including any

Trustee, except with respect to any party that timely files a Challenge and solely as to any stipulations

or admissions that are specifically and expressly challenged in such adversary proceeding; *provided*

that the filing of a motion by any official committee of unsecured creditors or any other party in

interest seeking standing with respect to a Challenge, attaching a draft of the complaint setting forth

such Challenge, shall toll any such committee's or party's Challenge Period in respect of such

Challenge, solely as to any stipulations or admissions that are specifically and expressly challenged

in such adversary proceeding, until the date that is one business day after the entry of a final order

of the Court (which order, on request of any party, will be issued within 7 days of the filing of the

Motion) ruling on such standing motion with respect to such Challenge (or to such later date as

agreed by the challenging party and Hallmark); and (ii) any Challenge not brought in such adversary

proceeding shall be forever barred; *provided* that, if and to the extent any challenges to a particular

stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such

stipulation also shall be binding on the Debtors' estates and all parties in interest. For the avoidance

of doubt, none of the DIP Collateral (including any proceeds thereof) shall be used to fund any

professional fees or expenses of any party in connection with any Challenge (other than such fees

and expenses of the Committee Professionals which subject to entry of the Final Order to the extent

provided therein shall not exceed the Investigation Budget) whether pursuant to this Final Order or

otherwise.

(b)    Nothing in this Final Order vests or confers on any person (as defined in the

Bankruptcy Code), including any official committee of unsecured creditors, standing or authority

to pursue any claims or causes of action belonging to the Debtors or their estates, including,

without limitation, any challenge with respect to the Prepetition Credit Documents, the Prepetition Liens or the Prepetition Secured Obligations.

25.    <u>Release</u>. Effective upon entry of this Final Order, subject to the rights of parties in interest, other than the Debtors, pursuant to paragraphs 23 and 24 of this Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally, and irrevocably releases and forever discharges and acquits Hallmark, its affiliates and each of its respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, solely in their capacities as such (collectively, the "<u>Released Parties</u>"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract tort or under any state or federal law or otherwise, arising out of or related to the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Credit Agreement, the other DIP Loan Documents, the Prepetition Credit Obligations, the Prepetition Liens, the obligations owing and the financial obligations made thereunder, and the negotiation of any of the foregoing and the deal reflected thereby; *provided*, that nothing herein shall relieve the Released Parties from fulfilling their obligations under the DIP Credit Agreement, the other DIP Loan Documents, and this Final Order.

26.    <u>Insurance</u>. At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date. Upon entry of this Final Order, Hallmark is, and will be deemed to be, without any further action or notice, named as an additional insured and lender's loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

27.    <u>Credit Bidding</u>. Hallmark shall have the unqualified and unconditional right to credit bid up to (X) the full amount of any DIP Obligations with respect to the New Money DIP Loans, and (Y) the full amount of any DIP Obligations with respect to the Roll-Up Loans in any sale of any of the Debtors' assets, including pursuant to (a) Bankruptcy Code section 363, (b) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (c) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725, in all cases subject to section 363(k) of the Bankruptcy Code. Hallmark shall have the absolute right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid to any acquisition entity or joint venture formed in connection with such bid.

28.    <u>No Obligation to Extend Credit</u>. Hallmark shall have no obligation to make any loan or advance under the relevant DIP Loan Documents or the DIP Credit Agreement unless all of the conditions precedent under the DIP Credit Agreement, the DIP Loan Documents and this Final Order have been satisfied in full or waived by the DIP Lenders and in accordance with the terms of the applicable DIP Loan Documents.

29.    <u>Restrictions on Transfer of DIP Collateral or Prepetition Collateral to Non-Debtor Affiliates</u>. Except to the extent permitted pursuant to any order entered by the Court in connection with the "first day" relief and the Approved DIP Budget, the Debtors shall not transfer or use any

42

DIP Collateral or Prepetition Collateral, including Cash Collateral, to or for the benefit of any direct or indirect non-debtor affiliate or subsidiary of the Debtor absent the express written consent of Hallmark.

30.    <u>Binding Effect; Successors and Assigns</u>. The DIP Credit Agreement, the other DIP Loan Documents, and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, Hallmark, any official committee of unsecured creditors, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of Hallmark; *provided* that Hallmark shall have no obligation to permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) or to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

31.    <u>Limitation of Liability</u>. Solely in determining to make any loan under the DIP Credit Agreement and the other DIP Loan Documents, permitting the use of Cash Collateral, or exercising any rights or remedies (excluding any actions taken after an exercise of remedies) as and when permitted pursuant to this Final Order, the DIP Loan Documents, the Prepetition Credit Obligations, Hallmark shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business, nor shall it owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors. Furthermore, nothing in this Final Order, the DIP Credit Agreement, the other DIP Loan

Documents or the Prepetition Credit Obligations shall in any way be construed or interpreted to impose or allow the imposition upon Hallmark of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

32.    <u>Amendment of the DIP Credit Agreement and Other DIP Loan Documents</u>. The DIP Credit Agreement and the other DIP Loan Documents may from time to time be amended, restated, waived, modified, or supplemented by the Debtors and Hallmark in accordance with the terms and conditions of this Final Order, the DIP Credit Agreement or other DIP Loan Document without further order of the Court, if the amendment, restatement, waiver, modification, or supplement does not (a) shorten the original stated maturity of the DIP Loans, (b) increase the aggregate commitments or the rate of interest payable thereunder or (c) amend the Events of Default or covenants under the DIP Credit Agreement or the other DIP Loan Documents to be materially more restrictive to the Debtors (taken as a whole) than the Events of Default as originally attached to this Final Order (and such amendment, restatement, waiver, modification or supplement, an "<u>Approved Modification</u>"); *provided that*, for the avoidance of doubt, other than as explicitly set forth in the DIP Credit Agreement or another DIP Loan Document, updates and supplements to the Approved DIP Budget required to be delivered by the Debtors under the DIP Credit Agreement or this Final Order shall not require further order of the Court. In the case of an amendment, restatement, waiver, supplement or other modification of the DIP Credit Agreement or any other DIP Loan Documents that is not an Approved Modification, the Debtors shall (a) provide notice (which may be provided through e-mail) to the U.S. Trustee, and (b) obtain approval of the Court.

33.    <u>Proofs of Claim</u>. Hallmark shall not be required to file proofs of claim in any of the Chapter 11 Cases or any successor cases for any claim allowed herein, and the stipulations in this

Final Order shall be deemed to constitute a timely filed proof of claim with respect to the Prepetition Secured Obligations against each of the applicable Debtors in the Chapter 11 Cases.

34.     <u>Automatic Stay Modified</u>. The automatic stay under Bankruptcy Code section 362 shall be modified and lifted to the extent necessary to allow Hallmark to provide any notices to the Debtors or take any other action as contemplated by and in accordance with this Final Order.

35.     <u>Necessary Action</u>. The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms and conditions of this Final Order.

36.     <u>Right to Seek Additional Adequate Protection</u>. This Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request additional forms of adequate protection at any time, subject to the consent of Hallmark and any party in interest's right to object thereto. Nothing herein shall be deemed a finding by the Court or an acknowledgment by the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect the Prepetition Secured Parties against any Diminution in Value.

37.     <u>Effectiveness</u>. This Final Order shall constitute findings of fact and conclusions of law and shall take effect as of the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule or Local Rule, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

38.     <u>Final Order Governs</u>. In the event of any inconsistency between the provisions of the DIP Credit Agreement, the other DIP Loan Documents and this Final Order, the provisions of this Final Order shall govern.

39.    <u>Bankruptcy Rules</u>. The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

40.    <u>Retention of Jurisdiction</u>.  The Court shall retain exclusive jurisdiction to resolve any and all disputes arising under or related to the DIP Obligations, the DIP Credit Agreement, the DIP Loan Documents or the provisions of this Final Order, and to enforce all of the conditions of the DIP Loan Documents and this Final Order.

**[END OF ORDER]**

I ask for this:

/s/ Maurice VerStandig
Maurice B. VerStandig, Esq.
Bar No. MD18071
The Belmont Firm
1050 Connecticut Avenue, NW, Suite 500
Washington, DC 20036
Phone: (202) 991-1101
mac@dcbankruptcy.com
*Counsel for the Debtor*

Exhibit A

**$10,720,562**

**SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION
CREDIT AND SECURITY AGREEMENT**

among

LBPO Management LLC, a Maryland limited liability company and each other Debtor in the chapter 11 Bankruptcy Cases jointly administered under *In re Banners of Abingdon, LLC, et al.*[1] filed in the United States Bankruptcy Court for the District of Columbia as Case No. 25-378-ELG

**(collectively, as "Borrowers")**

and

Hallmark Marketing Company, LLC, a Kansas limited liability company

**("Lender").**

_____

**Dated as November [___], 2025**

_____

[1]     Debtors in these cases are Banners of Abingdon, LLC; Banners of Reston, Inc.; Banner's of Dulles Town, Inc.; Banner's of Fair Oaks, LLC; Banner's Of Ashburn, LLC; Banner's of Gainesville, LLC; Banner's of Warrenton, LLC; Banner's of South Riding, LLC; Banner's of Stafford, LLC; Banner's of Oakton, LLC; Banner's of Bradlee Center, LLC; Banners of Fair Lakes, LLC; Banners of Woodbridge LLC; Banners of Williamsburg LLC; Banners of Newport News LLC; Banners of Commonwealth Midlothian LLC; Banners of Village Market Place Midlothian LLC; Banners of Fairfield Virginia Beach LLC; Banners of Hilltop Virginia Beach LLC; Banners of Central Park Fredericksburg LLC; Banners of Cosner's Corner Fredericksburg LLC; Banners of York River LLC; Banners of Lynchburg, LLC; Banners of Harrisonburg VA LLC; Banners of Winchester LLC; Banners of Christiansburg VA LLC; Banners of Chesapeake VA LLC; Banners of Columbus Village VA Beach LLC; Banner's of Burke, LLC; Banner's of Kamp Washington, LLC; Banners of Suffolk II LLC; Banners of Suffolk LLC; Banners of Henrico LLC; Banners Of Waynesboro LLC; Banners of Roanoke LLC; Banners of Rocky Mount VA, LLC; Banners of Manassas II LLC; Banners of Charlottesville LLC; Banners of Kingstowne LLC; Banners of Leesburg, LLC and LBPO Management, LLC.

**SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION
CREDIT AND SECURITY AGREEMENT**

THIS **SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION CREDIT
AND SECURITY AGREEMENT** (this "Agreement"), is entered into as of November [___],
2025, by and among LBPO Management LLC, a Maryland limited liability company and each
other Debtor in the Chapter 11 Bankruptcy Cases jointly administered under *In re Banners of
Abingdon, LLC, et al.*[2] filed in the United States Bankruptcy Court for the District of Columbia as
Case No. 25-378-ELG (each a "Borrower", and collectively the "Borrowers") and Hallmark
Marketing Company, LLC, a Kansas limited liability company ("Hallmark") and/or its affiliates,
successors, and assigns (each a "Lender" and together the "Lenders").

## PRELIMINARY STATEMENTS

WHEREAS, Lender and certain of the Borrowers (the "Prepetition Borrowers") are party
to certain Hallmark Account Agreements of various dates, Gold Crown Sublicence Agreements of
various dates, and an Agreement dated October 28, 2019 (collectively, the "Prepetition
Agreements") which provide for, among other things, the delivery of goods, products and
merchandise and the extension of credit and financing terms associated with the Prepetition
Borrowers' business operations, which indebtedness is evidenced and secured pursuant to that
certain Amended and Restated Loan and Security Agreement and Release dated as of January 1,
2020 (the "Prepetition Loan Agreement") and one or more promissory notes from time to time
executed by Borrowers in favor of the Lender in connection therewith (whether one or more, the
"Prepetition Notes").

WHEREAS, in addition to the Prepetition Agreements, the Prepetition Loan Agreement,
and the Prepetition Notes, the Prepetition Borrowers executed and delivered to, or in favor of the
Lenders, various other documents, instruments, agreements, notes, and certificates (all as
amended, modified or supplemented from time to time and in effect, and collectively with the
Prepetition Agreements, the Prepetition Loan Agreement, and the Prepetition Notes, the
"Prepetition Financing Documents");

WHEREAS, on September 14,15, and 16, 2025 (collectively the "Petition Date"), the
Borrowers (as used herein collectively sometimes the "Debtors") filed voluntary petitions for relief
(collectively, the "Cases") under chapter 11 of Title 11 of the United States Code (the "Bankruptcy
Code" with the United States Bankruptcy Court for the District of Columbia (the "Bankruptcy
Court").

WHEREAS, from and after the Petition Date, each of the Debtors will continue to operate
its business, manage its properties, and continue in the possession of its assets as a debtor and
debtor-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Borrowers have requested that the Lender make post-petition advances
and provide other financial or credit accommodations to the Borrowers, and the Lender has agreed,

---

[2]    See Fn.1.

subject to the conditions set forth herein, to extend a senior secured superpriority debtor-in-possession in-kind credit facility in the aggregate principal amount not to exceed of $10,720,562 (consisting of $4,300,000 in aggregate principal amount of New Money Loans and $6,420,562 in aggregate principal amount of Roll-Up Loans); and

WHEREAS, the Lender has indicated its willingness to make the above-described credit facility available to the Borrowers on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby agree follows:

Article I.       DEFINITIONS AND CONSTRUCTION.

Section 1.01     Definitions, Code Terms, Accounting Terms and Construction. Capitalized terms used in this Agreement shall have the meanings specified therefor on Schedule 1.1(a). Matters of interpretation of accounting terms and construction are also set forth on Schedule 1.1(a).

Article II.       AMOUNT OF CREDIT AND TERMS OF PAYMENT.

Section 2.01     The Commitments.

(a)     Initial New-Money Loan. Subject to and upon the terms and conditions set forth herein and in the DIP Orders, the Lender agrees to make a term loan (the "Initial New Money Loan") to the Borrowers, which Initial New Money Loan (i) shall be deemed to have been incurred pursuant to a single drawing on September 25, 2025 (the "Initial Closing Date"), (ii) shall be denominated in Dollars, (iii) shall be made by In-Kind Advances to the Borrowers, as joint and several obligors, in the form of the shipments of goods, products, and merchandise at gross wholesale value, as such term is used under or in connection with the Prepetition Agreements, and (iv) shall not exceed the Initial New Money Loan Commitment.

(b)     Delayed-Draw New Money Loan. Subject to and upon the terms and conditions set forth herein and in the DIP Orders, the Lender agrees to make a term loan (the "Delayed-Draw New Money Loan") to the Borrowers, which Delayed-Draw New Money Loan (i) shall be deemed to have been incurred pursuant to a single drawing on the date of entry of a Final Order approving the financing being extended to the Borrowers under this Agreement (the "Final Closing Date"), (ii) shall be denominated in Dollars, (iii) shall be made by In-Kind Advances to the Borrowers, as joint and several obligors, in the form of the shipments of goods, products, and merchandise at gross wholesale value, as such term is used under or in connection with the Prepetition Agreements, and (iv) shall not exceed the Delayed-Draw New Money Loan Commitment.

(c)     Roll-Up Loans. Subject to and upon the terms and conditions set forth herein and in the DIP Orders, Lender shall be deemed to have made, (i) on the date that is five (5) Business Days after the funding of the Initial New Money Loan on the Initial Closing Date, a Loan (the "Initial Roll-Up Loan") by Lender and borrowed by the Borrowers hereunder on

2

the Closing Date in an amount equal to the Initial Roll-Up Loan Commitment and (ii) on the date that is five (5) Business Days after the funding of the Delayed-Draw New Money Loan on the Final Closing Date, a Loan (the "<u>Delayed-Draw Roll-Up Loan</u>" and, together with the Initial Roll-Up Loan, collectively, the "<u>Roll-Up Loans</u>") by Lender and borrowed by the Borrowers hereunder on the Final Closing Date in an amount equal to the Delayed-Draw Roll-Up Loan Commitment. The deemed borrowing by the Borrowers of such Roll-Up Loans shall not entitle the Borrowers to receive any cash or other consideration from Lender and, notwithstanding that no such cash is exchanged, the Borrowers shall owe the aggregate principal amount of the Roll-Up Loans to the Lender under this Agreement.

(d)     Each In-Kind Advance and all proceeds resulting from the sale thereof, and from the sale of any other goods, products and merchandise used or sold in the ordinary operation of Borrowers' business (*i.e.*, not In-Kind Advances, Collateral or other goods, products and merchandise supplied to Borrowers by third parties that are not the Lender), and all proceeds resulting therefrom, shall be used solely for: (i) the payment of transaction fees, expenses and costs incurred in connection with this Agreement, (ii) the payment of fees, expenses and costs incurred in connection with the Cases, (iii) the payment of any adequate protection payments approved in the DIP Orders, and (iv) working capital, capital expenditures, and other general corporate purposes of the Borrowers including the payment of professional fees and expenses, in each case, consistent with, subject to, and within the categories and limitations contained in the Approved Budget.

(e)     Without limiting the foregoing, or any contrary provision herein, no portion of the proceeds of any In-Kind Advance or any Collateral subject to the liens in favor of the Lender, may be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to: (i) the amount, extent, priority, validity, perfection or enforcement of any portion of the Principal Balance or any other Obligation, or (ii) Liens or security interests in any Collateral securing such indebtedness, including challenges to the perfection, priority or validity of the liens granted in favor of the Lender, in its capacity as a prepetition secured party under the Prepetition Financing Documents or as the Lender hereunder with respect the Principal Balance and other Obligations.

(f)     Amounts borrowed (or, in the case of the Roll-Up Loans, deemed borrowed) under this Section 2.01 and repaid, prepaid, or otherwise satisfied in accordance with this Agreement may not be reborrowed.

Section 2.02    <u>Availability of In-Kind Advances</u>.

(a)     The In-Kind Advances shall be made to Borrowers in an amount up to $3,200,000 on the date of entry of the Interim Financing Order, and in an amount up to the greater of (i) $1,100,000 and (ii) the remaining unadvanced Commitment amount on the date of entry of the Final Financing Order. The In-Kind Advances shall be made in accordance with the terms hereof in accordance with the Approved Budget and the Minimum Inventory Requirements. Without limiting any other provision herein, the unadvanced portion of the Commitment and any obligation of the Lender to make In-Kind Advances to Borrowers shall terminate on the Maturity Date.

3

(b)     For the avoidance of doubt (i) the value of all In-Kind Advances shall be based on the "gross wholesale value" for goods, products and merchandise sold to Borrowers by, Lender as such term is used under or in connection with the Prepetition Agreements, and (ii) all goods, products and merchandise comprising In-Kind Advances shall be selected and shipped by Lender in its sole discretion.

Section 2.03    Prepayments.

(a)     Voluntary Prepayments. The Borrowers may prepay the Obligations in whole or in part at any time without premium or penalty, upon notice to the Lender, subject to the Approved Budget.

(b)     Mandatory Prepayments.

(i) Without limiting any other provision herein, the Borrowers shall prepay the Obligations, in full or in part, immediately (A) upon the occurrence of an Event of Default, (B) upon any sale or disposition of any Collateral (including, without limitation, a sale of all or substantially all of any Borrowers' assets under Section 363 of the Bankruptcy Code or otherwise consented to by the Lender) other than in the ordinary course of Borrowers' business, which shall be conducted in an orderly and prudent fashion as a going concern and not as a Liquidation, (C) upon receipt of the proceeds resulting of the incurence of any indebtedness by any Borrower other than in the ordinary course of business, or otherwise approved by the Lender in its sole discretion, which shall include Permitted Indebtedness, (D) upon receipt of any insurance proceeds received by the any Borrower from any casualty or other loss of any Collateral, (E) upon receipt of any condemnation or similar proceeds received by any Borrower in respect of any Collateral, (F) upon and the conversion of the Cases to a Chapter 7 Case(s) under the Bankruptcy Code, and/or (G) upon any dismissal of the Case for any reason (each, a "Prepayment Event").

(ii) If, at any time, any Borrowers receive proceeds from a Prepayment Event, 100% of Net Proceeds received from such Prepayment Event shall be paid over to Lender on the date of receipt by Borrowers and shall be utilized to prepay the Obligations, together with accrued and PIK interest thereon until paid in full, unless otherwise provided in the Approved Budget.  Lender shall not be required to release its Liens on any Collateral included in such Prepayment Event until all Net Proceeds have been actually received by Lender, unless otherwise agreed in writing with the Lender in advance.

(c)     All repayments or prepayments under this Section shall be prepaid without premium or penalty.

(d)     All cash Proceeds of Collateral received by the Lender, shall be applied, first, in accordance with the Approved Budget, and second, to reduce the outstanding Obligations until such Obligations are paid in full.

Section 2.04    Interest Rates: Rates, Payments, and Calculations.

4

(a)    <u>Interest Rate</u>. Except as otherwise provided herein, all outstanding Obligations shall bear interest on the aggregate outstanding balance thereof for the period commencing on the date of the making of each In-Kind Advance and continuing thereafter until the Obligations paid in full (whether at stated maturity, on acceleration or otherwise) at a rate equal to the Interest Rate.

