Maurice VerStandig, Esq.
Christianna Cathcart, Esq.
The Belmont Firm
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
Phone: (202) 991-1101
mac@dcbankruptcy.com
christianna@dcbankruptcy.com
*Counsel for the Substantively Consolidated Debtor*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-378-ELG |
| | ) | (Chapter 11) |
| Banners of Abingdon, LLC, *et al.*[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

## DISCLOSURE STATEMRNT FOR DEBTOR'S PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Comes now Banners of Abingdon, LLC ("Banners," the "Debtor," or the "Plan Proponent"), by and through undersigned counsel, pursuant to Section 1125 of Title 11 of the United States Code, and provides the following disclosure statement (the "Disclosure Statement")

---

[1] The Debtors in these cases are Banners of Abingdon, LLC; Banners of Reston, Inc.; Banner's of Dulles Town, Inc.; Banner's of Fair Oaks, LLC; Banner's Of Ashburn, LLC; Banner's of Gainesville, LLC; Banner's of Warrenton, LLC; Banner's of South Riding, LLC; Banner's of Stafford, LLC; Banner's of Oakton, LLC; Banner's of Bradlee Center, LLC; Banners of Fair Lakes, LLC; Banners of Woodbridge LLC; Banners of Williamsburg LLC; Banners of Newport News LLC; Banners of Commonwealth Midlothian LLC; Banners of Village Market Place Midlothian LLC; Banners of Fairfield Virginia Beach LLC; Banners of Hilltop Virginia Beach LLC; Banners of Central Park Fredericksburg LLC; Banners of Cosner's Corner Fredericksburg LLC; Banners of York River LLC; Banners of Lynchburg, LLC; Banners of Harrisonburg VA LLC; Banners of Winchester LLC; Banners of Christiansburg VA LLC; Banners of Chesapeake VA LLC; Banners of Columbus Village VA Beach LLC; Banner's of Burke, LLC; Banner's of Kamp Washington, LLC; Banners of Suffolk II LLC; Banners of Suffolk LLC; Banners of Henrico LLC; Banners Of Waynesboro LLC; Banners of Roanoke LLC; Banners of Rocky Mount VA, LLC; Banners of Manassas II LLC; Banners of Charlottesville LLC; Banners of Kingstowne LLC; Banners of Leesburg, LLC; and LBPO Management, LLC.

1

correlative to the Debtor's plan of reorganization as a substantively consolidated entity (the "Plan"):

THIS DISCLOSURE STATEMENT IS DESIGNED TO PROVIDE ADEQUATE INFORMATION TO ENABLE HOLDERS OF CLAIMS AGAINST THE DEBTOR TO MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN. ALL HOLDERS OF CLAIMS ARE HEREBY ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED HERETO AS EXHIBIT "A" AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE COURT BEFORE OR CONCURRENTLY WITH THE FILING OF THIS DISCLOSURE STATEMENT. FURTHERMORE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL CONTINUE TO BE MATERIALLY ACCURATE; AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

ALL HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT AS A WHOLE PRIOR TO VOTING ON THE PLAN. IN MAKING A DECISION TO ACCEPT OR REJECT THE PLAN, EACH CREDITOR MUST RELY ON ITS OWN EXAMINATION OF THE DEBTOR AS DESCRIBED IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.

NO PARTY IS AUTHORIZED BY THE SECURED CREDITOR TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS OR INFORMATION CONCERNING THE DEBTOR, ITS FUTURE BUSINESS OPERATIONS OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTOR. ANY INFORMATION OR REPRESENTATIONS GIVEN TO OBTAIN YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH ARE DIFFERENT FROM OR INCONSISTENT WITH THE INFORMATION OR REPRESENTATIONS CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY CREDITOR IN VOTING ON THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES HOLDING OR TRADING IN, OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, OR SECURITIES OF, THE DEBTOR, IF ANY, SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS SUCH COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT AND PLAN AND THE INFORMATION CONTAINED THEREIN SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS GOVERNED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER RULE OR STATUTE OF SIMILAR IMPORT. THIS DISCLOSURE STATEMENT AND PLAN SHALL NEITHER BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE SECURED CREDITORS OR ANY OTHER PARTY NOR BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN. EACH CREDITOR SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN OR THE TRANSACTIONS CONTEMPLATED THEREBY.

This Disclosure Statement and the Plan annexed hereto as Exhibit "A" are being furnished by the Plan Proponent to Holders of Claims pursuant to Section 1125 of the Bankruptcy Code, to permit Holders the opportunity to either accept or reject the Plan (and the transactions contemplated thereby, as disclosed herein), as necessary. Capitalized terms in this Disclosure Statement, to the extent not otherwise defined herein, shall have the same definition that is assigned to capitalized terms in the Plan.

## I. Introduction

The Debtor operates 39 Hallmark-branded stores throughout the Commonwealth of Virginia, while also consisting of an overarching management company for those stores and an entity that formerly operated one such store in the State of Maryland before selling substantially all tangible assets, to a third party, in 2025. Between September 14 and 16, 2025, the 41 related entities comprising the Debtor all petitioned for relief under Section 301 of the Bankruptcy Code; pursuant to a subsequent order of the Bankruptcy Court, the 41 entities were substantively consolidated into a singular entity for reorganizational purposes.

