IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 25-378-ELG |
| | ) | (Chapter 11) |
| Banners of Abingdon, LLC, *et al.*[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

**DEBTOR'S PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Maurice VerStandig, Esq.
Christianna Cathcart, Esq.
The Belmont Firm
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
Phone: (202) 991-1101
mac@dcbankruptcy.com
christianna@dcbankruptcy.com
*Counsel for the Substantively Consolidated Debtor*

---

[1] The Debtors in these cases are Banners of Abingdon, LLC; Banners of Reston, Inc.; Banner's of Dulles Town, Inc.; Banner's of Fair Oaks, LLC; Banner's Of Ashburn, LLC; Banner's of Gainesville, LLC; Banner's of Warrenton, LLC; Banner's of South Riding, LLC; Banner's of Stafford, LLC; Banner's of Oakton, LLC; Banner's of Bradlee Center, LLC; Banners of Fair Lakes, LLC; Banners of Woodbridge LLC; Banners of Williamsburg LLC; Banners of Newport News LLC; Banners of Commonwealth Midlothian LLC; Banners of Village Market Place Midlothian LLC; Banners of Fairfield Virginia Beach LLC; Banners of Hilltop Virginia Beach LLC; Banners of Central Park Fredericksburg LLC; Banners of Cosner's Corner Fredericksburg LLC; Banners of York River LLC; Banners of Lynchburg, LLC; Banners of Harrisonburg VA LLC; Banners of Winchester LLC; Banners of Christiansburg VA LLC; Banners of Chesapeake VA LLC; Banners of Columbus Village VA Beach LLC; Banner's of Burke, LLC; Banner's of Kamp Washington, LLC; Banners of Suffolk II LLC; Banners of Suffolk LLC; Banners of Henrico LLC; Banners Of Waynesboro LLC; Banners of Roanoke LLC; Banners of Rocky Mount VA, LLC; Banners of Manassas II LLC; Banners of Charlottesville LLC; Banners of Kingstowne LLC; Banners of Leesburg, LLC; and LBPO Management, LLC.

# Table of Contents

1. Definitions; Rules of Interpretation; Computation of Time .................................... 1

   1.1. Scope of Definitions ................................................................ 1

   1.2. Definitions ................................................................ 1

   1.3. Interpretation ................................................................ 7

   1.4. Computation of Time ................................................................ 7

2. Provisions for Payment of Allowed Administrative Expense Claims, Priority Tax
Claims, and Statutory Fees ................................................................ 7

   2.1. Administrative Expense Claims ................................................................ 7

   2.2. U.S. Trustee's Fees ................................................................ 7

   2.3. Priority Tax Claims ................................................................ 7

   2.4. Administrative Claim of Hallmark Marketing Company LLC ....................................... 8

   2.5. Administrative Claim of Michael Postal ................................................................ 8

   2.6. Post-Confirmation Professional Fees ................................................................ 8

   2.7. Full Satisfaction, Discharge and Release ................................................................ 8

3. Classification and Impairment of Claims Against and Equity Interests in the Debtor .......... 8

   3.1. Generally ................................................................ 8

   3.2. Security ................................................................ 9

   3.3. Identification and Treatment of Classes ................................................................ 9

4. Provisions for Executory Contracts and Unexpired Leases ....................................... 11

   4.1. Acceptance ................................................................ 11

   4.2. Rejection ................................................................ 11

5. Treatment of Allowed Hallmark Claim ................................................................ 11

6. Means of Implementing the Plan ................................................................ 16

   6.1. Vesting of Assets ................................................................ 16

   6.2. Non-Vesting of Assets ................................................................ 16

6.3. Merger ............................................................................................................ 16

6.4. Operation of Retail Stores ............................................................................ 17

6.5. Sale of Point of Sale Units ........................................................................... 17

6.6. Litigation ...................................................................................................... 17

6.7. Sale of Stores ................................................................................................ 18

6.8. Refinancing ................................................................................................... 18

6.9. Retention of Liens ........................................................................................ 18

7. Timing of Payments and Distributions .............................................................. 18

7.1. All Allowed Claims to be Paid in Full ......................................................... 18

7.2. Sale of Point of Sale Units ........................................................................... 19

7.3. Litigation Recovery ...................................................................................... 19

7.4. No Entitlement to Earlier Receipt ................................................................ 20

8. Provisions Governing Distributions .................................................................. 20

8.1. Delivery of Distributions .............................................................................. 20

8.2. No Interest Unless Otherwise Provided ....................................................... 20

8.3. Undistributed Property ................................................................................. 20

9. Conditions Precedent to Effectiveness of Plan ................................................. 21

9.1. Conditions Precedent to Effectiveness of Plan ............................................ 21

9.2. Notice of Confirmation of the Plan .............................................................. 21

10. Retention of Jurisdiction .................................................................................... 21

11. Release for Plan Proponent and Professionals .................................................. 22

12. Miscellaneous Provisions ................................................................................... 22

Comes now Banners of Abingdon, LLC ("Banners," the "Debtor," or the "Plan Proponent"), by and through undersigned counsel, pursuant to Section 1121(c) of Title 11 of the United States Code, and provides the following plan of reorganization (the "Plan") for itself, as a substantively consolidated entity:

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT ISSUED PURSUANT TO SECTION 1125(b) OF TITLE 11 OF THE UNITED STATES CODE IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, FEDERAL RULE OF BANKRUPTCY PROCEDURE 3018 AND IN THIS PLAN, THE PLAN PROPONENT RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THIS PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## 1. DEFINITIONS; RULES OF INTERPRETATION; COMPUTATION OF TIME

1.1.    **Scope of Definitions.**  For purposes of the Plan, except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings assigned to them in Article I of the Plan.  Any term used herein that is not defined herein, but that is used in Title 11 of the United States Code (the "Bankruptcy Code") or the Federal rules of Bankruptcy Procedure (the "Bankruptcy Rules"), shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.  Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine and the feminine gender shall include the masculine. Any term defined herein, not defined in the plural but used in the plural, shall have the pluralized form of the defined meaning, just as any term defined in the plural but used in the singular shall have the singular form of the defined meaning. All exhibits are incorporated into and are a part of this Plan as if set forth in full herein.

1.2.    **Definitions.**

1.2.1.    "Administrative Claim" means all Claims for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting and other services, and reimbursement of expenses pursuant to sections 328, 330(a), 331, or 332 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date, including Professional Claims; and (c) all requests for compensation or expense reimbursement for making a substantial contribution in the Bankruptcy Cases pursuant to section 503(b)(3), (4), and (5) of the Bankruptcy Code.

1

1.2.2.    "Administrative Claims Bar Date" means the last date for a Person to file any applications or requests for payment of Administrative Claims, which shall be thirty (30) days after the Effective Date.

1.2.3.    "Allowed" means a Claim (i) allowed by Final Order of the Bankruptcy Court; (ii) proof of which was timely filed on or before the applicable Claims Bar Date, or is not required to be evidenced by a Proof of Claim under the Bankruptcy Code or a Final Order; (iii) if no proof of Claim has been timely filed, which has been or hereafter is listed in the Schedules as of the Effective Date as liquidated in amount and not disputed or contingent; (iv) has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors by a Final Order; or (v) is allowed pursuant to the Plan or a Final Order; provided, however, that with respect to any Claim described in clauses (i) and (ii) above, such Claim shall be considered an allowed Claim only if, and to the extent that, with respect to any Claim, (1) no objection to the allowance of such Claim, request for estimation, motion to amend the Schedules, or other challenge of such Claim has been made by the Claims Objection Bar Date, or (2) such objection, request, motion or challenge is made and the Claim is determined to be an allowed Claim for distribution purposes by Final Order. Unless otherwise specified in the Plan, an allowed Claim does not include interest on the Claim accruing after the Petition Date. Moreover, any Claim or portion of a Claim that was or is satisfied or released during the Bankruptcy Cases is not an allowed Claim. For purposes of determining the amount of an allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim which the Debtor may hold against the Holder thereof, to the extent that such Claim may be set off pursuant to applicable law.  Any Claim that has been or is hereafter listed on the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely Filed, is deemed Disallowed and shall be expunged without further action by the Debtors and without further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding the foregoing or anything else to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed an allowed Claim unless and until such Entity pays in full the amount that it owes the Debtors.