(b)    <u>Default Rate</u>. Notwithstanding the foregoing, upon the occurrence and during the continuation of an Event of Default (following any applicable notice and cure periods) and continuing thereafter, all Obligations shall bear interest on the aggregate outstanding balance thereof from the date of such Event of Default at a rate equal to the Interest Rate plus five (5) percentage points (the "<u>Default Rate</u>").  Interest accrued in accordance with this Section 2.04(b) shall be payable from time to time on demand.

(c)    <u>Payment</u>.

(i)    Interest on the Principal Balance shall be paid monthly (in arrears on the first day of each month) in kind ("<u>PIK</u>") with such PIK interest being added to the Principal Balance on each such date and added to any credit bid amount which may be made by the Lender in connection with the purchase of Borrowers' assets under a section 363 sale in the Cases.

(ii)    Except for Mandatory Prepayments, no repayments of any Obligations shall be due until the Maturity Date. On the Maturity Date, the unpaid Principal Balance, together with all PIK and other unpaid interest, capitalized fees (*i.e.,* the Commitment Fee and the Exit Fee), and all other costs, fees, expenses, indemnities, and other amounts due hereunder shall be due and payable in full (by wire transfer of immediately available funds in the event Borrowers' assets are not sold to the Lender pursuant to a credit bid in a section 363 sale consummated prior to the Maturity Date) without demand by the Lender or consent or further action by the Bankruptcy Court.

(iii)    All fees, including without limitation the Commitment Fee and the Exit Fee, payable hereunder or under any of the other Loan Documents, all costs, and expenses payable hereunder or under any of the other Loan Documents, and all Lender Expenses shall be due and payable on the Maturity Date. No fees payable hereunder shall be due sooner than the Maturity Date; provided that, pursuant to Section 2.03(a), any fees payable hereunder may be paid in the Borrowers' discretion, in whole or part before the Maturity Date.

(iv)    All payments to be made by the Borrowers shall be made without set off, recoupment or counterclaim. Except as otherwise expressly provided herein, all payments by the Borrowers shall be made to the Lender, at the account designated by the Lender (the "<u>Designated Account</u>") and shall be made in Dollars and in immediately available funds, no later than 12:00 p.m. (Central Time) on the date specified herein.  Any payment received by the Lender after such time shall be deemed (for purposes of calculating interest only) to have been received on the following Business Day and any applicable interest shall continue to accrue.

5

(d)    Computation. All interest and fees chargeable under the Loan Documents shall be computed on the basis of a three hundred sixty (360) day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(e)    Maximum Lawful Rate. In no event shall the Interest Rate payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum amount as is allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

Section 2.05    Designated Account. Borrowers agree to establish and maintain one or more Designated Account for the purpose of receiving the proceeds of any In-Kind Advances. Unless otherwise agreed by the Lender and Borrowers in writing, amounts held in the Designated Account may only be used for the payment of expenses in accordance with the Approved Budget and as set forth in Section 2.01(d) above.

Section 2.06    Maintenance of Loan Account; Statements of Obligations. Lender shall maintain an account on its books in the name of Borrowers (the "Loan Account") in which will be recorded all In-Kind Advances, loans (including the Initial New Money Loan, the Delayed-Draw New Money Loan, and the Roll-Up Loan), additions and subtractions to the Principal Balance, customary credits and debits, refunds, chargeback, fees, and other notations made by Lender to Borrowers or for Borrowers' account and all payments, accruals, or capitalization of Obligations hereunder or under the other Loan Documents, including without limitation accrued interest, premiums, fees and expenses, and Lender Expenses. The Loan Account will be credited with all payments received by the Lender from Borrowers or for Borrowers' account. Upon written request by Borrower Representative, no more frequently than monthly, Lender will deliver to Borrowers a statement of said account. All monthly statements delivered by Lender to the Borrowers regarding the Loan Account, if any, including with respect to principal, interest, fees, premiums, and including an itemization of all charges and expenses constituting Lender Expenses owing, shall be subject to subsequent adjustment by Lender but shall, absent manifest error, be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and Lender unless, within five (5) days after receipt thereof by Borrowers, Borrowers shall deliver to Lender written objection thereto describing the error or errors contained in any such statements.

Section 2.07    Maturity Date. All outstanding Obligations shall be repaid in full on the earliest to occur of the following (such date being the "Maturity Date"): (i) March 2, 2026, (ii) 60 days after entry of the Interim Financing Order if the Final Financing Order has not been entered prior to the expiration of such 60-day period, (iii) the acceleration of the Obligations as a result of any Event of Default, (iv) the effective date of a Plan of Reorganization of the Borrowers, that is confirmed pursuant to an order entered by the Bankruptcy Court in the Cases, or (v) entry of an order by the Bankruptcy Court in the Cases: (A) dismissing such Cases or converting such Cases

6

to a case(s) under Chapter 7 of the Bankruptcy Code, or (B) appointing a chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of the Borrowers (*i.e.*, powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), in each case without the consent of the Lender. All principal, accrued interests, and all other amounts outstanding hereunder shall be due and payable in full, and the Commitment thereunder shall terminate, on the Maturity Date, without requirement for any further notice or demand to Borrowers and without further order from the Bankruptcy Court. Without limiting, and notwithstanding, the foregoing Lender acknowledges that the maturity date for that portion of the Obligations constituting the Roll-Up Loan may be extended under section (iv) immediately above, subject in Lender's approval, in its reasonable discretion, of Borrowers' Plan of Reorganization.

Section 2.08    <u>Reserved</u>.

Section 2.09    <u>Priority; Liens</u>. All of the Obligations are secured by Liens on the Collateral and at all times shall constitute administrative expenses of the Borrowers in the Cases with priority under Section 364(c)(1) of the Bankruptcy Code over any and all other administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, subject and subordinate only to the Professional Fee Carve Out.  All Liens which secure the Obligations shall constitute first priority Liens under Section 364(c)(2) and/or junior Liens under Section 364(c)(3) of the Bankruptcy Code, subject only to Permitted Liens having priority under applicable law. No other claims having a priority superior or pari passu to that granted to or on behalf of the Lender shall be granted or approved while any of the Obligations remain outstanding.

Section 2.10    <u>Extent of Each Borrower's Liability, Contribution</u>.

(a)    Each Borrower agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to the Lender the prompt payment and performance of, all Obligations, and that such Obligations are absolute and unconditional, irrespective of (i) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Obligations or Loan Document, or any other document, instrument or agreement to which any Borrower is or may become a party or be bound; (ii) the absence of any action to enforce this Agreement (including this Section) or any other Loan Document, or any waiver, consent or indulgence of any kind by the Lender with respect thereto; (iii) the existence, value or condition of, or failure to perfect any of the Lender's Liens or to preserve rights against, any security or guaranty for the Obligations or any action, or the absence of any action, by the Lender in respect thereof (including the release of any security or guaranty); (iv) the insolvency of any Borrower; (v) any election by Lender in an Insolvency Proceeding for the application of Section 1111(b)(2) of the Bankruptcy Code; (vi) any borrowing or grant of a Lien by any other Borrower, as debtor-in-possession under Section 364 of the Bankruptcy Code or otherwise; (vii) the disallowance of any claims of Lenders against any Borrower for the repayment of any Obligations under Section 502 of the Bankruptcy Code or otherwise; or (viii) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except cash payment in full of all Obligations.

(b)    Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability

7

incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Lender with respect to any of the Obligations or any Collateral security therefor until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to the Lender hereunder are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

Section 2.11   <u>Appointment of Borrower Representative</u>. Each Borrower hereby irrevocably appoints LBPO Management LLC as the borrowing agent and attorney-in-fact for all Borrowers (the "<u>Borrower Representative</u>") which appointment shall remain in full force and effect unless and until Lender shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Borrower Representative. Each Borrower hereby irrevocably appoints and authorizes the Borrower Representative (a) to provide the Lender with all notices and instructions under this Agreement, and (b) to take such action as the Borrower Representative deems appropriate on its behalf to carry out the purposes of this Agreement. It is understood that the handling of the Loan Account and the Collateral in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Borrowers in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that Lender shall not incur liability to any Borrower as a result hereof. Each Borrower expects to derive benefit, directly or indirectly, from the handling of any In-Kind Advance, application of Proceeds, and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group. To induce Lender to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify Lender and hold Lender harmless against any and all liability, expense, loss or claim of damage or injury, made against Lender by any Borrower or by any third party whosoever, arising from or incurred by reason of (a) the handling of any In-Kind Advance, application of Proceeds, and the Collateral as herein provided, or (b) Lender's relying on any instructions of the Borrower Representative; except, that Borrowers will have no liability to Lender under this Section with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of Lender.

Article III.    SECURITY INTEREST.

Section 3.01   <u>Grant of Security Interest</u>. Each Borrower hereby unconditionally grants, assigns, and pledges to the Lender, as security for the payment and performance of the Obligations, a continuing security interest (hereinafter referred to as the "<u>Security Interest</u>") in all of such Borrower's right, title, and interest in and to the Collateral. The Security Interest created hereby secures the payment and performance of the Obligations, whether now existing or arising hereafter. Without limiting the generality of the foregoing, this Agreement secures the payment of all amounts which constitute part of the Obligations and would be owed by any Borrower to the Lender, but for the fact that they are unenforceable or not allowable (in whole or in part) as a claim in an Insolvency Proceeding involving any Borrower due to the existence of such Insolvency Proceeding.

8

Section 3.02    <u>Borrowers Remain Liable</u>. Anything herein to the contrary notwithstanding, (a) each Borrower shall remain liable under the contracts and agreements included as Collateral to perform all of the duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by Lender of any of the rights hereunder shall not release any Borrower from any of its duties or obligations under such contracts and agreements included in the Collateral, and (c) Lender shall not have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of any Borrower thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

Section 3.03    <u>Assignment of Insurance</u>. As additional security for the Obligations, each Borrower hereby assigns to Lender, all rights of such Borrower under every policy of insurance covering the Collateral and all other assets and property of each Borrower and all business records and other documents relating to it, and all monies (including proceeds and refunds) that may be payable under any policy, and each Borrower hereby directs the issuer of each policy to pay all such monies directly and solely to Lender. Subject to the approval of the Bankruptcy Court if applicable, at any time, whether or not a Default or Event of Default shall have occurred, Lender may (but need not), in any Borrower's name, execute and deliver proofs of claim, receive payment of proceeds and endorse checks and other instruments representing payment of the policy of insurance, and adjust, litigate, compromise or release claims against the issuer of any policy. Any monies received under any insurance policy assigned to Lender, other than liability insurance policies, or received as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid to Lender to be applied to prepayment of the Obligations or disbursed to Borrowers under payment terms reasonably satisfactory to the Lender for application to the cost of repairs, replacements, or restorations of the affected Collateral which shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed.

Section 3.04    <u>Financing Statements</u>. Subject to the approval of the Bankruptcy Court if applicable, each Borrower authorizes Lender to file financing statements describing Collateral to perfect Lender's Security Interest in the Collateral. All financing statements filed before the date of this Agreement to perfect the Security Interest were authorized by such Borrower and are hereby ratified. Lender may take any other action Lender deems necessary or advisable to perfect its Security Interests and Liens in the Collateral.

Section 3.05    <u>Certain Bankruptcy Matters</u>.

(a)    the parties hereto agree, and the DIP Orders shall provide, that the Lender shall not be required to prepare, file, register or publish any financing statements, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the DIP Orders or any other Loan Document.  If the Lender (in its sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Lender's Liens on the Collateral, (i) all such

9

documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim Financing Order is entered, and (ii) shall not negate or impair the validity or effectiveness of this Section or of the perfection of any other Liens in favor of the Lender on the Collateral;

(b)       except as otherwise agreed to by the Lender, the Liens, Lien priorities, DIP Superpriority Claims and other rights and remedies granted to Lender pursuant to this Agreement, the DIP Orders or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by any Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Cases, or by any other act or omission whatsoever;

(c)       without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act, or omission:

(i)       subject only to the Professional Fee Carve Out and to the extent otherwise provided in any of the DIP Orders, no costs or expenses of administration which have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of Lender against Borrowers in respect of any Obligations;

(ii)       other than as provided in the DIP Orders or the Loan Documents, Lender's Liens on the Collateral shall constitute valid, enforceable and perfected Liens, and, except with respect to the Professional Fee Carve Out and Permitted Liens, shall be prior to all other Liens now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)       the DIP Orders shall provide, that the Lender's Liens on the Collateral securing the Obligation shall continue to be valid, enforceable and perfected without the need for the Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Lender's Liens under applicable non-bankruptcy law.

(d)       In connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of a restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by the Lender, in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, each Borrower hereby gives the Lender the power and right, without assent by such Borrower, to "credit bid" an amount up to the full amount of all Obligations then outstanding, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

10

Article IV.     CONDITIONS.

Section 4.01   <u>Conditions Precedent to Initial Extension of Credit</u>. The obligation of the Lender to make the initial In-Kind Advance is subject to the conditions precedent that Lender shall have received all of the following, each duly executed and dated the Closing Date (or such earlier date as shall be satisfactory to Lender), in form and substance satisfactory to Lender (and the date on which all such conditions precedent have been satisfied or waived in writing by Lender is called the "<u>Closing Date</u>"):

(a)     <u>Approved Budget</u>. The Lender shall have received the Approved Budget and such other financial information regarding the Borrowers as the Lender may reasonably require; and

(b)     <u>Interim Order</u>. The Bankruptcy Court shall have entered the Interim Financing Order authorizing this Agreement and the matters set forth herein, which shall be in full force, subject only to the entry of the Final Financing Order, which shall be in a form and substance acceptable to the Lender, as determined in its reasonable  discretion, and shall be entered within sixty (60) days of the date of the entry of the Interim Financing Order.

Section 4.02   <u>Conditions Precedent to All In-Kind Advances</u>. The obligation of Lender to make each In-Kind Advance, or to consent to use any Collateral proceeds other than in accordance with the Approved Budget or the terms set forth herein, shall be subject to the following conditions:

(a)     <u>Compliance with Warranties, No Default, etc</u>. Both before and after giving effect to any In-Kind Advance or other advance, the following statements shall be true and correct:

(i)     the representations and warranties of each Borrower set forth in this Agreement and the other Loan Documents shall be true and correct in all respects with the same effect as if then made (except to the extent stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct as of such earlier date);

(ii)     no Default or Event of Default shall have occurred and be continuing; and

(iii)     each advance or use of Proceeds of Collateral shall be made pursuant to and in accordance with the Approved Budget.

(b)     <u>No Challenge</u>. Unless waived or consented to by the Lender, which consent shall be in Lender's sole discretion (i) there shall not have been any order granted by the Bankruptcy Court in the Cases granting or sustaining any motion, complaint, objection or other pleading filed by any party, challenging, in either case, the validity, priority, perfection, or enforceability of the this Agreement, any Prepetition Financing Document, any Obligations, or any Lien granted pursuant to this Agreement or any Prepetition Financing Document, or any other similar challenge under Chapter 5 of the Bankruptcy Code or otherwise, and (ii) no Lien granted pursuant to this Agreement or under any

11

Prepetition Financing Document shall have been determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any party in interest in the Cases, including, without limitation, any Creditors' Committee.

(c)     This Agreement and, to the extent requested by any Lender, a Note made payable to such Lender, and all other Loan Documents, shall have been approved in accordance with the Final Financing Order and executed by each Borrower.

The conditions set forth in this Section 4.02 are for the sole benefit of the Lender, provided, that, the making of any such In-Kind Advances shall not be deemed a modification or waiver by Lender of the provisions of this Article 4 on any future occasion or a waiver of any rights of the Lender as a result of any such failure to comply with the terms set forth in this Section.

Article V.     REPRESENTATIONS AND WARRANTIES.

Section 5.01   To induce Lender to enter into this Agreement, each Borrower makes the representations and warranties to Lender set forth on Exhibit D. Each of such representations and warranties shall be true, correct, and complete, in all material respects (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Closing Date and as of each date such representations and warranties are deemed made pursuant to Section 4.02, and such representations and warranties shall survive the execution and delivery of this Agreement.

Article VI.     AFFIRMATIVE COVENANTS.

Each Borrower covenants and agrees that, until termination of this Agreement and the Commitment and payment in full of the Obligations, each Borrower shall comply with each of the following:

Section 6.01   Financial Statements, Reports, Etc.

(a)     Deliver Lender copies of each of the financial statements, reports, and other items set forth on Schedule 6.01 no later than the times specified therein.

(b)     In connection with the approval of the Final Financing Order, Borrower shall have delivered to Lender, a proposed revised Approved Budget inclusive of periods through December 14, 2025, which shall be subject to the reasonable approval of the Lender, it being further agreed that, if such proposed Approved Budget (or any further revision thereof) does not receive such approval, (i) the Borrowers shall use their commercially reasonable efforts to revise and resubmit such proposed Approved Budget in response to comments received thereon from the Lender and (ii) until such time as the revised Approved Budget is approved, the then existing Approved Budget will remain in effect as the Approved Budget;

(c)     As soon as available but no later than 5:00 p.m. Central Time on the last Monday (or such other day of the week as Borrowers and Lender shall mutually agree) of

12

each rolling two-week period, a budget variance and reconciliation report setting forth: (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Approved Budget, and (ii) the percentage variance of the aggregate receipts and aggregate disbursements, for (A) the rolling two-week period ended on (and including) the last Sunday of the two-week reporting period and (B) the cumulative period to date and (iii) projections for the following 13 weeks, including a rolling cash receipts and disbursements forecast for such period;

(d)    upon the reasonable request of the Lender, periodic estimated summaries of the then Reported Fee Accruals;

(e)    all documents and information required to be delivered pursuant to the DIP Orders; and

(f)    upon the reasonable request of the Lender, any other information regarding the operation of the Borrowers' business including without limitation inventory levels (as supplied by Lender and any other vendor) financial performance, expenses, lease payments, and negotiations with landlords and vendors.

Section 6.02    Collateral Reporting; Lender Calls.

(a)    Provide Lender with each of the reports set forth on Schedule 6.02 at the times specified therein.

(b)    Borrowers shall hold progress conference calls for Lender on a weekly basis, or more frequently if Lender may reasonably request, until the Maturity Date. During such conference calls Michael Postal shall provide Lender with a reasonably comprehensive update relating to the business, condition (financial or otherwise), operation, performance, properties or prospects of any of the Borrowers and any other information that may be reasonably requested by Lender (including, without limitation, in respect of the Approved Budget, any Variance Report, and the status of the process with respect to any Permitted Disposition). The foregoing notwithstanding, no such weekly calls shall be required to be held in any calendar week containing fewer than five days on which the New York Stock Exchange opens for regular trading.

Section 6.03    Existence. Except as otherwise permitted herein, at all times maintain and preserve in full force and effect (a) its existence (including being in good standing in its jurisdiction of organization) and (b) all rights and franchises, licenses and permits material to its business; provided, however, that, no Borrower shall be required to preserve any such right or franchise, licenses or permits if such Person's manager shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to the Lender; provided, that Borrowers deliver at least ten (10) days prior written notice to Lender of such Borrower's election not to preserve any such right or franchise, license or permit. The foregoing notwithstanding, Lender expressly agrees that a cessation of existence by virtue of reorganization or merger, as approved by the Bankruptcy Court (through a Plan of Reorganization or otherwise), shall not constitute a

13

breach hereof. Lender further acknowledges that Banners of Abingdon, LLC shall not be subject to the provisions of this Section 6.03.

Section 6.04    <u>Maintenance of Properties</u>. Maintain and preserve all of its assets that are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear, tear and casualty excepted and Permitted Dispositions excepted (and except where the failure to so maintain and preserve such assets could not reasonably be expected to result in a Material Adverse Change), and, to the extent required under the Bankruptcy Code or the DIP Orders, comply with the material provisions of all material leases to which it is a party as lessee, so as to prevent the loss or forfeiture thereof, unless such provisions are the subject of a Permitted Protest.

Section 6.05    <u>Taxes; Other Obligations</u>.

(a)    Cause all assessments and taxes imposed, levied, or assessed against any Borrower, or any of their respective assets or in respect of any of its income, businesses, or franchises to be paid in full, before delinquency or before the expiration of any extension period, except to the extent that the validity of such assessment or tax shall be the subject of a Permitted Protest and so long as, in the case of an assessment or tax that has or may become a Lien against any of the Collateral, (i) such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such assessment or tax, and (ii) any such other Lien is at all times subordinate to Lender's Liens.

(b)    Each Borrower will make timely payment or deposit of all tax payments and withholding taxes required of it and them by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will, upon request, furnish Lender with proof reasonably satisfactory to the Lender indicating that such Borrower has made such payments or deposits.