During the ensuing months, the Debtor has continued in operation of Hallmark-branded stores through the 2025 holiday season. The Debtor's retail operations have generally been without incident or issue for the life of this case, with a somewhat-seasonal business showing an anticipated spike in sales during the last quarter of the calendar year. Banners has remained current on post-petition monetary obligations and, through two debtor-in-possession loan facilities ("DIP Facilities") discussed in greater detail *infra*, has been able to accommodate the seasonal demand for consumer products.

Banners now looks to use the Plan to pay the Allowed Claims of creditors, in full. Macroscopically, the Debtor proposes to do so through paying (i) the Claims of Landlords, whose leases are being assumed, over a period of four (4) months; (ii) Secured Claims over a period of five (5) years; and (iii) Unsecured Claims over a period of time commencing in December 2026 and ending in December 2035. The Debtor generally proposes to make these payments with funds

realized through the operation of retail Hallmark stores, though the Plan also has allowances for (a) the Claim of one Secured Creditor to be paid through the monetization of assets held by a third party, and for (b) the recovery of monies through pursuit of various litigation rights (which the Plan breaks into the categories of "Bankruptcy Litigation Rights" and "Non-Bankruptcy Litigation Rights").

The Plan is one that has been carefully crafted by Banners, with an eye toward empirical data derived from historic store-specific sales, through consultations with the Debtor's licensor, and through analysis of the economic metrics of this Bankruptcy Case.

## II.     The Chapter 11 Confirmation Process

The Chapter 11 confirmation process is governed, in large part, by the Bankruptcy Code. Under the Bankruptcy Code, to be confirmed, the Plan must be accepted by at least one (1) Class of Creditors whose Claims against the Debtor will be "impaired" under the Plan. Claimants who are scheduled to receive full payment on their Claims without modification or changes to their right to payment are deemed to have accepted the Plan and do not vote. Only Creditors whose Claims are "impaired" or their right to payment terms is modified or changed are entitled to vote in favor of accepting or rejecting the Plan. A Class of Claims is "impaired" if the amount to be paid to the Class provides the Claimants in that Class with less than full payment of the Allowed Claims in that Class or the terms for repayment are extended beyond the contractual due date or some other contractual terms are changed. Acceptance by such Class requires that at least one-half of the Creditors in the Class who cast accepting votes on the Plan, and hold at least two-thirds of the total dollar amount of the Claims in that Class casting votes on the Plan. A Class of Claims that is likely to receive nothing under the Plan is not entitled to vote thereon and, to the contrary, is presumed to have rejected the Plan.

As indicated in the instructions accompanying the Ballot, which is the form on which you may cast your vote to accept or reject the Plan, the Ballot must be delivered to the Plan Proponent's counsel in time to ensure that your Ballot will be received by the due date. Ballots received after the due date may not be counted.

Pursuant to Federal Rule of Bankruptcy Procedure 3017, a Ballot shall be mailed only to "creditors and equity security holders entitled to vote on the plan." The Plan consists of ten Classes of Claims entitled to vote on the Plan, and thus those Classes will receive ballots. No Classes of Claims are presumed to have rejected the Plan.

## III.    Debtor's Background and Financial History

As discussed *infra*, the Debtor is comprised of 41 substantively consolidated entities, all in the business of operating—or having operated—Hallmark-licensed retail stores. Certain constituent entities are decades old; other entities were formed in markedly more recent history. Thirty-nine (39) of the entities correlate to brick-and-mortar shops in the Commonwealth of Virginia; one (1) of the entities is a management company that oversees the Debtor's operations and is frequently the contractual counterparty to vendors and Landlords; and one (1) of the entities correlates to a retail store formerly operated by the Debtor in the State of Maryland, which sold substantially all of its tangible assets pre-petition but nonetheless joined in these

4

bankruptcy filings so as to ensure the Debtor would be able to pursue certain litigation rights, from the strongest possible posture, as part of its reorganization.

As with any retail operator, the Debtor's stores vary in size and sales bandwidth. Certain stores are larger than others and certain stores are located in more densely populated urban areas than others. Virginia is an eclectic state and the Debtor's operations—which more-or-less blanket the Commonwealth—in many ways mirror the socioeconomic diversity of Virginia.

Each retail location operates under a license from Hallmark. None of the stores are franchises; all are license holders. Though the Debtor does not operate every Hallmark-licensed locale in Virginia, Banners does operate the predominance of Hallmark-licensed "Gold Crown" stores in the Commonwealth. There are no geographic exclusivity provisions contained in any license and the Debtor is free to sell not just Hallmark-branded merchandise but, too, the products of other vendors (which are colloquially known as "Allied" vendors). There exist well more than 100 Allied vendors whose merchandise is sold by the Debtor, and Banners retains enormous discretion in choosing which products to place upon its store shelves and how to best position those products for sale to the general public.

While all stores are presently located in Virginia, the Banners family of operations formerly included several stores in Maryland, North Carolina and South Carolina. All of these out-of-state locations saw their assets sold before the Bankruptcy Case was filed, with the purchasers being arm's length third parties that are not Insiders of the Debtor. These pre-petition sales are of minimal relevance to Banners' reorganization, except that (i) the Claim of one (1) Creditor is secured by POS systems held by one of these purchasers; and (ii) certain Non-Bankruptcy Litigation Rights stem from a belief that the Debtor was not properly compensated in accord with the provisions of the agreements underlying these sales. It is also possible there may be one or more Bankruptcy Litigation Rights held against the purchaser(s) in these pre-petition asset sales, though such has not been a focus of the Bankruptcy Case and is not an eventuality upon which the Debtor has relied in crafting the Plan.