1.2.4.    "Allowed Priority Tax Claims" means a Priority Tax Claim that is also an Allowed Claim.

1.2.5.    "Allowed Secured Claim" means a Secured Claim that is also an Allowed Claim.

1.2.6.    "Allowed Unsecured Claim" means an Unsecured Claim that is also an Allowed Claim.

1.2.7.    "Approved DIP Budget" has the meaning set forth in the Final Hallmark DIP Order.

1.2.8.    "Ballot" means the ballot, the form of which has been approved by the Bankruptcy Court, provided to each Holder of a Claim entitled to vote to accept or reject this Plan.

1.2.9.    "Bankruptcy Cases" means *In re Banners of Abingdon, LLC, et al.*, Case Number 25-378-ELG, pending in the Bankruptcy Court.

1.2.10.    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Bankruptcy Cases, as may be amended from time to time.

1.2.11.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Columbia.

1.2.12.    "Bankruptcy Litigation Rights" means any and all claims, choses in action, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payments and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, in law, equity or otherwise, which are owned or held by, or have accrued to, the Debtor, by operation of (i) Sections 542 through 550, and 553 of the Bankruptcy Code; (ii) the Debtor's rights to seek to determine the extent, validity and priority of liens and encumbrances; (iii) the Debtor's right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under Section 505 of the Bankruptcy Code and/or (iv) the Debtor's rights to seek redress for any violation of the automatic stay set forth in Section 362 of the Bankruptcy Code.

1.2.13.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as applicable to the Bankruptcy Cases, promulgated under Section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

1.2.14.    "Banners" has the definition set forth in the preamble of this Plan.

1.2.15.    "Business Day" means any day that is not a Saturday, a Sunday or "legal holiday" in the District of Columbia as such term is defined in Bankruptcy Rule 9006(a).

1.2.16.    "Cash" means the legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

1.2.17.    "Cash on Hand" means any currency or deposits being held by the Debtor, or hereafter collected by the Debtor.

1.2.18.    "Claim" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

1.2.19.    "Claims Bar Date" means, with reference to a Claim, the date by which Proofs of Claim must be or must have been Filed with respect to such Claim, as ordered by the Bankruptcy Court pursuant to the Claims Bar Date Notice or another Final Order.

1.2.20.    "Claims Bar Date Notice" means the Notice of Chapter 11 Bankruptcy Case [Docket No. 25] filed September 18, 2025 and served on all Creditors and Claimants on September 20, 2025.

1.2.21.    "Claimant" means the Holder of a Claim.

1.2.22.    "Class" means a category of Holders of Claims or Equity Interests as set forth in Article III of the Plan.

1.2.23.    "Confirmation" shall mean the entry of an order of the Bankruptcy Court confirming the Plan in accordance with Section 1129 of the Bankruptcy Code

1.2.24.    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

1.2.25.    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code, as such order may be amended, modified or supplemented.

1.2.26.    "Creditor" has the meaning ascribed in Section 101(10) of the Bankruptcy Code and shall refer to any Holder of a Claim against any Debtor or Holder of any Claim against Property of Debtor as defined in Section 102(2) of the Bankruptcy Code.

1.2.27.    "Cure Payments" means the amount of money due to Landlords, as and for unpaid pre-petition rental obligations, necessary to cure any monetary default under the correlative leases, pursuant to Section 365(b) of the Bankruptcy Code.

1.2.28.    "Debtor" has the definition set forth in the preamble of this Plan and shall additionally mean the "Reorganized Debtor" in connection with any obligations or rights existing after entry of the Confirmation Order.

1.2.29.    "Disclosure Statement" means the Disclosure Statement with respect to this Plan, as may be amended.

1.2.30.    "Distribution" means each distribution of Cash to Holders of Allowed Claims pursuant to and under the terms of this Plan by the Debtor on each Distribution Date.

1.2.31.    "Distribution Date" means the date(s) which Distributions shall be made pursuant to and under the terms of this Plan by the Debtor.

1.2.32.    "Effective Date" shall mean the first Business Day next succeeding the fourteenth calendar day following entry of the Confirmation Order.

1.2.33.    "Equity Interest" means any ownership interest or share in the Debtor (including, without limitation all rights to obtain such an interest or share in any Debtor).

1.2.34.    "Estate" means the estate created in this case for the Debtor pursuant to Section 541 of the Bankruptcy Code.

1.2.35.    "File, Filed or Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Bankruptcy Cases.

1.2.36.    "Final Hallmark DIP Order" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Providing Superiority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Docket No. 145] entered on November 24, 2025.

4

1.2.37.    "Final Order" means an order or judgment of the Bankruptcy Court which has not been reversed, stayed, modified or amended and: (i) as to which the time to appeal or seek reconsideration or rehearing thereof has expired; (ii) in the event of a motion for reconsideration or rehearing is filed, such motion shall have been denied by an order or judgment of the Bankruptcy Court; or (iii) in the event of an appeal is filed and pending, a stay pending appeal has not been entered; provided, however that with respect to an order or judgment of the Bankruptcy Court allowing or disallowing a Claim, such order or judgment shall have become final and non-appealable; and provided further, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not cause such order or judgment not to be a Final Order.

1.2.38.    "Holder" means a Person holding a Claim or any authorized agent who has completed, executed and delivered a Ballot in accordance with the applicable voting instructions.

1.2.39.    "Impaired" has the meaning ascribed in Section 1124 of the Bankruptcy Code.

1.2.40.    "Insider" has the meaning ascribed in Section 101(31) of the Bankruptcy Code.

1.2.41.    "Landlords" has the meaning ascribed in Section 3.3.4 of this Plan.

1.2.42.    "Lien" means any mortgage, lien, pledge, security interest or other charge or encumbrance or security device of any kind affecting any asset or any property of the Debtor contemplated by Section 101(37) of the Bankruptcy Code.

1.2.43.    "Non-Bankruptcy Litigation Rights" means, any and all claims, choses in action, causes of action suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payments and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether assertable directly or derivatively, in law, equity or otherwise, which are owned or held by, or have accrued to, the Debtor, whether arising before or after the Petition Date, including, without limitation, those which are: (i) against any party that has filed a Claim herein; (ii) property of any Estate under and pursuant to Section 541 of the Bankruptcy Code; (iii) for subrogation and contribution; (iv) related to federal or state securities laws; (v) direct or derivative claims or causes of action of any type or kind; (vi) against any and all current and/or former officers and directors of any Debtor; (vii) under and pursuant to any policies of insurance maintained by any Debtor; (viii) for collection on accounts, accounts receivables, loans, notes receivables or other rights to payment; and/or (xiv) may be available to any Debtor against any third party(ies) under any legal or equitable theory, *provided, however*, Non-Bankruptcy Litigation Rights shall *not* include any Bankruptcy Litigation Rights.

1.2.44.    "Person" has the meaning ascribed in Section 101(41) of the Bankruptcy Code.

1.2.45.     "Petition Date" means September 14, 2025, the date on which the Debtor commenced this case by filing the first of 41 petitions for relief pursuant to Section 301 of the Bankruptcy Code.

1.2.46.     "Plan" means this Chapter 11 plan, either in its present form or as it may be altered, amended, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

1.2.47.     "Plan Proponent" has the definition set forth in the preamble of this Plan.

1.2.48.     "POS" has the definition set forth in Section 6.5 of this Plan.

1.2.49.     "PNC Collateral" means all assets securing the Claim of PNC Bank, N.A.

1.2.50.     "Priority Claim" means a Claim to the extent that it is of the kind described in, and entitled to priority under Sections 507(a)(3), (a)(4), (a)(5), (a)(6), (a)(7) or (a)(9) of the Bankruptcy Code, that is not a Priority Tax Claim.

1.2.51.     "Priority Tax Claim" means a Claim of a governmental unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code.

1.2.52.     "Professional" means any professional employed or to be compensated pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

1.2.53.     "Property" means all assets and property included within "property of the estate" as set forth in and within the meaning of Section 541 of the Bankruptcy Code.