(c)    Pay and discharge as the same shall become due and payable following the Petition Date, all its obligations and liabilities, including (i) all lawful claims (including, without limitation, claims of landlords and warehousemen) which, if unpaid, would by law become a Lien upon its property; and (ii) unless consented to in advance in writing by the Lender, set forth in any Approved Budget, or approved pursuant to any Final Order under the Bankruptcy Code, all Indebtedness (or tax obligation), as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness (or tax obligation), except, in each case, where the validity of such obligation or liability shall be the subject of a Permitted Protest and so long as, in the case of an obligation or liability that has or may become a Lien against any of the Collateral, (x) such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such assessment or tax, (y) any such other Lien is at all times subordinate to Lender's Liens and (z) the failure to make payment pending such Permitted Protest could not reasonably be expected to result in a Material Adverse Change. The obligations of this Section 6.05(c) shall only apply to those rental obligations accruing on or after November 1, 2025, *provided* however, that the obligations of this Section 6.05(c) shall also apply to all rental obligations, payable following the Petition Date, owing to any landlord or warehouseman who brings a motion for relief from the automatic stay imposed

14

pursuant to Section 362 of the Bankruptcy Code and where such motion has been pending for five (5) business days.

(d)     For the avoidance of ambiguity, this Section 6.05 shall not apply to assessments and taxes imposed, levied, or assessed against any Borrower prior to the Petition Date.

Section 6.06    Insurance. At Borrowers' expense, maintain insurance respecting each of the Collateral and all of Borrowers' other assets wherever located, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses in the same or similar geographic locales. All such policies of insurance shall be with responsible and reputable insurance companies acceptable to Lender and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope reasonably satisfactory to the Lender. All property insurance policies covering the Collateral are to be made payable to Lender, as its interests may appear, in case of loss, pursuant to a lender loss payable endorsement reasonably acceptable to Lender and are to contain such other provisions as Lender may reasonably require to fully protect the Lender's interest in the Collateral and to any payments to be made under such policies. All certificates of property and general liability insurance shall be delivered to Lender, with the lender loss payable endorsement (but only in respect of Collateral) and additional insured endorsements (with respect to general liability coverage) in favor of Lender, and shall provide for not less than thirty (30) days (ten (10) days in the case of nonpayment) prior written notice to Lender of the exercise of any right of cancellation. If Borrowers fail to maintain such insurance, Lender may arrange for such insurance, but at Borrowers' expense and without any responsibility on Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Borrowers shall give Lender prompt notice of any loss exceeding $25,000 covered by their casualty or business interruption insurance. Upon the occurrence of an Event of Default, Lender shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

Section 6.07    Inspections, Exams, Audits and Appraisals. Permit Lender and its duly authorized representatives or professionals to visit any of Borrowers properties and inspect any Collateral, assets, and books and records, to conduct inspections, exams, audits, appraisals and valuations of the Collateral, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as Lender may designate and, so long as no Default or Event of Default exists, with reasonable prior notice to Borrowers.  The Borrowers shall pay the fees and expenses of the Lender and any such representatives or professionals engaged by Lender with respect to the foregoing, including, without limitation, such appraisals and commercial finance examinations as Lender may determine advisable, in its exclusive discretion.

Section 6.08    Account Verification. Permit Lender, in Lender's name or in the name of a nominee of Lender or, to verify the validity, amount or any other matter relating to any Account

CORE/0500971.0226/231701685.9

(as such term is defined in the Code), by mail, telephone, facsimile transmission or otherwise. Further, at the request of Lender, Borrowers shall send requests for verification of Accounts, to the extent such Accounts are Collateral, or send notices of assignment of such Accounts to Account Debtors and other obligors.

Section 6.09   Compliance with Laws. Comply with the requirements of all applicable laws, rules, regulations, licenses, approvals, orders and permits applicable to it and duly observe all requirements of any foreign, federal, state or local Governmental Authority, except where (i) the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change, or (ii) the non-compliance with which is otherwise permitted under the Bankruptcy Code or the DIP Orders.

Section 6.10   Disclosure Updates.

(a)      Promptly and in no event later than five (5) Business Days after obtaining knowledge thereof or after the occurrence thereof, whichever is earlier, notify Lender:

(i)      if any written information, exhibit, or report furnished to Lender contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made. Any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto;

(ii)      of all actions, suits, or proceedings brought by or against any Borrower before any court or Governmental Authority which reasonably could be expected to result in a Material Adverse Change, excluding notices in the Cases to the extent delivered in the ordinary course of the Cases; provided, that in any event, such notification shall not be later than five (5) days after service of process with respect thereto on any Borrower; and provided that such notice shall not apply to any notice delivered in Cases delivered in the ordinary course thereof and further provided that such obligation shall not apply to notices served upon Lender (whether directly or through counsel) at a time substantially contemporaneous with their service upon any Borrower;

(iii)      of any material loss or damage to any Collateral or any substantial adverse change in the Collateral, the ordinary sale and disposition of Collateral being expressly excepted; and

(iv)      of any matter that has resulted or could reasonably be expected to result in a Material Adverse Change.

(b)      Immediately upon obtaining knowledge thereof or after the occurrence thereof, notify Lender of any event or condition which constitutes a Default or an Event of Default and provide a statement of the action that such Borrower proposes to take with respect to such Default or Event of Default.

16

(c)     Upon request of Lender, each Borrower shall deliver to Lender all materials, reports, records, or information reasonably requested relating to the operations, business affairs, financial condition of any Borrower or the Collateral.

Section 6.11    Collateral Covenants.

(a)     Reserved.

(b)     Controlled Accounts.

(i)     Reserved.

(ii)     On or prior to the Closing Date (or such later date as Lender may agree in its discretion), each Borrower shall deposit or cause to be deposited promptly, and in any event no later than the first (1st) Business Day after the date of receipt thereof, all of its Collections (including those sent directly by their Account Debtors to a Borrower), into a bank account insured by the Federal Deposit Insurance Company or otherwise covered by the debtor-in-possession bank account program overseen by the Office of the United States Trustee (whether one or more, each, a "Controlled Account") which is used by such Borrower solely for the purpose of receiving Collections. All Proceeds of Collateral shall be deposited immediately upon receipt into the Controlled Account, which may be applied to the repayment of the Obligations or otherwise in accordance with the Approved Budget.

(c)     Material Contracts. Provide Lender with copies of (a) each Material Contract, and (b) each material amendment or modification of any Material Contract, whether now existing or hereafter arising. Borrowers shall maintain all Material Contracts in full force and effect and shall not default in the payment or performance of any obligations thereunder.

(d)     Location of Goods, Inventory, other Collateral and Books; Maintenance of Books and Records. Keep all Collateral and Books and Records only at the locations identified on Schedules 5.5(b) and 5.22 to the Information Certificate and keep their chief executive offices only at the locations identified on Schedule 5.5(b) to the Information Certificate; provided, however, that Borrowers may amend such Schedules so long as such amendment occurs by written notice to Lender not less than ten (10) days prior to the date on which such Collateral or Books or Records are moved to such new location. Maintain proper records and account, in which full, true, and correct entries shall be made of all financial transactions and matters involving the Collateral and business of the Borrowers; and maintain such Books and Records in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrowers.

Section 6.12    Further Assurances. At any time upon the reasonable request of Lender, execute or deliver to Lender any and all financing statements, Collateral Access Agreements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title, collateral reviews, and all other documents (the "Additional Documents") that Lender may reasonably request and in form and substance reasonably satisfactory to the Lender, to create,

17

perfect, and continue perfection or to better perfect Lender's Liens in all of the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents. Each Borrower acknowledges that no Borrower is authorized to file any financing statement or amendment or termination statement with respect to any financing statement filed in connection with this Agreement without the prior written consent of Lender, subject to such Borrower's rights under Section 9-509(d)(2) of the Code.

Section 6.13   Reserved.

Section 6.14   Performance Within Approved Budget.

(a)   Approved Budget. The Borrowers shall not pay any expenses other than those set forth in the Approved Budget, subject to allowed variances and requirements set forth in subsection (b) below. Further, the Borrowers shall not use funds allocated to a specific period in the Approved Budget (i.e., any week) to pay any expenses under any other period in the Approved Budget without, in each instance, the prior express written consent of the Lender, which consent may be conditioned or withheld in the Lender's sole discretion.

(b)   Budget Variance. Beginning with the third week ending immediately following the entry of the Final Financing Order, and continually thereafter, the Borrowers shall (a) achieve weekly cash receipts of not less than eighty-five percent (85%) of those projected in the Approved Budget, (b) shall be in compliance with the Minimum Inventory Requirements, and (c) not cause or permit actual aggregate expenses to be incurred and/or disbursements made in any week to exceed 110% of those projected in the Approved Budget. Compliance with the covenants set forth in this Section shall be tested as of the close of business on the last Monday (or such other day of the week as Lender and Borrowers shall mutually agree) of each rolling two-week period and on a cumulative basis from the Petition Date through the end of each rolling two-week period after the Petition Date. Compliance with the foregoing shall be reflected in the Variance Report delivered pursuant to Section 6.01(c).

Section 6.15   Case Milestones. (a) By no later than 45 days from entry of the Final Financing Order, Borrowers shall file a Plan of Reorganization and Disclosure Statement in the Cases that is acceptable to the Lender in its reasonable discretion. As an alternative, Borrowers may file a motion to sell substantially all their assets within 45 days from the entry of the Final Financing Order; and (b) by not later than one hundred five (105) days following the entry of the Final Financing Order, Borrowers' Plan shall be confirmed by the Bankruptcy Court, which shall be in a form and substance acceptable to the Lender in its reasonable discretion.

Article VII.   NEGATIVE COVENANTS.

Each Borrower covenants and agrees that, until termination of this Agreement and the Commitment and payment in full of the Obligations, the Borrowers will not do any of the following:

18

Section 7.01    Indebtedness. Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

Section 7.02    Liens. Create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any Collateral or any other assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

Section 7.03    Restrictions on Fundamental Changes.

(a)    Except as set forth in a Plan of Reorganization, subject to the Lender's approval in its reasonable discretion, enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its equity interests or stock, except for any merger or consolidation between Borrowers; provided that a Borrower must be the surviving entity of any such merger to which it is a party;

(b)    Except as contemplated by a sale motion approved in advance by Lender in its sole discretion, liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution);

(c)    Suspend or cease operation of a substantial portion of its or their business, except as permitted hereunder or under (b) above or in connection with the transactions permitted hereunder; or

(d)    Form or acquire any direct or indirect Subsidiary.

Section 7.04    Disposal of Assets. Other than Permitted Dispositions, including without limitation the sale of Inventory in the ordinary course of Borrowers' business, or transactions expressly permitted hereunder, Borrowers shall not sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, any of the Collateral. The Lender shall not be deemed to have consented to any sale or other disposition of any of the Collateral or any other asset except as expressly permitted in this Agreement or the other Loan Documents.

Section 7.05    Change Name. Change any Borrower's name, organizational identification number, state of organization, organizational identity, or "location" for purposes of Section 9-307 of the Code, except as permitted by the Bankruptcy Court.

Section 7.06    Nature of Business. Make any change in the nature of its or their business as conducted on the date of this Agreement or acquire any properties or assets that are not reasonably related to the conduct of such business activities.

Section 7.07    Prepayments and Amendments.

(a)    Except in connection with Refinancing Indebtedness:

(i)    pay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Borrower, other than (A) the Obligations under the Loan Documents; and (B) the Permitted Indebtedness, or

19

(ii)    make any payment on account of Indebtedness that has been contractually subordinated in right of payment to the Obligations if such payment is not permitted at such time under the subordination terms and conditions or otherwise permitted through a Plan of Reorganization, subject to the Lender's reasonable consent, or

(b)    Directly or indirectly, amend, modify, or change (or permit the amendment, modification or change of) any of the terms or provisions of:

(i)    any agreement, instrument, document, indenture, or other writing evidencing or concerning Permitted Indebtedness, other than the Obligations in accordance with this Agreement, and Borrowers shall furnish to Lender all notices or demands in connection with such Permitted Indebtedness either received by any Borrower or on its behalf, promptly after the receipt thereof, or sent by any Borrower or on its behalf, concurrently with the sending thereof, as the case may be; or

(ii)    any Material Contract except to the extent that such amendment, modification, or change could not, individually or in the aggregate, reasonably be expected to be materially adverse to the interests of Lender.

Section 7.08    <u>Change of Control</u>. Except as set forth in a Plan of Reorganization subject to the Lender's approval in its reasonable discretion, Cause, permit, or suffer, directly or indirectly, any Change of Control unless the Lender shall have provided its prior written consent.

Section 7.09    <u>Reserved</u>.

Section 7.10    <u>Accounting Methods; Inventory Reporting</u>. Modify or change its fiscal year or its method of accounting. Modify or change its standard cost of reporting of inventory unless Lender has provided its prior written consent.

Section 7.11    <u>Investments</u>. Except for Permitted Investments, directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment.

Section 7.12    <u>Transactions with Affiliates</u>. Directly or indirectly enter into or permit to exist any transaction between a Borrower with any Affiliate of such Borrower except for transactions set forth in the Approved Budget, except where such transactions (i) are fully disclosed to Lender prior to the consummation thereof, if they involve one or more payments by a Borrower or Borrowers not in excess of $5,000 for any single transaction or series of related transactions, and (ii) are no less favorable, taken as a whole, to the Borrowers, as applicable, than would be obtained in an arm's length transaction with a non-Affiliate. Obtaining an order of substantial consolidation shall not be deemed a transaction between a Borrower and any Affiliate for purposes of any provision of this Agreement. Should an order of substantial consolidation not be entered by the Bankruptcy Court, obtaining an order permitting the Borrowers to undertake one or more mergers between and amongst themselves shall not be deemed a transaction between a Borrower and any Affiliate.

Section 7.13    <u>Use of Proceeds</u>.

20

(a)    Use the proceeds of any In-Kind Advance or other Collateral for any purpose other than (i) to pay fees, costs, and expenses, including Lender Expenses, incurred in connection with this Agreement and the other Loan Documents, and the transactions contemplated hereby and thereby and, to the extent approved by the Bankruptcy Court and as set forth in the DIP Orders in connection with the Cases, (ii) for other payments permitted to be made by the DIP Orders and any other order of the Bankruptcy Court, and (iii) to the extent expressly permitted under applicable law, the Loan Documents, the DIP Orders, and in accordance with the Approved Budget, for general corporate and working capital purposes for their lawful and permitted purposes.

(b)    Without limiting the foregoing, no proceeds of any In-Kind Advance or any Collateral shall be used, except as expressly provided in the DIP Orders and this Agreement. Without limiting the foregoing no such Proceeds shall be used (i) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of the Lender or its respective rights and remedies under this Agreement and the other Loan Documents, (ii) for the payment of any services rendered by the professionals retained by the Borrowers or the Creditors' Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief: (A) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the Liens securing same, (B) for monetary, injunctive or other affirmative relief against the Lender or any Collateral, or (C) preventing, hindering or otherwise delaying the exercise by the Lender of any rights and remedies under the Loan Documents or applicable Law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the court or otherwise) by Lender upon any of the Collateral, (iii) make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other Governmental Authority without the prior written consent of the Lender (except pursuant to a Plan of Reorganization); or (iv) to pay any fees or similar amounts to any Person who has proposed or may propose to purchase interests in any Borrower without the prior written consent of the Lender.

Section 7.14    Limitation on Issuance of Stock. Except as set forth in a Plan of Reorganization consented to by Lender in its reasonable discretion, issue or sell or enter into any agreement or arrangement for the issuance and sale of any of their equity interests.

Section 7.15    Collateral with Bailees. Store any inventory, equipment or other tangible property which is part of the Collateral at any time now or hereafter with a bailee, warehouseman, or similar party, except as set forth on Schedule 5.22 to the Information Certificate.

Section 7.16    Bankruptcy Related Negative Covenants. Seek, consent to, or permit to exist any of the following:

(i)    Any order which authorizes the rejection or assumption of any leases (for any real or personal property) of any Borrower without the Lender's prior consent, whose consent shall not be unreasonably withheld;

(ii)     Any modification, stay, vacation or amendment to the DIP Orders to which the Lender has not consented in writing;

(iii)     A priority claim or administrative expense or unsecured claim against any Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Lender in respect of any of the Obligations, except with respect to the Professional Fee Carve Out;

(iv)     Any Lien on any Collateral is authorized or granted having a priority equal or superior to the Lien securing the Obligations, other than with respect to (i) the Professional Fee Carve Out, (ii) Permitted Liens having priority by operation of applicable law or court order, and (iii) the Liens otherwise consented to by Lender in its sole discretion;

(v)     Any order which authorizes the return of any of the Borrowers' property pursuant to Section 546(h) of the Bankruptcy Code;

(vi)     Any order which authorizes the payment of any Indebtedness (other than the Obligations, Indebtedness reflected in the Approved Budget, and other Indebtedness approved by the Lender) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien; or

(vii)     Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any other Loan Documents.

## Article VIII.   EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement and each other Loan Document:

Section 8.01     Payment. If any Borrower fails to pay when due and payable, or when declared due and payable, and such failure continues for a period of five (5) days after the date on which written notice thereof is given to such Borrower by the Lender, all or any portion of the Obligations consisting of principal, interest, fees, charges, premiums or other amounts due the Lender, reimbursement of Lender Expenses, or other amounts (other than any portion thereof constituting principal) constituting Obligations;

Section 8.02     Covenants. Any Borrower:

(a)     fails to perform or observe any covenant or other agreement contained in Sections 6.01, 6.02, or 6.14 and (x) such failure is not as a result of the commencement of the Cases or any payment or compliance is stayed by the Bankruptcy Court, and (y) such

CORE/0500971.0226/231701685.9

failure continues for a period of five (5) days after the date on which written notice thereof is given to such Borrower by the Lender; or

(b)      fails to perform or observe any other covenant or other agreement contained in this Agreement not covered by Section 8.02(a), or in any of the other Loan Documents, in each case, other than any such covenant or agreement that is unable to be cured or is the subject of another provision of this Section 8 (in which event such other provision of this Section 8 shall govern), and (y) such failure continues for a period of five (5) days after the earlier of (i) the date on which such failure shall first become known to or should have been known by any officer of such Borrower or (ii) the date on which written notice thereof is given to such Borrower by the Lender;

(c)      fails to maintain or adhere to the Minimum Inventory Requirements and such failure continues for a period of five (5) days after the date on which written notice thereof is given to such Borrower by the Lender;

(d)      Except as set forth in a Plan of Reorganization subject to  to the Lender's approval in its reasonable discretion, any Borrower shall dissolve, wind up or cease doing business, *except* it is expressly recognized that entry of an order of substantive consolidation shall not constitute a breach of this covenant;

(e)      Borrowers shall fail to obtain additional cash debtor-in-possession financing in an amount not less than $2,000,000 by no later than 5 business days from entry of the Interim Order, which financing shall be subordinate in all respect to the DIP Loan, provided that the provider of such financing shall be entitled to a priority purchase money security interest in any goods, products and merchandise actually purchased with the proceeds of such loan (with such loan to be drawn in sums and temporal increments in accord with the Borrowers' business judgment); and provided that the proceeds resulting from any disposition of such goods, products and merchandise shall not be repaid, except as provided in the Approved Budget and in each instances subject to the prior consent of the DIP Lender, which shall not be unreasonably withheld; and

(f)      Borrowers shall fail to achieve the weekly cash budget targets set forth in the Approved Budget subject to the permitted variance terms otherwise set forth herein and such failure continues for a period of five (5) days after the date on which written notice thereof is given to such Borrower by the Lender.