All of the 41 entities comprising the Debtor are owned by A & S, Inc., a corporation that is *not* a debtor in bankruptcy. A & S, Inc., in turn, is wholly owned by Leonard Banner and Michael Postal. Messrs. Banner and Postal are both active in their management of the Debtor, not just as the derivative owners of A & S, Inc. but, too, as salaried employees of the Debtor. While the exact number fluctuates in accord with both seasonality and the usual sways of any regional retail operation, the Debtor entered bankruptcy with approximately 518 other employees.

IV.     **Description and Valuation of Assets**

Banners entered chapter 11 with approximately $9,570,285.41 in assets and $20,204,865.58 in liabilities. These numbers are approximate because (i) they do not include a value for any litigation claims held by the Debtor, either as pre-petition assets or on account of bankruptcy-centric litigation rights that accrued upon the filing of a petition for relief; and (ii) the claims of certain creditors, as disclosed on the Debtor's schedules, are slightly—albeit not materially—at odds with those later asserted by the correlative creditors through the filing of proofs of claim.

Of the approximately $9.5 million in assets on the Petition Date, slightly less than $500,000.00 was in the form of cash and cash equivalents, while more than $7.9 million was in the form of inventory, and the remainder was comprised of (i) $811,411.00 in office furniture and fixtures; (ii) $358,485.00 in automobiles; (iii) a domain name valued at $1.00; and (iv) the Non-Bankruptcy Litigation Rights, which the Debtor has been unable to value.[2]

A detailed list of the Debtor's inventory was appended to the schedules filed in the Bankruptcy Case at docket entry #88. The other assets—and their respective valuations—are neatly broken out on Schedule A/B (at the same docket entry).

Insofar as the Debtor's retail operations are all in the Commonwealth of Virginia, which has an unusual common law definition of "fixtures," it is possible the Debtor's office furniture and fixtures are actually worth far less than the $811,411.00 indicated in Schedule A/B insofar as it is possible the fixtures are actually assets of various Landlords, not the Debtor. For purposes of the Plan, Banners does not believe this issue to be material insofar as (i) the Plan calls for the payment of all Secured Claims *and* Unsecured Claims, in full; (ii) the Plan does *not* contemplate the sale of fixtures in any retail location for which a lease is being rejected; and (iii) categorization of the fixtures' ownership is not relevant to the Debtor's forward-looking cash flow.

The Bankruptcy Litigation Rights are believed to be comprised of litigation claims held against two (2) third party entities, with the legal foundation for the litigation claims arising under Chapter 5 of the Bankruptcy Code. One of the third party entities is a "Merchant Cash Advance" ("MCA") entity; the other third party is a private lender. The Debtor believes it holds preference claims, under Section 547 of the Bankruptcy Code, against both entities, that can be used to recover monies paid in the 90 days preceding the filing of this Bankruptcy Case. The Debtor also believes it holds claims against the MCA rooted in the unwinding of a fraudulent conveyance and against the private lender for violating the automatic stay set forth in Section 362 of the Bankruptcy Code. The MCA was paid approximately $125,000.00 in the 90 days preceding the filing of the Bankruptcy Case; the private lender was paid approximately $330,000.00 during the same time period. The Debtor believes these sums to be avoidable under Section 547 of the Bankruptcy Code. Banners also believes the entire MCA transaction—including *all* payments made, pre-petition, to the MCA—may be in the nature of a fraudulent conveyance avoidable under Sections 544 and 548 of the Bankruptcy Code.

The Non-Bankruptcy Litigation Rights are believed to be comprised of litigation claims held against the purchasers of assets formerly held by the Debtor, where Banners does not believe the Debtor received full and proper compensation pursuant to the terms of the correlative asset purchase agreements. Insofar as litigation is innately perilous, risky and expensive, the Debtor is loathe to endeavor to assign a value to any of the Non-Bankruptcy Litigation Rights and has intentionally formulated the Plan in a manner that is *not* dependent upon success in the pursuit of any such claims.

All of the Debtor's litigation rights—both the Bankruptcy Litigation Rights *and* the Non-Bankruptcy Litigation Rights—are subject to the lien of at least one Secured Claimant. Insofar

---

[2] The Bankruptcy Litigation Rights, as a matter of law, did not accrue until the time the Bankruptcy Case was filed, and thusly do not constitute an asset of the Debtor at the time of case filing.

6

as the Plan proposes to pay all Claims in full, Banners does not believe this security interest to be overly-material, other than to observe that a litigation recovery might invite the prompter payment of one or more Secured Claims which, in turn, would allow the Debtor to *potentially* make other Plan payments early. The Plan does *not* mandate the making of payments of early.

## V.      Summary of the Plan and Treatment of Claims and Interests

The Plan provides for the Debtor to (i) continue to operate retail stores; (ii) pursue litigation; and (iii) use the monetization of equipment, by a third party, to pay down at least one Secured Claim. The Plan breaks Claims into 10 separate Classes:

**Class 1 (Two Sub-Classes) – Allowed Secured Claims of PNC Bank, N.A.** Class 1 consists of the Claim of PNC Bank, N.A. This Class is bifurcated into two sub-classes: (i) the senior, Secured Claim of PNC Bank, N.A., in the allowed amount of $543,000.00, which is Class 1.1 and which is senior to the Claims of all other secured Creditors with respect to the PNC Collateral; and (ii) the junior, Unsecured Claim of PNC Bank, N.A., in the allowed amount of $2,407,878.93, which is Class 1.2.