1.2.54.     "Reorganized Debtor" has the definition set forth in Section 6.1 of this Plan.

1.2.55.     "Schedules" means the Debtor's schedules of assets and liabilities and statement of financial affairs filed with the clerk of the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they have been or may be amended or supplemented from time to time in accordance with Bankruptcy Rule 1009.

1.2.56.     "Secured Claim" means a Claim that is secured by a Lien on, or security interest in, Property of the Debtor, or that has the benefit of rights of setoff under Section 553 of the Bankruptcy Code, but only to the extent of the value of the Creditor's interest in the Debtor's interest in such Property, which value shall be determined as provided in Section 506 of the Bankruptcy Code.

1.2.57.     "U.S. Trustee" shall mean the Office of the United States Trustee.

1.2.58.     "Unclaimed Property" has the definition set forth in Section 8.3 of this Plan.

1.2.59.     "Unsecured Claim" means a Claim as of the Petition Date that is not an Administrative Claim, a Secured Claim, a Priority Claim or a Priority Tax Claim.

1.3.    **Interpretation.**  For purposes of the Plan, (a) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) any reference herein to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented; (c) unless otherwise specified, all references herein to Articles, Sections, Schedules and Exhibits are references to Articles, Sections, Schedules and Exhibits of or to the Plan; (d) the words "herein" and "hereto" refer to the Plan in their entirety rather than to a particular portion of the Plan; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; and (f) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

1.4.    **Computation of Time.**  In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006 shall apply.

2.  **PROVISIONS FOR PAYMENT OF ALLOWED ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, AND STATUTORY FEES**

2.1.    **Administrative Expense Claims**.  Unless otherwise agreed in writing by a Holder of an Allowed Administrative Claim, the Holder of an Allowed Administrative Claim against the Debtor shall receive, in full and final satisfaction of such Holder's Allowed Claim, cash in an amount equal to the unpaid portion of such Allowed Claim on the later of (a) the Effective Date; or (b) the date on which such Holder's Administrative Claim becomes an Allowed Claim. To facilitate the orderly payment of Administrative Claims, the Confirmation Order will constitute establishment of the Administrative Claims Bar Date as described in this Plan. All Administrative Claims must be asserted no later than the Administrative Claims Bar Date in order to be Allowed (as defined in, and subject to the provisions of, Section 1.2.3) and eligible for payment. Parties who fail to assert Administrative Claims in accordance with the Administrative Bar Date will be forever barred from receiving Distributions under the Plan as Administrative Claim Holders, *except* Professionals representing the Debtor and/or the Estate may apply for allowance of fees and expenses, and assert correlative Claims, at any time until the thirtieth (30th) day following the date on which a final decree is entered pursuant to Section 12.18 of this Plan. Administrative Claims remain subject to approval of the Bankruptcy Court as a condition precedent to payment.

2.2.    **U.S. Trustee's Fees.**  The U.S. Trustee shall receive payment, on or before the Effective Date, of all fees owed under 28 U.S.C. § 1930(a)(6) on account of disbursements made by the Debtor from the Petition Date through the Effective Date. Any U.S. Trustee's fees owed subsequent to the Effective Date will be paid on the date when said fees come due. The Cash on Hand shall be used to pay these fees.

2.3.    **Priority Tax Claims**. Each Holder of a Priority Tax Claim that is an Allowed Claim against the Debtor shall receive, in full and final satisfaction of such Holder's Allowed Claim, cash in an amount equal to the unpaid portion of such Allowed Claim. For the avoidance of doubt, the terms of this Plan are constructed to ensure such payment occur not later than a date within five (5) years of the Petition Date. Notwithstanding the foregoing, the Holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising

with respect to or in connection with the Allowed Priority Tax Claim. It is not believed there exist any Priority Tax Claims in this case.

2.4.    **Administrative Claim of Hallmark Marketing Company LLC.** Hallmark Marketing Company LLC ("Hallmark") holds an Allowed Superpriority Administrative Claim, in the principal sum of $10,720,562.00 as set forth more fully in the Final Hallmark DIP Order.  As of January 5, 2026, the current amount of Hallmark's Allowed Superpriority Administrative Claim, after deducting payments made by the Debtors to Hallmark as authorized in the Approved DIP Budget, is approximately $6,948,973.85 plus any additional cost, expenses and attorneys' fees incurred by Hallmark, the Exit Fee (as defined in the Final Hallmark DIP Order), and all interest accruing thereon at the rate of eleven percent (11%) per annum (collectively, the "Allowed Hallmark Claim").  On the Effective Date, the Exit Fee and all attorneys' fees and expense incurred by Hallmark as of the Effective Date shall be added to the principal balance of the Allowed Hallmark Claim. The treatment of the Allowed Hallmark Claim is set forth in the DIP Credit Agreement, as modified by the provisions set forth in Article V of the Plan.

2.5.    **Administrative Claim of Michael Postal.** Michael Postal ("Mr. Postal") holds an Allowed Administrative Claim, in a sum equal to monies advanced pursuant to a debtor-in-possession financing agreement (the "Postal Agreement"). The Allowed Administrative Claim of Mr. Postal, alongside interest and fees comprising a part thereof, will be paid, from the Cash on Hand, on the Effective Date, to the extent not previously paid. As of the filing of this Plan, the overwhelming majority (if not the whole) of this Allowed Administrative Claim has been paid. The Allowed Administrative Claim of Mr. Postal is separate and distinct from his Claim for unpaid wages, which is placed in Class 6 in Section 3.2.6, *infra*.

2.6.    **Post-Confirmation Professional Fees**. The fees and expenses of Professionals, incurred after the Confirmation Date, shall *not* be Administrative Claims, and shall *not* require judicial review or approval, notwithstanding any provision of the Bankruptcy Code to the contrary (including, but not limited to, Section 330 thereof), *except* the engagement of any Professional, to pursue the Non-Bankruptcy Litigation Rights on a contingent basis, shall require leave of the Bankruptcy Court, pursuant to the provisions of Section 6.6.2 of this Plan.

2.7.    **Full Satisfaction, Discharge and Release**. The payments, Distributions and other treatment afforded to Holders of Allowed Administrative Claims and Allowed Priority Tax Claims against the Debtor under this Article 2 shall be in full and complete satisfaction, discharge and release of such allowed Claims.

3.    **CLASSIFICATION AND IMPAIRMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR**

3.1.    **Generally.**   All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are placed in Classes as set forth below.  A Claim or Equity Interest is placed in a particular Class only to the extent that such Claim or Equity Interest is an Allowed Claim or Equity Interest in that Class and such Claim or Equity Interest has not been paid, released, or otherwise settled or paid prior to the Effective Date, and is classified in other Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Classes.

3.2.    **Security.** The secured nature of each Class, *vel non*, is based upon a computation of (i) the size of that Class's Claim(s); (ii) the priority of Liens recorded against the Debtor, pre-petition; (iii) the treatment of pre-petition Liens in the debtor-in-possession financing, and cash collateral, orders entered during the pendency of the Bankruptcy Cases (including a "roll up" of at least one pre-petition Lien); and (iv) the Debtor's asset value, of $9,570,285.41, on the Petition Date, as indicated on the Schedules. This treatment results in two (2) Claimants holding bifurcated Claims: (i) PNC Bank, N.A., the Claim of which is not materially impacted insofar as both bifurcated portions are fully secured; and (ii) Gold Crown Managers Acceptance Corp. ("Crown MAC"), the Claim of which *is* materially impacted insofar as the preponderance thereof is deemed unsecured.

3.3.    **Identification and Treatment of Classes.**  The following are the designations for, and treatment of, the Classes of Claims against and Equity Interests in the Debtor:

3.3.1.    **Class 1 – Allowed Secured Claims of PNC Bank, N.A.**    Class    1 consists of the Claim of PNC Bank, N.A. This Class is bifurcated into two sub-classes:

(i) the senior, Secured Claim of PNC Bank, N.A., in the allowed amount of $543,000.00, which is Class 1.1 and which is senior to the Claims of all other secured Creditors only with respect to the PNC Collateral; and

(ii) the junior, Unsecured Claim of PNC Bank, N.A., in the allowed amount of $2,407,878.93, which is Class 1.2.