Section 8.03    If after the Petition Date, there is entered or filed against a Borrower, or with respect to any of their respective assets, (a) one or more judgments, orders, or awards for the payment of money in an amount in excess of $50,000 in any one case or in excess of $100,000 in the aggregate (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage), or (b) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Change, and with respect to any of the events described in the foregoing clauses (a) or (b), either (i) there is a period of ten (10) consecutive days at any time after the entry of any such judgment, order, or award during which (A) the same is not discharged, satisfied, vacated, or bonded pending appeal, or (B) a stay of enforcement thereof is not in effect,

23

or (ii) enforcement proceedings are commenced upon such judgment, order, or award; except this Section 8.03 shall not apply to claims allowed by the Bankruptcy Court (including, but not limited to, administrative claims);

Section 8.04    If (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Borrower under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $25,000 or which would reasonably likely result in a Material Adverse Change, or (ii) a Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $50,000 or which could reasonably likely result in a Material Adverse Change;

Section 8.05    If there occurs any uninsured loss to any material portion of the Collateral;

Section 8.06    If any Borrower is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of such Borrower;

Section 8.07    If, except as a result of the commencement of the Cases or unless payment is stayed by the Bankruptcy Court, there is a default under one or more agreements to which a Borrower is a party with one or more third Persons relative to a Borrower's Indebtedness involving an aggregate amount of $10,000 or more, and such default (i) occurs at the final maturity of the obligations thereunder, or (ii) results in a right by such third Person, irrespective of whether exercised, to accelerate the maturity of such Borrower's obligations thereunder; except this Section 8.07 shall not apply to obligations stemming from the rejection of any lease, provided such rejection be in accord with the provisions of this Agreement;

Section 8.08    If any warranty, representation, certificate, statement, or Record made herein or in any other Loan Document or delivered in writing to the Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

Section 8.09    If this Agreement or any other Loan Document (including, without limitation, any DIP Order) shall for any reason fail or cease to create a valid and perfected first priority Lien on any Collateral, except as a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement;

Section 8.10    If there occurs any Material Adverse Change;

Section 8.11    If any event or circumstance shall occur which, in the Permitted Discretion of the Lender exercised in good faith, would be reasonably likely to cause the Lender to suspect that any Borrower has engaged in fraudulent activity with respect to any Collateral or other matters and the Court has been notified of such fraudulent activity;

Section 8.12    Unless otherwise waived by Lenders, if any director or officer of a Borrower is convicted of a felony offense under state or federal law, or a Borrower hires an officer or appoints

CORE/0500971.0226/231701685.9

a director who has been convicted of any such felony offense within the preceding seven (7) years, or such Person becomes an owner of any of the issued and outstanding ownership interests of a Borrower;

Section 8.13   If the validity or enforceability of any provision of any Loan Document (including, without limitation, any DIP Order) shall at any time for any reason be declared to be null and void, or a proceeding shall be commenced by a Borrower, or by any Governmental Authority having jurisdiction over a Borrower, seeking to establish the invalidity or unenforceability thereof, or a Borrower shall deny that such Borrower has any liability or obligation purported to be created under any Loan Document (including, without limitation, any DIP Order);

Section 8.14   If there is entered an order in the Cases which stays, modifies, or reverses any DIP Order or which otherwise materially adversely affects the effectiveness of any provision of any Loan Document (including, without limitation, any DIP Order) without the express written consent of the Lender;

Section 8.15   If there occurs either (i) the appointment in the Cases of a trustee, any examiner having expanded powers to operate all or any part of any Borrower's business, or similar insolvency official or administrator, or (ii) the conversion of the Cases to a case under chapter 7 of the Bankruptcy Code;

Section 8.16   If the Bankruptcy Court fails to enter a Final Financing Order, in form and substance satisfactory to the Lender, within forty-five (45) days after the entry of the Interim Financing Order;

Section 8.17   Without the prior written consent of the Lender, if there is entered any order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code which permits any creditor to (a) realize upon, or to exercise any right or remedy with respect to any Collateral, to the extent such realization or exercise of rights or remedies would be reasonably likely to have a Material Adverse Change, or (b) to terminate any lease, license, franchise, or similar agreement, where such termination would reasonably be likely to have a Material Adverse Change;

Section 8.18   If there is filed any application by any Borrower without the express prior written consent of the Lender for the approval of any superpriority claim in the Cases or which is pari passu with or senior to the priority of the Claims of the Lender for the Obligations, or there shall arise any such superpriority claim under the Bankruptcy Code having such effect, in each instance without the prior written consent of the Lender;

Section 8.19   If there occurs the payment or other discharge by any Borrower of any pre-petition Indebtedness, except as expressly permitted hereunder, under any DIP Order or any other "First Day" or Final Orders entered in the Cases, or otherwise set forth in the Approved Budget or by order in the Cases to which order the Lender has provided its written consent; provided that it shall not be a default under this Section 8.19 if any Borrower makes a payment to any third party in accordance with the Approved Budget for a post-petition obligation and such third party applies

25

the payment to pre-petition Indebtedness owing to such third party without the knowledge or consent of the Borrower;

Section 8.20    Unless waived or consented to in advance by the Lender, consent shall not be unreasonably withheld, if there is entered any order in the Cases which provides adequate protection, or the granting by any Borrower of similar relief in favor of any one or more of a Borrower's pre-petition creditors, contrary to the terms and conditions of any DIP Order or the terms hereof;

Section 8.21    If there occurs failure of any Borrower to (a) comply with each and all of the terms and conditions of this Agreement or any DIP Order or (b) comply in all material respects with any other order entered in the Cases, and such failure continues for a period of five (5) days after the date on which written notice thereof is given to such Borrower by the Lender;

Section 8.22    If there is filed any motion by any Borrower seeking, or the entry of any order in the Cases, without the prior written consent of the Lender: (a) (i) permitting working capital or other financing (other than ordinary course trade credit, unsecured debt, and the loan of Michael Postal) for any Borrower from any Person other than the Lender (unless the proceeds of such financing are used to pay all Obligations in full, to cash collateralize all Obligations due in connection with any cash management, depository or similar products (collectively, the "Unliquidated Claims"), and the establishment of a reserve account for all indemnification obligations hereunder), (ii) granting a Lien on, or security interest in (other than a Permitted Lien) any of the Collateral, other than with respect to this Agreement and the DIP Orders (unless such Liens are granted in connection with a financing, the proceeds of which are applied to the payment in full of all Obligations and the cash collateralization of all Obligations due in connection with any Unliquidated Claims and indemnification obligations hereunder), (iii) except as permitted by this Agreement and the DIP Orders, permitting the use of any of the Collateral pursuant to Section 363(c) of the Bankruptcy Code, (iv) permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (v) dismissing the Cases or conversion of the Cases to a case under chapter 7 of the Bankruptcy Code; or (b) the filing of any motion by any party in interest or any Creditors' Committee appointed in the Cases: (i) seeking any of the matters specified in the foregoing clause (a) that is not dismissed or denied within sixty (60) days of the date of the filing of such motion (or such later date agreed to in writing by the Lender) or (ii) seeking the reconsideration of any DIP Order;  or

Section 8.23    If (i)  there occurs the filing of any pleading or order by any Borrower challenging the validity, priority, perfection, or enforceability of the Prepetition Financing Documents, this Agreement, any Obligations, or any Lien granted pursuant to the Prepetition Financing Documents or this Agreement, or (ii) the validity, priority, perfection, or enforceability of the Prepetition Financing Documents, this Agreement, any Obligations, or any Lien granted pursuant to the Prepetition Financing Documents or this Agreement is determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Cases, including, without limitation, the Creditors' Committee.

Article IX.     REMEDIES.

26

Section 9.01    Except as provided in, and subject to the provisions of, the DIP Orders, if any Event of Default has occurred and is continuing, Lender may without further notice or demand on Borrowers: (a) suspend or terminate the Commitment with respect to In-Kind Advances, whereupon no additional In-Kind Advances will be made in Lender's sole discretion; (b) notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, or order from, the Bankruptcy Court, increase the rate of interest applicable to the Principal Balance to the Default Rate (c) declare all or any portion of the Obligations, including all or any portion of any Obligations to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrowers, (d) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all rights, remedies and powers provided under the Bankruptcy Code, the Code and other applicable law to, among other things: (i) to take immediate possession and control of all Collateral, to operate or permit a designated third party to operate Borrowers' stores under one or more transition services agreement among Borrowers, Lender, and such other Persons as Lender may from time to time deem necessary to carry out the forgoing, in each instance acceptable to the Lender in its sole discretion, and to provide for the orderly operation and sale of Borrowers' business and any Collateral, and  (ii) transfer, sell or otherwise dispose of the Collateral by the Lender to itself or its assignees, designees, affiliates, receivers, liquidators and/or third parties, and such other terms as the Lender may require;

Section 9.02    No course of dealing and no delay or failure of the Lender in exercising any right, power, remedy or privilege under this Agreement or any other Loan Document shall affect any other or future exercise thereof or operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any further exercise thereof or of any other right, power, remedy or privilege or shall be construed to be a waiver of any Event of Default.  The enumeration of the rights and remedies of the Lender specified in this Agreement is not intended to be exhaustive and the exercise by the Lender of any right or remedy shall not preclude the exercise of any other rights or remedies, all of which shall be cumulative, and shall be in addition to any other right or remedy given hereunder or under the other Loan Documents or that may now or hereafter exist at law or in equity or by suit or otherwise.

Article X.        WAIVERS; INDEMNIFICATION.

Section 10.01  <u>Demand; Protest; etc</u>. Each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Lenders on which such Borrower may in any way be liable.

Section 10.02  <u>The Lender's Liability for Collateral</u>. Each Borrower hereby agrees that: (a) so long as Lender complies with its obligations, if any, under the Code, Lender shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by each Borrower.

Section 10.03 <u>Indemnification</u>. Each Borrower shall pay, indemnify, defend, and hold the Lender and its Related Persons and the permitted successors and assigns of the foregoing (each, an "<u>Indemnified Person</u>") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery, enforcement, performance, or administration (including any restructuring, forbearance or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of each Borrower's compliance with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, (c) in connection with the custody, preservation, use or operation of, or, upon an Event of Default, the sale of, collection from, or other realization upon, any of the Collateral in accordance with this Agreement and the other Loan Documents, (d) with respect to the failure by any Borrower to perform or observe any of the provisions hereof or any other Loan Document, and (e) in connection with the exercise or enforcement of any of the rights of Lender hereunder or under any other Loan Document (each and all of the foregoing, the "<u>Indemnified Liabilities</u>"). The foregoing to the contrary notwithstanding, no Borrower shall have any obligation to any Indemnified Person under this Section 10.03 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person or its officers, directors, employees, or attorneys. This provision shall survive the termination of this Agreement, the repayment of the Obligations and the termination of the Commitment. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which a Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Borrower with respect thereto.

Article XI.      NOTICES.

Section 11.01 Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or telefacsimile. In the case of notices or demands to Borrowers or Lender, as the case may be, they shall be sent to the respective address set forth below:

If to any Borrower:

LBPO Management LLC
Attn:  Michael Postal
1801 16th Street, Northwest

28

Unit 606
Washington, DC 20009
Email: mikepostal@tenacitygroup.com

with courtesy copies to (which shall not constitute Notice for purposes of
this Section 12):

Maurice "Mac" VerStandig, Esq.
The VerStandig Law Firm, LLC
Phone: (301) 444-4600
Cell: (240) 351-6442
Facsimile: (301) 444-4600
Email: mac@mbvesq.com


If to Lender:

Hallmark Marketing Company, LLC
Attn:  General Counsel's Office
2501 McGee Trafficway
Mail Drop 339
Kansas City, MO 64108
Email: Phyllis.Leach@hallmark.com

with courtesy copies to (which shall not constitute Notice for purposes of
this Section 12):

Stinson LLP
1201 Walnut Street
Suite 2900
Kansas City, MO 64106
Attn: Nicholas J. Zluticky
Email: Nicholas.Zluticky@stinson.com

Section 11.02  Any party hereto may change the address at which they are to receive
notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices
or demands sent in accordance with this Section 11, shall be deemed received on the earlier of the
date of actual receipt or three (3) Business Days after the deposit thereof in the mail; provided, that
(a) notices sent by overnight courier service shall be deemed to have been given when received,
(b) notices by facsimile shall be deemed to have been given when sent (except, that, if not given
during normal business hours for the recipient, shall be deemed to have been given at the opening
of business on the next Business Day for the recipient) and (c) notices by electronic mail shall be
deemed received upon the sender's receipt of an acknowledgment from the intended recipient
(such as by the "return receipt requested" function, as available, return email or other written
acknowledgment). Any notice given by the Lender to any Borrower as provided in this Section 11
shall be deemed sufficient notice as to all Borrowers, regardless of whether each Borrower is sent
a separate copy of such notice or whether each Borrower is specifically identified in such notice.

29

Article XII.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

Section 12.01 THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO AS WELL AS ALL CLAIMS, CONTROVERSIES OR DISPUTES ARISING UNDER OR RELATED TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE BANKRUPTCY CODE AND THE LAWS OF THE DISTRICT OF COLUMBIA.

Section 12.02 THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS MAY BE TRIED AND LITIGATED IN THE BANKRUPTCY COURT OF THE DISTRICT OF COLUMBIA AND THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN DISTRICT OF COLUMBIA; PROVIDED, HOWEVER, THAT, ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH PARTY HERETO WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 12.02.

Section 12.03 TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH, A "CLAIM"). EACH PARTY HERETO REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Section 12.04 NO CLAIM MAY BE MADE BY ANY BORROWER AGAINST THE LENDER, OR ANY AFFILIATE OF LENDER OR ANY DIRECTOR, OFFICER, EMPLOYEE, COUNSEL, REPRESENTATIVE, AGENT, OR ATTORNEY-IN-FACT OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN

30

CONNECTION THEREWITH, AND EACH BORROWER HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.

Article XIII.    ASSIGNMENTS; SUCCESSORS.

Section 13.01 This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that, no Borrower may assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void ab initio.  No consent to assignment by the Lender shall release any Borrower from its Obligations.

Section 13.02  Lender may assign this Agreement and the other Loan Documents in whole or in part and its rights and duties hereunder to any Person (each such assignee, an "Assignee") without notice or requirement of consent of any Borrower.

Section 13.03  The Lender may furnish any information concerning any Borrower in the possession of the Lender from time to time to Assignees. The Borrowers shall assist any Lender permitted to sell assignments or participations under this Section 13 in whatever manner reasonably necessary in order to enable or effect any such assignment, including (but not limited to) the execution and delivery of any and all agreements, notes and other documents and instruments as shall be requested and the delivery of informational materials, appraisals or other documents for, and the participation of relevant management in meetings and conference calls with, potential lenders. Borrowers shall certify the correctness, completeness, and accuracy, in all material respects, of all descriptions of the Borrowers and their affairs provided, prepared, or reviewed by any Borrower that are contained in any selling materials and all other information provided by it and included in such materials. The Lender may disclose the Loan Documents and any other financial or other information relating to Borrower to any potential Assignee, provided that such Assignee agrees to protect the confidentiality of such documents and information using the same measures that it uses to protect its own confidential information.

Article XIV.    AMENDMENTS; WAIVERS.

Section 14.01  Neither this Agreement nor any other Loan Document nor any terms hereof or thereof may be amended, waived, discharged or terminated unless such amendment, waiver, discharge or termination is in writing signed by the Lender and as to amendments to any of the Loan Documents by the Borrowers, and such amendment, waiver, discharge or termination shall be effective and binding as to the Lender only in the specific instance and for the specific purpose for which given.

Article XV.    TAXES.

Section 15.01  All payments made by any Borrower hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense. In addition, all such payments will be made free and clear of, and without deduction or withholding for, any present or future Taxes. If any Taxes are levied or imposed, each Borrower agrees to pay the full amount of such Taxes and such additional amounts as may be necessary so that every payment of all amounts

31

due under this Agreement, any note, or Loan Document, including any amount paid pursuant to this Section after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein; provided, however, that, Borrowers shall not be required to increase any such amounts if the increase in such amount payable results from Lender's own willful misconduct or gross negligence (as finally determined by a court of competent jurisdiction). Each Borrower will furnish to Lender as promptly as possible after the date the payment of any Tax is due pursuant to applicable law, certified copies of tax receipts evidencing such payment by such Borrower.

Section 15.02  Each Borrower agrees to pay any present or future stamp, value added or documentary taxes or any other excise or property taxes, charges, or similar levies that arise from any payment made hereunder or from the execution, delivery, performance, recordation, or filing of, or otherwise with respect to this Agreement or any other Loan Document.

Article XVI.   GENERAL PROVISIONS.

Section 16.01  <u>Effectiveness</u>. This Agreement shall be binding and deemed effective when executed by each Borrower and Lender.

Section 16.02  <u>Section Headings</u>. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

Section 16.03  <u>Interpretation</u>. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against any party hereto, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties, shall be construed, and interpreted according to the ordinary meaning of the words used to accomplish fairly the purposes and intentions of all parties hereto.

Section 16.04  <u>Severability of Provisions</u>. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

Section 16.05  <u>Debtor-Creditor Relationship</u>. The relationship between the Lender, on the one hand, and the Borrowers, on the other hand, is solely that of creditor and debtor. Lender shall not have (and shall not be deemed to have) any fiduciary relationship or duty to any Borrower arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between Lender, on the one hand, and the Borrowers, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

Section 16.06  <u>Counterparts; Electronic Execution</u>. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also

32

shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

Section 16.07 <u>Revival and Reinstatement of Obligations</u>. If the incurrence or payment of the Obligations by any Borrower or the transfer to Lenders of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "<u>Voidable Transfer</u>"), and if Lenders are required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lenders are required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys' fees of Lender related thereto, the liability of such Borrower automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made and all of Lender's Liens in the Collateral shall be automatically reinstated without further action.

Section 16.08 <u>Reserved</u>.

Section 16.09 <u>Setoff</u>. Lender may at any time, in its sole discretion and without demand or notice to anyone, setoff any liability owed to any Borrower by Lender against any of the Obligations, whether or not due.

Section 16.10 <u>Survival</u>. All representations and warranties made by the Borrowers in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any loan or any fee or any other amount payable under this Agreement is outstanding and so long as the obligation of Lender to provide extensions of credit hereunder has not expired or been terminated.

Section 16.11 <u>Integration</u>. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the Closing Date.

Section 16.12 <u>Plan(s) of Reorganization</u>. Notwithstanding any other provision of this Agreement, the obligations of the Borrowers hereunder are subject to modification through one or more Plans of Reorganization, which Plan(s) shall be subject to the consent of the Lender, which consent shall not be unreasonably withheld. Without waiving Lender's right to reasonably withhold consent based on other terms not expressly delineated in this Section 16.12, it shall not be unreasonable for Lender to refuse to consent to any deletion, amendment, reduction, extension, or other modification adverse to Lender's interests or rights hereunder with respect to the

33

repayment terms applicable to the Initial New Money Loan and/or the Delayed Draw New Money Loan or the default provisions associated therewith.

      Section 16.13 <u>Relationship with DIP Orders</u>. In the event of any inconsistency between the terms of the DIP Orders and the Loan Documents, the terms of the DIP Orders shall control and the representations, warranties, covenants, agreements or events of default made herein and in the other Loan Documents shall be subject to the terms of the DIP Orders.

34

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their duly authorized manager, officer, and authorized representative as of the day and year first above written, to be effective as of the Closing Date.

**BORROWERS:**

LBPO Management LLC, a Maryland limited liability company,
as a Borrower and as Debtor-In-Possession

By:      _____
Name:
Title:

35

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their duly authorized manager, officer, and authorized representative as of the day and year first above written, to be effective as of the Closing Date.

**LENDERS**:

**HALLMARK MARKETING COMPANY, LLC,** as a Lender


By: _____
Name:
Title:

CORE/0500971.0226/231701685.9

### Schedule 1.1(a)

1. **Definitions**. As used in this Agreement, the following terms shall have the following definitions:

"Account Debtor" has the meaning set forth in the Code.

"Accounting Change" shall have the meaning given in paragraph 2 of this Schedule 1.1.

"Additional Documents" has the meaning specified therefor in Section 6.12 of this Agreement.

"Borrower Representative" means LBPO Management LLC, in its capacity as Borrower Representative on behalf of itself and the other Borrowers pursuant to Section 2.11 hereof.

"Affiliate" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Stock, by contract, or otherwise; provided, however, that, for purposes of Section 7.12 of this Agreement: (a) any Person which owns directly or indirectly ten (10%) percent or more of the Stock (or equity interests) having ordinary voting power for the election of the board of directors, manager(s), or equivalent governing body of a Person or ten (10%) percent or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership in which a Person is a general partner shall be deemed an Affiliate of such Person.

"Agreement" means the Senior Secured Superpriority Debtor In Possession Credit and Security Agreement to which this Schedule 1.1 is attached.

"Approved Budget" shall mean the rolling consolidated 13-week cash flow and financial projections of the Borrowers initially covering the period ending on December 14, 2025, and itemizing on a weekly basis all uses, and anticipated uses, of In-Kind Advances and the Proceeds of any Collateral, revenues and other payments projected to be received, and all expenditures proposed to be made during such period, which shall at all times be in form and substance satisfactory to the Lender in its sole discretion which Approved Budget may be amended only with the prior written consent of the Lender.

"Assignee" has the meaning specified therefor in Section 13.02 of this Agreement.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Bankruptcy Court" has the meaning specified therefor in the recitals of this Agreement.

"Bankruptcy Recoveries" means any claims and causes of action to which any Borrower may be entitled to assert by reason of any avoidance or other power vested in or on behalf of any

37

Borrower or the estate of any Borrower under Chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof.

"Borrowers" means, collectively, (a) LBPO Management LLC, a Maryland limited liability company and each other Debtor in the Chapter 11 Bankruptcy Cases jointly administered under *In re Banners of Abingdon, LLC, et al.* filed in the United States Bankruptcy Court for the District of Columbia as Case No. 25-378-ELG, and (b) each other Person that becomes a guarantor after the Closing Date pursuant to Section 6.16 of this Agreement, and "Borrower" means any one of them.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close pursuant to the rules and regulations of the Federal Reserve System.

"Carve Out Trigger Notice" means written notice from the Lender to the Borrower Representative, its counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee of the occurrence and during the continuance of an Event of Default.

"Case Professionals" means Persons or firms retained by the Debtors or any Creditors' Committee or other statutory committee appointed in the Cases pursuant to §§327 and 1103 of the Bankruptcy Code.