**Class 2 – Allowed Superpriority Administrative and Secured Claim of Hallmark Marketing Company LLC.** Class 2 consists of the Allowed Hallmark Claim. As of January 5, 2026, the amount owing to Hallmark under the Allowed Hallmark Claim is estimated by the Debtors to be approximately $6,948,973.85 plus any additional cost, expenses and attorneys' fees incurred by Hallmark, the Exit Fee (as defined in the Final Hallmark DIP Order), and all interest accruing thereon at the rate of eleven percent (11%) per annum. The security interest of this Class is senior to all other Classes *except* for the Class 1.1 Claim of PNC Bank, N.A. only with respect to the PNC Collateral. Class 2 is an Impaired Class.

**Class 3 (Two Sub-Classes) – Allowed Secured and Unsecured Claims of Crown MAC.** Class 3 consists of the Allowed Claim of Crown MAC. The pre-petition debt owed to Crown MAC is estimated by the Debtor to be $5,350,168.00. This Class is bifurcated into two sub-classes: (i) Class 3.1, being the Allowed Secured Claim of Crown MAC in the amount of $2,606,723.41; and (ii) Class 3.2, being the Allowed Unsecured Claim of Crown MAC in the amount of $2,743,444.59. The security interest of Class 3.1 is senior to any secured Claim *except* for those of Class 1.1, Class 1.2, and Class 2. The lack of a security interest of Class 3.2 is based upon the cumulative value of the Debtor's assets ($9,570,285.41) on the Petition Date and the sum of the senior security interests of Classes 1.1, 1.2, and 2. Classes 3.1 and 3.2 are both Impaired Classes.

**Class 4 (Two Sub-Classes) – Allowed Claims of Holders of Leased Real Estate**. Class 4 consists of the Allowed Claims of holders of real estate leased to the Debtor (colloquially, "Landlords"). This Class is bifurcated into two sub-classes: (i) Class 4.1, being the Claims of Landlords whose correlative leases are being assumed hereunder; and (ii) Class 4.2, being the Claims of Landlords whose correlative leases are being rejected hereunder. Classes 4.1 and 4.2 are both Impaired Classes.

**Class 4.1** – The Claims of Class 4.1 shall constitute the Cure Payments due to each Claim Holder. For purposes of Section 365(b)(1)(A) of the Bankruptcy Code, the Debtor submits that the temporally-prioritized payment of these arrearages under this Plan, coupled with the

Debtor's healthy post-petition financial performance and timely making of post-petition rent payments, constitutes "adequate assurance" of the Cure Payments being made. The Debtor equally submits that in the prism of this case, a four month cure period is "prompt" in nature.

**Class 4.2** – The Claims of Class 4.2 are in the nature of (i) pre-petition monies due to each Claim Holder, if any; plus (ii) rejection damages, as computed pursuant to the allowances of Section 502(b)(6) of the Bankruptcy Code.

**Class 5 – General Unsecured Trade Creditors**. Class 5 consists of the allowed Claims of general unsecured trade Creditors and lenders who are not (i) employees of the Debtor; or (ii) Secured Creditors. Class 5 is an Impaired Class.

**Class 6 – Employee Claims**. Class 6 consists of the allowed wage Claims of employees of the Debtor (including Claims derivative from the employment of Persons who are no longer employees of the Debtor). Class 6 does *not* include the secured Claim of Mr. Postal in his capacity as a secured lender but *does* include the general unsecured wage Claims of Mr. Postal and Leonard Banner, each of whom are Insiders of the Debtor. Class 6 is an Impaired Class.

**Class 7 – Equity**. Class 7 consists of the equity Claim of A & S, Inc., which shall retain all Equity Interest in the Reorganized Debtor but which shall be prohibited from taking any dividend or member distribution until such a time as the Claims of all other Classes are paid, in full (though the derivative members of this Class may continue to draw their usual and customary salaries, and receive their usual and customary benefits, from the Reorganized Debtor, for the life of this Plan). Class 7 is an Impaired Class by reason of the prohibition on the taking of dividends and/or member distributions. Class 7 is comprised exclusively of an Insider of the Debtor.

**Schedule.** A schedule of Claim Holders, the Class(es) into which they are placed, and the amount of their Claims is appended to the Plan as Exhibit A, *except* members of Class 4.1 and Class 4.2 are generally referred to as simply being in "Class 4." Each such Claim is designated in the sum scheduled by the Debtor *except* where a proof of claim has been filed in a differentiated amount, in which case said Claim is stated in the sum stated on the proof of claim.

## VI. Designation and Treatment of Unclassified Claims

**Administrative Expense Claims**. On the Effective Date or at such time as otherwise agreed, the Holder of an Allowed Administrative Claim against the Debtor shall receive, in full and final satisfaction of such Holder's Allowed Claim, cash in an amount equal to the unpaid portion of such Allowed Claim. To facilitate the orderly payment of Administrative Claims, the Confirmation Order will constitute establishment of the Administrative Claims Bar Date as described in the Plan. All Administrative Claims must be asserted no later than the Administrative Claims Bar Date in order to be allowed and eligible for payment. Parties who fail to assert Administrative Claims in accordance with the Administrative Bar Date will be forever barred from receiving Distributions under the Plan as Administrative Claim Holders, *except* Professionals representing the Debtor and/or the Estate may apply for allowance of fees and expenses, and assert correlative Claims, at any time until the thirtieth (30th) day following the date on which a final decree is entered pursuant to Section 12.18 of the Plan. Administrative Claims remain subject to approval of the Bankruptcy Court as a condition precedent to payment.