Classes 1.1 and 1.2 are both Impaired Classes.

3.3.2.    **Class 2 – Allowed Superpriority Administrative and Secured Claim of Hallmark Marketing Company LLC.** Class 2 consists of the Allowed Hallmark Claim. As of January 5, 2026, the amount owing to Hallmark under the Allowed Hallmark Claim is estimated by the Debtors to be approximately $6,948,973.85 plus any additional cost, expenses and attorneys' fees incurred by Hallmark, the Exit Fee (as defined in the Final Hallmark DIP Order), and all interest accruing thereon at the rate of twelve percent (12%) per annum. The security interest of this Class is senior to all other Classes *except* for the Class 1.1 Claim of PNC Bank, N.A. only with respect to the PNC Collateral.

Class 2 is an Impaired Class.

3.3.3.    **Class 3 – Allowed Secured and Unsecured Claims of Crown MAC.** Class 3 consists of the Allowed Claim of Crown MAC. The pre-petition debt owed to Crown MAC is estimated by the Debtor to be $5,350,168.00. This Class is bifurcated into two sub-classes:

(i) Class 3.1, being the Allowed Secured Claim of Crown MAC in the amount of $2,606,723.41; and

(ii) Class 3.2, being the Allowed Unsecured Claim of Crown MAC in the amount of $2,743,444.59.

The security interest of Class 3.1 is senior to any Secured Claim *except* for those of Class 1.1 and Class 2. The lack of a security interest of Class 3.2 is based upon the cumulative value of the Debtor's assets ($9,570,285.41) on the Petition Date and the sum of the senior security interests of Classes 1.1 and 2.

Classes 3.1 and 3.2 are both Impaired Classes.

  3.3.4.  **Class 4 – Allowed Claims of Holders of Leased Real Estate**. Class 4 consists of the Allowed Claims of holders of real estate leased to the Debtor (collectively, the "Landlords"). This Class is bifurcated into two sub-classes:

    (i) Class 4.1, being the Claims of Landlords whose correlative leases are being assumed hereunder; and

    (ii) Class 4.2, being the Claims of Landlords whose correlative leases are being rejected hereunder.

Classes 4.1 and 4.2 are both Impaired Classes.

  3.3.4.1.  **Class 4.1 –** The Claims of Class 4.1 shall constitute the Cure Payments due to each Claim Holder. For purposes of Section 365(b)(1)(A) of the Bankruptcy Code, the Debtor submits that the temporally-prioritized payment of these arrearages under this Plan, coupled with the Debtor's healthy post-petition financial performance and timely making of post-petition rent payments, constitutes "adequate assurance" of the Cure Payments being made and of future performance under the terms of the assumed leases. The Debtor equally submits that in the prism of this case, a four-month cure period is "prompt" in nature.

  3.3.4.2.  **Class 4.2** – The Claims of Class 4.2  are in the nature of (i) pre-petition monies due to each Claim Holder, if any; plus (ii) rejection damages, as computed pursuant to the allowances of Section 502(b)(6) of the Bankruptcy Code.

  3.3.5.  **Class 5 – General Unsecured Trade Creditors**. Class 5 consists of the allowed Claims of general unsecured trade Creditors and lenders who are not (i) employees of the Debtor; or (ii) Secured Creditors.

Class 5 is an Impaired Class.

  3.3.6.  **Class 6 – Employee Claims**. Class 6 consists of the allowed wage Claims of employees of the Debtor (including Claims derivative from the employment of Persons who are no longer employees of the Debtor). Class 6 does *not* include the secured Claim of Mr. Postal in his capacity as a secured lender but *does* include the general unsecured wage Claims of Mr. Postal and Leonard Banner, each of whom are Insiders of the Debtor.

Class 6 is an Impaired Class.

  3.3.7.  **Class 7 – Equity**. Class 7 consists of the equity Claim of A & S, Inc., which shall retain all Equity Interest in the Reorganized Debtor but which shall be prohibited from taking any dividend or member distribution until such a time as the Claims of all other Classes are paid,

in full (though the derivative members of this Class may continue to draw their usual and customary salaries, and receive their usual and customary benefits, from the Reorganized Debtor, for the life of this Plan).

Class 7 is an Impaired Class by reason of the prohibition on the taking of dividends and/or member distributions. Class 7 is comprised exclusively of an Insider of the Debtor.

3.3.8.    **Schedule.** A schedule of Claim Holders, the Class(es) into which they are placed, and the amount of their Claims is appended hereto as Exhibit A, *except* members of Class 4.1 and Class 4.2 are generally referred to as simply being in "Class 4." Each such Claim is designated in the sum scheduled by the Debtor *except* where a proof of claim has been filed in a differentiated amount, in which case said Claim is stated in the sum stated on the proof of claim.

## 4.    PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

4.1.    **Acceptance**. Except as set forth in Section 4.2 hereof, the Debtor assumes the executory contracts and unexpired leases set forth in Schedule G, as found at ECF #88, as well as (i) all leases for improved non-residential real estate; (ii) all contracts governing the provision of utility services (whether in the nature of water, power, gas, telecommunication, waste, or sewage); (iii) all employee contracts; and (iv) all contracts with customers, for the delivery of consumer goods, to the extent any such contracts are extant.

4.2.    **Rejection**. The Debtor rejects the following executory contracts and unexpired leases and, pursuant to this Plan, shall pay rejection damages to the counterparties thereof, each such counterparty being a member of Class 4.2:

a)    The unexpired lease with Fairfax Company of Virginia LLC, as listed on Line 2.9 of Schedule G;

b)    The unexpired lease with Bull Run Plaza LLLC, as listed on Line 2.3 of Schedule G;

c)    The unexpired lease with South Riding Owner LLC, as listed on Line 2.30 of Schedule G; and

4.3.    The unexpired lease with Fair City HHH LLC, as listed on Line 2.7 of Schedule G..

## 5.    TREATMENT OF ALLOWED HALLMARK CLAIM

5.1.    The Allowed Hallmark Claim is required to be paid in full on the earlier of (a) the Effective Date; or (b) the Maturity Date, unless otherwise agreed to by Hallmark.  The Debtor has requested that Hallmark agree to an extension of time to permit the payment of the Allowed Hallmark Claim and Hallmark has agreed to the Debtor's request solely on the terms and conditions set forth herein.

5.2.    Amended and Restated Credit Agreement.  Upon entry of the Confirmation Order, the Debtor shall execute an Amended and Restated Credit and Security Agreement with Hallmark

as Lender (as the same may be amended or extended from time to time, the "Hallmark Credit Agreement"), which shall amend and restate the terms of the DIP Credit Agreement.  In addition to the Hallmark Credit Agreement the Reorganized Debtor shall execute an amended and restated promissory note and any other documents, instruments or agreements reasonably requested by Hallmark to evidence or secure the obligations set forth in the Hallmark Credit Agreement, which shall include without limitation unlimited, unconditional, irrevocable guarantees given by each of Leonard Banner, Michael Postal and A&S, Inc. (collectively the "Amended and Restated Guarantees"), *except* no such guaranty shall be for a gross obligation in excess of that guaranteed— by the correlative guarantor—as of the Petition Date, and an Amended and Restated Promissory Note in the principal amount of the Class 2 Allowed Superpriority Administrative and Secured Claim of Hallmark Marketing Company LLC (the "Amended Note" and together with the Amended and Restated Guarantees and the Hallmark Credit Agreement and the other agreements described herein, the "Revised Loan Documents")  The final form of the Hallmark Credit Agreement shall be filed with the Court and served on the master service list no later than fourteen (14) days prior to the Confirmation Hearing.  The Hallmark Credit Agreement, and as applicable the other Revised Loan Documents, shall contain the following material changes:

5.2.1.    Section 2.01(a) and (b) shall be deleted in their entirety and replaced with the following:

Subject to the terms and conditions set forth herein, in the DIP Orders, and in the Confirmation Order, Lender shall be deemed to have made, as of November 24, 2025, loans by Lender to the Borrower in the aggregate principal amount of $10,720,562 (the "Original Credit Facility").  The deemed borrowing by the Borrower of the Original Credit Facility shall not entitle the Borrower to receive any cash or other consideration from Lender and, notwithstanding that no such cash is exchanged, the Borrower shall owe the aggregate principal amount of the Original Credit Facility to Lender under this Agreement.  Amounts deemed borrowed under this Section 2.01 and repaid, prepaid or otherwise satisfied in accordance with this Agreement may not be reborrowed.