"Cases" has the meaning specified therefor in the recitals of this Agreement.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one (1) year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one (1) year from the date of acquisition thereof and having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than two hundred seventy (270) days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within one (1) year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having combined capital and surplus of not less than $250,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $250,000,000, having a term of not more than seven (7) days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above,

CORE/0500971.0226/231701685.9

and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

"Cash Management Order" means an order entered by the Bankruptcy Court, in form and substance reasonably satisfactory to the Lender, authorizing the Debtors to, among other things, continue their cash management systems and to otherwise comply with the terms of this Agreement and the other Loan Documents.

"Cash Management Services" means any cash management or related services including treasury, depository, return items, overdraft, controlled disbursement, merchant stored value cards, epayables services, electronic funds transfer, interstate depository network, automatic clearing house transfer (including the Automated Clearing House processing of electronic funds transfers through the direct Federal Reserve Fedline system) and other cash management arrangements.

"Change of Control" means any change in the ownership of any membership interests of the Borrowers.

"Claim" has the meaning specified therefor in Section 12.03 of this Agreement.

"Closing Date" means the date on which all conditions precedent hereunder (including entry of the Interim Financing Order) to the obligation of the Lender to make any In-Kind Advance available to the Borrowers have been satisfied, as determined in the sole discretion of the Lender.

"Closing Fee" means a commitment fee in the amount of $172,000.00 (4% of the aggregate In-Kind Commitment amount), which amount shall be earned and due upon entry of the Interim Financing Order, to be added to the Principal Balance on such date, regardless of whether the Closing Date occurs.

"Code" means the Kansas Uniform Commercial Code, as in effect from time to time; provided, however, that, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, priority, or remedies with respect to Lender's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of Kansas, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies. To the extent that defined terms set forth herein shall have different meanings under different Articles under the Uniform Commercial Code, the meaning assigned to such defined term under Article 9 of the Uniform Commercial Code shall control.

"Collateral" means all of each Borrower's rights, titles, and interests in all of its tangible and intangible personal property, including without limitation the following property, whether now owned or hereafter acquired:

(a)     All Goods, Inventory, products, and merchandise, securing the repayment of the Prepetition Credit Accommodations and other obligations of the Borrowers to the Lender under the Prepetition Financing Documents;

39

(b)     All Goods, Inventory, products and merchandise, Equipment, Fixtures, Accounts, Accounts Receivable, General Intangibles, Payment Intangibles, Contract Rights, Rights to Payment, Investment Property (including a pledge of the direct ownership interest in each domestic subsidiary of each Borrower), Deposit Accounts, documents, instruments, Chattel Paper, Supporting Obligations, Letter-of-Credit Rights, Commercial Tort Claims, and books and records relating to any of the foregoing;

(c)     without limiting the foregoing, all rights of any Borrower in, to and under any owned or leased real property, including any of Borrower's rights in real property leases, options, easements, licenses, and related rights arising from or related thereto;

(d)     all Bankruptcy Recoveries and avoidance actions under Chapter 5 of the Bankruptcy Code, including any and all claims against any Borrower or any third party, and all Proceeds thereof (other than those arising under Section 549 of the Bankruptcy Code and amounts necessary to reimburse the DIP Lender for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other avoidance actions);

(e)     all Proceeds realized upon the sale, disposition and/or termination of any of the foregoing Collateral, whether or not perfected prior to the Petition Date, for the avoidance of doubt such Proceeds shall include Proceeds which are Accounts; General Intangibles, Payment Intangibles, Notes, Chattel Paper, Deposit Accounts, Goods, including Equipment, Inventory and Fixtures, Investment Related Property, Negotiable Collateral, Supporting Obligations, Commercial Tort Claims, money, Cash Equivalents, or other similar personal property of any Borrower;

(f)     any cash held in any escrow or other Account of the Borrowers as provided for in the Approved Budget or any order in the Cases; and

(g)     to the extent not covered in any of the foregoing, all of the Proceeds (as such term is defined in the Code) and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering or relating to any or all of the foregoing (collectively, the "Proceeds").

"Collateral" shall also include all "Collateral" and "Prepetition Collateral" as defined in any applicable Loan Document (including, without limitation, a DIP Order), together with all other property that is or is intended under the terms of the Loan Documents (including, without limitation, the DIP Orders) to be pledged as collateral security for any of the Obligations but excluding any Excluded Property.

"Collateral Access Agreement" means a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in a Borrower's Books, Equipment, Accounts or Inventory, in each case, in favor of Lender, with respect to the Collateral at such premises or otherwise in the custody, control or possession of such lessor, warehouse, processor, consignee or other Person and in form and substance reasonably satisfactory to Lender.

CORE/0500971.0226/231701685.9

"Collections" means all cash, checks, notes, instruments, and other items of payment (including insurance Proceeds, cash Proceeds of asset sales, rental Proceeds, and tax refunds) received in respect of any Collateral.

"Commitment" has the meaning set forth in Section 2.01 and shall mean and include the Initial New Money Loan, the Delayed-Draw New Money Loan, and the Roll-up Loans, jointly or severally as the context may require.

"Commercial Tort Claims" means commercial tort claims (as that term is defined in the Code) and includes the commercial tort claims listed on Schedule 5.5(d) to the Information Certificate.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate substantially in the form of Exhibit A.

"Consummation Date" means the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Plan of Reorganization confirmed by a Final Order.

"Control Agreement" means a control agreement, in form and substance reasonably satisfactory to Lender, executed and delivered by each Borrower and the applicable securities intermediary (with respect to a Securities Account) or bank (with respect to each Deposit Account, including each Controlled Account or any other Deposit Account into which the Proceeds of any Collateral are received or deposited).

"Creditors' Committee" means any official committee of creditors formed, appointed, or approved in the Cases or any successor case pursuant to the Bankruptcy Code.

"Debtor Relief Law" means title 11 of the Bankruptcy Code, as in effect from time to time, or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Delayed Draw New Money Loan Commitment" means an amount not to exceed the greater of (a) $1,100,000 and (b) $1,100,000 plus the remaining portion of the Initial New Money Loan Commitment, which was not advanced on the Initial Closing Date, in each case as measured in gross wholesale value of goods, products, and merchandise.

"Deposit Account" has the meaning set forth in the Code.

"DIP Orders" means and refers to the Interim Financing Order and the Final Financing Order.

"<u>Disclosure Statement</u>" means a disclosure statement filed in the Cases in connection with a Plan of Reorganization.

"<u>Dollars</u>" or "<u>$</u>" means United States dollars.

"<u>Effect of Bankruptcy</u>" means, with respect to any contractual obligation, contract or agreement to which a Borrower is a party, any default or other legal consequences arising on account of the commencement or the filing of the Cases (including the implementation of any stay), or the rejection of any such contractual obligation, contract or agreement with the approval of the Bankruptcy Court if required under applicable law.

"<u>Environmental Law</u>" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on any Borrower, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"<u>Event of Default</u>" has the meaning specified therefor in <u>Article VIII</u> of this Agreement.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as in effect from time to time.

"<u>Excluded Property</u>" means any personal property collateral (a) in which any existing creditor of any Borrower, as of the Petition Date, has a valid, non-contested, perfected, specific (i.e., non-blanket) first-priority lien and which secures Permitted Indebtedness approved in writing by the Lender in connection herewith, and (b) any personal property collateral, which Lender has consented to a purchase-money security interest therein to secure any other debtor-in-possession financing which is otherwise subordinate to the liens and interest of the Lender hereunder.

"<u>Exit Fee</u>" means an exit fee in the amount of $172,000.00 (4% of the aggregate In-Kind Commitment amount) which amount shall be earned and due Maturity Date, to be added to the Principal Balance on such date or otherwise paid in accordance with the terms hereof.

"<u>Existing Liabilities</u>" means the Obligations existing under the Prepetition Financing Documents.

"<u>Final Financing Order</u>" means an order of the Bankruptcy Court which order shall be in form, scope and substance reasonably acceptable to the Lender, which, among other matters but not by way of limitation, authorizes the Borrowers to obtain credit, incur Obligations, grant Liens under this Agreement, the other Loan Documents, and the DIP Orders, and provides for the super priority of the Lender's claims, which order is a Final Order.

"<u>Final Order</u>" means an order or judgment of the Bankruptcy Court, as entered on the docket of the Clerk of the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal or seek leave to appeal, petition for certiorari, reargue or seek rehearing has expired and no proceeding for certiorari, reargument or rehearing is pending or if an appeal, petition for certiorari, reargument, or rehearing has been sought, the order or

42

judgment of the Bankruptcy Court has been affirmed by the highest court to which the order was appealed, from which the reargument or rehearing was sought, or certiorari has been denied and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied; provided, however, that, all calculations relative to liabilities shall be made without giving effect to Statement of Financial Accounting Standards No. 159.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation, by-laws, or other organizational documents of such Person.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Guarantor" means each Person that executes or has executed a guaranty or other similar agreement in favor of Lender, in connection with the Obligations, the Prepetition Agreements, this Agreement, or any other Loan Document.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million.

"Indebtedness" as to any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of a Person as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all obligations of such Person owing under Hedge Agreements (which amount shall be calculated based on the amount that would be payable by such Person if the Hedge Agreement were terminated on the date of determination), (g) any Prohibited Preferred Stock of such Person, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes

43

of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Information Certificate" means the Information Certificate completed and executed by the Borrowers attached hereto as Exhibit E.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, receiverships, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Initial New Money Loan Commitment" means an amount not to exceed the $3,200,000 in gross wholesale value of goods, products, and merchandise.

"Interest Rate" means a fixed interest rate equal to twelve percent (12%) per annum.

"Interim Financing Order" means an order entered by the Bankruptcy Court, substantially in the form and substance satisfactory to the Lender, entered upon an application or motion of the Borrowers, which shall also be in form and substance satisfactory to the Lender, which among other things: (i) authorizes the Borrowers to enter into the transactions contemplated hereunder, including the authorization to accept In-Kind Advances on the terms set forth herein, (ii) grants the superpriority claim status and senior priming and other liens contemplated in this Agreement, (iii) subject only to the entry of the Final Financing Order, containing provisions (A) prohibiting claims against any Collateral of the Lender in respect of the Prepetition Financing Documents or against any Collateral pledged hereunder to the Lender in accordance with the terms of this Agreement, pursuant to 11 U.S.C. § 506(c), (B) a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (C) a waiver of the equitable doctrine of marshalling, (iv) approves payment by the Borrowers of all amounts, costs, fees and expenses provided for herein, and (v) shall not have been stayed, vacated, reversed or rescinded, or, without the prior written consent of the Lender, amended or modified.

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions or acquisitions of Indebtedness, Stock, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"Lender Expenses" means all (a) costs and expenses (including taxes, and insurance premiums) required to be paid by any Borrower under any of the Loan Documents that are paid, advanced, or incurred by Lender, (b) out-of-pocket fees and charges paid or incurred by Lender in connection with Lender's transactions with any Borrower under any of the Loan Documents, (c)

CORE/0500971.0226/231701685.9

customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) by Lender to or for the account of Borrowers (whether by wire transfer or otherwise), together with any out of pocket costs and expenses incurred in connection therewith, (d) out-of-pocket costs and expenses paid or incurred by Lender to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, (e) fees and expenses to initiate electronic reporting by Borrowers to Lender, (f) out-of-pocket examination fees and expenses (including reasonable travel, meals, and lodging) of Lender related to any inspections, examinations, audits or appraisals to the extent of the fees and charges (and up to the amount of any limitation) contained in this Agreement, (g) out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or Lender's relationship with any Borrower, (h) Lender's costs and expenses (including reasonable attorneys' fees) incurred in advising, structuring, drafting, reviewing, administering (including reasonable travel, meals, and lodging), or amending the Loan Documents and (i) Lender's costs and expenses (including attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with the Cases or any successor case or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any remedial or enforcement action concerning any Collateral.

"Lender" has the meaning specified therefor in the recitals of this Agreement and the term "Lenders" also includes any assignee of all or a portion of its interest hereunder to another lender, and any successors and assigns of such Persons.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Liquidation" means the exercise by the Lender of those rights and remedies accorded to the Lender under the Loan Documents and applicable Laws as a creditor of the Borrowers with respect to the realization on the Collateral (subject to the terms of the DIP Orders), including (after the occurrence and during the continuation of an Event of Default) the conduct by the Borrowers acting with the consent of the Lender, of any public, private or other similar sale or any other disposition of the Collateral for the purpose of liquidating the Collateral.  Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Loan Documents" means this Agreement, Prepetition Financing Documents, any Control Agreements, any Collateral Access Agreements, the DIP Orders and any other instrument or agreement entered into, now or in the future, by any Borrower with, to or in favor of Lender in connection with this Agreement.

"Loans" shall mean the Initial New Money Loan, the Delayed-Draw New Money Loan, the Initial Roll-Up Loan, and the Delayed-Draw Roll-Up Loan.

CORE/0500971.0226/231701685.9

"Material Adverse Change" means (a) a material adverse change in the business, prospects, operations, results of operations, assets, liabilities or condition (financial or otherwise) of the Borrowers taken as a whole, (b) a material impairment of Borrowers' ability to perform their obligations under the Loan Documents to which it is a party or of the Lender's ability to enforce the Obligations or realize upon the Collateral, (c) a material impairment of the enforceability or priority of Lender's Liens with respect to the Collateral as a result of an action or failure to act on the part of any Borrower, or (d) any claim against any Borrower or threat of litigation which if determined adversely to any Borrower, would result in the occurrence of an event described in clauses (a), (b) or (c) above.  Notwithstanding anything to the contrary, a "Material Adverse Change" shall not be deemed to exist as a result of the Effect of Bankruptcy or the events leading up to and resulting therefrom.

"Material Contract" means, with respect to any Person, all contracts or agreements, the loss of which could reasonably be expected to result in a Material Adverse Change, including without limitation all real property leases for Borrowers' store locations and all other personal property leases, licenses, and other contracts or agreements necessary for the orderly operation of each Borrowers' business.

"Minimum Inventory Requirements" maintenance of inventory levels at each Borrower location of goods, products and merchandise (including In-Kind Advances, and other goods, products and merchandise from time to time supplied to the Borrowers by third parties), as such levels as shall be determined in the reasonable discretion of the Lender, which shall be in amounts necessary to permit the continued orderly on-going operation of the Borrowers' business for the pendency of the Cases as going concerns and not as liquidation, wind-down or other cessation of business.

"Net Proceeds" means (a) with respect to a sale, assignment or other disposition of property or assets, including a Permitted Disposition, proceeds (including cash receivable (when received) by way of deferred payment) received by such Person in cash from such asset disposition, net of: (i) the reasonable and customary costs and expenses actually incurred in connection with such asset disposition (including legal fees and sales commissions); (ii) amounts applied to repayment of Indebtedness (other than the Obligations) secured by a Permitted Lien on such Collateral disposed of that is senior in priority to the Lender's Liens; (iii) transfer or similar taxes; and (iv) reserves for escrows and indemnities, until such reserves are no longer required and such reserves or escrows are released to such Person; (b) with respect to the incurrence or issuance of any Indebtedness by any Borrower (other than Permitted Indebtedness), the result of (i) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance minus (ii) the underwriting discounts and commissions, and other reasonable out-of-pocket costs, fees, commissions, premiums and expenses incurred by the Borrowers in connection with such incurrence or issuance to the extent such amounts (A) were not deducted in determining the amount referred to in clause (i) above, (B) are, at the time of receipt of such cash or Cash Equivalents, actually paid or payable to a Person that is not an Affiliate of any Borrower, and (C) are properly attributable to such transaction; and (c) with respect to the sale or issuance of any Stock of a Borrower (or its direct or indirect parent) (or successor thereof), the result of (i) the sum of the cash and Cash Equivalents received in connection with such sale or issuance minus (ii) the underwriting discounts and commissions, and other reasonable out-of-pocket costs, fees, commissions, premiums and expenses, incurred by such Borrower (or its direct or indirect parent)

46

(or successor thereof) in connection with such sale or issuance to the extent such amounts (A) were not deducted in determining the amount referred to in clause (c)(i) above, (B) are, at the time of receipt of such cash or cash equivalents, actually paid or payable to a Person that is not an Affiliate of any Borrower, and (C) are properly attributable to such transaction.

"Note" mean a promissory note or notes of a Borrower substantially in the form attached as Exhibit B hereto.

"Obligations" means all loans (including the Initial New Money Loan, the Delayed-Draw New Money Loan, and the Roll-Up Loans), debts, principal, interest, premiums, liabilities, obligations (including indemnification obligations), fees, costs, Lender Expenses, guaranties, and all covenants and duties of any other kind and description owing by any Borrower pursuant to or evidenced by this Agreement or any of the other Loan Documents (which for the avoidance of doubt shall include the Principal Balance) and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, liquidated or unliquidated, determined or undetermined, voluntary or involuntary, due, not due or to become due, sole, joint, several or joint and several, incurred in the past or now existing or hereafter arising, however arising, and including all interest not paid when due, and all other expenses or other amounts that any Borrower is required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents.  Any reference in this Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) maintained for employees of any Borrower or any ERISA Affiliate and covered by Title IV of ERISA.

"Permitted Discretion" means a determination made in the exercise of reasonable (from the perspective of a secured lender) business judgment.

"Permitted Dispositions" means (i) the sale of any furniture, fixture or equipment that is no longer used or useful in the business of the Borrowers, (ii) the sale of all or substantially all of the Borrowers' assets as a going concern in a single transaction or series of related transactions as approved by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code, or other applicable law; provided that any such going concern sale shall be for cash consideration in an amount in excess of all outstanding Obligations, which amount shall be paid to Lender for application to the Obligations, or (iii) a transaction or transactions combining the sale of certain of the Borrowers' business assets as a going concern, as approved by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code or other applicable law, which transaction or transactions shall be on terms reasonably satisfactory to Lender and shall together, be for cash consideration in excess of all outstanding Obligations, which amount shall be paid to Lender for application to the Obligations.

"Permitted Indebtedness" means:

(a)    Indebtedness evidenced by this Agreement or the other Loan Documents;

CORE/0500971.0226/231701685.9

(b)    Indebtedness set forth on the Information Certificate and any Refinancing Indebtedness in respect of such Indebtedness;

(c)    Indebtedness composing Permitted Investments;

(d)    Indebtedness owed to any Person providing property, casualty, liability, or other insurance to any Borrower, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year;

(e)    the existing Obligations under the Prepetition Financing Documents;

(f)    any other Indebtedness consented to in writing by the Lender, which consent may be withheld or conditioned in the sole discretion of the Lender, and approved by the Bankruptcy Court, to the extent related to the operation of Borrowers' business; and

(g)    the indebtedness to Michael Postal, pursuant to his provision of post-petition debtor-in-possession financing as approved by the Bankruptcy Court.

"Permitted Investments" means:

(a)    Investments in cash and Cash Equivalents;

(b)    Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(c)    advances made in connection with purchases of goods, inventory, or services in the ordinary course of business;

(d)    Investments owned by any Borrower on the Closing Date and set forth in the schedules hereto;

(e)    Investments received in settlement of amounts due to any Borrower effected in the ordinary course of business or owing to any Borrower as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Borrower; and

(f)    deposits of cash made in the ordinary course of business to secure performance of operating leases.

"Permitted Liens" means:

(a)    Liens granted to, or for the benefit of, Lender to secure the Obligations;

(b)    Liens for unpaid taxes, assessments, or other governmental charges or levies that either (i) are not yet delinquent, or (ii) do not have priority over Lender's Liens and the underlying taxes, assessments, or levies are the subject of Permitted Protests;

48

(c)     judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under this Agreement;

(d)     Liens that are replacements of Permitted Liens to the extent that the original Indebtedness is the subject of permitted Refinancing Indebtedness and so long as the replacement Liens only encumber those assets that secured the original Indebtedness;

(e)     Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of business and not in connection with the borrowing of money, and which Liens either (i) are for sums not yet delinquent, or (ii) are the subject of Permitted Protests,

(f)     Liens on amounts deposited to secure Borrowers' obligations in connection with worker's compensation or other unemployment insurance,

(g)     Liens on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness;

(h)     Liens securing Permitted Indebtedness; and

(i)     the Lien of PNC Bank, National Association, in the amount of $543,000.00.

"Permitted Protest" means the right of any Borrower to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment; provided, that, (a) a reserve with respect to such obligation is established on such Borrower's books and records in such amount as may be reasonably requested by the Lender, (b) any such protest is instituted promptly and prosecuted diligently by such Borrower, as applicable, in good faith, and (c) while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lender's Liens.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Petition Date" has the meaning specified therefor in the recitals of this Agreement.

"Plan of Reorganization" or "Plan" means a plan filed in the Cases pursuant to Chapter 11 of the Bankruptcy Code.

"Principal Balance" means the (a) the value of all In-Kind Advances made to Borrowers in accordance with the terms hereof, plus (b) the Roll-Up amounts, plus (c) all PIK interest accruing from time to time on the outstanding Obligations, plus (d) all other costs, fees and expenses from time to time accruing or added to the Principal Balance in accordance with the terms hereof, including the Closing Fee, the Exit Fee, and any Lender Expenses.