8

**U.S. Trustee's Fees.** The U.S. Trustee shall receive payment, on or before the Effective Date, of all fees owed under 28 U.S.C. § 1930(a)(6) on account of disbursements made by the Debtor from the Petition Date through the Effective Date. Any U.S. Trustee's fees owed subsequent to the Effective Date will be paid on the date when said fees come due. The Cash on Hand shall be used to pay these fees.

**Priority Tax Claims**. Each Holder of a Priority Tax Claim that is an Allowed Claim against the Debtor shall receive, in full and final satisfaction of such Holder's Allowed Claim, cash in an amount equal to the unpaid portion of such Allowed Claim. For the avoidance of doubt, the terms of this Plan are constructed to ensure such payment occur not later than a date within five (5) years of the Petition Date. Notwithstanding the foregoing, the Holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. It is not believed there exist any Priority Tax Claims in this case.

**Administrative Claim of Hallmark Marketing Company LLC.** Hallmark holds an Allowed Superpriority Administrative Claim, in the principal sum of $10,720,562.00 as set forth more fully in the Final Hallmark DIP Order. As of January 5, 2026, the current amount of Hallmark's Allowed Superpriority Administrative Claim, after deducting payments made by the Debtors to Hallmark as authorized in the Approved DIP Budget, is approximately $6,948,973.85 plus any additional cost, expenses and attorneys' fees incurred by Hallmark, the Exit Fee (as defined in the Final Hallmark DIP Order), and all interest accruing thereon at the rate of eleven percent (11%) per annum (collectively, the "Allowed Hallmark Claim"). The treatment of the Allowed Hallmark Claim is set forth in the DIP Credit Agreement, as modified by the provisions set forth in Article 5 of the Plan.

**Administrative Claim of Michael Postal.** Michael Postal ("Mr. Postal") holds an Allowed Administrative Claim, in a sum equal to monies advanced pursuant to a debtor-in-possession financing agreement (the "Postal Agreement"). The Allowed Administrative Claim of Mr. Postal, alongside interest and fees comprising a part thereof, will be paid, from the Cash on Hand, on the Effective Date, to the extent not previously paid. As of the filing of the Plan, the overwhelming majority (if not the whole) of this Allowed Administrative Claim has been paid. The Allowed Administrative Claim of Mr. Postal is separate and distinct from his Claim for unpaid wages, which is placed in Class 6.

**Post-Confirmation Professional Fees**. The fees and expenses of Professionals, incurred after the Confirmation Date, shall *not* be Administrative Claims, and shall *not* require judicial review or approval, notwithstanding any provision of the Bankruptcy Code to the contrary (including, but not limited to, Section 330 thereof), *except* the engagement of any Professional, to pursue the Non-Bankruptcy Litigation Rights on a contingent basis, shall require leave of the Bankruptcy Court, pursuant to the provisions of Section 6.6.2 of the Plan..

**VII.      Release**. The Plan contains a release of any and all claims against Hallmark, as well as all affiliates of Hallmark and various broadly-defined parties of relation to Hallmark. The release, while not technically global as-written, has the pragmatic impact of being a global release of any and all claims against Hallmark and its affiliates. During the course of the Bankruptcy Case, the Debtor has had occasion to investigate whether or not there exist any *bona fide* claims against

Hallmark, with particular emphasis on any claims correlative to disruptions in the shipment of Hallmark products during certain pre-petition timeframes. The Debtor and Hallmark have had frank and open discussions about whether or not such claims would be viable. Ultimately, the Debtor has concluded that such a claim ought not be pursued because, *inter alia*, (i) Hallmark has already, gratuitously, compensated the Debtor—in cash and kind—in an effort to mitigate any harms stemming from shipment issues; (ii) Hallmark is agreeing to further accommodate the Debtor, under the Plan, by allowing the maturity date of Hallmark's post-petition promissory note to be extended by more than five years; (iii) the Debtor is reliant upon Hallmark, as both a licensor and a vendor, for the Debtor's ongoing business operations, with such reliance militating against the bringing of claims that might do outsized and disproportionate harm to the parties' relationship; and (iv) the Debtor believes it best to emerge from chapter 11 without the distractions, uncertainty, and potential perils of pending litigation against the Debtor's closest business counterparty and the namesake of the Debtor's retail stores.

**VIII.** **Anti-Refiling Provisions**. The Plan contains various clauses that would make it difficult—if not pragmatically impossible—for the Debtor to again seek bankruptcy protection at any time before the claim of Hallmark is retired in full. The Debtor supports this language insofar as such is a byproduct of extensive negotiations with Hallmark, through which the Debtor has received significant economic relief in the form of deferred monetary obligations that, in turn, will set the Debtor up with the best possible opportunity to perform as a healthy company post-bankruptcy. Banners did not enter chapter 11 with the intent of re-filing in the future and certainly does not exit chapter 11 with the intent of re-filing in the future. Interested parties, however, should take note of these provisions and the resulting reality that Banners will need to perform under the Plan without seeking to again reorganize.

**IX.** **Notable Risks**

The Debtor's performance under the Plan is reliant upon Banners' continued operation of retail Hallmark stores in the Commonwealth of Virginia. This invites various notable risks to Claimants, the two most notable of which are (i) economy-wide vulnerabilities attendant to the retail sector; and (ii) potential license issues.

In terms of market-wide economic risks, there is certainly a perennial risk that broad economic factors may invite an increase—or decrease—in consumer spending which, in turn, will have a direct impact on the retail sector. Any broad economic downturn would likely have a deleterious impact on the Debtor's operations. Similarly, any renewed outbreak of pestilence would similarly work a likely-negative impact on the Debtor's forward-looking cash flow.