5.2.2.    Section 2.02 shall be deleted in its entirety.

5.2.3.    Section 2.04(c)(i) shall be deleted in its entirety and replaced with the following:

(i)  Borrower shall make monthly payments to Lender (in arrears on the first day of each month) in the amounts indicated on Exhibit C to Borrower's confirmed Plan of Reorganization, which shall be attached as Exhibit C to the Credit Agreement (the "Payment Schedule").  The Payment Schedule shall not be modified without the express written consent of Hallmark in its sole discretion. Nothing contained in this section shall modify the Borrower's rights under Section 2.03(a) of the Credit Agreement.

5.2.4.    Section 2.04(c)(ii) shall be deleted in its entirety and replaced with the following:

Except for the payments set forth in the Payment Schedule and Mandatory Prepayments, no repayments of any Obligations shall be due until the Maturity Date. On the Maturity Date, the unpaid Principal Balance, together with all PIK and other unpaid interest, capitalized fees (i.e., the Exit Fee), and all other costs, fees, expenses, indemnities, and other amounts due hereunder shall be due and payable in full (by wire transfer of immediately available funds without demand by the Lender.

5.2.5.    Section 2.04(c)(iii) shall be deleted in its entirety and replaced with the following:

Payments Under Original Credit Facility.

(i)  On the first day of each calendar month, the Borrower shall make payments to Lender in the following amounts:

(a)    Payments of all unpaid interest accrued under Section 2.04 and paid in accordance with the Payment Schedule and on the terms and conditions set forth in Section 2.04(c)(i); and

(b)    Payments of the remaining unpaid Principal Balance, together with all fees payable hereunder or under any of the other Loan Documents (including, but not limited to, the Exit Fee), all costs, and expenses due or arising hereunder or under any of the other Loan Documents, and all Lender Expenses, and paid in accordance with the Payment Schedule and on the terms and conditions set forth in Section 2.04(c)(i).

(ii)  On December 24 or the first Business Day thereafter, the Borrower shall make a mandatory annual principal reduction payment, which shall be applied by the Lender to the remaining then unpaid Obligations on the following schedule:

(a)    December 24, 2026:  $1,200,000.00;

(b)    December 24, 2027:  $1,800,000.00;

(c)    December 24, 2028:  $1,200,000.00; and

(d    December 24, 2029: $1,000,000.00.

5.2.6.    Section 2.07 shall be deleted in its entirety and replaced with the following:

All outstanding Obligations shall be repaid in full on the earliest to occur of the following (such date being the "Maturity Date"): (i) April 1, 2030; or (ii) the acceleration of the Obligations as the result of an Event of Default. All principal, accrued interests, and all other amounts outstanding hereunder shall be due and payable in full, and the Commitment thereunder shall terminate, on the Maturity Date, without requirement for any further notice or demand to Borrower and without further order from the Bankruptcy Court.

     5.2.7.     The definition of "Interest Rate" shall be deleted in its entirety and replaced with the following:

     "Interest Rate" means a fixed interest rate equal to eleven percent (11%) per annum.

     5.3.     Immediately upon entry of the Confirmation Order, the Borrower and Hallmark shall negotiate and execute the Revised Loan Documents and any additional amended and restated documents as are reasonably necessary to reflect the terms of the Plan, including, without limitation, Hallmark's treatment thereunder, and shall contain such terms, provisions, and events of default as are consistent with the terms of the Plan and the Confirmation Order.

     5.4.     The Hallmark Credit Agreement and the Confirmation Order shall contain the following language regarding the release of Hallmark:

     Release. Effective upon entry of this Confirmation Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally, and irrevocably releases and forever discharges and acquits Hallmark, its affiliates and each of its respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, solely in their capacities as such (collectively, the "Released Parties"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract tort or under any state or federal law or otherwise, arising out of or related to the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Credit Agreement, the other DIP Loan Documents, the Prepetition Obligations, the Prepetition Liens, the License Agreements, any other agreements between the Debtors and Hallmark, the obligations owing and the financial obligations made thereunder, the negotiation of any of the foregoing and the deal reflected thereby, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause, or thing whatsoever arising at any time on or prior to the date of this Confirmation Order.

     5.5.     Default Under the Plan or the Revised Loan Documents. The Plan, the Hallmark Credit Agreement, and the Revised Loan Documents are the culmination of extensive discussions, litigation, and ultimately compromises made between the Debtor and Hallmark. The Debtor, after advice of counsel, and Hallmark acknowledge that as a component of the resolution of methods for repayment of the Class 2 Claim as set forth in the Plan and in the Revised Loan Documents, the parties have agreed to the provisions of this section in exchange for which Hallmark has agreed to a substantially longer payment term of an obligation that would otherwise be required to be repaid upon the earlier of March 2, 2026 or the Effective Date. Accordingly, in the event of a

14

Default under the Plan or the Revised Loan Documents that is not cured under the terms and conditions set forth in the Revised Loan Documents:

    5.5.1.   Hallmark shall have all the rights and remedies afforded to it under the Revised Loan Documents and applicable law;

    5.5.2.   The Debtor acknowledges and agrees, and in the Confirmation Order it will be expressly ordered, decreed and directed, that if, after the entry of the Confirmation Order, the Debtor or its successors and assigns, either commences a bankruptcy case, seeks relief under Bankruptcy Code, or attempts to reopen this bankruptcy case, or if an involuntary case is filed against the Debtor (collectively a "Subsequent Bankruptcy Case") then in the Subsequent Bankruptcy Case:

    5.5.2.1.        The Debtor shall list the Class 2 Claim as undisputed;

    5.5.2.2.        The Debtor shall attach the Plan and the Confirmation Order to its petition and specifically file a notice in the Subsequent Bankruptcy Case that it agrees that the automatic stay does not apply to Hallmark and that if it does, the automatic stay should be lifted immediately to permit Hallmark to enforce its rights and remedies in its collateral;

    5.5.2.3.        The automatic stay of section 362 of the Bankruptcy Code shall be deemed modified and lifted without further order of the Bankruptcy Court to permit Hallmark to enforce its rights and remedies in any property in which Hallmark asserts a security interest and lien;

    5.5.2.4.        At Hallmark's option, Hallmark shall be entitled to the entry of an order granting it relief from the automatic stay to enforce its rights and remedies in its collateral *ex parte* pursuant to section 362(f) of the Bankruptcy Code (the "Lift Stay Order");

    5.5.2.5.        The Debtor, holders of Claims, and all parties in interest who have received notice of the proceedings of this Bankruptcy Case, each determined as of the Effective Date, shall be and are hereby enjoined from any actions to (a) contest the entry of the Lift Stay Order, (b) modify, amend or obtain reconsideration of the Confirmation Order as it relates to these provisions governing Hallmark, (c) prevent, restrain or impair Hallmark from realizing on its collateral as of the commencement of the Subsequent Bankruptcy Case, or (d) otherwise impose or reimpose the automatic stay on Hallmark in the Subsequent Bankruptcy Case;

    5.5.2.6.        The Court presiding over the Subsequent Bankruptcy Case shall abstain from hearing any contest or objection to the entry of the Lift Stay Order and any attempt to modify, amend or reconsider the Lift Stay Order, pursuant to the authority granted in 28 U.S.C. § 1334(c) and sections 105 and 305 of the Bankruptcy Code and the Confirmation Order shall constitute a final order of abstention under such statutes that is not subject to review or appeal;

    5.5.2.7.        The Debtor shall be barred from seeking to have the automatic stay apply to Hallmark's actions to collect from any guarantor of the debts owing by the Debtor to Hallmark, whether pursuant to sections 362(a) or 105 of the Bankruptcy Code; and

5.5.2.8.     The entry of the Confirmation Order is final, res judicata and collateral estoppel as to each of these provisions in this case and in any bankruptcy case.