"Prepayment Event" has the meaning set forth in Section 2.03(b)(1).

49

(a)     any sale, assignment or other disposition of any Prepetition Equipment or DIP Collateral;

(b)     any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation, expropriation, or similar proceeding, in any such case after the Closing Date, of, any Collateral; or

(c)     any incurrence of any Indebtedness by any Borrower or any Subsidiary thereof, excluding Permitted Indebtedness.

"Prepetition Agreements" has the meaning specified in the recitals of this Agreement.

"Prepetition Collateral" means all goods, inventory, products, merchandise, equipment, furnishings, accounts, and all other personal property of the Borrowers subject to liens, security interests or claims in favor of the Lender in its capacity as the secured party or supplier under the Prepetition Financing Documents.

"Prepetition Financing Documents" has the meaning specified in the recitals of this Agreement.

"Proceeds" has the meaning specified therefor in the definition of "Collateral" set forth in this Schedule 1.1(a).

"Professional Fee Carve Out" shall mean a carve out for the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court; (ii) all statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c), as determined by agreement of the U.S. Trustee or by a Final Order of the Bankruptcy Court; (iii) all accrued and unpaid fees, disbursements, costs and expenses incurred by Case Professionals to the extent allowed at any time, through the date of service by the Lender of a Carve Out Trigger Notice, up to and as limited by the respective Approved Budget amounts for each Case Professional or category of Case Professional through the date of service of said Carve Out Trigger Notice (including partial amounts for any Carve Out Trigger Notice given other than at the end of a week, and after giving effect to all carryforwards and carrybacks from prior or subsequent favorable Approved Budget variances), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice less the amount of pre-petition retainers received by such Case Professionals and not previously applied to fees and expenses; (iv) all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $25,000.00 less the amount of pre-petition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (iii) above. The Professional Expense Carve-Out shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve Out Trigger Notice in respect of fees and expenses incurred after delivery of the Carve Out Trigger Notice.

"Professional Fees and Expenses" means, subject to any limitations contained in the DIP Orders, (a) allowed administrative expenses payable pursuant to 28 U.S.C. § 1930(a)(6), and (b) professional fees of, and costs and expenses incurred by, Case Professionals.

50

"Projections" means each Borrower's forecasted (a) balance sheets, (b) profit and loss statements, (c) availability projections, and (d) cash flow statements, all prepared on a basis consistent with such Borrower's historical financial statements, together with appropriate supporting details and a statement of underlying assumptions.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Refinancing Indebtedness" means refinancings, renewals, or extensions of Indebtedness so long as:

(a)    such refinancings, renewals, or extensions do not result in an increase in the principal amount of the Indebtedness so refinanced, renewed, or extended, other than by the amount of premiums paid thereon and the fees and expenses incurred in connection therewith and by the amount of unfunded commitments with respect thereto,

(b)    such refinancings, renewals, or extensions do not result in a shortening of the average weighted maturity (measured as of the refinancing, renewal, or extension) of the Indebtedness so refinanced, renewed, or extended, nor are they on terms or conditions that, taken as a whole, are or could reasonably be expected to be materially adverse to the interests of Lender,

(c)    if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, or extension must include subordination terms and conditions that are at least as favorable to the Lender as those that were applicable to the refinanced, renewed, or extended Indebtedness, and

(d)    the Indebtedness that is refinanced, renewed, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended.

"Related Persons" means a Person's Affiliates, officers, directors, employees, attorneys, and agents.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"Reported Fee Accruals" means the amount of Professional Fees and Expenses which have been incurred, accrued, or invoiced (but remain unpaid) prior to such time as the Lender notifies the Borrowers of the occurrence and continuation of an Event of Default. For purposes of determining the amount of the Professional Fee Carve Out, "Reported Fee Accruals" shall be equal to the aggregate "Professional Fees" reflected in the Approved Budget for the relevant time period minus any payments received on account thereof, which payments are reported to the Lender in accordance with the provisions of Section 6.1 hereof. Any Professional Fees and Expenses which have been incurred, accrued or invoiced (and remain unpaid) but are in excess of the amounts reflected on the Approved Budget for the relevant time period (subject to the Variance Report delivered pursuant to Section 6.1 hereof) shall not constitute "Reported Fee Accruals."

"Roll-Up Debt" means all Obligations of the Borrowers owing to the Lender under the Prepetition Financing Documents as of the Petition Date, fifty percent (50%) of which shall be added to the Principal Balance on the date of entry of the Interim Financing Order, and fifty percent (50%) of which shall be added to the Principal Balance on the date of entry of the Final Financing Order, with interest accruing thereon from each such date, in accordance with the provisions hereof.

"S&P" has the meaning specified therefor in the definition of Cash Equivalents.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Security Interest" has the meaning specified therefor in Section 3.1 of this Agreement.

"Solvent" means, with respect to any Person on a particular date, that, (i) at fair valuations, the sum of such Person's assets (and including as assets for this purpose all rights of subrogation, contribution or indemnification arising pursuant to any guarantees given by such Person) is greater than all of such Person's debts and including subordinated and contingent liabilities computed at the amount which, such Person has a reasonable basis to believe, represents an amount which can reasonably be expected to become an actual or matured liability (and including as to contingent liabilities arising pursuant to any guarantee the face amount of such liability as reduced to reflect the probability of it becoming a matured liability); and (ii) such Person is able to pay its debts as they mature and has (and has a reasonable basis to believe it will continue to have) sufficient capital (and not unreasonably small capital) to carry on its business consistent with its practices as of the Closing Date.

"Subsidiary" or "subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the shares of Stock having ordinary voting power to elect a majority of the appliable governing body of such Person (or appoint other comparable managers) of such corporation, partnership, limited liability company, or other entity.

"Supporting Obligations" means supporting obligations (as such term is defined in the Code) and includes letters of credit and guaranties issued in support of Accounts, Chattel Paper, documents, General Intangibles, instruments, or Investment Related Property.

"Taxes" means any taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments and all interest, penalties or similar liabilities with respect thereto; provided, however, that, Taxes shall exclude any tax imposed on the net income or net profits of Lender, in each case imposed by the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Lender is organized or the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Lender's principal office is located in each case as a result of a present or former connection between such Lender and the jurisdiction or taxing authority imposing the tax (other than any such connection arising solely from such Lender having executed, delivered or performed its obligations or

52

received payment under, or enforced its rights or remedies under this Agreement or any other Loan Document).

"Variance Report" means a report prepared by a duly authorize representative of the Borrower Representative reflecting on a line-item basis the Borrowers' actual performance compared to the Approved Budget for the immediately preceding week and on a cumulative basis for the period after the Petition Date and the percentage variance of the Borrowers' actual results from those reflected in the then existing Approved Budget, along with Borrowers' management's explanation of such variance.

"Voidable Transfer" has the meaning specified therefor in Section 16.07 of this Agreement.

2.     **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, however, that, if any Borrower notifies Lender that such Borrower requests an amendment to any provision hereof to eliminate the effect of any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions) (an "Accounting Change") occurring after the Closing Date, or in the application thereof (or if any Lender notifies any Borrower that it requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such Accounting Change or in the application thereof, then Lender and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such Accounting Change with the intent of having the respective positions of the Lender and each Borrower after such Accounting Change conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be calculated as if no such Accounting Change had occurred. Whenever used herein, the term "financial statements" shall include the footnotes and schedules thereto. Whenever the term "Borrower" or is used in respect of a financial covenant or a related definition, it shall be understood to mean Borrowers on a consolidated basis, unless the context clearly requires otherwise. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Accounting Standards Codification 825-10 (or any other financial accounting standard having a similar result or effect) to value any Indebtedness or other liabilities of any person at "fair value."

3.     **Code**. Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein. The meaning of any term defined herein by reference to the Code will not be limited by reason of any limitation set forth on the scope of the Code, whether under Section 9-109 of the Code, by reason of federal preemption or otherwise.

4.     **Construction**. Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other

53

Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in full in Dollars in cash or immediately available funds of all of the Obligations (including the payment of any Lender Expenses that have accrued irrespective of whether demand has been made therefor and the payment of any termination amount or prepayment premium then applicable other than unasserted contingent indemnification Obligations. Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement for a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record. References herein to any statute or any provision thereof include such statute or provision (and all rules, regulations, and interpretations thereunder) as amended, revised, re-enacted, and for consolidated from time to time and any successor statute thereto.

5.    **Schedules and Exhibits**. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

54

**Schedule A**
**Prepetition Agreements**

Hallmark Account Agreements of various dates, Gold Crown Sublicence Agreements of various dates, and an Agreement dated October 28, 2019, which provide for, among other things, the delivery of goods, products and merchandise and the extension of credit and financing terms associated with the Prepetition Borrowers' business operations.

Amended and Restated Loan and Security Agreement and Release dated as of January 1, 2020 (as amended, supplemented, or otherwise modified from time to time, the "Loan Agreement").

Promissory Note dated June 2024, executed under the Loan Agreement.

**Schedule 6.01**

Deliver to the Lender, each of the financial statements, reports, or other items set forth below at the following times in form and substance satisfactory to Lender:

| | |
|---|---|
| As soon as available, but in any event within twenty (20) days after the end of each month | an unaudited consolidated and consolidating balance sheet, income statement, statement of cash flow, and statement of owner's/member's equity with respect to Borrowers during such period and compared to the prior period and plan, subject to year-end audit adjustments and the absence of footnotes, together with a corresponding discussion and analysis of results from management; and |
| As soon as available, but in any event within ninety (90) days after the end of each fiscal year | consolidated and consolidating financial statements of Borrowers for such fiscal year, reviewed financial statements reviewed and certified as true and correct in all material respects by a certified public accountant reasonably acceptable to the Lender (such financial statements to include a balance sheet, income statement, statement of cash flow, and statement of owners/members equity and, if prepared, such accountants' letter to management); |
| at least two (2) Business Days prior to the furnishing or filing thereof, unless relief is being requested on an expedited basis, in which case, a copy will be provided in a reasonable time prior to filing as time permits, | copies of any statement, report or pleading proposed to be furnished to or filed with the Bankruptcy Court or the Creditors' Committee in connection with the Cases |
| | |

**Schedule 6.02**

Provide Lender with each of the documents set forth below at the following times in form and substance satisfactory to Lender:

| | |
|---|---|
| Weekly no later than Monday of each week (or such other day of the week as Lender and Borrowers shall mutually agree) | (a)      a completed Compliance Certificate and Variance Report and all supporting information required to be delivered in connection therewith |
| Weekly no later than Monday of each week (or such other day of the week as Lender and Borrowers shall mutually agree) | (a) a summary of ageing, by vendor, of each Borrower's accounts payable (delivered electronically in an acceptable format, if a Borrower has implemented electronic reporting); <br><br> (b) notice of all claims, offsets, or disputes asserted by Account Debtors with respect to each Borrower's |
| Weekly no later than Monday of each week (or such other day of the week as Lender and Borrowers shall mutually agree) | (a) copies of purchase orders and invoices for Inventory and to be acquired by each Borrower in accordance with the Approved Budget; <br><br> (b) copies of invoices together with corresponding shipping and delivery documents and credit memos together with corresponding supporting documentation with respect to such invoices and credit memos in excess of an amount determined in the reasonable discretion of the Lender, <br><br> (c) such other reports and information as to the Collateral and each In-Kind Advance as Lender may reasonably request; <br><br> (d) a detailed aging of each Borrower's Accounts, together with a reconciliation to the monthly Account roll-forward and supporting documentation for any reconciling items noted (delivered electronically in an acceptable format, if a Borrower has implemented electronic reporting); and <br><br> (e) a reconciliation of Accounts aging, trade accounts payable aging, and Inventory of each Borrower to the general ledger and the monthly financial statements, including any book reserves related to each category. |

**EXHIBIT A**

FORM OF COMPLIANCE CERTIFICATE

[on Borrowers' letterhead]

To:    Hallmark Marketing Company, LLC
       Attn:  General Counsel's Office
       2501 McGee Trafficway
       Mail Drop 339
       Kansas City, MO 64108
       Email: Phyllis.Leach@hallmark.com


       As Lender party to the Credit Agreement

Re:    Compliance Certificate dated [_____]

Ladies and Gentlemen:

Reference is made to that certain Senior Secured Superpriority Debtor In Possession Credit and Security Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement") dated as of November [___], 2025, by and among LBPO Management LLC, a Maryland limited liability company and each other Debtor in the Chapter 11 Bankruptcy Cases jointly administered under *In re Banners of Abingdon, LLC, et al.*[3] filed in the United States Bankruptcy Court for the District of Columbia as Case No. 25-378-ELG (hereinafter referred to, individually and collectively, jointly and severally, as "Borrower"), and Hallmark Marketing Company, LLC, a Kansas limited liability company and/or its affiliates, successors, and assigns (each a "Lender" and together the "Lenders")

Pursuant to Schedule 6.01 of the Credit Agreement, the Borrower Representative for itself and for each other Borrower, hereby certifies that:

1.    Such authorized person, acting in his capacity the duly authorized representative of the Borrowers, has reviewed the terms of the Loan Agreement and has made, or caused to be made

---

[3]    Debtors in these cases are Banners of Abingdon, LLC; Banners of Reston, Inc.; Banner's of Dulles Town, Inc.; Banner's of Fair Oaks, LLC; Banner's Of Ashburn, LLC; Banner's of Gainesville, LLC; Banner's of Warrenton, LLC; Banner's of South Riding, LLC; Banner's of Stafford, LLC; Banner's of Oakton, LLC; Banner's of Bradlee Center, LLC; Banners of Fair Lakes, LLC; Banners of Woodbridge LLC; Banners of Williamsburg LLC; Banners of Newport News LLC; Banners of Commonwealth Midlothian LLC; Banners of Village Market Place Midlothian LLC; Banners of Fairfield Virginia Beach LLC; Banners of Hilltop Virginia Beach LLC; Banners of Central Park Fredericksburg LLC; Banners of Cosner's Corner Fredericksburg LLC; Banners of York River LLC; Banners of Lynchburg, LLC; Banners of Harrisonburg VA LLC; Banners of Winchester LLC; Banners of Christiansburg VA LLC; Banners of Chesapeake VA LLC; Banners of Columbus Village VA Beach LLC; Banner's of Burke, LLC; Banner's of Kamp Washington, LLC; Banners of Suffolk II LLC; Banners of Suffolk LLC; Banners of Henrico LLC; Banners Of Waynesboro LLC; Banners of Roanoke LLC; Banners of Rocky Mount VA, LLC; Banners of Manassas II LLC; Banners of Charlottesville LLC; Banners of Kingstowne LLC; Banners of Leesburg, LLC and LBPO Management, LLC.

under her/his supervision, a review in reasonable detail of the transactions and condition of each Borrower and such review has not disclosed the existence on and as of the date hereof, and the undersigned does not have knowledge of the existence as of the date hereof, of any event or condition that constitutes a Default or Event of Default [, except [_____]].

   2.  Set forth on Schedule 1 hereof is a Variance Report.

   3.  Set forth on Schedule 2 hereof are any updates to the Information Certificate to make the Information Certificate most recently delivered to the Lender be true, correct, and complete as of the date hereof.

   4.  The information and calculations set forth on Schedule 1 and Schedule 2 are true, correct and complete in all material respects.

   IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned this [_____] day of [_____], [_____].

**BORROWERS:**

LBPO MANAGEMENT LLC, in its capacity as Borrower Representative and as a Borrower and as Debtor-In-Possession

By:   _____
Name:
Title:

\*\*\*\*

**SCHEDULE 1 TO COMPLIANCE CERTIFICATE**

\*\*\*\*

**SCHEDULE 2 TO COMPLIANCE CERTIFICATE**

**EXHIBIT B**

**PROMISSORY NOTE**

November [_____], 2025                                                                    Kansas City, MO

FOR VALUE RECEIVED, the undersigned, LBPO Management LLC, a Maryland limited liability company and each other Debtor in the Chapter 11 Bankruptcy Cases jointly administered under *In re Banners of Abingdon, LLC, et al.*[4] filed in the United States Bankruptcy Court for the District of Columbia as Case No. 25-378-ELG (hereinafter referred to, individually and collectively, jointly and severally, as "Borrower"), hereby unconditionally promises to pay to the order of Hallmark Marketing Company, LLC, a Kansas limited liability company and/or its affiliates, successors, and assigns (each a "Lender" and together the "Lenders") in lawful money of the United States or such other currency as may be provided in the Loan Agreement (as defined below) and in immediately available funds, the principal amount of TEN MILLION SEVEN HUNDRED TWENTY THOUSAND FIVE HUNDRED AND SIXTY TWO AND NO/100 DOLLARS ($10,720,562) (consisting of $4,300,000 in aggregate principal amount of New Money Loans and $6,420,562 in aggregate principal amount of Roll-Up Loans, a such terms are defined in the Loan Agreement) or if more the aggregate outstanding Principal Balance, as such term is defined in the Loan Agreement, pursuant to the terms of the Loan Agreement on the date on which such amounts become due and payable pursuant to the terms of the Loan Agreement, in strict accordance with the terms thereof.  Borrower likewise unconditionally promises to pay to Lender interest from and after the date hereof on the Principal Balance at such interest rates, payable at such times, and computed in such manner as are specified in the Loan Agreement, in strict accordance with the terms thereof.

This Promissory Note (this "Note") is issued pursuant to, and is a "Note" referred to in, the Senior Secured Superpriority Debtor In Possession Credit and Security Agreement dated November _____, 2025 (as the same may be amended from time to time, the "Loan Agreement"), by and among Borrowers and the Lenders, and their respective successors and assigns. Lender is and shall be entitled to all benefits thereof and of all Loan Documents executed and delivered in connection therewith. This Note is subject to the terms and conditions of the Loan Agreement, including, without limitation, certain restrictions on transfer or assignment as provided in the Loan

---

[4]     Debtors in these cases are Banners of Abingdon, LLC; Banners of Reston, Inc.; Banner's of Dulles Town, Inc.; Banner's of Fair Oaks, LLC; Banner's Of Ashburn, LLC; Banner's of Gainesville, LLC; Banner's of Warrenton, LLC; Banner's of South Riding, LLC; Banner's of Stafford, LLC; Banner's of Oakton, LLC; Banner's of Bradlee Center, LLC; Banners of Fair Lakes, LLC; Banners of Woodbridge LLC; Banners of Williamsburg LLC; Banners of Newport News LLC; Banners of Commonwealth Midlothian LLC; Banners of Village Market Place Midlothian LLC; Banners of Fairfield Virginia Beach LLC; Banners of Hilltop Virginia Beach LLC; Banners of Central Park Fredericksburg LLC; Banners of Cosner's Corner Fredericksburg LLC; Banners of York River LLC; Banners of Lynchburg, LLC; Banners of Harrisonburg VA LLC; Banners of Winchester LLC; Banners of Christiansburg VA LLC; Banners of Chesapeake VA LLC; Banners of Columbus Village VA Beach LLC; Banner's of Burke, LLC; Banner's of Kamp Washington, LLC; Banners of Suffolk II LLC; Banners of Suffolk LLC; Banners of Henrico LLC; Banners Of Waynesboro LLC; Banners of Roanoke LLC; Banners of Rocky Mount VA, LLC; Banners of Manassas II LLC; Banners of Charlottesville LLC; Banners of Kingstowne LLC; Banners of Leesburg, LLC and LBPO Management, LLC.

Agreement. All capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed to such terms in the Loan Agreement.

The repayment of the principal balance of this Note is subject to the provisions of the Loan Agreement. The entire unpaid principal balance and all accrued interest on this Note shall be due and payable in such amounts and on such dates as set forth in the Loan Agreement.

All payments of principal and interest shall be made in Dollars, in immediately available funds, to the Lender's benefit as specified in the Loan Agreement.

Upon or after the occurrence of an Event of Default and for so long as such Event of Default exists, the principal balance and all accrued interest of this Note may be declared (or shall become) due and payable in the manner and with the effect provided in the Loan Agreement, and the unpaid principal balance hereof shall bear interest at the default rate as and when provided in the Loan Agreement. Borrower agrees to pay, and to save Lender harmless against, any liability for the payment of, all costs and expenses, including, but not limited to, reasonable attorneys' fees, if this Note is collected by or through an attorney-at-law.

Time is of the essence of this Note. To the fullest extent permitted by applicable law, each Borrower, for itself and its legal representatives, successors and assigns, expressly waives presentment, demand, protest, notice of dishonor, notice of non-payment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption or insolvency laws.

Wherever possible each provision of this Note shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or remaining provisions of this Note. No delay or failure on the part of the Lender in the exercise of any right or remedy hereunder or under any other Loan Document shall operate as a waiver thereof, nor as an acquiescence in any default, nor shall any single or partial exercise by Lender of any right or remedy preclude any other right or remedy. The Lender, at its option, may enforce its rights against any Collateral securing this Note without enforcing its rights against any Borrower, guarantor of the indebtedness evidenced hereby or any other property or indebtedness due or to become due to any Borrower. Borrowers agree that, without releasing or impairing any Borrower's liability hereunder, the Lender may at any time release, surrender, substitute or exchange any Collateral securing this Note and may at any time release any party primarily or secondarily liable for the indebtedness evidenced by this Note.