More microscopically, a number—albeit not all—of Banners' stores operate in the Washington, DC metropolitan area. Any prolonged disruption of government activities, downsizing of the federal government's footprint, or protracted government shutdown would be likely to yield a discernable impact on the Debtor's operations, which are—in many ways—directly tied to the disposable income of those living and working in proximity to Banners stores.

The Debtor is less concerned about license-centric issues, having proudly worked with Hallmark for decades and having been grateful for the opportunity to continue doing so through this Bankruptcy Case—including through Hallmark's participation as a post-petition in-kind

10

lender. However, it bears notation that the Debtor's licenses are revocable at any time, for any reason or no reason at all, and there is accordingly some risk—faint as it may be—in such a revocation occurring. There is similarly some risk in Hallmark creating new, competitive license relationships in geographic proximity to the Debtor's various retail stores.

Similarly, while the Debtor regards the Hallmark brand as a preeminent parcel of Americana, it bears notation that any denigration of that brand would, in turn, likely impart a negative impact upon the Debtor's retail operations.

These are not the only risks the Debtor faces—other potential perils ranging from labor strife to consumer shifts toward secularism are, no doubt, cognizable—but these are the potential perils the Debtor believes most noteworthy in the prism of the Plan and the forward-looking economic projections appended thereto.

## X.     Bar Date for Filing Claims

The bar date for filing a proof of claim in this case is January 26, 2026 for all creditors (except a governmental unit). The bar date for governmental entities to file proofs of claim is March 13, 2026. The failure to file or deliver a proof of claim or a proof of interest by the applicable bar date constitutes a bar against the assertion, allowance or distribution on account of any such claim or interest.

## XI.    Acceptance and Confirmation of Plan

Except as discussed below, a prerequisite to the confirmation of the Plan is the acceptance of the Plan by each impaired class. A class is impaired unless, with respect to each claim or interest in such class, the Plan: (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default, (a) cures any such default that occurred before or after the Petition Date (other than "ipso facto" defaults as specified in Section 365(b)(2) of the Bankruptcy Code); (b) reinstates the maturity of such claim or interest as such maturity existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

In order to carry a designated class for purposes of confirmation of the Plan, the affirmative vote of holders of claims in each such class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class who actually vote on the Plan, other than a holder who has been designated by the Court as in bad faith having accepted or rejected the Plan, or whose acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of chapter 11 of the Bankruptcy Code is required. If the requisite acceptances from holders of allowed claims in each class of claims are obtained, and the Plan is confirmed, the Plan will be binding on all holders of claims and interests, including those who did not vote or who voted to reject the Plan (or those who are deemed to reject the Plan).

The Plan Proponent reserves the right to seek to confirm the Plan pursuant to the cramdown provisions of Section 1129(b) of the Bankruptcy Code. As a condition to confirmation, the Bankruptcy Code generally requires that each impaired class of claims or interest accepts a plan of reorganization. In the event that an impaired class does not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan if (i) the Plan satisfies all other requirements of Section 1129(a) of the Bankruptcy Code, and (ii) the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired class that has not accepted the Plan.

A plan of reorganization does not discriminate unfairly if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are identical with those of the non-accepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Plan Proponent believes that the Plan satisfies these requirements with respect to each class.

The Bankruptcy Code establishes different tests for secured creditors, unsecured creditors and interest holders to determine if the Plan is "fair and equitable." The tests may be summarized as follows:

(a) Secured Creditors: either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value as of the Effective Date equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds, and the liens against such proceeds are treated in accordance with clause (i) or (ii), above.

(b) Unsecured Creditors: either (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed unsecured claim, or (ii) the holders of claims and equity interests that are junior to the claims of the non-accepting Class do not receive any property under the Plan on account of such claims and interests.

(c) Equity Interest Holders: either (i) each interest holder will receive or retain under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any of its interest or (b) the value of its interest, or (ii) the holders of interests that are junior to the non-accepting class will not receive any property under the Plan.

The Plan Proponent believes that the Plan is "fair and equitable" to Holders, Unsecured Creditors, and Secured Creditors.

The Plan Proponent reserves all rights to modify or withdraw the Plan at any time prior to the Effective Date.

## XII. Alternatives to Confirmation and Consummation of the Plan

The alternatives to the confirmation and consummation of the Plan include (1) the preparation and presentation of an alternative plan of reorganization and (2) the liquidation of the Debtor under chapter 7 of the Bankruptcy Code. The Plan Proponent believes that neither alternative provides any greater return to its creditors.

**Alternative Plans of Reorganization.** The Plan Proponent does not believe that an alternative plan would be viable or in the best interest of creditors or parties in interest. The Plan efficiently pays all claims in full, whilst allowing the Debtor to continue in operations as a means of (i) raising funds requisite to pay Claimants; (ii) preserving value as a going concern; (iii) retaining the employment of a robust workforce; and (iv) remaining a vibrant community actor.