5.5.2.9.     The provisions of this Section 5.5.2 shall terminate upon the payment of the Allowed Hallmark Claim in full as set forth in the Plan and the Revised Loan Documents.

5.6.     During the repayment term of the Allowed Hallmark Claim, as described in the Plan and in the Revised Loan Documents, and as long as there is no default under the Plan or the Revised Loan Documents, Hallmark agrees to forbear from suing or commencing any other action or making a claim against all personal guarantors of the debts owing from the Debtor to Hallmark, including, without limitation, Leonard Banner, Michael Postal and A&S, Inc.

5.7.     Contemporaneously with the entry of the Confirmation Order, the Reorganized Debtor (as defined below) shall execute an amended and restated (i) Hallmark Account Agreement, (ii) Trademark Sublicense Agreement, (iii) Hallmark Crown Rewards Program Agreement; and (iv) any other attendant documents necessary or required for Debtor to operate its Hallmark stores, in form and substance acceptable to Hallmark in its sole discretion (collectively, the "Amended Hallmark Account Agreements") and all existing Hallmark Account Agreements shall be deemed assumed by and assigned to the Reorganized Debtor as modified by the Amended Hallmark Account Agreements.

## 6.  MEANS OF IMPLEMENTING THE PLAN

6.1.     **Vesting of Assets**. Except as otherwise provided herein, on the Effective Date, all assets of the Debtor's Estate shall vest in LBPO Management LLC (the "Reorganized Debtor"), and the Reorganized Debtor shall continue to—and, to the extent not already so doing, commence to—carry on business under the name of LBPO Management LLC, inclusive of all trade names held, utilized, reserved, or otherwise associated with the Debtor. The Reorganized Debtor shall use the articles of organization of LBPO Management LLC for all future purposes, for the life of this Plan (and, at the discretion of the Reorganized Debtor, thereafter).

6.2.     **Non-Vesting of Assets**. Notwithstanding the provisions of Section 6.1 hereof, the Bankruptcy Litigation Rights and the Non-Bankruptcy Litigation Rights shall remain an asset of the Debtor's Estate, and shall *not* vest in the Reorganized Debtor, until the earlier of (i) March 2, 2036; or (ii) the latest date permitted by controlling law.

6.3.     **Merger**. The forty-one (41) entities comprising the Debtor, pursuant to the entry of an order of substantive consolidation in the Bankruptcy Cases, shall be deemed to have merged into the Reorganized Debtor on the Petition Date. The Reorganized Debtor shall have no obligation to maintain the existence of any pre-petition constituent entity, *except* the Reorganized Debtor shall be bound to maintain the existence of LBPO Management LLC and to file with applicable federal, state and municipal officials and authorities such documents as may be necessary to continue to carry on business in the name of LBPO Management LLC, pursuant to the provisions of Section 6.1 hereof. For the avoidance of doubt or ambiguity, the Reorganized Debtor shall *not* be required to file any further documents to effectuate the merger set forth herein, or to assume the pre-petition assets of the other constituent entities of the substantively consolidated Debtor; the filing obligations of the Reorganized Debtor, with federal, state and municipal entities and

officials, shall solely be those requisite to continue operations as a limited liability company formed pursuant to the laws of the State of Maryland.

6.4.    **Operation of Retail Stores**.  Pursuant to Section 1123(a)(5) of the Bankruptcy Code, the Reorganized Debtor shall assume and take all Property of the Estate, except as expressly provided hereunder, for the life of this Plan, and shall use the same to operate the same retail stores operated by the Debtor during the life of this Bankruptcy Cases. The Debtor reasonably projects the operation of said stores will provide cash sufficient to (i) pay ongoing operational expenses; and (ii) make all payments called for in this Plan, in the manner and on the dates provided for in Article 6 hereto. While not a binding component of this Plan, cash flow projections—aimed solely at demonstrating the feasibility of this Plan—are appended hereto as Exhibit B.

6.5.    **Sale of Point of Sale Units.** As further provided in Section 7.2 hereof, the Debtor reasonably anticipates that certain point of sale ("POS") units, not constituting an asset of the Estate but comprising a part of the collateral of the Class 1.1 Creditor, will occur in the weeks and months succeeding the Effective Date, if not sooner. The proceeds of said sales shall be used to pay the Creditor comprising Class 1.1.

6.6.    **Litigation.**

6.6.1.    **Bankruptcy Litigation Rights.** The Debtor shall pursue the Bankruptcy Litigation Rights, on behalf of the Estate, in the Bankruptcy Court, to the extent the Debtor believes such pursuit to be a prudent exercise of business judgment, and shall be entitled to settle, adjust, or pursue any and all claims—whether in law or equity—encompassed therein, *provided* that any settlement or adjustment thereof shall be undertaken in accord with the rigors of Federal Rule of Bankruptcy Procedure 9019. In pursuit of the Bankruptcy Litigation Rights, the Debtor may—but shall not be required to—rely on the advice of the Debtor's general reorganization counsel, and to continue to utilize the services of said counsel. This Plan does *not* rely on the success of any such claims, with the payments called for in Article 7 hereof being solely tied to the Reorganized Debtor's future retail performance. However, to the extent any such claim(s) do(es) yield a monetary benefit, the same shall be used (i) first to pay all expenses of the pursuit of said claim(s), including legal fees and expenses; (ii) second to satisfy any unpaid portion of the Allowed Hallmark Claim; and (iii) in accordance with Section 7.3 hereof.

6.6.2.    **Non-Bankruptcy Litigation Rights.** Pursuant to Section 1123(b)(3) of the Bankruptcy Code, Michael Postal ("Mr. Postal") is appointed a representative of the Debtor's Estate for purposes of pursuing the Non-Bankruptcy Litigation Rights, to the extent Mr. Postal believes such pursuit to be a prudent exercise of business judgment, and shall be entitled to settle, adjust, or pursue any and all claims—whether in law or equity—encompassed therein. In pursuit of the Non-Bankruptcy Litigation Rights, the Debtor shall engage the licensed and qualified litigation counsel of the Debtor's election, on an hourly fee basis (or, in the judgment of Mr. Postal and with approval of the Bankruptcy Court, on a contingent basis in accord with Section 328 of the Bankruptcy Code). The Debtor's general reorganization counsel shall *not* be presumed to be counsel to the Debtor for purposes of pursuing the Non-Bankruptcy Litigation Rights but shall advise the Estate's counsel, in connection with said claims, on such matters related to this Plan and to the Debtor's Bankruptcy Cases as may be reasonably prudent in the general prism of the Bankruptcy Cases.  This Plan does *not* rely on the success of any such claims, with the payments

called for in Article 7 hereof being solely tied to the Reorganized Debtor's future retail performance. However, to the extent any such claim(s) do(es) yield a monetary benefit, the same shall be used (i) first to pay all expenses of the pursuit of said claim(s), including legal fees and expenses; (ii) second to satisfy any unpaid portion of the Allowed Hallmark Claim; and (iii) in accordance with Section 7.3 hereof.

6.7.    **Sale of Stores.** The Debtor may—but shall not be required or obligated to—sell any or all assets correlative to the operation of one or more retail stores, at any time, provided such sale be with the express written consent of Hallmark. The proceeds of any such sale(s) shall be used to make payments under this Plan but no such sale(s) shall create an obligation on the part of the Debtor to sooner pay any obligation hereunder.

6.8.    **Refinancing.** The Debtor may—but shall not be required or obligated to— refinance any obligation under this Plan, through the taking of a loan from a third party (whether or not an Insider), *provided* the Debtor may not assign a security interest to any lender, in any asset of the Estate, unless the proceeds of the correlative loan are sufficient to retire, in full, the Claims of all parties holding a Lien upon said Property. To the extent the Debtor seeks to pledge its rights under any contract with Hallmark, as collateral for any such loan, the Debtor may not undertake such pledge without the express written consent of Hallmark.