The rights of Lender and obligations of Borrower hereunder shall be construed in accordance with and governed by the laws (without giving effect to the conflict of law principles thereof) of the District of Columbia.

[Signature pages immediately follow.]

2

IN WITNESS WHEREOF, Borrower has caused this Note to be executed and delivered by its duly authorized officers on the date first above written.

LBPO MANAGEMENT LLC, in its capacity as Borrower Representative and as a Borrower and as Debtor-In-Possession

By: _____
Name:
Title:

[ $^{5}$ ], in its capacity as a Borrower and as Debtor-In-Possession

By: _____
Name:
Title:

---

[5] All Borrowers to be added to execution copy of this Promissory Note.

3

## EXHIBIT D

### REPRESENTATIONS AND WARRANTIES

**5.1     Due Organization and Qualification; Subsidiaries**.

(a)     Each Borrower, excepting Banners of Abingdon, LLC, (i) is duly organized and existing and in good standing under the laws of the jurisdiction of its organization, (ii) is qualified to do business in any jurisdiction where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, and (iii) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)     Except as set forth on Schedule 5.1(b), no Borrower has any subsidiary or Affiliates.

**5.2     Due Authorization; No Conflict**.

(a)     As to each Borrower, subject to the entry of the DIP Orders, the execution, delivery, and performance by such Borrower of the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Borrower.

(b)     As to each Borrower, subject to the entry of the DIP Orders, the execution, delivery, and performance by such Borrower of the Loan Documents to which it is a party do not and will not (i) violate any material provision of federal, state, or local law or regulation applicable to any Borrower, the Governing Documents of any Borrower, or any order, judgment, or decree of any court or other Governmental Authority binding on any Borrower, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract of any Borrower except to the extent that any such conflict, breach or default could not individually or in the aggregate reasonably be expected to cause a Material Adverse Change, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any assets of any Borrower, other than Permitted Liens, or (iv) require any approval of any Borrower's interest holders or any approval or consent of any Person under any Material Contract of any Borrower, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of Material Contracts, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Change.

**5.3     Binding Obligations**. Subject to the entry of the DIP Orders, each Loan Document has been duly executed and delivered by each Borrower that is a party thereto and is the legally valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

**5.4     No Encumbrances**. All of Borrowers' assets are free and clear of Liens except for Permitted Liens.

5.5     **Organizational Identification Number**

Each Borrower's tax identification numbers and organizational identification numbers, if any, are identified on their respective petitions for bankruptcy relief.

5.6     **Litigation**.

(a)     Except for the Effect of Bankruptcy, there are no actions, suits, or proceedings pending or, to the knowledge of any Borrower, after due inquiry, threatened in writing against a Borrower that (i) either individually or in the aggregate could reasonably be expected to result in a Material Adverse Change or (ii) seeks to enjoin, either directly or indirectly, the execution, delivery or performance by any Borrower of the Loan Documents or the transactions contemplated thereby. The foregoing notwithstanding, and as disclosed by the Borrowers, there exists one state court tort claim, seeking damages of $25,000.00, brought by a *pro se* plaintiff, in which it is not clear if one or more Borrowers are defendants.

5.7     **Compliance with Laws**. No Borrower (a) is in violation of any laws, rules, regulations, executive orders, or codes (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change.

5.8     **No Material Adverse Change**. All historical financial statements relating to the Borrowers that have been delivered by Borrowers to Lender present fairly in all material respects, the Borrowers' consolidated financial condition as of the date thereof and results of operations for the period then ended. Since June 30, 2025, except for the Effect of Bankruptcy, no event, circumstance, or change has occurred that has or could reasonably be expected to result in a Material Adverse Change with respect to the Borrowers.

5.9     **Fraudulent Transfer**. No transfer of property is being made by any Borrower, and no obligation is being incurred by any Borrower in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Borrower.

5.10    **Leases**. Each Borrower enjoys peaceful and undisturbed possession under all real and personal property leases material to their business and to which they are parties or under which they are operating, and, subject to Permitted Protests, all of such material leases are valid and subsisting and no material default by the applicable Borrower exists under any of them.

5.11    **Reserved**.

5.12    **Complete Disclosure**. All factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) furnished by or on behalf of a Borrower in writing

to the Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents, and all other such factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about such Borrowers' industry) hereafter furnished by or on behalf of a Borrower in writing to the Lender will be, true and accurate, in all material respects, on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.

**5.13    Material Contracts; No Default**. Set forth on Schedule 5.13 from time to time in accordance herewith) is a detailed description of the Material Contracts of each Borrower. Except for matters which, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change, each Material Contract (other than those that have expired at the end of their normal terms): (a) is in full force and effect and is binding upon and enforceable against the applicable Borrower and, to such Borrower's knowledge, after due inquiry, each other Person that is a party thereto in accordance with its terms, (b) has not been otherwise amended or modified, and (c) is not in default due to the action or inaction of the applicable Borrower.

**5.14    Reserved.**

**5.15    Indebtedness**. Set forth in schedules filed with the Bankruptcy Court is a true and complete list of all secured Indebtedness of the Borrowers outstanding immediately prior to the Petition Date that is to remain outstanding immediately thereafter and such Schedule accurately sets forth the aggregate principal amount of such Indebtedness as of the Petition Date.

**5.16    Payment of Taxes**. Except as otherwise disclosed in writing to Lender prior to the Closing Date, all tax returns and reports of each Borrower required to be filed by any of them have been timely filed.

**5.17    Reserved**.

**5.18    Reserved**.

**5.19    Employee and Labor Matters**. There is (i) no unfair labor practice complaint pending or, to the knowledge of Borrowers, threatened against any Borrower before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Borrower which arises out of or under any collective bargaining agreement and that could reasonably be expected to result in a material liability, (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened in writing against any Borrower that could reasonably be expected to result in a material liability, or (iii) to the knowledge of Borrowers, after due inquiry, no union representation question existing with respect to the employees of any Borrower and no union organizing activity taking place with respect to any of the employees of any Borrower. No Borrower has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or similar state law, which remains unpaid or unsatisfied. The hours worked and payments made to employees of Borrowers have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such

violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change. All material payments due from any Borrower on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Borrower, except where the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change.

**5.20    Collateral**. This Agreement creates a valid security interest in the Collateral of each Borrower, to the extent a security interest therein can be created under the Code or other applicable Law, securing the payment of the Obligations. Except to the extent a security interest in the Collateral cannot be perfected by the filing of a financing statement under the Code, all filings and other actions necessary or desirable to perfect and protect such security interest have been duly taken or will have been taken upon the filing of financing statements (or other assignments, acknowledgments, or confirmations) listing the applicable Borrower, as a debtor, and the Lender, as secured party, in the jurisdictions listed next to such Borrower's name on the Information Certificate. Upon the making of such filings (or obtaining control or otherwise perfection Lender's interest in such Collateral), Lender shall have a valid first priority perfected security interest in the Collateral of each Borrower to the extent such security interest can be perfected by the filing of a financing statement or otherwise perfected, subject only to Permitted Liens. All actions by any Borrower necessary to protect and perfect such security interest on each item of Collateral has been duly taken.

**5.21    Insurance**. The Collateral and all owned and leased properties of the Borrowers are insured with financially sound and reputable insurance companies which are not Affiliates of the Borrowers, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrowers operate their businesses. Each insurance policy listed is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

**5.22    Locations of Collateral**. No  Collateral is stored with a bailee, warehouseman, or similar party and is located only at, or in-transit between or to, the locations identified on Schedule 5.22 to the Information Certificate, except to the extent Borrowers store Collateral at a warehouse known to Lenders and disclosed to the Bankruptcy Court on the Borrowers' statement of financial affairs and further except to the extent Borrowers store Collateral in the retail stores that comprise their ordinary places of business operations.

**5.23    Brokers**. No broker or finder brought about the obtaining, making, or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan  Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

# EXHIBIT E

## INFORMATION CERTIFICATE

Dated: [_____], 2025

Reference is made to that certain Senior Secured Superpriority Debtor In Possession Credit and Security Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") dated as of November [___], 2025, by and among LBPO Management LLC, a Maryland limited liability company and each other Debtor in the Chapter 11 Bankruptcy Cases jointly administered under *In red Banners of Abingdon, LLC, et al.*[6] filed in the United States Bankruptcy Court for the District of Columbia as Case No. 25-378-ELG (each a "Borrower", and collectively the "Borrowers") and Hallmark Marketing Company, LLC, a Kansas limited liability company and/or its affiliates, successors, and assigns (each a "Lender" and together the "Lenders").

The undersigned Borrower Representative (as defined in the Credit Agreement), for itself and on behalf of each Borrower represents and warrants to Lender the information set forth in each attached Schedules about each Borrower is true, accurate and complete as of the date set forth above. The Lender is entitled to rely upon the foregoing in all respects, and the undersigned is duly authorized to execute and deliver this Information Certificate on behalf of each Borrower.

Very truly yours,

**BORROWERS:**

LBPO MANAGEMENT LLC, in its capacity as Borrower Representative and as a Borrower and as Debtor-In-Possession

By: _____
Name:
Title:

---

[6] Debtors in these cases are Banners of Abingdon, LLC; Banners of Reston, Inc.; Banner's of Dulles Town, Inc.; Banner's of Fair Oaks, LLC; Banner's Of Ashburn, LLC; Banner's of Gainesville, LLC; Banner's of Warrenton, LLC; Banner's of South Riding, LLC; Banner's of Stafford, LLC; Banner's of Oakton, LLC; Banner's of Bradlee Center, LLC; Banners of Fair Lakes, LLC; Banners of Woodbridge LLC; Banners of Williamsburg LLC; Banners of Newport News LLC; Banners of Commonwealth Midlothian LLC; Banners of Village Market Place Midlothian LLC; Banners of Fairfield Virginia Beach LLC; Banners of Hilltop Virginia Beach LLC; Banners of Central Park Fredericksburg LLC; Banners of Cosner's Corner Fredericksburg LLC; Banners of York River LLC; Banners of Lynchburg, LLC; Banners of Harrisonburg VA LLC; Banners of Winchester LLC; Banners of Christiansburg VA LLC; Banners of Chesapeake VA LLC; Banners of Columbus Village VA Beach LLC; Banner's of Burke, LLC; Banner's of Kamp Washington, LLC; Banners of Suffolk II LLC; Banners of Suffolk LLC; Banners of Henrico LLC; Banners Of Waynesboro LLC; Banners of Roanoke LLC; Banners of Rocky Mount VA, LLC; Banners of Manassas II LLC; Banners of Charlottesville LLC; Banners of Kingstowne LLC; Banners of Leesburg, LLC and LBPO Management, LLC.

**Schedule 5.1(b)**

Subsidiaries; Affiliates; Investments

Part 1 - Subsidiaries

Part 2 - Affiliates (Less than fifty (50%) percent Owned by a Borrower)

| Name | Jurisdiction of Organization | Percentage Owned |
|------|------------------------------|------------------|
|      |                              |                  |

Part 3 - Affiliates (Subject to common ownership with a Borrower)

| Name | Jurisdiction of Organization | Percentage Owned |
|------|------------------------------|------------------|
|      |                              |                  |

**Schedule 5.5(a)**

Exact Legal Name/Jurisdiction of Organization

| Name | Jurisdiction of Organization |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

Schedule 5.5(b)

Locations

<u>Part 1 - Chief Executive Office</u>

[_____]

[_____]

[_____]

<u>Part 2 - Location of Books and Records</u>

[_____]

[_____]

[_____]

**Schedule 5.5(c)**

Federal Employer Identification Number
Organizational Identification Number

| Name | Organizational Identification Number | Federal Employer Identification Number |
|---|---|---|
|  |  |  |
|  |  |  |

**Schedule 5.13**

Material Contracts

| Name of Agreement | Date of Agreement | Parties to Agreement | Date of Expiration/Termination |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

**Schedule 5.22**

Locations of Collateral

| Address | Owned/Leased/Third Party | Name/Address of Lessor or Third Party, as Applicable |
|---|---|---|

Exhibit B

WEEKLY BUDGET VARIANCE

CUMMALATIVE BUDGET VARIANCE

## WEEKLY CASH FLOW PROJECTION

| | | 9/23/25 | 9/29/25 | 10/6/25 | 10/13/25 | 10/20/25 | 10/27/25 | 11/3/25 | 11/10/25 | 11/17/25 | 11/24/25 | 12/1/25 | 12/8/25 | 12/15/25 | 12/22/25 | 12/29/25 | 1/5/26 | 1/12/26 | 1/19/26 | 1/26/26 | 2/2/26 | 2/9/26 | 2/16/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | Week 19 | Week 20 | Week 21 | Week 22 |
| **Beginning Cash Balance** | | 10,000 | 275,030 | 192,577 | 463,200 | 270,715 | 738,208 | 523,963 | 645,155 | 868,221 | 769,292 | 576,547 | 1,508,338 | 2,221,748 | 4,245,275 | 3,368,261 | 3,438,639 | 2,515,405 | 2,945,968 | 2,703,688 | 2,423,528 | 2,397,233 | 2,734,965 |

### Cash Inflows

| | 9/23/25 | 9/29/25 | 10/6/25 | 10/13/25 | 10/20/25 | 10/27/25 | 11/3/25 | 11/10/25 | 11/17/25 | 11/24/25 | 12/1/25 | 12/8/25 | 12/15/25 | 12/22/25 | 12/29/25 | 1/5/26 | 1/12/26 | 1/19/26 | 1/26/26 | 2/2/26 | 2/9/26 | 2/16/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hallmark Sales | 244,065 | 251,300 | 280,710 | 691,900 | 601,679 | 449,378 | 389,275 | 589,922 | 661,197 | 676,382 | 850,328 | 1,507,851 | 1,291,146 | 1,519,710 | 1,469,010 | 493,142 | 321,874 | 287,100 | 266,207 | 317,187 | 336,321 | 562,627 |
| Allied Sales | 251,807 | 282,327 | 278,704 | 315,714 | 330,670 | 312,171 | 318,624 | 473,410 | 505,344 | 503,836 | 771,296 | 500,788 | 1,307,638 | 1,308,890 | 1,092,706 | 436,453 | 313,609 | 287,549 | 279,133 | 367,723 | 294,893 | 611,062 |
| Missed Sales | (149,943) | (153,998) | (167,636) | (99,766) | (60,265) | (43,042) | (150,657) | (212,666) | (498,209) | (449,778) | (324,323) | (467,729) | (319,757) | (484,805) | (512,534) | (184,219) | (122,430) | (100,054) | (162,569) | (218,708) | (220,894) | (410,061) |
| **TOTAL CASH RECEIPTS** | 347,530 | 359,332 | 391,393 | 897,893 | 867,093 | 764,736 | 668,692 | 850,666 | 758,381 | 633,441 | 1,297,291 | 1,636,911 | 2,679,028 | 2,450,138 | 737,276 | 453,043 | 360,200 | 339,050 | 406,305 | 410,232 | 763,028 | |

| | AVERAGE MISS | -30.00% | -30.00% | -30.00% | -10.50% | -7.00% | -7.00% | -7.00% | -20.00% | -35.00% | -35.00% | -20.00% | -20.00% | -20.00% | -20.00% | -20.00% | -20.00% | -30.00% | -35.00% | -35.00% | -30.00% | -30.00% | -30.00% |

### Cash Disbursements

| | 9/23/25 | 9/29/25 | 10/6/25 | 10/13/25 | 10/20/25 | 10/27/25 | 11/3/25 | 11/10/25 | 11/17/25 | 11/24/25 | 12/1/25 | 12/8/25 | 12/15/25 | 12/22/25 | 12/29/25 | 1/5/26 | 1/12/26 | 1/19/26 | 1/26/26 | 2/2/26 | 2/9/26 | 2/16/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rent | | | 261,366 | | 410,000 | | | 400,000 | 91,000 | | | | | 491,000 | | | | | | | | |
| Payroll | 302,975 | | 320,512 | | 353,000 | | 570,000 | | 370,000 | | 498,000 | | 500,000 | | 500,000 | | 370,000 | | 350,000 | | 400,000 | |
| Merchant Services | | 60,000 | | | 55,551 | | | | 68,387 | | | | 283,217 | | | | | 95,716 | | | | |
| General & Admin._Prof Fees | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 |
| General & Administrative | 75,000 | 75,000 | 15,000 | 100,000 | 150,000 | 95,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 100,000 | 50,000 | 100,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 |
| **TOTAL CASH DISBURSEMENTS** | 82,500 | 385,475 | 82,500 | 748,378 | 557,500 | 951,051 | 248,500 | 727,500 | 157,500 | 926,087 | 244,500 | 157,500 | 157,500 | 697,100 | 749,517 | 857,000 | 82,500 | 452,500 | 669,216 | 432,500 | 82,500 | 482,500 |
| **NET CASH FLOW** | 260,030 | (24,143) | 308,893 | 157,515 | 709,593 | (209,365) | 421,192 | 323,166 | 600,881 | (290,655) | 1,049,791 | 1,573,411 | 1,521,526 | 2,002,118 | 1,750,610 | 75,779 | 150,100 | (82,500) | (220,100) | (34,206) | 227,700 | 280,528 |
| **ENDING CASH BALANCE BEFORE DIP** | 275,030 | 246,887 | 501,671 | 620,715 | 930,308 | 523,963 | 945,155 | 1,168,321 | 1,468,202 | 576,547 | 1,625,338 | 2,373,748 | 4,245,275 | 6,247,394 | 3,868,879 | 2,515,405 | 2,945,568 | 2,703,688 | 2,423,528 | 2,397,233 | 2,734,965 | 3,005,493 |

### DIP Inflow

| | 9/23/25 | 9/29/25 | 10/6/25 | 10/13/25 | 10/20/25 | 10/27/25 | 11/3/25 | 11/10/25 | 11/17/25 | 11/24/25 | 12/1/25 | 12/8/25 | 12/15/25 | 12/22/25 | 12/29/25 | 1/5/26 | 1/12/26 | 1/19/26 | 1/26/26 | 2/2/26 | 2/9/26 | 2/16/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DIP - Additional DIP | 2,782,650 | 217,341 | | | | | | 1,388,000 | | | | | (1,034,533) | (1,433,235) | | | | | | | | |
| DIP - MP | | | 500,000 | | | | | | | | | | (346,000) | | | | | | | | | |
| **TOTAL DIP INFLOW** | 2,782,650 | 217,341 | 500,000 | - | - | - | - | 1,388,000 | - | - | - | - | (1,374,115) | (1,433,235) | - | - | - | - | - | - | - | - |

### Product Purchases

| | 9/23/25 | 9/29/25 | 10/6/25 | 10/13/25 | 10/20/25 | 10/27/25 | 11/3/25 | 11/10/25 | 11/17/25 | 11/24/25 | 12/1/25 | 12/8/25 | 12/15/25 | 12/22/25 | 12/29/25 | 1/5/26 | 1/12/26 | 1/19/26 | 1/26/26 | 2/2/26 | 2/9/26 | 2/16/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hallmark | 2,782,650 | 217,341 | | | | | | 1,700,000 | | | | | | | | | | | | | | |
| Allied | 56,310 | 36,471 | 800,000 | 250,000 | | 100,000 | 300,000 | 300,000 | 100,000 | 125,000 | 250,000 | | 200,000 | | | | | | | | | |
| **TOTAL Product Purchases** | 2,838,960 | 253,812 | 800,000 | 250,000 | | 100,000 | 300,000 | 2,000,000 | 100,000 | 125,000 | 250,000 | | 200,000 | | | | | | | | | |
| **NET CASH FLOW** | (56,310) | (36,471) | (300,000) | (250,000) | | (100,000) | (300,000) | (700,000) | (100,000) | (125,000) | (250,000) | | (4,978,115) | (1,433,235) | | | | | | | | |
| **ENDING CASH BALANCE** | 275,030 | 192,577 | 463,200 | 270,715 | 738,208 | 523,963 | 645,155 | 868,321 | 769,292 | 576,547 | 1,500,238 | 2,221,748 | 4,245,275 | 2,188,261 | 3,435,639 | 2,515,405 | 2,945,568 | 2,703,688 | 2,423,528 | 2,397,233 | 2,734,965 | 3,005,493 |

\* Revenue attributed to Hallmark $1.1m DIP is conditioned upon timely shipment of agreed orders