**Liquidation Under Chapter 7 of the Bankruptcy Code.** If no plan can be confirmed, it is the Plan Proponent's firm belief that liquidation under chapter 7 would result in lesser distribution than proposed by the Plan. Administrative claims would be increased as a result of the chapter 7 trustee fees and related administrative expense claims. Additionally, a chapter 7 conversion would cause creditors to wait longer before receiving what is anticipated to be a significantly lesser payment of their claims. The Debtor believes Creditors would receive well less than 50% of their claims in such an eventuality, with Unsecured Creditors receiving no funds. Specifically, the Debtor believes that, in a liquidation, Hallmark would exercise recourse against the whole of the Debtor's inventory, cash, and cash equivalents. It is possible—albeit not likely—Crown MAC would be able to monetize certain additional assets of the Debtor (such as furniture and fixtures), after retirement of the Hallmark claim. PNC would be left with recourse against third-party POS systems. No monies would be available for distribution to unsecured creditors and the Debtor's Landlords would be without cure payments.

## XIII. Distribution

**Delivery of Distributions**. All Distributions to Holders of Allowed Claims shall be made at the address of such Holder as set forth in the claims register maintained in the Bankruptcy Case (subject to any transfer effectuated pursuant to Bankruptcy Rule 3001(e) or, after the Effective Date, a change of address notification provided by a Holder in a manner reasonably acceptable to the Debtor) or, in the absence of a filed proof of Claim, the Schedules. The responsibility to provide the Debtor a current address of a Holder of Claims shall always be the responsibility of such Holder and at no time shall the Debtor have any obligation to determine a Holder's current address. Nothing contained in the Plan shall require the Debtor to attempt to locate any Holder of an Allowed Claim. Amounts in respect of undeliverable Distributions made by the Debtor shall be held in trust on behalf of the Holder of the Claim to which they are payable by the Debtor until the earlier of the date that such undeliverable Distributions are claimed by such Holder and the date ninety (90) days after the date the undeliverable Distributions were made.

**No Interest Unless Otherwise Provided**. No interest shall be paid on any Claim unless, and only to the extent permitted, under the terms of the Plan.

**Undistributed Property**. If any Distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the Holder entitled thereto ("Unclaimed Property"), then such Unclaimed Property shall be (i) first paid to other members of the Class of the Claimant not claiming said Distribution, until such a time as said Class is paid in full; (ii) second paid to each junior Class, until all Classes are paid in full; and (iii) then, if and when each Class is paid in full, remaining funds shall be donated to the University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond, Esq. in the charitable manner she sees most fit. The University of Miami School of Law Bankruptcy Clinic

13

works with members of the South Florida legal community to provide *pro bono* services to individuals in need of bankruptcy relief, while also furnishing law students with valuable pedagogical experience in the field of bankruptcy law. Should Patricia Redmond, Esq. cease to operate the University of Miami School of Law Bankruptcy Clinic, for any reasons, at any time during the life of this Plan, the Bankruptcy Court shall have the right to appoint a comparable charitable recipient upon the making of a motion by any party in interest.

XIV. **Retention of Jurisdiction**

Pursuant to Sections 1334 and 157 of Title 28 of the United States Code, the Bankruptcy Court shall retain jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, for the purposes of Sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a) to hear and determine any and all adversary proceedings, applications, or contested matters, including avoidance actions, and any remands from any appeals;

(b) to hear and to determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan;

(c) to consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(d) to enter, enforce and implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement, consummate or enforce the terms and conditions of the Plan and the transactions contemplated hereunder;

(e) to enter and to implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement or enforce the terms and conditions of the Plan;

(f) to hear and to determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan; and

(g) to enter a final decree closing this Chapter 11 case.

XV. **Certain Tax Consequences**

The following discussion summarizes certain federal income tax consequences to the Debtor and Debtor's holders of claims and equity interests. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions and published administrative rulings and pronouncements of the IRS, as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated hereafter could alter or modify the analysis and conclusions

14

set forth below. Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below. This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special categories of taxpayers who are holders of claims (such as taxpayers who are not domestic corporations or citizens or residents of the United States, or are S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers and tax-exempt organizations) and assumes that each creditor holds its claim directly.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Plan Proponent has not requested and will not request a ruling from the IRS with respect to any of the tax aspects of the Plan.

**THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.**

**Certain Federal Income Tax Consequences to Debtor.** Upon information and belief, the Debtor is a pass-through entity for federal income tax purposes. Thus, the Debtor is not subject to taxes imposed under chapter 1 of the Tax Code. Accordingly, any net operating income or losses generated by the Debtor during a taxable year ("NOLs") will pass through to the equity interest.

Upon a sale of the Debtor' property any recognized gain or loss equal to the difference between the pre-distribution sale proceeds and Debtors' adjusted tax basis in the property that may be subject to capital gains tax will pass through to equity interest. The amount of gain recognized will include the full proceeds from any sale of property, including the amount of any indebtedness assumed by the buyer to which the property is subject. If the sale of the property results in a gain and such property was used in Debtors' trade or business, such gain would generally be treated as a "section 1231 gain." Such gain would be combined with other Tax Code § 1231 gains and losses. Generally, Tax Code § 1231 gains and losses are offset against each other on an annual basis, and net gain is treated as long-term capital gain, while net loss is treated as ordinary loss. Net § 1231 gains must, however, be treated as ordinary income to the extent of net § 1231 losses taken over the five most recent years, to the extent such losses have not been previously "recaptured."

**Certain Federal Income Tax Consequences to Creditors.** The federal income tax consequences of the Plan to a creditor will depend upon several factors, including but not limited to: (i) whether the creditor's claim (or portion thereof) constitutes a claim for principal or interest; (ii) whether the creditor is a resident of the United States for tax purposes (or falls into any of the special classes

of taxpayers excluded from this discussion as noted above); and (iii) whether the creditor has taken a bad debt deduction with respect to its claim. In addition, if a claim is a "security" for tax purposes, different rules may apply.