6.9.    **Retention of Liens.** All Holders of Secured Claims shall retain the Lien(s) securing said Claim (as of the Effective Date of this Plan), to and through the date on which each such Holder is paid, in full, pursuant to the allowances of this Plan. The Lien of each such Holder of a Secured Claim shall reduce, dollar-for-dollar, as payments are made to the correlative Holder, but not Holder shall be required to execute, file, or otherwise acknowledge a Lien release unless and until the Claim of said Holder has been paid in full, *provided, however,* any such Holder shall furnish a payoff statement, to the Reorganized Debtor or any entity so designated by the Reorganized Debtor, upon the written request of the Reorganized Debtor. Any Holder of a Secured Claim may file this Plan, the Confirmation Order, or both documents, in any UCC registry, or amongst the land records of any jurisdiction.

## 7.    TIMING OF PAYMENTS AND DISTRIBUTIONS

7.1.    **All Allowed Claims to be Paid in Full.** The Debtor will pay the Allowed Claims of all Class members, in full, pursuant to this Plan. The timing of payments to each such Class shall be as follows:

7.1.1.    **Class 1.1**. The Claim of Class 1.1 shall be paid by the Debtor over a five (5) year period, with simple interest accruing from the Petition Date at the rate of eight percent (8%) per annum, commencing on the first Business Day of the first calendar month next succeeding the Effective Date, through the making of monthly payments in irregular sums computed to address the seasonal nature of the Debtor's business, as set forth on the payment schedule attached hereto as Exhibit D.

7.1.2.    **Class 2**. The Claim of Class 2 shall be paid by the Debtor under the terms and conditions set forth in Article 5 of the Plan.

      7.1.3.     **Class 3.1**. The Claim of Class 3.1 shall be paid by the Debtor over a five (5) year period, with simple interest accruing from the Petition Date at the rate of eight percent (8%) per annum, commencing on the first Business Day of the first calendar month next succeeding the Effective Date, through the making of monthly payments in irregular sums computed to address the seasonal nature of the Debtor's business, as set forth on the payment schedule attached hereto as Exhibit E.

      7.1.4.     **Class 4.1**. The Claims of Class 4 shall be paid by the Debtor over a four (4) month period, through the making of equal monthly payments, commencing on the first Business Day of the first calendar month next succeeding the Effective Date, and continuing on the first Business Day of each successive month thereafter, until each such Claim is paid in full, as set forth on the payment schedule attached hereto as Exhibit B.

      7.1.5.     **Classes 1.2, 3.2, 4.2, 5 and 6**.The Claims of Classes 1.2, 3.2, 4.2, 5 and 6 shall be paid by the Debtor over a period commencing on the first Business Day of December 2026, and extending through the first Business Day of December 2035, through the making of monthly payments in irregular sums computed to address the seasonal nature of the Debtor's business, as set forth on the payment schedule attached hereto as Exhibit B. For the avoidance of doubt or ambiguity, these Classes will *not* receive payments in any month prior to December 2026 and will cease receiving payments in March 2036.

     7.2.     **Sale of Point of Sale Units**. The Lien of Class 1.1 attaches to certain POS units held by third party entities that purchased retail stores, pre-petition, from the Debtor or one or more affiliates of the Debtor. The Debtor reasonably anticipates these POS units will be sold in the coming months or, alternatively, that the Holder of the Lien will be compensated for the POS units in the coming months. Upon the sale of each such POS unit (or the other monetization thereof in satisfaction—whether partial or full—of the correlative Lien), the proceeds thereof shall be paid over the Class 1.1 Creditor. Upon the making of each such payment to the Class 1.1 Creditor, the remaining payments due to the Class 1.1 Creditor shall be reamortized by the Debtor and said reamortization shall then govern the Debtor's forward-looking obligations to the Class 1.1 Creditor, pursuant to the terms of this Plan.

     7.3.     **Bankruptcy Litigation Recovery.** To the extent the Debtor recovers any monies through the litigation addressed in Section 6.6 hereof, the net proceeds thereof—after accounting for all fees and expenses of said litigation—shall be first used to retire the Claim of Class 2 then, to the extent monies remain, used to retire the Claim of Class 1.1 then, to the extent monies remain, used to retire the Claim of Class 3.1 then, to the extent monies remain, used to retire the Claims of Class 4.1 then, to the extent monies remain, used to retire the Claims of Classes 3.2, 4.2, 5 and 6. Upon the making of any payment to Class 1.1, Class 2, or Class 3 hereunder, the remaining payments due to each such class shall be reamortized by the Debtor and said reamortization shall then govern the Debtor's forward-looking obligations to each such Class, pursuant to the terms of this Plan.

     7.4.     **Non-Bankruptcy Litigation Recovery.** To the extent the Debtor recovers any monies through the litigation addressed in Section 6.6 hereof, the net proceeds thereof—after accounting for all fees and expenses of said litigation—shall be first used to retire the Claim of Class 1.1 (if any only to the extent that the Holder of the Claim of Class 1.1 has a valid and

perfected security interest in and lien on such litigation recover) then, to the extent monies remain, used to retire the Claim of Class 2 then, to the extent monies remain, used to retire the Claim of Class 3.1 then, to the extent monies remain, used to retire the Claims of Class 4.1 then, to the extent monies remain, used to retire the Claims of Classes 3.2, 4.2, 5 and 6. Upon the making of any payment to Class 1.1, Class Class 2, or Class 3 hereunder, the remaining payments due to each such class shall be reamortized by the Debtor and said reamortization shall then govern the Debtor's forward-looking obligations to each such Class, pursuant to the terms of this Plan.

7.5.    **No Entitlement to Earlier Receipt**. No Holder of any Claim shall have any entitlement to the receipt of any monies, held by the Debtor or for the benefit of the Debtor, prior to the date(s) on which such Holder is to be paid in accord with the provisions of this Article 7, *however*, pursuant to Section 6.9 hereof, the Liens of Secured Claim Holders shall continue to attach to the Debtor's assets where applicable (as determined on a creditor-by-creditor and Lien-by-Lien basis)—including, but not limited to, cash and cash equivalents, inventory, litigation claims, and other Property—until such a time as the Claim of the correlative Holder is retired in full.

8.   **PROVISIONS GOVERNING DISTRIBUTIONS**

8.1.    **Delivery of Distributions**.  All Distributions to Holders of Allowed Claims shall be made at the address of such Holder as set forth in the claims register maintained in the Bankruptcy Cases (subject to any transfer effectuated pursuant to Bankruptcy Rule 3001(e) or, after the Effective Date, a change of address notification provided by a Holder in a manner reasonably acceptable to the Debtor) or, in the absence of a filed proof of Claim, the Schedules. The responsibility to provide the Debtor a current address of a Holder of Claims shall always be the responsibility of such Holder and at no time shall the Debtor have any obligation to determine a Holder's current address. Nothing contained in the Plan shall require the Debtor to attempt to locate any Holder of an Allowed Claim. Amounts in respect of undeliverable Distributions made by the Debtor shall be held in trust on behalf of the Holder of the Claim to which they are payable by the Debtor until the earlier of the date that such undeliverable Distributions are claimed by such Holder and the date ninety (90) days after the date the undeliverable Distributions were made.

8.2.    **No Interest Unless Otherwise Provided**.  No interest shall be paid on any Claim unless, and only to the extent permitted, under the terms of the Plan.

8.3.    **Undistributed Property**. If any Distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the Holder entitled thereto ("Unclaimed Property"), then such Unclaimed Property shall be (i) first paid to other members of the Class of the Claimant not claiming said Distribution, until such a time as said Class is paid in full; (ii) second paid to each junior Class, until all Classes are paid in full; and (iii) then, if and when each Class is paid in full, remaining funds shall be donated to the University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond, Esq. in the charitable manner she sees most fit. The University of Miami School of Law Bankruptcy Clinic works with members of the South Florida legal community to provide *pro bono* services to individuals in need of bankruptcy relief, while also furnishing law students with valuable pedagogical experience in the field of bankruptcy law. Should Patricia Redmond, Esq. cease to operate the University of Miami School of Law Bankruptcy Clinic, for any reasons, at

any time during the life of this Plan, the Bankruptcy Court shall have the right to appoint a comparable charitable recipient upon the making of a motion by any party in interest.