## PROJECTED INVENTORY

### Beginning Inventory

| | 9/23/25 | 9/29/25 | 10/6/25 | 10/13/25 | 10/20/25 | 10/27/25 | 11/3/25 | 11/10/25 | 11/17/25 | 11/24/25 | 12/1/25 | 12/8/25 | 12/15/25 | 12/22/25 | 12/29/25 | 1/5/26 | 1/12/26 | 1/19/26 | 1/26/26 | 2/2/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hallmark | 4,407,504 | 4,310,625 | 8,983,876 | 7,103,759 | 8,745,687 | 8,415,323 | 6,155,372 | 5,923,909 | 5,635,000 | 7,073,435 | 6,814,147 | 6,387,710 | 5,870,728 | 5,276,570 | 4,611,636 | 3,712,123 |
| Allied | 3,325,480 | 3,251,398 | 3,231,380 | 3,588,872 | 3,918,561 | 4,032,373 | 3,904,427 | 3,852,889 | 3,985,493 | 4,144,614 | 4,071,780 | 3,912,802 | 3,941,658 | 3,387,476 | 2,981,717 | 2,337,152 |
| **Total** | 7,732,984 | 7,562,022 | 10,225,257 | 10,292,631 | 10,664,248 | 10,447,696 | 10,059,798 | 8,776,798 | 9,620,493 | 11,218,049 | 10,885,926 | 10,310,312 | 9,712,386 | 8,664,046 | 7,593,357 | 6,049,275 |

### Purchases

| | 9/23/25 | 9/29/25 | 10/6/25 | 10/13/25 | 10/20/25 | 10/27/25 | 11/3/25 | 11/10/25 | 11/17/25 | 11/24/25 | 12/1/25 | 12/8/25 | 12/15/25 | 12/22/25 | 12/29/25 | 1/5/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hallmark | 0 | 2,782,650 | 217,341 | 0 | 0 | 0 | 0 | 1,700,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Allied | 0 | 56,310 | 36,471 | 850,000 | 250,000 | 0 | 100,000 | 300,000 | 300,000 | 100,000 | 125,000 | 250,000 | 0 | 200,000 | 0 | 0 |
| **Total** | 0 | 2,838,960 | 253,812 | 850,000 | 250,000 | 0 | 100,000 | 300,000 | 2,000,000 | 100,000 | 125,000 | 250,000 | 0 | 200,000 | 0 | 0 |

### Cost of Goods Sold

| | 9/23/25 | 9/29/25 | 10/6/25 | 10/13/25 | 10/20/25 | 10/27/25 | 11/3/25 | 11/10/25 | 11/17/25 | 11/24/25 | 12/1/25 | 12/8/25 | 12/15/25 | 12/22/25 | 12/29/25 | 1/5/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hallmark | 96,879 | 98,407 | 107,458 | 358,072 | 330,364 | 259,951 | 231,463 | 288,909 | 261,565 | 258,288 | 416,437 | 526,982 | 584,159 | 664,933 | 899,517 | 376,181 |
| Allied | 74,082 | 76,328 | 80,979 | 120,312 | 126,188 | 127,946 | 151,537 | 167,396 | 145,880 | 172,833 | 284,178 | 320,945 | 454,182 | 605,759 | 644,565 | 208,711 |
| **Total** | 170,962 | 175,735 | 188,437 | 478,384 | 466,552 | 387,898 | 383,000 | 456,305 | 402,444 | 432,121 | 700,615 | 847,926 | 1,048,340 | 1,270,689 | 1,544,082 | 584,871 |

### Ending Inventory

| | 9/23/25 | 9/29/25 | 10/6/25 | 10/13/25 | 10/20/25 | 10/27/25 | 11/3/25 | 11/10/25 | 11/17/25 | 11/24/25 | 12/1/25 | 12/8/25 | 12/15/25 | 12/22/25 | 12/29/25 | 1/5/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hallmark | 4,310,625 | 8,983,876 | 7,103,759 | 8,745,687 | 8,415,323 | 6,155,372 | 5,923,909 | 5,635,000 | 7,073,435 | 6,814,147 | 6,387,710 | 5,870,728 | 5,276,570 | 4,611,636 | 3,712,123 | 3,335,942 |
| Allied | 3,251,398 | 3,231,380 | 3,188,872 | 4,032,373 | 3,904,427 | 3,852,889 | 3,985,493 | 4,144,614 | 4,071,780 | 3,912,802 | 3,841,658 | 3,387,476 | 2,981,717 | 2,337,152 | 2,128,442 | 564,871 |
| **Total** | 7,562,022 | 10,225,257 | 10,292,631 | 10,664,248 | 10,447,696 | 10,059,798 | 8,776,798 | 9,620,493 | 11,218,049 | 10,885,926 | 10,310,312 | 9,712,386 | 8,664,046 | 7,593,357 | 6,049,275 | 5,464,404 |

## HISTORICAL INVENTORY

### Beginning Inventory

| | 9/23/25 | 9/29/25 | 10/6/25 | 10/13/25 | 10/20/25 | 10/27/25 | 11/3/25 | 11/10/25 | 11/17/25 | 11/24/25 | 12/1/25 | 12/8/25 | 12/15/25 | 12/22/25 | 12/29/25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hallmark | 8,926,405 | 9,391,367 | 10,107,472 | 10,214,574 | 10,381,317 | 10,264,638 | 10,381,498 | 10,522,500 | 10,349,641 | 10,221,767 | 9,739,205 | 9,311,788 | 8,653,572 | 7,521,998 | 6,443,102 | 6,104,169 |
| Allied | 7,318,287 | 7,483,554 | 7,772,748 | 8,071,850 | 8,690,995 | 9,035,379 | 9,165,312 | 9,157,441 | 9,368,482 | 9,112,867 | 8,833,124 | 8,354,089 | 8,108,521 | 7,924,955 | 6,746,193 | 6,580,280 |
| **Total** | 15,944,691 | 16,874,920 | 17,880,221 | 18,286,425 | 19,072,312 | 19,293,017 | 19,547,429 | 19,679,943 | 19,518,102 | 19,334,654 | 18,572,329 | 17,665,877 | 16,762,093 | 15,446,954 | 13,189,394 | 12,684,549 |

### Cost of Goods Sold

| | 9/23/25 | 9/29/25 | 10/6/25 | 10/13/25 | 10/20/25 | 10/27/25 | 11/3/25 | 11/10/25 | 11/17/25 | 11/24/25 | 12/1/25 | 12/8/25 | 12/15/25 | 12/22/25 | 12/29/25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hallmark | 138,390 | 142,010 | 153,512 | 397,858 | 355,230 | 279,518 | 248,885 | 361,136 | 402,408 | 398,904 | 520,548 | 658,727 | 742,898 | 831,163 | 1,124,396 | 470,201 |
| % | 57% | 57% | 55% | 58% | 59% | 63% | 64% | 61% | 59% | 61% | 59% | 61% | 59% | 55% | 76% | 55% |
| Allied | 105,832 | 109,040 | 135,684 | 133,679 | 146,438 | 137,577 | 162,944 | 209,245 | 216,738 | 265,898 | 355,223 | 401,181 | 567,727 | 757,199 | 855,706 | 260,888 |
| % | 42% | 43% | 42% | 42% | 44% | 44% | 49% | 44% | 43% | 46% | 45% | 42% | 51% | 51% | 63% | 63% |
| **Total** | 244,221 | 251,049 | 289,196 | 531,537 | 501,669 | 417,094 | 411,828 | 570,381 | 619,145 | 664,802 | 875,769 | 1,059,908 | 1,310,425 | 1,588,361 | 1,930,102 | 731,089 |

### ACTUAL WEEKLY RESULTS

| | 9/22/25 Week 1 | 9/29/25 Week 2 | 10/6/25 Week 3 | 10/13/25 Week 4 | 10/20/25 Week 5 | 10/27/25 Week 6 | 11/3/25 Week 7 | 11/10/25 Week 8 | 11/17/25 Week 9 | 11/24/25 Week 10 | 12/1/25 Week 11 | 12/8/25 Week 12 | 12/15/25 Week 13 | 12/22/25 Week 14 | 12/29/25 Week 15 | 1/5/26 Week 16 | 1/12/26 Week 17 | 1/19/26 Week 18 | 1/26/26 Week 19 | 2/2/26 Week 20 | 2/9/26 Week 21 | 2/16/26 Week 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 10,000 | 345,949 | 266,700 | 478,269 | 962,350 | 1,462,989 | 1,130,337 | 1,360,696 | 1,075,267 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Cash Inflows** | | | | | | | | | | | | | | | | | | | | | | |
| Hallmark Sales | 186,004 | 186,358 | 207,861 | 711,505 | 550,551 | 360,309 | 323,180 | 596,449 | | | | | | | | | | | | | | |
| Allied Sales | 101,281 | 194,299 | 187,020 | 172,075 | 179,869 | 168,953 | 186,224 | 313,330 | | | | | | | | | | | | | | |
| Missed Sales | | | | | | | | | | | | | | | | | | | | | | |
| TOTAL CASH RECEIPTS | 307,285 | 380,657 | 394,880 | 883,580 | 730,420 | 562,262 | 509,420 | 819,779 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | | | | | | | | |
| **Cash Disbursements** | | | | | | | | | | | | | | | | | | | | | | |
| Rent | | | | 262,388 | | | 43,827 | 54,600 | 340,660 | | | | | | | | | | | | | |
| Payroll | | 362,975 | | | | 302,359 | | 326,763 | | | | | | | | | | | | | | |
| Merchant Services | | | 62,285 | 320,512 | | | | | | | | | | | | | | | | | | |
| General & Admin., Prof Fees | 16,215 | 6,892 | | | | | 45,564 | | | | | | | | | | | | | | | |
| General & Administrative | 38,236 | 79,421 | 47,438 | 85,564 | 100,174 | 50,010 | 38,451 | 63,527 | | | | | | | | | | | | | | |
| TOTAL CASH DISBURSEMENTS | 38,236 | 398,611 | 116,670 | 678,442 | 100,174 | 440,786 | 18,816 | 733,865 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NET CASH FLOW | 255,049 | (17,954) | 278,211 | 205,138 | 630,246 | 115,466 | 370,764 | 68,779 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| ENDING CASH BALANCE BEFORE DIP | 265,049 | 323,095 | 544,896 | 683,407 | 1,592,595 | 1,578,456 | 1,501,121 | 1,472,475 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

### ACTUAL WEEKLY RESULTS

| | 9/22/25 Week 1 | 9/29/25 Week 2 | 10/6/25 Week 3 | 10/13/25 Week 4 | 10/20/25 Week 5 | 10/27/25 Week 6 | 11/3/25 Week 7 | 11/10/25 Week 8 | 11/17/25 Week 9 | 11/24/25 Week 10 | 12/1/25 Week 11 | 12/8/25 Week 12 | 12/15/25 Week 13 | 12/22/25 Week 14 | 12/29/25 Week 15 | 1/5/26 Week 16 | 1/12/26 Week 17 | 1/19/26 Week 18 | 1/26/26 Week 19 | 2/2/26 Week 20 | 2/9/26 Week 21 | 2/16/26 Week 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DIP Inflow | | | | | | | | | | | | | | | | | | | | | | |
| DIP - Additional DIP | | 2,782,658 | 217,341 | | | | | | | | | | | | | | | | | | | |
| DIP - MP | | | | 500,000 | | | | | | | | | | | | | | | | | | |
| TOTAL DIP INFLOW | | 2,782,658 | 217,341 | 500,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Product Purchases | | | | | | | | | | | | | | | | | | | | | | |
| Hallmark | | 2,782,658 | 217,341 | | | | | | | | | | | | | | | | | | | |
| Allied Cash Payments | 56,310 | 66,727 | 221,057 | 129,607 | 448,119 | 117,435 | 397,208 | | | | | | | | | | | | | | | |
| TOTAL PRODUCT PURCHASES | 2,838,968 | 284,068 | 221,057 | 129,607 | 448,119 | 117,435 | 397,208 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NET CASH FLOW | (56,310) | (66,727) | 278,943 | (129,607) | (448,119) | (117,435) | (397,208) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| ENDING CASH BALANCE | 265,049 | 266,780 | 478,269 | 962,350 | 1,462,989 | 1,130,337 | 1,383,696 | 1,075,267 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

## WEEKLY BUDGET VARIANCE

| | 9/22/25 Week 1 | 9/29/25 Week 2 | 10/6/25 Week 3 | 10/13/25 Week 4 | 10/20/25 Week 5 | 10/27/25 Week 6 | 11/3/25 Week 7 | 11/10/25 Week 8 | 11/17/25 Week 9 | 11/24/25 Week 10 | 12/1/25 Week 11 | 12/8/25 Week 12 | 12/15/25 Week 13 | 12/22/25 Week 14 | 12/29/25 Week 15 | 1/5/26 Week 16 | 1/12/26 Week 17 | 1/19/26 Week 18 | 1/26/26 Week 19 | 2/2/26 Week 20 | 2/9/26 Week 21 | 2/16/26 Week 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | | | | | | | | | | | | | | | | | | | | | | |
| **Cash Inflows** | | | | | | | | | | | | | | | | | | | | | | |
| Hallmark Sales | -23.9% | -25.8% | -26.0% | 4.3% | -8.5% | -11.7% | -14.1% | | | | | | | | | | | | | | | |
| Allied Sales | -28.0% | -25.0% | -32.9% | -45.5% | -45.0% | -45.9% | -33.8% | | | | | | | | | | | | | | | |
| Missed Sales | | | | | | | | | | | | | | | | | | | | | | |
| **TOTAL CASH RECEIPTS** | 5.7% | 5.0% | 0.8% | -1.6% | -15.6% | -20.2% [23.5%] | -3.6% | | | | | | | | | | | | | | | |
| **Cash Disbursements** | | | | | | | | | | | | | | | | | | | | | | |
| Rent | | | 0.0% | 0.0% | | -89.0% | -80.2% | #DIV/0! | | | | | | | | | | | | | | |
| Payroll | | 0.0% | 0.0% | 0.0% | | -0.2% | -11.7% | #DIV/0! | | | | | | | | | | | | | | |
| Merchant Services | | | | | | #DIV/0! | | | | | | | | | | | | | | | | |
| General & Admin., Prof Fees | | -3.8% | -7.3% | | | | | | | | | | | | | | | | | | | |
| General & Administrative | | 116.2% | 218.3% | -36.3% | -33.2% | -46.7% | -74.4% | | | | | | | | | | | | | | | |
| **TOTAL CASH DISBURSEMENTS** | -31.7% | 5.9% | 3.4% | -8.4% | -36.4% | -51.0% | -57.6% | | | | | | | | | | | | | | | |
| **NET CASH FLOW** | -56.1% | 3.4% | 41.4% | -8.4% | -36.4% | -51.0% | -44.2% | 38.6% | | | | | | | | | | | | | | |
| **ENDING CASH BALANCE BEFORE DIP** | 24.6% | 29.8% | 8.6% | 10.1% | 62.0% | 201.3% | 58.8% | 26.0% | | | | | | | | | | | | | | |
| DIP Inflow | | | | | | | | | | | | | | | | | | | | | | |
| DIP - Additional DIP | | | | | | | | | | | | | | | | | | | | | | |
| DIP - HP | | | | | | | | | | | | | | | | | | | | | | |
| **TOTAL DIP INFLOW** | | | | | | | | | | | | | | | | | | | | | | |
| **Product Purchases** | | | | | | | | | | | | | | | | | | | | | | |
| Hallmark | | | | | | | | | | | | | | | | | | | | | | |
| Allied Cash Payments | | | | | | | | | | | | | | | | | | | | | | |
| **TOTAL Product Purchases** | | | | | | | | | | | | | | | | | | | | | | |
| **NET CASH FLOW** | | | | | | | | | | | | | | | | | | | | | | |
| **ENDING CASH BALANCE** | | | | | | | | | | | | | | | | | | | | | | |

WEEKLY PRODUCT PROJECTION - subject to cash availability, product needs and availability, and timing

United States Bankruptcy Court

District of Columbia

In re:                                                          Case No. 25-00378-ELG

Banners of Abingdon LLC                                          Chapter 11

   Debtor

# CERTIFICATE OF NOTICE

| | | |
|---|---|---|
| District/off: 0090-1 | User: admin | Page 1 of 2 |
| Date Rcvd: Nov 24, 2025 | Form ID: pdf001 | Total Noticed: 1 |

The following symbols are used throughout this certificate:

**Symbol**    **Definition**

+        Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP.

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Nov 26, 2025:**

| Recip ID | Recipient Name and Address |
|---|---|
| dbpos | + Banners of Abingdon LLC, 1801 16th Street NorthwestUnit 606, Washington, DC 20009-3365 |

TOTAL: 1

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI).

NONE

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

NONE

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Nov 26, 2025         Signature:       /s/Gustava Winters

---

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on November 24, 2025 at the address(es) listed below:**

| Name | Email Address |
|---|---|
| Adam Nathe | on behalf of Creditor Hallmark Marketing Company  LLC adam.nathe@stinson.com, mpl.lssteam5@stinson.com |
| Addison J. Chappell | on behalf of Creditor Bull Run Plaza  LLC achappell@milesstockbridge.com |
| Addison J. Chappell | on behalf of Creditor Leesburg Plaza  LLC achappell@milesstockbridge.com |
| Addison J. Chappell | on behalf of Creditor South Riding Owner  LLC achappell@milesstockbridge.com |
| Adrien Pickard | on behalf of Creditor Rivercrest Realty Associates  LLC and its affiliate Lynchburg (Wards Crossing), LLC apickard@barclaydamon.com |
| Augustus Curtis | |

District/off: 0090-1                          User: admin                          Page 2 of 2
Date Rcvd: Nov 24, 2025                  Form ID: pdf001                       Total Noticed: 1

on behalf of Creditor Burketown Plaza  LLC augie.curtis@offitkurman.com

Augustus Curtis

on behalf of Creditor Stafford Marketplace  LLC augie.curtis@offitkurman.com

Bradley David Jones

on behalf of Creditor Hallmark Marketing Company  LLC brad.jones@stinson.com, brad.jones2020@ecf.pacerpro.com

C. Kevin Kobbe

on behalf of Creditor Itria Ventures LLC kevin.kobbe@us.dlapiper.com  DLAPiper@ecfxmail.com

Catherine Brady DiFazio Harrington

on behalf of Creditor Leesburg Plaza  LLC charrington@milesstockbridge.com

Catherine Brady DiFazio Harrington

on behalf of Creditor Bull Run Plaza  LLC charrington@milesstockbridge.com

Catherine Brady DiFazio Harrington

on behalf of Creditor South Riding Owner  LLC charrington@milesstockbridge.com

Christianna Annette Cathcart

on behalf of Debtor In Possession Banners of Abingdon LLC christianna@dakotabankruptcy.com

Christopher A. Glaser

on behalf of Creditor PR II/RP Ridge Shopping Center LLC cglaser@jackscamp.com
iluaces@jackscamp.com;statum@jackscamp.com

Christopher A. Glaser

on behalf of Creditor CSB Family Investors  LLC cglaser@jackscamp.com, iluaces@jackscamp.com;statum@jackscamp.com

Eugene A Burcher

on behalf of Creditor Fair City HHH  L.L.C. eaburcher@thelandlawyers.com

John D. Sadler

on behalf of Creditor Federal Realty Partners  L.P. Sadlerj@ballardspahr.com, andersonn@ballardspahr.com

John D. Sadler

on behalf of Creditor Federal Realty OP LP Sadlerj@ballardspahr.com  andersonn@ballardspahr.com

John D. Sadler

on behalf of Creditor CP Venture Two LLC Sadlerj@ballardspahr.com  andersonn@ballardspahr.com

John D. Sadler

on behalf of Creditor PR Harbour View East  LLC Sadlerj@ballardspahr.com, andersonn@ballardspahr.com

Karen C. Bifferato

on behalf of Creditor NMP-C4 Fairfield S/C  LLC kbifferato@connollygallagher.com

Kenneth N Whitehurst, III

on behalf of U.S. Trustee U. S. Trustee for Region Four kenneth.n.whitehurst@usdoj.gov

Kristen S. Eustis

on behalf of U.S. Trustee U. S. Trustee for Region Four Kristen.S.Eustis@usdoj.gov  Robert.W.Ours@usdoj.gov

Leonidas Koutsouftikis

on behalf of Creditor GRI Bradlee  LLC lkouts@mckplaw.com, mcook@magruderpc.com

Maurice Belmont VerStandig

on behalf of Debtor In Possession Banners of Abingdon LLC mac@mbvesq.com
lisa@mbvesq.com;mac@dcbankruptcy.com;verstandig.mauricer104982@notify.bestcase.com;verstandiglaw@recap.email

Michael D. Nord

on behalf of Creditor PNC Bank  N.A. mnord@gebsmith.com

Neil E. McCullagh

on behalf of Creditor Village Marketplace  LLC nmccullagh@spottsfain.com,
eanderson@spottsfain.com;rchappell@spottsfain.com;tmoore@spottsfain.com;churley@spottsfain.com;jwest@spottsfain.com;rw
estermann@spottsfain.com

Robert L. LeHane

on behalf of Creditor Brixmor Holdings 1 SPE  LLC rlehane@kelleydrye.com

Stephen A. Metz

on behalf of Creditor Ashburn Village Center LLC smetz@offitkurman.com  mmargulies@offitkurman.com

Steven Wallace

on behalf of Creditor Gold Crown Managers Acceptance Corp steven@ghalaw.com
denise@ghalaw.com;swallacelegal@gmail.com

U. S. Trustee for Region Four

USTPRegion04.DC.ECF@USDOJ.GOV


TOTAL: 31