**CREDITORS ARE STRONGLY ADVISED TO CONSULT WITH THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.**

A creditor receiving solely cash in exchange for its claim will generally recognize taxable gain or loss in an amount equal to the difference between the amount realized and its adjusted tax basis in the allowed claim. The amount realized will equal the amount of cash to the extent that such consideration is not allocable to any portion of the allowed claim representing accrued and unpaid interest, as further discussed below.

The character of any recognized gain or loss (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the creditor, the nature of the allowed claim in the creditor's hands, the purpose and circumstances of its acquisition, the creditor's holding period of the allowed claim, and the extent to which the creditor previously claimed a deduction for the worthlessness of all or a portion of the allowed claim. A loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of a loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

A portion of the consideration received by a creditor in satisfaction of an allowed claim may be allocated to the portion of such claim (if any) that represents accrued but unpaid interest. If any portion of the distribution were required to be allocated to accrued interest, such portion would be taxable to the creditor as interest income, except to the extent the creditor has previously reported such interest as income.

In the event that a creditor has not previously reported the interest income, only the balance of the distribution after the allocation of proceeds to accrued interest would be considered received by the creditor in respect of the principal amount of the allowed claim. Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the creditor with respect to the allowed claim. If such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

**Federal Income Tax Consequences to Holders of Equity Interests Receiving Distributions.**
Holders of allowed equity interests receiving distributions will generally recognize loss or gain in the amount of each such holder's adjusted tax basis in the equity interest. The character of any recognized loss or gain (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the equity interest in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period, and the extent to which the holder had previously claimed a deduction for the worthlessness of all or a portion of the equity interest.

16

A gain or loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

**Importance of Obtaining Professional Tax Assistance. No holder of a claim or equity interest should rely on the tax discussion in this Disclosure Statement in lieu of consulting with one's own tax professional. The foregoing is intended to be a summary only and not a substitute for consultation with a tax professional. The federal, state, local and foreign tax consequences of the Plan are complex and, in some respects, uncertain. Such consequences may also vary based upon the individual circumstances of each holder of a claim or equity interest. Accordingly, each holder of a claim or equity interest is strongly urged to consult with its own tax advisor regarding the federal, estate, local and foreign tax consequences of the Plan.**

## XVI. Miscellaneous Provisions

**Severability.** Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any claim or equity interest or transaction, the Plan Proponent may modify the Plan in accordance with the Plan, as applicable, so that such provision shall not be applicable to the holder of any claim or equity interest.

**Binding Effect.** Upon the entry of the Confirmation Order, all provisions of the Plan shall be binding upon, and shall inure to the benefit of, the Debtor, the holders of claims and equity interests, and such persons' respective successors and assigns.

**Governing Law.** Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law provision is provided, the laws of the District of Columbia shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.

**Timing of Distributions.** Any distribution required to be made hereunder on a day other than a business day shall be due and payable on the next succeeding business day.

**Revocation or Withdrawal of Plan.** The Plan Proponent reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order. If the Plan is withdrawn or revoked, then the result shall be the same as if the Confirmation Order had not been entered and the Effective Date had not occurred. If the Plan is revoked or withdrawn prior to the entry of the Confirmation Order, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or any other person or to prejudice in any manner the rights of the such entity or any person in any further proceedings involving such entity.

**Nonmaterial Modifications.** The Plan Proponent may, with the approval of the Bankruptcy Court and without notice to holders of claims and equity interests, correct any nonmaterial defect, omission, or inconsistency herein in such manner and to such extent as may be necessary or desirable.

**Material Modifications.** Modifications of the Plan may be proposed in writing by the Plan Proponent at any time prior to confirmation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code, and the Plan Proponent shall have complied with Section 1125 of the Bankruptcy Code. The Plan may be modified at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under Section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.

**Notices.** Any notice required or permitted to be provided hereunder shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) prepaid overnight delivery service and addressed as follows:

>Maurice B. VerStandig, Esq.
>THE BELMONT FIRM
>1050 Connecticut Avenue, NW
>Suite 500
>Washington, DC 20036
>*Counsel for the Substantively Consolidated Debtor*

**Successors and Assigns.** The rights, benefits and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person.

**Case Closure.** On the Effective Date, all cases of the substantively consolidated Debtor—except for *In re Banners of Abingdon, LLC, et al.*, Case Number 25-378-ELG and any then-pending adversary proceedings—that are pending in the Bankruptcy Court shall be deemed closed.

## XVII.     Confirmation Request

The Plan Proponent respectfully urges all parties entitled to vote on the Plan to do so in favor of the Plan, and respectfully pray this Honorable Court confirm the Plan.

*[Signature on Following Page]*

18

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: January 23, 2026 | By: /s/ Maurice B. VerStandig<br>Maurice B. VerStandig, Esq.<br>Bar No. MD18071<br>The Belmont Firm<br>1050 Connecticut Avenue, NW<br>Suite 500<br>Washington, DC 20036<br>Phone: (202) 991-1101<br>Facsimile: (301) 444-4600<br>mac@dcbankruptcy.com<br><br>Christianna Cathcart, Esq.<br>Bar No. ND0008<br>The Belmont Firm<br>1050 Connecticut Avenue, NW<br>Suite 500<br>Washington, DC 20036<br>Phone: (202) 655-2066<br>Facsimile: (301) 444-4600<br>christianna@dcbankruptcy.com<br><br>*Counsel for the Substantively Consolidated Debtor* |