## 9.   CONDITIONS PRECEDENT TO EFFECTIVENESS OF PLAN

9.1.   **Conditions Precedent to Effectiveness of Plan.**  The Effective Date of the Plan shall not occur unless and until the following conditions shall have been satisfied or waived by the Plan Proponent: (a) the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Plan Proponent, and such Confirmation Order shall be a Final Order; and (b) the Bankruptcy Court shall have approved the information contained in the Disclosure Statement as adequate pursuant to Section 1125 of the Bankruptcy Code.

9.2.   **Notice of Confirmation of the Plan.**  Notice of entry of the Confirmation Order shall be provided as required by Bankruptcy Rule 3020(c)(2).

## 10.  RETENTION OF JURISDICTION

10.1.   **Retention of Jurisdiction.**  Pursuant to Sections 1334 and 157 of Title 28 of the United States Code, the Bankruptcy Court shall retain jurisdiction of all matters arising in, arising under, and related to the Bankruptcy Cases and the Plan, for the purposes of Sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a) to hear and determine any and all adversary proceedings, applications, or contested matters, including avoidance actions, and any remands from any appeals;

(b) to hear and to determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan;

(c) to consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(d) to enter, enforce and implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement, consummate or enforce the terms and conditions of the Plan and the transactions contemplated hereunder;

(e) to enter and to implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement or enforce the terms and conditions of the Plan;

(f) to hear and to determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan; and

(g) to enter a final decree closing this Bankruptcy Cases.

10.2.   **Abstention and Other Courts.**   If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to the Bankruptcy Cases, this Article 10 of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter, though this Section 10.2 shall not be deemed to vest jurisdiction in any court otherwise devoid of jurisdiction or to limit the right of any party in interest to remove any proceeding from any state or tribal court, to any court of the United States, pursuant to the allowances of Section 1452 of Title 28 of the United States Code.

## 11.  RELEASE FOR PLAN PROPONENT AND PROFESSIONALS

11.1.   **Limitation of Liability in Connection with the Bankruptcy Cases, the Plan, and Related Documents.**  Pursuant to § 1125(e) of the Bankruptcy Code, the Plan Proponent and its Professionals, representatives, successors, and assigns (collectively, the "Plan Participants") will neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with or related to the Bankruptcy Cases, including, but not limited to, the formulation, preparation, dissemination, negotiation, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement, pleading or document created or entered into, the pursuit, non-pursuit or settlement of Causes of Action or any other act taken or omitted to be taken in connection with or for the purpose of carrying out the Plan, the Disclosure Statement, the Confirmation Order or related agreement, including solicitation of acceptances of the Plan ("Exculpated Conduct"); provided, however, that no Person shall be relieved of liability for fraud, gross negligence, and intentional misconduct. All Persons are permanently enjoined from commencing, or continuing in any manner, any action or proceeding against the Plan Participant, whether directly, derivatively, on account of or respecting any Claim, debt, right, or cause of action based in whole or in part upon any Exculpated Conduct.

## 12. MISCELLANEOUS PROVISIONS

12.1.   **Severability.**   Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Equity Interest or transaction, the Plan Proponents may modify the Plan in accordance with the Plan, as applicable, so that such provision shall not be applicable to the Holder of any Claim or Equity Interest.

12.2.   **Binding Effect.**   Upon the entry of the Confirmation Order, all provisions of the Plan shall be binding upon, and shall inure to the benefit of, the Debtor, the Holders of Claims and Equity Interests, and such Persons' respective successors and assigns.

12.3.   **Transfer Tax Exemption.**   Pursuant to § 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any notes or securities under the Plan, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, deeds of trust, mortgages, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan.

12.4.   **Governing Law.**   Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law

provision is provided, the laws of the District of Columbia shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.

12.5.    **Form of Payments**. Cash payments under the Plan shall be made, at the option, and in the sole discretion, of the Debtor, by wire, check, or such other method as the Debtor deems appropriate under the circumstances. Cash payments to foreign Creditors may be made, at the option, and in the sole discretion, of the Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. Pursuant to Section 8.3 of the Plan, Cash payments in the form of checks issued by the Debtor shall be null and void if not cashed within ninety (90) days of the date of the issuance thereof and deemed undeliverable Distributions. Following the expiration of ninety (90) days after issuance of such null and void checks, in accordance with Section 8.3 of the Plan, amounts in respect of these undeliverable Distributions shall escheat.

12.6.    **Fractional Distributions**. Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

12.7.    *De Minimis* **Distributions.** Notwithstanding anything to the contrary contained in the Plan, the Reorganized Debtor shall not be required to distribute, and shall not distribute, Cash or other Property to the Holder of any Allowed Claim if the amount of Cash or other Property to be distributed on account of such Claim is less than $100.00. Any Holder of an Allowed Claim on account of which the amount of Cash or other Property to be distributed is less than $100.00 shall be forever barred from asserting such Claim.

12.8.    **Timing of Distributions.**  Any Distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

12.9.    **Revocation or Withdrawal of Plan.**  The Plan Proponent reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order. If the Plan is withdrawn or revoked, then the result shall be the same as if the Confirmation Order had not been entered and the Effective Date had not occurred.  If the Plan is revoked or withdrawn prior to the entry of the Confirmation Order, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the such entity or any Person in any further proceedings involving such entity.

12.10.    **Nonmaterial Modifications.**  The Plan Proponent may, with the approval of the Bankruptcy Court and without notice to Holders of Claims and Equity Interests, correct any nonmaterial defect, omission, or inconsistency herein in such manner and to such extent as may be necessary or desirable.

12.11.    **Material Modifications.**  Modifications of the Plan may be proposed in writing by the Plan Proponents at any time prior to Confirmation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code, and the Plan Proponents shall have complied with Section 1125 of the Bankruptcy Code. The Plan may be modified at any

time after Confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under Section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.

12.12.  **Cramdown.**    This section shall constitute the Plan Proponent's request, if necessary, pursuant to Section 1129(b)(1) of the Bankruptcy Code, that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of Section 1129(a)(8) of the Bankruptcy Code may not be met.

12.13.  **No Recourse.**  No Person entitled to receive a payment or Distribution under the Plan will have any recourse against the Estate, the Debtor and its Professionals, other than the right to receive Distributions in accordance with the terms of the Plan.

12.14.  **Notices.**  Any notice required or permitted to be provided hereunder shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) prepaid overnight delivery service and addressed as follows:

> Maurice B. VerStandig, Esq.
> THE BELMONT FIRM
> 1050 Connecticut Avenue, NW
> Suite 500
> Washington, DC 20036
> *Counsel for the Substantively Consolidated Debtor*

12.15.  **Saturday, Sunday, or Legal Holiday.**  If any payment or act under the Plan should be required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next succeeding day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

12.16.  **Successors and Assigns.**  The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person.

12.17.  **Case Closure.** On the Effective Date, all cases of the substantively consolidated Debtor—except for *In re Banners of Abingdon, LLC, et al.*, Case Number 25-378-ELG and any then-pending adversary proceedings—that are pending in the Bankruptcy Court shall be deemed closed.

12.18.  **Entry of a Final Decree**.  The Reorganized Debtor may file a motion with the Bankruptcy Court to obtain the entry of a final decree upon completion of Plan payments.

*[Signature on Following Page]*

24

Respectfully submitted,

Dated: January 23, 2026                By: /s/ Maurice B. VerStandig
                                       Maurice B. VerStandig, Esq.
                                       Bar No. MD18071
                                       The Belmont Firm
                                       1050 Connecticut Avenue, NW
                                       Suite 500
                                       Washington, DC 20036
                                       Phone: (202) 991-1101
                                       Facsimile: (301) 444-4600
                                       mac@dcbankruptcy.com

                                       Christianna Cathcart, Esq.
                                       Bar No. ND0008
                                       The Belmont Firm
                                       1050 Connecticut Avenue, NW
                                       Suite 500
                                       Washington, DC 20036
                                       Phone: (202) 655-2066
                                       Facsimile: (301) 444-4600
                                       christianna@dcbankruptcy.com

                                       *Counsel for the Substantively
                                       Consolidated Debtor*