**AMENDED AND RESTATED
CREDIT AND SECURITY AGREEMENT**

among

LBPO Management LLC, a Maryland limited liability company

**("Borrower")**

and

Hallmark Marketing Company, LLC, a Kansas limited liability company

**("Lender").**

_____

**Dated as March [___], 2026**

## AMENDED AND RESTATED
## CREDIT AND SECURITY AGREEMENT

THIS **AMENDED AND RESTATED CREDIT AND SECURITY AGREEMENT** (this "Agreement"), is entered into as of March [___], 2026, by and between LBPO Management LLC, a Maryland limited liability company, as borrower and successor in interest to each other Debtor[1] in the Cases, as defined herein (the "Borrower") and Hallmark Marketing Company, LLC, a Kansas limited liability company ("Hallmark") and/or its affiliates, successors, and assigns (collectively, the "Lender").

## PRELIMINARY STATEMENTS

WHEREAS, Lender, Borrower, and the other Debtors are parties to that certain Senior Secured Superpriority Debtor in Possession Credit and Security Agreement dated November 25, 2025 (the "DIP Credit Agreement"), pursuant to which Lender made certain loans and agreed to extend certain financial accommodations to the Borrower and the other Debtors for the purpose of financing their business operations during the pendency of the Cases;

WHEREAS, the Debtors have filed their Disclosure Statement for Debtor's Plan of Reorganization Under Chapter 11 of The Bankruptcy Code (Doc. 157) (the "Disclosure Statement") and proposed Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (Doc. 158) (the "Proposed Plan"), pursuant to which the Debtors, by and through the Borrower as the Reorganized Debtor (as defined in the Proposed Plan), have proposed, among other things (a) to consolidate and restructure certain of their prepetition secured and unsecured indebtedness and other Administrative Claims allowed in the Cases (the "Claims"), (b) to continue to operate certain of the Hallmark branded retail stores operated by them during the pendency of the Cases, and (c) to repay allowed Administrative Claims in accordance with the terms of the final Plan of Reorganization approved by the Bankruptcy Court in the Cases;

WHEREAS, Hallmark holds an Allowed Superpriority Administrative Claim, which as of January 5, 2026, after deducting payments made by the Debtors pursuant to the Final Financing Order and the DIP Credit Agreement, remains outstanding in the amount of $6,948,973.85 plus

---

[1]    "Debtor" means each of the Debtors in the substantively consolidated chapter 11 Bankruptcy cases (the "Cases") jointly administered under *In re Banners of Abingdon, LLC, et al.* filed in the United States Bankruptcy Court for the District of Columbia as Case No. 25-378-ELG and include Banners of Abingdon, LLC; Banners of Reston, Inc.; Banner's of Dulles Town, Inc.; Banner's of Fair Oaks, LLC; Banner's Of Ashburn, LLC; Banner's of Gainesville, LLC; Banner's of Warrenton, LLC; Banner's of South Riding, LLC; Banner's of Stafford, LLC; Banner's of Oakton, LLC; Banner's of Bradlee Center, LLC; Banners of Fair Lakes, LLC; Banners of Woodbridge LLC; Banners of Williamsburg LLC; Banners of Newport News LLC; Banners of Commonwealth Midlothian LLC; Banners of Village Market Place Midlothian LLC; Banners of Fairfield Virginia Beach LLC; Banners of Hilltop Virginia Beach LLC; Banners of Central Park Fredericksburg LLC; Banners of Cosner's Corner Fredericksburg LLC; Banners of York River LLC; Banners of Lynchburg, LLC; Banners of Harrisonburg VA LLC; Banners of Winchester LLC; Banners of Christiansburg VA LLC; Banners of Chesapeake VA LLC; Banners of Columbus Village VA Beach LLC; Banner's of Burke, LLC; Banner's of Kamp Washington, LLC; Banners of Suffolk II LLC; Banners of Suffolk LLC; Banners of Henrico LLC; Banners Of Waynesboro LLC; Banners of Roanoke LLC; Banners of Rocky Mount VA, LLC; Banners of Manassas II LLC; Banners of Charlottesville LLC; Banners of Kingstowne LLC; Banners of Leesburg, LLC and LBPO Management, LLC.

additional cost, expenses and attorneys' fees incurred by Hallmark, <u>plus</u> the Exit Fee (collectively, the "<u>Allowed Hallmark Claim</u>");

WHEREAS, subject to entry of the Confirmation Order, the Lender, Borrower, and the other Debtors have agreed to terms for the repayment of the Allowed Hallmark Claim; and

WHEREAS, this Agreement amends and restates but is not a novation of the DIP Credit Agreement, and is being entered into by the Borrower and the Lender, along with the other Loan Documents described herein, to evidence and secure the Borrower's agreements, undertakings, and Obligations (as defined herein), including the repayment of the Allowed Hallmark Claim in accordance with the Plan of Reorganization.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby agree as follows:

Article I. DEFINITIONS AND CONSTRUCTION.

Section 1.01    <u>Definitions, Code Terms, Accounting Terms and Construction</u>. Capitalized terms used in this Agreement shall have the meanings specified therefor on Schedule 1.1(a). Matters of interpretation of accounting terms and construction are also set forth on Schedule 1.1(a).

Article II.        AMOUNT OF CREDIT AND TERMS OF PAYMENT.

Section 2.01    <u>The Loan</u>. Subject to the terms and conditions set forth herein, the Plan of Reorganization, and the Confirmation Order, Lender shall be deemed to have made, as of November 25, 2025, loans to the Borrower in the aggregate principal amount of $10,720,562 (the "<u>Original Credit Facility</u>"), which after deducting payments made by the Debtors pursuant to the Final Financing Order and the DIP Credit Agreement, is being refinanced hereby in the amount of $6,948,973.85 <u>plus</u> additional cost, expenses and attorneys' fees incurred by Hallmark, <u>plus</u> the Exit Fee (the "<u>Commitment</u>"), as of the Effective Date, subject to the satisfaction of the conditions set forth in Article III below. The final Commitment amount and Loan amount shall be calculated and deemed advanced upon entry of the Confirmation Order and shall be evidenced by the Note. Neither the borrowing by the Borrower of the Original Credit Facility nor the refinancing hereunder pursuant to the Commitment shall entitle the Borrower to receive any cash or other consideration from Lender; and, notwithstanding that no such cash is exchanged, the Borrower agrees that it shall owe and repay the aggregate Principal Balance (as defined herein) together with interest accruing thereon in accordance with the terms of this Agreement and the other Loan Documents, which amount is referred to sometimes herein as the Loan. Amounts deemed borrowed under this Section 2.01 and repaid, prepaid, or otherwise satisfied in accordance with this Agreement may not be reborrowed.

Section 2.02    <u>Reserved</u>.

Section 2.03    <u>Prepayments</u>.

(a)    <u>Voluntary Prepayments</u>. The Borrower may prepay the Obligations in whole or in part at any time without premium or penalty, upon prior written notice to the Lender.

(b)    <u>Mandatory Prepayments</u>.

(i) Without limiting any other provision herein, the Borrower shall prepay the Obligations, in full or in part, immediately (A) upon the occurrence of an Event of Default, (B) upon any sale or disposition of any Collateral other than dispositions in the ordinary course of Borrower's business, which shall be conducted in an orderly and prudent fashion as a going concern and not as a Liquidation, (C) upon receipt of the proceeds resulting of the incurrence of any Indebtedness by the Borrower other than Indebtedness incurred in the ordinary course of Borrower's business, Indebtedness incurred in accordance with the Plan of Reorganization, or Indebtedness otherwise approved by the Lender in its sole discretion, which shall include Permitted Indebtedness, (D) upon receipt of any insurance proceeds received by the Borrower from any casualty or other loss of any Collateral, and (E) upon receipt of any condemnation or similar proceeds received by the Borrower in respect of any Collateral (each, a "<u>Prepayment Event</u>").

(ii) If, at any time, any Borrower receives proceeds from a Prepayment Event, 100% of Net Proceeds received from such Prepayment Event shall be paid over to Lender on the date of receipt by Borrower and shall be utilized to prepay the Obligations, together with accrued interest thereon until paid in full. Lender shall not be required to release its Liens on any Collateral included in any Prepayment Event until all Net Proceeds have been actually received by Lender, unless otherwise agreed in writing with the Lender in advance.

(c)    All repayments or prepayments under this Section shall be made without premium or penalty.

(d)    All cash Proceeds of Collateral received by the Lender, shall be applied, to reduce the outstanding Obligations until such Obligations are paid in full.

Section 2.04    <u>Interest Rates: Rates, Payments, and Calculations</u>.

(a)    <u>Interest Rate</u>. Except as otherwise provided herein, all outstanding Obligations shall bear interest until paid in full (whether at stated maturity, on acceleration or otherwise) at a fixed rate of eleven percent (11.0%) per annum (the "Interest Rate").

(b)    <u>Default Rate</u>. Notwithstanding the foregoing, upon the occurrence and during the continuation of an Event of Default (following any applicable notice and cure periods) and continuing thereafter, all Obligations shall bear interest at a rate equal to the Interest Rate <u>plus</u> five percent (5.0%) (the "<u>Default Rate</u>"). Interest accrued in accordance with this Section 2.04(b) shall be payable from time to time on demand.

(c)    <u>Payment</u>.

(i)    In addition to the payments required under Section 2.03 and 2.04(c)(iii) below (but without duplication) Borrower shall make monthly payments to Lender (in arrears on the first day of each month) in the amounts indicated on Exhibit C to Borrower's confirmed Plan of Reorganization, which shall be attached as Exhibit B-1 to the Note attached to this Agreement (the "Payment Schedule"). The Payment Schedule shall not be modified without the express written consent of the Lender in its sole discretion.

(ii)    On the Maturity Date (as defined herein), the unpaid Principal Balance, together with all unpaid interest, capitalized fees (i.e., the Exit Fee), and all other costs, fees, expenses, indemnities, and other amounts due hereunder shall be due and payable in full (by wire transfer of immediately available funds) without demand by the Lender.

(iii)    In addition to, and without limiting the payments required under Section 2.03 or the foregoing clauses (i) and (ii): .

(A)    On December 24, or the first Business Day thereafter, of each calendar year during the term of this Agreement, the Borrower shall make a mandatory annual principal reduction payment on the Principal Balance, which shall be applied by the Lender to the then remaining unpaid Obligations as follows:

(I)    December 24, 2026: $1,200,000.00;

(II)    December 24, 2027: $1,800,000.00;

(III)    December 24, 2028: $1,200,000.00; and

(IV)    December 24, 2029: $1,000,000.00.

(iv)    All payments to be made by the Borrower shall be made without set off, recoupment or counterclaim. Except as otherwise expressly provided herein, all payments by the Borrower shall be made to the Lender, at the account designated by the Lender and shall be made in Dollars and in immediately available funds, no later than 12:00 p.m. (Central Time) on the date specified herein. Any payment received by the Lender after such time shall be deemed (for purposes of calculating interest only) to have been received on the following Business Day and any applicable interest shall continue to accrue.

(d)    Computation. All interest and fees chargeable under the Loan Documents shall be computed on the basis of a three hundred sixty (360) day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(e)    Maximum Lawful Rate. In no event shall the Interest Rate payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable; provided, however, that, anything contained herein to the

4

contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, as of the date of this Agreement, Borrower are and shall be liable only for the payment of such maximum amount as is allowed by law, and payment received from Borrower in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

Section 2.05    Reserved.

Section 2.06    Maintenance of Loan Account; Statements of Obligations. Lender shall maintain an account on its books in the name of Borrower (the "Loan Account") in which will be recorded all additions and subtractions to the Principal Balance, customary credits and debits, refunds, chargeback, fees, and other notations made by Lender to Borrower or for Borrower's account and all payments, accruals, or capitalization of Obligations hereunder or under the other Loan Documents, including without limitation accrued interest, premiums, fees and expenses, and Lender Expenses. The Loan Account will be credited with all payments received by the Lender from Borrower or for Borrower's account. Upon written request, no more frequently than quarterly, Lender will deliver to Borrower a statement of said account. All such statements delivered by Lender to the Borrower regarding the Loan Account, if any, including with respect to principal, interest, fees, premiums, and including an itemization of all charges and expenses constituting Lender Expenses owing, shall be subject to subsequent adjustment by Lender but shall, absent manifest error, be conclusively presumed to be correct and accurate and constitute an account stated between Borrower and Lender unless, within five (5) days after receipt thereof by Borrower, Borrower shall deliver to Lender written objection thereto describing the error or errors contained in any such statements, and Lender shall in Lender's sole discretion determine that such objection is valid and supported by written records provided to Lender by Borrower.

Section 2.07    Maturity Date. All outstanding Obligations shall be repaid in full on the earliest to occur of the following (such date being the "Maturity Date"): (i) April 1, 2030; or (ii) the date on which repayment of the Obligations is accelerated as the result of an Event of Default, following any notice or cure period, if applicable. All principal, accrued interests, and all other amounts outstanding hereunder shall be due and payable in full on the Maturity Date, without requirement for any further notice or demand to Borrower and without further order from the Bankruptcy Court.

Section 2.08    Priority; Liens. In accordance with the Plan of Reorganization, all of the Obligations shall be secured by Liens and Security Interests on the Collateral. All Liens shall secure the Obligations on a first priority basis, subject only to Permitted Liens having priority under applicable law or order, or pursuant to the Plan of Reorganization. No other Liens or Claims having a priority superior or pari passu to that granted to or on behalf of the Lender hereunder shall be granted or approved while any of the Obligations remain outstanding.

Section 2.09    Extent of The Borrower's Liability, Contribution.

(a)    The Borrower agrees that it is liable for, and absolutely and unconditionally guarantees to the Lender the prompt payment and performance of, all Obligations, and that such Obligations are absolute and unconditional, irrespective of (i) the genuineness,

5

validity, regularity, enforceability, subordination or any future modification of, or change in, any Obligations or Loan Document, or any other document, instrument or agreement to which the Borrower is or may become a party or be bound; (ii) the absence of any action to enforce this Agreement (including this Section) or any other Loan Document, or any waiver, consent or indulgence of any kind by the Lender with respect thereto; (iii) the existence, value or condition of, or failure to perfect any of the Lender's Liens or to preserve rights against, any security or guaranty for the Obligations or any action, or the absence of any action, by the Lender in respect thereof (including the release of any security or guaranty); (iv) the insolvency of the Borrower; (v) any election by Lender in an Insolvency Proceeding for the application of Section 1111(b)(2) of the Bankruptcy Code; (vi) any borrowing or grant of a Lien by Borrower, as debtor-in-possession under Section 364 of the Bankruptcy Code or otherwise; (vii) the disallowance of any claims of Lender against the Borrower for the repayment of any Obligations under Section 502 of the Bankruptcy Code or otherwise; or (viii) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except cash payment in full of all Obligations.

(b)     The Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Person with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Lender with respect to any of the Obligations or any Collateral security therefor until such time as all of the Obligations have been paid in full in cash. Any claim which the Borrower may have against any other Person with respect to any payments to the Lender hereunder are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

Article III.     SECURITY INTEREST.

Section 3.01     <u>Grant of Security Interest</u>. The Borrower hereby unconditionally grants, assigns, and pledges to the Lender, as security for the payment and performance of the Obligations, a continuing security interest (hereinafter referred to as the "<u>Security Interest</u>") in all of Borrower's right, title, and interest in and to the Collateral. The Security Interest created hereby secures the payment and performance of the Obligations, whether now existing or arising hereafter. Without limiting the generality of the foregoing, this Agreement secures the payment of all amounts which constitute part of the Obligations.

Section 3.02     <u>Borrower Remains Liable</u>. Anything herein to the contrary notwithstanding, (a) the Borrower shall remain liable under the contracts and agreements included as Collateral to perform all of the duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by Lender of any of the rights hereunder shall not release the Borrower from any of its duties or obligations under such contracts and agreements included in the Collateral, and (c) Lender shall not have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of the Borrower thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

Section 3.03    Assignment of Insurance. As additional security for the Obligations, the Borrower hereby assigns to Lender, all rights of Borrower under every policy of insurance covering the Collateral and all other assets and property of the Borrower and all business records and other documents relating to it, and all monies (including proceeds and refunds) that may be payable under any policy, and the Borrower hereby directs the issuer of each policy to pay all such monies directly and solely to Lender. Subject to the approval of the Plan of Reorganization if applicable, at any time, whether or not a Default or Event of Default shall have occurred, Lender may (but need not), in the Borrower's name, execute and deliver proofs of claim, receive payment of proceeds and endorse checks and other instruments representing payment of the policy of insurance, and adjust, litigate, compromise or release claims against the issuer of any policy. Any monies received under any insurance policy assigned to Lender, other than liability insurance policies, or received as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid to Lender to be applied to prepayment of the Obligations or disbursed to Borrower under payment terms reasonably satisfactory to the Lender for application to the cost of repairs, replacements, or restorations of the affected Collateral which shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed.

Section 3.04    Financing Statements. Subject to the approval and confirmation of the Plan of Reorganization, the Borrower authorizes Lender to file financing statements describing Collateral to perfect Lender's Security Interest in the Collateral, naming the Borrower (as such term is defined herein) as a debtor and Lender as Secured Party. Any financing statements filed before the date of this Agreement to perfect the Security Interest are authorized by Borrower and are hereby ratified in all respects. Without limiting the foregoing, Lender may take any other action Lender deems necessary or advisable to perfect, preserve, ratify, or enforce its Security Interests and Liens in the Collateral.

Section 3.05    Certain Bankruptcy Matters.

(a)    the parties hereto agree that the Lender may prepare, file, register or publish any financing statements, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or take possession of any Collateral or take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the Confirmation Order or any other Loan Document, including without limitation filing financing statements naming any other Debtor as a debtor and Lender as a Secured Party. If the Lender (in its sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, account control agreements, notices of Lien or similar instruments, takes possession of any Collateral, or takes any other action to validate, render enforceable or perfect all or any portion of the Lender's Liens on the Collateral, (i) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Confirmation Order is entered, and (ii) shall not negate or impair the validity or effectiveness of this Section or of the perfection of any other Liens in favor of the Lender on the Collateral, including without limitation any such Liens provided for in the DIP Orders and/or the Confirmation Order;

(b)     except as otherwise agreed to by the Lender, the Liens, Lien priorities, Allowed Hallmark Claim and other rights and remedies granted to Lender pursuant to this Agreement, the DIP Orders, the Plan of Reorganization, the Confirmation Order, or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrower or any other Debtor (including any other Indebtedness allowed under the Plan of Reorganization), or by dismissal or conversion of the Cases, or by any other act or omission whatsoever;

(c)     without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act, or omission:

(i)     subject only to the Plan of Reorganization, no costs or expenses of administration which have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of Lender against Borrower in respect of any Obligations;

(ii)     other than as provided in the Confirmation Order or the Loan Documents, Lender's Liens on the Collateral shall constitute valid, enforceable, and perfected Liens, and, except with respect to the Permitted Liens, shall be prior to all other Liens now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)     the Confirmation Order shall provide, that the Lender's Liens on the Collateral securing the Obligation shall continue to be valid, enforceable and perfected without the need for the Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Lender's Liens under applicable non-bankruptcy law.

Article IV.     CONDITIONS.

Section 4.01   <u>Conditions Precedent to Effectiveness of this Agreement</u>. The obligation of the Lender to extend the Loan to the Borrower hereunder is subject to the conditions precedent that Lender shall have received all of the following, each duly executed and dated the Effective Date (or such earlier date as shall be satisfactory to Lender), in form and substance satisfactory to Lender:

(a)     A Final Order confirming the Plan of Reorganization;

(b)     This Agreement and each other Loan Document duly executed by each counterparty thereto;

(c)     Amended and Restated Hallmark Account Agreement(s) duly executed by Borrower, pursuant to which Borrower has, among other things, assumed the obligations

of each Debtor party to any prepetition Hallmark Account Agreements and contain such other changes as are reasonably acceptable to the Lender;

(d)    Amended and Restated Gold Crown Sublicence Agreement(s), duly executed by Borrower, pursuant to which Borrower has, among other things, assumed the obligations of each Debtor party to any prepetition Gold Crown Sublicence Agreement(s) and contain such other changes as are reasonably acceptable to the Lender;

(e)    Amended and Restated Guaranty Agreements duly executed by each of A&S Inc., Michael Postal, and Leonard Banner, pursuant to which each has unconditionally, irrevocably, and jointly and severally guaranteed the payment and performance of the Obligations;

(f)    Any other documents, instruments, or agreements reasonably requested by the Lender in its reasonable discretion to evidence, secure, perfect or preserve the rights, titles and interests of the Lender evidenced by this Agreement, the Plan of Reorganization, and any other Final Order entered in the Cases.

(g)    All reporting, certificates, budgets, and other information required to be provided to the Lender under Sections 6.01 and 6.02 and/or set forth in Schedules 6.01 and 6.02.

## Article V.    REPRESENTATIONS AND WARRANTIES.

Section 5.01    To induce Lender to enter into this Agreement, the Borrower makes the representations and warranties to Lender set forth on <u>Exhibit C</u>. Each of such representations and warranties shall be true, correct, and complete, in all material respects (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Effective Date, and such representations and warranties shall survive the execution and delivery of this Agreement.

## Article VI.    AFFIRMATIVE COVENANTS.

The Borrower covenants and agrees that, until termination of this Agreement and payment in full of the Obligations, the Borrower shall comply with each of the following:

Section 6.01    <u>Financial Statements, Reports, Etc.</u>

(a)    Deliver to Lender copies of each of the financial statements, reports, and other items set forth on Schedule 6.01 no later than the times specified therein; and

(b)    upon the reasonable request of the Lender, any other information regarding the operation of the Borrower's business including without limitation inventory levels (as supplied by Lender and any other vendor) financial performance, expenses, lease payments, and negotiations with landlords and vendors.

Section 6.02    <u>Collateral Reporting; Lender Calls.</u>

Case 25-00378-ELG    Doc 183-2    Filed 03/01/26    Entered 03/01/26 23:40:41    Desc
Exhibit B - Amended and Restated Credit and Security Agreement    Page 11 of 66

(a)    Provide Lender with each of the reports set forth on Schedule 6.02 at the times specified therein.

(b)    Borrower shall participate in conference calls with the Lender on a quarterly basis, or more frequently if Lender reasonably requests, until the Maturity Date. During such conference calls Michael Postal shall provide Lender with a reasonably comprehensive update relating to the business, condition (financial or otherwise), operation, performance, properties or prospects of the Borrower and any other information that may be reasonably requested by Lender (including, without limitation, in respect of any Permitted Disposition).

Section 6.03    Existence. Except as otherwise permitted herein or set forth in the Plan of Reorganization, at all times maintain and preserve in full force and effect (a) its existence (including being in good standing in its jurisdiction of organization) and (b) all rights and franchises, licenses and permits material to its business; provided, however, that, Borrower shall not be required to preserve any such right or franchise, licenses or permits if the Lender, upon request and approval of the Lender, shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower, and that the loss thereof is not disadvantageous in any material respect to the Lender. The foregoing notwithstanding, Lender expressly agrees that a cessation of existence by virtue of reorganization or merger, as approved by the Bankruptcy Court (through the Plan of Reorganization or otherwise), shall not constitute a breach hereof.

Section 6.04    Maintenance of Properties. Maintain and preserve all of its assets that are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear, tear and casualty excepted and Permitted Dispositions excepted (and except where the failure to so maintain and preserve such assets could not reasonably be expected to result in a Material Adverse Change), and, to the extent required under the Bankruptcy Code or Plan of Reorganization, comply with the material provisions of all material leases to which it is a party as lessee, so as to prevent the loss or forfeiture thereof, unless such provisions are the subject of a Permitted Protest.

Section 6.05    Taxes; Other Obligations.

(a)    Cause all assessments and taxes imposed, levied, or assessed against the Borrower, or any of their respective assets or in respect of any of its income, businesses, or franchises to be paid in full, before delinquency or before the expiration of any extension period, except to the extent that the validity of such assessment or tax shall be the subject of a Permitted Protest and so long as, in the case of an assessment or tax that has or may become a Lien against any of the Collateral, (i) such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such assessment or tax, and (ii) any such other Lien is at all times subordinate to Lender's Liens.

(b)    The Borrower will make timely payment or deposit of all tax payments and withholding taxes required of it by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will,

upon request, furnish Lender with proof reasonably satisfactory to the Lender indicating that Borrower has made such payments or deposits.

(c)     Pay and discharge as the same shall become due and payable following the Effective Date, all its obligations and liabilities, including (i) all lawful claims (including, without limitation, claims of landlords and warehousemen) which, if unpaid, would by law become a Lien upon its property or any Collateral; and (ii) unless consented to in advance in writing by the Lender, set forth in the Plan of Reorganization, all Indebtedness (or tax obligation), as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness (or tax obligation), except, in each case, where the validity of such obligation or liability shall be the subject of a Permitted Protest and so long as, in the case of an obligation or liability that has or may become a Lien against any of the Collateral, (x) such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such assessment or tax, (y) any such other Lien is at all times subordinate to Lender's Liens and (z) the failure to make payment pending such Permitted Protest could not reasonably be expected to result in a Material Adverse Change.

(d)     For the avoidance of ambiguity, this Section 6.05 shall not apply to assessments and taxes imposed, levied, or assessed against the Borrower prior to the Petition Date.

Section 6.06    Insurance. At Borrower's expense, maintain insurance respecting each of the Collateral and all of Borrower's other assets wherever located, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses in the same or similar geographic locales. All such policies of insurance shall be with responsible and reputable insurance companies acceptable to Lender and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy, and scope reasonably satisfactory to the Lender. All property insurance policies covering the Collateral are to be made payable to Lender, as its interests may appear, in case of loss, pursuant to a lender loss payable endorsement reasonably acceptable to Lender and are to contain such other provisions as Lender may reasonably require to fully protect the Lender's interest in the Collateral and to any payments to be made under such policies. All certificates of property and general liability insurance shall be delivered to Lender, with the lender loss payable endorsement (but only in respect of Collateral) and additional insured endorsements (with respect to general liability coverage) in favor of Lender, and shall provide for not less than thirty (30) days (ten (10) days in the case of nonpayment) prior written notice to Lender of the exercise of any right of cancellation. If Borrower fails to maintain such insurance, Lender may arrange for such insurance, but at Borrower's expense and without any responsibility on Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Borrower shall give Lender prompt notice of any loss exceeding $25,000 covered by its casualty or business interruption insurance. Upon the occurrence of an Event of Default, Lender shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases,

assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

Section 6.07    Inspections, Exams, Audits and Appraisals. Permit Lender and its duly authorized representatives or professionals to visit any of Borrower's properties and inspect any Collateral, assets, and books and records, to conduct inspections, exams, audits, appraisals and valuations of the Collateral, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as Lender may designate and, so long as no Default or Event of Default exists, with reasonable prior notice to Borrower. The Borrower shall pay the fees and expenses of the Lender and any such representatives or professionals engaged by Lender with respect to the foregoing, including, without limitation, such appraisals and commercial finance examinations as Lender may determine advisable, in its exclusive discretion.

Section 6.08    Account Verification. Permit Lender, in Lender's name or in the name of a nominee of Lender or, to verify the validity, amount or any other matter relating to any Account (as such term is defined in the Code), by mail, telephone, facsimile transmission or otherwise. Further, at the request of Lender, Borrower shall send requests for verification of Accounts, to the extent such Accounts are Collateral, or send notices of assignment of such Accounts to Account Debtors and other obligors.

Section 6.09    Compliance with Laws. Comply with the requirements of all applicable laws, rules, regulations, licenses, approvals, orders and permits applicable to it and duly observe all requirements of any foreign, federal, state or local Governmental Authority, except where (i) the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change, or (ii) the non-compliance with which is otherwise permitted under the Bankruptcy Code or the Plan of Reorganization.

Section 6.10    Disclosure Updates.

(a)    Promptly and in no event later than five (5) Business Days after obtaining knowledge thereof or after the occurrence thereof, whichever is earlier, notify Lender:

(i)    if any written information, exhibit, or report furnished to Lender contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made. Any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto;

(ii)    of all actions, suits, or proceedings brought by or against the Borrower before any court or Governmental Authority which reasonably could be expected to result in a Material Adverse Change, excluding notices in the Cases to the extent delivered in the ordinary course of the Cases; provided, that in any event, such notification shall not be later than five (5) days after service of process with respect thereto on the Borrower; and provided that such notice shall not apply to any notice

12

delivered in Cases delivered in the ordinary course thereof and further provided that such obligation shall not apply to notices served upon Lender (whether directly or through counsel) at a time substantially contemporaneous with their service upon the Borrower;

(iii)    of any material loss or damage to any Collateral or any substantial adverse change in the Collateral, the ordinary sale and disposition of Collateral being expressly excepted; and

(iv)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Change.

(b)    Immediately upon obtaining knowledge thereof or after the occurrence thereof, notify Lender of any event or condition which constitutes a Default or an Event of Default and provide a statement of the action that Borrower proposes to take with respect to such Default or Event of Default.

(c)    Upon request of Lender, the Borrower shall deliver to Lender all materials, reports, records, or information reasonably requested relating to the operations, business affairs, financial condition of the Borrower or the Collateral.

Section 6.11    Collateral Covenants.

(a)    Reserved.

(b)    Reserved.

(c)    Material Contracts. Provide Lender with copies of (a) each Material Contract, and (b) each material amendment or modification of any Material Contract, whether now existing or hereafter arising. Borrower shall maintain all Material Contracts in full force and effect and shall not default in the payment or performance of any obligations thereunder.

(d)    Location of Goods, Inventory, other Collateral and Books; Maintenance of Books and Records. Keep all Collateral and Books and Records only at the locations identified on Schedules 5.5(b) and 5.22 to the Information Certificate and keep its chief executive office only at the locations identified on Schedule 5.5(b) to the Information Certificate; provided, however, that Borrower may amend such Schedules so long as such amendment occurs by written notice to Lender not less than ten (10) days prior to the date on which such Collateral or Books or Records are moved to a new location. Maintain proper records and accounts, in which full, true, and correct entries shall be made of all financial transactions and matters involving the Collateral and business of the Borrower; and maintain such Books and Records in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrower.

Section 6.12    Further Assurances. At any time upon the reasonable request of Lender, execute or deliver to Lender any and all financing statements, Collateral Access Agreements, fixture filings, security agreements, pledges, assignments, endorsements of certificates of title,

collateral reviews, and all other documents that Lender may reasonably request and in form and substance reasonably satisfactory to the Lender, to create, perfect, and continue perfection or to better perfect Lender's Liens in all of the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents. The Borrower acknowledges that it is authorized to file, or authorize the filing of, any financing statement or amendment or termination statement with respect to any financing statement filed in connection with this Agreement, subject to Borrower's rights under Section 9-509(d)(2) of the Code.

## Article VII.    NEGATIVE COVENANTS.

The Borrower covenants and agrees that, until termination of this Agreement and payment in full of the Obligations, the Borrower will not do any of the following:

Section 7.01    <u>Indebtedness</u>. Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

Section 7.02    <u>Liens</u>. Create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any Collateral or any other assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

Section 7.03    <u>Restrictions on Fundamental Changes</u>.

(a)    Except as set forth in the Plan of Reorganization, subject to the Lender's approval in its reasonable discretion, enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its equity interests or stock, except for any merger or consolidation between Borrower; provided that a Borrower must be the surviving entity of any such merger to which it is a party;

(b)    Suspend or cease operation of a substantial portion of its business, except as permitted hereunder or under the Plan of Reorganization or in connection with the transactions permitted hereunder; or

(c)    Form or acquire any direct or indirect Subsidiary.

Section 7.04    <u>Disposal of Assets</u>. Other than Permitted Dispositions (including without limitation the sale of Inventory in the ordinary course of Borrower' business, or transactions expressly permitted hereunder), sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any security interest, lien, option, or other encumbrance on or with respect to, any of the Collateral. The Lender shall not be deemed to have consented to any sale or other disposition of any of the Collateral or any other asset except as expressly permitted in this Agreement or the other Loan Documents.

Section 7.05    <u>Change Name</u>. Change its name, organizational identification number, state of organization, organizational identity, or "location" for purposes of Section 9-307 of the Code, except as permitted by the Plan of Reorganization or other order approved in the Cases.

14

Section 7.06    Nature of Business. Make any change in the nature of its business as conducted on the date of this Agreement or acquire any properties or assets that are not reasonably related to the conduct of such business activities.

Section 7.07    Prepayments and Amendments.

(a)    Except in connection with Refinancing Indebtedness:

(i)    pay, redeem, defease, purchase, or otherwise acquire any Indebtedness, other than (A) the Obligations under the Loan Documents; and (B) the Permitted Indebtedness, or

(ii)    make any payment on account of Indebtedness that has been contractually subordinated in right of payment to the Obligations if such payment is not permitted at such time under the subordination terms and conditions or otherwise permitted through a Plan of Reorganization, subject to the Lender's reasonable consent, or

(b)    Directly or indirectly, amend, modify, or change (or permit the amendment, modification or change of) any of the terms or provisions of:

(i)    any agreement, instrument, document, indenture, or other writing evidencing or concerning Permitted Indebtedness, other than the Obligations in accordance with this Agreement, and Borrower shall furnish to Lender all notices or demands in connection with such Permitted Indebtedness either received by the Borrower or on its behalf, promptly after the receipt thereof, or sent by the Borrower or on its behalf, concurrently with the sending thereof, as the case may be; or

(ii)    any Material Contract except to the extent that such amendment, modification, or change could not, individually or in the aggregate, reasonably be expected to be materially adverse to the interests of Lender.

Section 7.08    Change of Control. Except as set forth in a Plan of Reorganization subject to the Lender's approval in its reasonable discretion, cause, permit, or suffer, directly or indirectly, any Change of Control unless the Lender shall have provided its prior written consent.

Section 7.09    Accounting Methods; Inventory Reporting. Modify or change its fiscal year or its method of accounting. Modify or change its standard cost of reporting of inventory unless Lender has provided its prior written consent.

Section 7.10    Investments. Except for Permitted Investments, directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment.

Section 7.11    Transactions with Affiliates. Directly or indirectly enter into or permit to exist any transaction between the Borrower with any Affiliate of the Borrower, except where such transactions (i) are fully disclosed to Lender prior to the consummation thereof, if they involve one or more payments in excess of $5,000 for any single transaction or series of related

15

transactions, and (ii) are no less favorable, taken as a whole, to the Borrower, as applicable, than would be obtained in an arm's length transaction with a non-Affiliate.

Section 7.12    Use of Proceeds. Use proceeds of the Loan for purposes other than those set forth in the Plan of Reorganization and the DIP Credit Agreement, including for general corporate and working capital purposes of the Borrower for its lawful and permitted purposes in accordance therewith.

Section 7.13    Limitation on Issuance of Stock. Except as set forth in a Plan of Reorganization, issue or sell or enter into any agreement or arrangement for the issuance and sale of any of its equity interests.

Section 7.14    Collateral with Bailees. Store any inventory, equipment or other tangible property which is part of the Collateral at any time now or hereafter with a bailee, warehouseman, or similar party, except as set forth on Schedule 5.22 to the Information Certificate.

Section 7.15    Bankruptcy Related Negative Covenants. Except as permitted in the Plan of Reorganization and/or the Confirmation Order, seek, consent to, or permit to exist any of the following:

(i)    Any order which authorizes the rejection or assumption of any leases (for any real or personal property) of the Borrower without the Lender's prior consent, whose consent shall not be unreasonably withheld;

(ii)    Any modification, stay, vacation or amendment to the DIP Orders or any other order entered in the Cases to which the Lender has not consented in writing;

(iii)    A priority claim or administrative expense or unsecured claim against the Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Lender in respect of any of the Obligations, except with respect to the Professional Fee Carve Out;

(iv)    Any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, other than with respect to (i) [reserved], (ii) Permitted Liens having priority by operation of applicable law or court order, or (iii) the Liens otherwise consented to by Lender in its sole discretion;

(v)    Any order which authorizes the return of any of the Borrower's property pursuant to Section 546(h) of the Bankruptcy Code;

(vi)    Any order which authorizes the payment of any Indebtedness (other than the Obligations, Indebtedness reflected in the Plan of Reorganization, and other Indebtedness approved by the Lender); or

16

(vii)    Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any other Loan Documents.

Article VIII.    EVENTS OF DEFAULT.

The occurrence of any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement and each other Loan Document:

Section 8.01    Payment. The Borrower fails to pay when due and payable, or when declared due and payable, and such failure continues for a period of five (5) days after written notice thereof is given to Borrower by the Lender, all or any portion of the Obligations consisting of principal, interest, fees, charges, premiums or other amounts due the Lender hereunder;

Section 8.02    Covenants.

(a)    The Borrower fails to perform or observe any covenant or other agreement contained in Sections 6.01 or 6.02, and such failure continues for a period of ten (10) days after the date on which written notice thereof is given to Borrower by the Lender; or

(b)    The Borrower fails to perform or observe any other covenant or other agreement contained in this Agreement not covered by Section 8.02(a), or in any of the other Loan Documents, in each case, other than any such covenant or agreement that is unable to be cured or is the subject of another provision of this Section 8 (in which event such other provision of this Section 8 shall govern), and (y) such failure continues for a period of five (5) days after the earlier of (i) the date on which such failure shall first become known to or should have been known by any officer of the Borrower or (ii) the date on which written notice thereof is given to the Borrower by the Lender;

(c)    The Borrower fails to perform or any default or event of default (however defined) occurs under any Hallmark Agreement, including without limitation the failure by Borrower to maintain or adhere to the Minimum Inventory Requirements and such failure continues for a period of five (5) days after the date on which written notice thereof is given to the Borrower by the Lender;

(d)    Except as set forth in a Plan of Reorganization, subject to the Lender's approval in its reasonable discretion, the Borrower shall dissolve, wind up or cease doing business, *except* it is expressly recognized that the entry of the order granting substantive consolidation in the Cases shall not constitute a breach of this covenant;

(e)    Any provision of this Agreement or any provision of any other Loan Document (including without limitation each Guaranty) shall for any reason cease to be valid and binding on the Borrower, any Guarantor, or any other party thereto or any such Person shall so state in writing;

(f)    Any Change of Control shall occur; or

17

(g)    Any (i) individual Guarantor shall die or, if applicable, resign, be terminated, or otherwise cease to devote substantially all of his business time and attention to conducting the business of the Borrower, and said Guarantor—within 180 days of the receipt of notice to Borrower from Lender—shall not have his guaranty replaced by a new guaranty from an individual, entity or other Person, whose creditworthiness shall conform to Lender's then-existing applicable guidelines and who shall be reasonably acceptable to Lender in its reasonable commercial discretion; or (ii) entity Guarantor shall dissolve, wind up or cease doing business.

Section 8.03    If after the Effective Date, there is entered or filed against the Borrower, or with respect to any of its assets (a) one or more judgments, orders, or awards for the payment of money in an amount in excess of $50,000 in any one case or in excess of $100,000 in the aggregate (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage), or (b) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Change; and, with respect to any of the events described in the foregoing clauses (a) or (b), either (i) there is a period of ten (10) consecutive days at any time after the entry of any such judgment, order, or award during which (A) the same is not discharged, satisfied, vacated, or bonded pending appeal, or (B) a stay of enforcement thereof is not in effect, or (ii) enforcement proceedings are commenced upon such judgment, order, or award; except this Section 8.03 shall not apply to claims allowed by the Bankruptcy Court (including, but not limited to, administrative claims);

Section 8.04    If (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of the Borrower under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $25,000 or which would reasonably likely result in a Material Adverse Change, or (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $50,000 or which could reasonably likely result in a Material Adverse Change;

Section 8.05    If there occurs any uninsured loss to any material portion of the Collateral;

Section 8.06    If the Borrower is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs;

Section 8.07    If, except as a result of the commencement of the Cases or unless payment is stayed by the Bankruptcy Court, there is a default under one or more agreements to which a Borrower is a party with one or more third Persons relative to a Borrower's Indebtedness involving an aggregate amount of $10,000 or more, and such default (i) occurs at the final maturity of the obligations thereunder, or (ii) results in a right by such third Person, irrespective of whether exercised, to accelerate the maturity of Borrower's obligations thereunder; except this Section 8.07 shall not apply to obligations stemming from the rejection of any lease, provided such rejection be in accord with the provisions of this Agreement and the Plan of Reorganization;

Section 8.08    If any warranty, representation, certificate, statement, or Record made herein or in any other Loan Document or delivered in writing to the Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

Section 8.09    If this Agreement or any other Loan Document shall for any reason fail or cease to create a valid and perfected first priority Lien on any Collateral, except as a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement;

Section 8.10    If there occurs any Material Adverse Change;

Section 8.11    If any event or circumstance shall occur which, in the Permitted Discretion of the Lender exercised in good faith, would be reasonably likely to cause the Lender to suspect that the Borrower has engaged in fraudulent activity with respect to any Collateral or other matters relating to the operation of its business or its performance of its Obligations hereunder or under any Hallmark Agreement;

Section 8.12    Unless otherwise waived by Lender, if any director or officer of a Borrower is convicted of a felony offense under state or federal law, or a Borrower hires an officer or appoints a director who has been convicted of any such felony offense within the preceding seven (7) years, or such Person becomes an owner of any of the issued and outstanding ownership interests of a Borrower;

Section 8.13    If the validity or enforceability of any provision of any Loan Document (including, without limitation, any DIP Order) shall at any time for any reason be declared to be null and void, or a proceeding shall be commenced by a Borrower, or by any Governmental Authority having jurisdiction over a Borrower, seeking to establish the invalidity or unenforceability thereof, or a Borrower shall deny that Borrower has any liability or obligation purported to be created under any Loan Document (including, without limitation, any DIP Order);

Section 8.14    If there occurs either (i) the appointment in the Cases of a trustee, any examiner having expanded powers to operate all or any part of the Borrower's business, or similar insolvency official or administrator, or (ii) the conversion of the Cases to a case under chapter 7 of the Bankruptcy Code;

Section 8.15    Without the prior written consent of the Lender, if there is entered any order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code which permits any creditor to (a) realize upon, or to exercise any right or remedy with respect to any Collateral, to the extent such realization or exercise of rights or remedies would be reasonably likely to have a Material Adverse Change, or (b) to terminate any lease, license, franchise, or similar agreement, where such termination would reasonably be likely to have a Material Adverse Change;

Section 8.16    If there occurs the payment or other discharge by the Borrower of any pre-petition Indebtedness, except as expressly permitted under the Plan of Reorganization;

19

Section 8.17    If there occurs failure of the Borrower to comply with each and all of the terms and conditions of this Agreement, the Plan of Reorganization or any agreement or undertaking executed in connection therewith with any creditor or other Person, and such failure continues for a period of five (5) days after the date on which written notice thereof is given to Borrower by the Lender; or

Section 8.18    If (i) there occurs the filing of any pleading or order by the Borrower challenging the validity, priority, perfection, or enforceability of this Agreement, any Obligations, or any Lien granted pursuant to this Agreement, or (ii) the validity, priority, perfection, or enforceability of this Agreement, any Obligations, or any Lien granted pursuant to this Agreement is determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Cases; or

Section 8.19    If Borrower fails to timely deliver any financial statements, reports, or other items specified in Schedule 6.01 or Schedule 6.02, and such failure continues for a period of ten (10) days after the date on which written notice thereof is given to Borrower by the Lender; or

Section 8.20    Without limiting any other provision herein, except as set forth in the Plan of Reorganization, if Borrower shall fail to timely pay any landlord under any real property lease where it conducts its business as of the Effective Date, which failure shall continue beyond any applicable notice and cure period specified in the applicable lease (as may be modified by the Plan of Reorganization). Borrower hereby consents and expressly grants Lender permission from time to time during the term of this Agreement, to communicate directly with each such landlord regarding Borrower's payments under and compliance with such leases. Lender may share this provision with such landlords, who shall be entitled to rely on this provision regarding Borrower's consent.

Article IX.    REMEDIES.

Section 9.01    Except as otherwise provided herein, and subject to the provisions of the Plan of Reorganization, if any Event of Default has occurred and is continuing, Lender may without further notice or demand on Borrower: (a) Reserved; (b) notwithstanding the provisions of Section 362 of the Bankruptcy Code or other applicable law, without any application, motion or notice to, or order from, the Bankruptcy Court, increase the rate of interest applicable to the Principal Balance to the Default Rate (c) declare all or any portion of the Obligations, including all or any portion of any Obligations to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower, (d) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all rights, remedies and powers provided under the Bankruptcy Code, the Code and other applicable law, (e) take immediate possession and control of all Collateral, operate or permit a designated third party to operate any Borrower store under one or more transition services agreements between Borrower (or custodian or receiver appointed for the Borrower or the Borrower's property) and Lender, or such other Persons as Lender may from time to time deem necessary to carry out the forgoing, in each instance acceptable to the Lender in its sole discretion, to provide for the orderly operation and sale of Borrower's business and any Collateral, and (f) transfer, sell or otherwise dispose of the Collateral by the Lender to itself or its assignees,

designees, affiliates, receivers, liquidators and/or third parties, and such other terms as the Lender may require.

Section 9.02    No course of dealing and no delay or failure of the Lender in exercising any right, power, remedy or privilege under this Agreement or any other Loan Document shall affect any other or future exercise thereof or operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any further exercise thereof or of any other right, power, remedy or privilege or shall be construed to be a waiver of any Event of Default. The enumeration of the rights and remedies of the Lender specified in this Agreement is not intended to be exhaustive and the exercise by the Lender of any right or remedy shall not preclude the exercise of any other rights or remedies, all of which shall be cumulative, and shall be in addition to any other right or remedy given hereunder or under the other Loan Documents or that may now or hereafter exist at law or in equity or by suit or otherwise.

Article X.        WAIVERS; INDEMNIFICATION; RELEASE.

Section 10.01  Demand; Protest; Etc. The Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Lender on which the Borrower may in any way be liable.

Section 10.02  The Lender's Liability for Collateral. The Borrower hereby agrees that: (a) so long as Lender complies with its obligations, if any, under the Code, Lender shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by the Borrower.

Section 10.03  Indemnification. The Borrower shall pay, indemnify, defend, and hold the Lender and its Related Persons and the permitted successors and assigns of the foregoing (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery, enforcement, performance, or administration (including any restructuring, forbearance or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of the Borrower's compliance with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, (c) in connection with the custody, preservation, use or operation of, or, upon an Event of Default, the sale of, collection from, or other realization upon, any of the Collateral in accordance with this Agreement and the other Loan Documents, (d) with

21

respect to the failure by the Borrower to perform or observe any of the provisions hereof or any other Loan Document, and (e) in connection with the exercise or enforcement of any of the rights of Lender hereunder or under any other Loan Document (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, no Borrower shall have any obligation to any Indemnified Person under this Section 10.03 with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person or its officers, directors, employees, or attorneys. This provision shall survive the termination of this Agreement, the repayment of the Obligations and the termination of the Commitment. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which a Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrower with respect thereto.

Section 10.04 Release. Effective upon entry of the Confirmation Order, the Borrower for itself and on behalf of each of the Debtors and the Debtors' estates (collectively as used in this Section "Debtors"), on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally, and irrevocably releases and forever discharges and acquits Lender, its affiliates and each of its respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, solely in their capacities as such (collectively, the "Released Parties"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action arising prior to the Effective Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract tort or under any state or federal law or otherwise, arising out of or related to the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Credit Agreement, the other DIP Loan Documents, the Prepetition Obligations, the Prepetition Liens, the Hallmark Account Agreements, the Gold Crown Sublicence Agreements, any other agreements between the Debtors and the Lender, the obligations owing and the financial obligations made thereunder, the negotiation of any of the foregoing and the deal reflected thereby, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause, or thing whatsoever arising at any time on or prior to the date of the Confirmation Order. Certain defined terms used in this Section to the extent not otherwise defined in this Agreement shall have the meanings given to them in the DIP Credit Agreement. For the avoidance of ambiguity, licensees of the Lender shall not be deemed "Released Parties."

Article XI.    NOTICES.

Section 11.01 Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by certified mail (postage prepaid, return receipt

requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or telefacsimile. In the case of notices or demands to Borrower or Lender, as the case may be, they shall be sent to the respective address set forth below:

If to the Borrower:

LBPO Management LLC
Attn: Michael Postal
1801 16th Street, Northwest
Unit 606
Washington, DC 20009
Email: mikepostal@tenacitygroup.com

with courtesy copies to (which shall not constitute Notice for purposes of this Section 11.01):

Maurice "Mac" VerStandig, Esq.
The VerStandig Law Firm, LLC
9812 Falls Road
#114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
Cell: (240) 351-6442
Facsimile: (301) 444-4600
Email: mac@mbvesq.com


If to Lender:

Hallmark Marketing Company, LLC
Attn: General Counsel's Office
2501 McGee Trafficway
Mail Drop 339
Kansas City, MO 64108
Email: Phyllis.Leach@hallmark.com

with courtesy copies to (which shall not constitute Notice for purposes of this Section 11.01):

Stinson LLP
1201 Walnut Street
Suite 2900
Kansas City, MO 64106
Attn: Nicholas J. Zluticky
Email: Nicholas.Zluticky@stinson.com

Section 11.02  Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with Section 11.01, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail; provided, that (a) notices sent by overnight courier service shall be deemed to have been given when received, (b) notices by facsimile shall be deemed to have been given when sent (except, that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient) and (c) notices by electronic mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment). Any notice given by the Lender to the Borrower as provided in Section 11.01 shall be deemed sufficient notice as to all Borrowers, regardless of whether the Borrower is sent a separate copy of such notice or whether Borrower is specifically identified in such notice.

Article XII.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

Section 12.01  THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO AS WELL AS ALL CLAIMS, CONTROVERSIES OR DISPUTES ARISING UNDER OR RELATED TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE BANKRUPTCY CODE AND THE LAWS OF THE DISTRICT OF COLUMBIA.

Section 12.02  THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS MAY BE TRIED AND LITIGATED IN THE BANKRUPTCY COURT OF THE DISTRICT OF COLUMBIA AND THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN DISTRICT OF COLUMBIA; PROVIDED, HOWEVER, THAT, ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH PARTY HERETO WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 12.02.

Section 12.03  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY

CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH, A "CLAIM"). EACH PARTY HERETO REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Section 12.04  NO CLAIM MAY BE MADE BY THE BORROWER AGAINST THE LENDER, OR ANY AFFILIATE OF LENDER OR ANY DIRECTOR, OFFICER, EMPLOYEE, COUNSEL, REPRESENTATIVE, AGENT, OR ATTORNEY-IN-FACT OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION THEREWITH, AND THE BORROWER HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.

Article XIII.   ASSIGNMENTS; SUCCESSORS.

Section 13.01  This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that, Borrower may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void ab initio. No consent to assignment by the Lender shall release the Borrower from its Obligations.

Section 13.02  Lender may assign this Agreement and the other Loan Documents in whole or in part and its rights and duties hereunder to any Person (each such assignee, an "Assignee") without notice or requirement of consent of the Borrower.

Section 13.03  The Lender may furnish any information concerning the Borrower in the possession of the Lender from time to time to Assignees. The Borrower shall assist any Lender permitted to sell assignments or participations under this Section 13 in whatever manner reasonably necessary in order to enable or effect any such assignment, including (but not limited to) the execution and delivery of any and all agreements, notes and other documents and instruments as shall be requested and the delivery of informational materials, appraisals or other documents for, and the participation of relevant management in meetings and conference calls with, potential Lender. Borrower shall certify the correctness, completeness, and accuracy, in all material respects, of all descriptions of the Borrower and its affairs provided, prepared, or reviewed by the Borrower that are contained in any selling materials and all other information provided by it and included in such materials. The Lender may disclose the Loan Documents and any other financial or other information relating to Borrower to any potential Assignee, provided that such Assignee agrees to protect the confidentiality of such documents and information using the same measures that it uses to protect its own confidential information.

Article XIV.   AMENDMENTS; WAIVERS.

25

Section 14.01  Neither this Agreement nor any other Loan Document nor any terms hereof or thereof may be amended, waived, discharged or terminated unless such amendment, waiver, discharge or termination is in writing signed by the Lender, and as to amendments to any of the Loan Documents, by the Borrower; and such amendment, waiver, discharge or termination shall be effective and binding as to the Lender only in the specific instance and for the specific purpose for which given.

Article XV.    TAXES.

Section 15.01  All payments made by the Borrower hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense. In addition, all such payments will be made free and clear of, and without deduction or withholding for, any present or future Taxes. If any Taxes are levied or imposed, the Borrower agrees to pay the full amount of such Taxes and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement, any note, or Loan Document, including any amount paid pursuant to this Section after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein; provided, however, that, Borrower shall not be required to increase any such amounts if the increase in such amount payable results from Lender's own willful misconduct or gross negligence (as finally determined by a court of competent jurisdiction). The Borrower will furnish to Lender as promptly as possible after the date the payment of any Tax is due pursuant to applicable law, certified copies of tax receipts evidencing such payment by Borrower.

Section 15.02  The Borrower agrees to pay any present or future stamp, value added or documentary taxes or any other excise or property taxes, charges, or similar levies that arise from any payment made hereunder or from the execution, delivery, performance, recordation, or filing of, or otherwise with respect to this Agreement or any other Loan Document.

Article XVI.    GENERAL PROVISIONS.

Section 16.01  Effectiveness. This Agreement shall be binding and deemed effective when executed by the Borrower and Lender.

Section 16.02  Section Headings. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

Section 16.03  Interpretation. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against any party hereto, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties, shall be construed, and interpreted according to the ordinary meaning of the words used to accomplish fairly the purposes and intentions of all parties hereto.

Section 16.04  Severability of Provisions. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

Section 16.05  <u>Debtor-Creditor Relationship</u>. The relationship between the Lender, on the one hand, and the Borrower, on the other hand, is solely that of creditor and debtor. Lender shall not have (and shall not be deemed to have) any fiduciary relationship or duty to the Borrower arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between Lender, on the one hand, and the Borrower, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

Section 16.06  <u>Counterparts; Electronic Execution</u>. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

Section 16.07  <u>Revival and Reinstatement of Obligations</u>. If the incurrence or payment of the Obligations by the Borrower or the transfer to Lender of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "<u>Voidable Transfer</u>"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys' fees of Lender related thereto, the liability of Borrower automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made and all of Lender's Liens in the Collateral shall be automatically reinstated without further action.

Section 16.08  <u>Reserved</u>.

Section 16.09  <u>Setoff</u>. Lender may at any time, in its sole discretion and without demand or notice to anyone, setoff any liability owed to the Borrower by Lender against any of the Obligations, whether or not due.

Section 16.10  <u>Survival</u>. All representations and warranties made by the Borrower in this Agreement and each other Loan Document and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of the Loan, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal

of or any accrued interest on any loan or any fee or any other amount payable under this Agreement is outstanding.

Section 16.11 <u>Integration</u>. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the Effective Date.

Section 16.12 <u>Plan(s) of Reorganization</u>. Notwithstanding any other provision of this Agreement, the obligations of the Borrower hereunder are subject to modification through one or more Plans of Reorganization, which Plan(s) shall be subject to the consent of the Lender, which consent shall not be unreasonably withheld; provided that it shall not be unreasonable for the Lender to refuse to consent to any deletion, amendment, reduction, extension, or other modification adverse to Lender's interests or rights hereunder with respect to any material term set forth in this Agreement, including without limitation the amount of the Obligations, the repayment terms, applicable rates of interest, reporting requirements or default provisions set forth herein. Any such deletion, amendment, reduction, extension, or other modification shall be subject to the sole discretion of the Lender.

Section 16.13 <u>Amendment and Restatement; No Novation</u>. This Agreement constitutes an amendment and restatement of the DIP Credit Agreement, effective from and after the Effective Date. The execution and delivery of this Agreement shall not constitute a novation of any Indebtedness or other Obligations owing to the Lender under the DIP Credit Agreement based on facts or events occurring or existing prior to the execution and delivery of this Agreement. On the Effective Date, the credit facilities described in the DIP Credit Agreement, shall be amended, supplemented, modified and restated in their entirety by the facilities described herein, and all loans and other obligations of the Borrowers under the DIP Credit Agreement outstanding as of such date under the DIP Credit Agreement, shall be deemed to be the Loan and Obligations described herein, without any further action by any Person.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their duly authorized manager, officer, and authorized representative as of the day and year first above written, to be effective as of the Effective Date.

**BORROWER:**

LBPO Management LLC, a Maryland limited liability company, as a Borrower

By: _____
Name:
Title:

29

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their duly authorized manager, officer, and authorized representative as of the day and year first above written, to be effective as of the Effective Date.

**LENDER**:

**HALLMARK MARKETING COMPANY, LLC,** as a Lender


By: _____
Name:
Title:

**Schedule 1.1(a)**

1.      **Definitions**. As used in this Agreement, the following terms shall have the following definitions:

"Account Debtor" has the meaning set forth in the Code.

"Accounting Change" shall have the meaning given in paragraph 2 of this Schedule 1.1.

"Additional Documents" has the meaning specified therefor in Section 6.12 of this Agreement.

"Affiliate" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Stock, by contract, or otherwise; provided, however, that, for purposes of Section 7.12 of this Agreement: (a) any Person which owns directly or indirectly ten (10%) percent or more of the Stock (or equity interests) having ordinary voting power for the election of the board of directors, manager(s), or equivalent governing body of a Person or ten (10%) percent or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership in which a Person is a general partner shall be deemed an Affiliate of such Person.

"Agreement" means this Amended and Restated Credit and Security Agreement as amended, restated, supplemented, or otherwise modified from time to time.

"Assignee" has the meaning specified therefor in Section 13.02 of this Agreement.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Columbia.

"Bankruptcy Recoveries" means any claims and causes of action to which the Borrower may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Borrower or the estate of the Borrower under Chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof.

"Borrower" means LBPO Management LLC, a Maryland limited liability company as the Reorganized Debtor under the Plan of Reorganization and shall include any and all Borrowers under the DIP Credit Agreement as substantively consolidated or otherwise merged with or into the Reorganized Debtor in accordance with the Plan of Reorganization and any other orders issued in the Cases.

31

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close pursuant to the rules and regulations of the Federal Reserve System.

"Cases" has the meaning specified in footnote 1 to this Agreement.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one (1) year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one (1) year from the date of acquisition thereof and having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than two hundred seventy (270) days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within one (1) year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having combined capital and surplus of not less than $250,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $250,000,000, having a term of not more than seven (7) days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

"Change of Control" means any change in the ownership of any membership interests of the Borrower.

"Claim" has the meaning specified therefor in Section 12.03 of this Agreement.

"Closing Date" means the closing date of the DIP Credit Agreement.

"Code" means the Kansas Uniform Commercial Code, as in effect from time to time; provided, however, that, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, priority, or remedies with respect to Lender's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of Kansas, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies. To the extent that defined terms set forth herein shall have different meanings under different Articles under the Uniform Commercial Code, the

32

meaning assigned to such defined terms under Article 9 of the Uniform Commercial Code shall control.

"Collateral" means all of the Borrower's rights, titles, and interests in all of its tangible and intangible personal property, including without limitation the following property, whether now owned or hereafter acquired:

(a)     All Goods, Inventory, products and merchandise, Equipment, Fixtures, Accounts, Accounts Receivable, General Intangibles, Payment Intangibles, Contract Rights, Rights to Payment, Investment Property (including a pledge of the direct ownership interest in each domestic subsidiary of the Borrower), Deposit Accounts, documents, instruments, Chattel Paper, Supporting Obligations, Letter-of-Credit Rights, Commercial Tort Claims, and books and records relating to any of the foregoing;

(b)     all rights of the Borrower in, to and under any owned or leased real property, including any of Borrower's rights in real property leases, options, easements, licenses, and related rights arising from or related thereto;

(c)     all Bankruptcy Recoveries and avoidance actions under Chapter 5 of the Bankruptcy Code, including any and all claims against the Borrower or any third party, and all Proceeds thereof (other than those arising under Section 549 of the Bankruptcy Code and amounts necessary to reimburse the DIP Lender for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other avoidance actions);

(d)     all Proceeds realized upon the sale, disposition and/or termination of any of the foregoing Collateral, which shall include, for the avoidance of doubt any and all Accounts; General Intangibles, Payment Intangibles, Notes, Chattel Paper, Deposit Accounts, Goods, including Equipment, Inventory and Fixtures, Investment Related Property, Negotiable Collateral, Supporting Obligations, Commercial Tort Claims, money, Cash Equivalents, or other similar personal property of the Borrower;

(e)     any cash, including cash held in any escrow or other Account of the Borrower; and

(d)     to the extent not covered in any of the foregoing, all of the Proceeds (as such term is defined in the Code) and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering or relating to any or all of the foregoing (collectively, the "Proceeds").

"Collateral Access Agreement" means a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in Borrower's Books, Equipment, Accounts or Inventory, in each case, in favor of Lender, with respect to the Collateral at such premises or otherwise in the custody, control or possession of such lessor, warehouse, processor, consignee or other Person and in form and substance reasonably satisfactory to Lender.

33

"Collections" means all cash, checks, notes, instruments, and other items of payment (including insurance Proceeds, cash Proceeds of asset sales, rental Proceeds, and tax refunds) received in respect of any Collateral.

"Commitment" has the meaning set forth in Section 2.01.

"Commercial Tort Claims" means commercial tort claims (as that term is defined in the Code) and includes the commercial tort claims listed on Schedule 5.5(d) to the Information Certificate.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate substantially in the form of Exhibit A.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan of Reorganization, pursuant to Section 1129 of the Bankruptcy Code, as such order may be amended, modified, or supplemented.

"Consummation Date" means the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the Effective Date) of the Plan of Reorganization confirmed by a Final Order.

"Control Agreement" means a control agreement, in form and substance reasonably satisfactory to Lender, executed and delivered by the Borrower and the applicable securities intermediary (with respect to a Securities Account) or bank (with respect to each Deposit Account, including each Controlled Account or any other Deposit Account into which the Proceeds of any Collateral are received or deposited).

"Debtor" and "Debtors" have the meaning specified in footnote 1 to this Agreement.

"Debtor Relief Law" means title 11 of the Bankruptcy Code, as in effect from time to time, or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Deposit Account" has the meaning set forth in the Code.

"DIP Orders" means and refers to the Interim Financing Order and the Final Financing Order.

"Disclosure Statement" means a disclosure statement filed in the Cases in connection with a Plan of Reorganization.

"Dollars" or "$" means United States dollars.

34

"<u>Effect of Bankruptcy</u>" means, with respect to any contractual obligation, contract or agreement to which a Borrower is a party, any default or other legal consequences arising on account of the commencement or the filing of the Cases (including the implementation of any stay), or the rejection of any such contractual obligation, contract or agreement with the approval of the Bankruptcy Court if required under applicable law.

"<u>Effective Date</u>" means the date on which all conditions precedent to the effectiveness of the Plan of Reorganization and this Agreement have been satisfied, which shall be no earlier than the Consummation Date.

"<u>Environmental Law</u>" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on the Borrower, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"<u>Event of Default</u>" has the meaning specified therefor in <u>Article VIII</u> of this Agreement.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as in effect from time to time.

"<u>Excluded Property</u>" means any personal property collateral which secures Permitted Indebtedness approved in writing by the Lender in connection with the Plan of Reorganization, or the terms hereof.

"<u>Exit Fee</u>" means a fee in the amount of $172,000.00 which was added to and is part of the Principal Balance as of the Effective Date.

"<u>Final Financing Order</u>" means the Final Order affirming the Interim Financing Order, authorizing the Borrower to obtain credit, incur the Obligations, grant Liens under the DIP Credit Agreement, the other Loan Documents, and the DIP Orders, and provides for the super priority of the Lender's claims, which order is a Final Order.

"<u>Final Order</u>" means an order or judgment of the Bankruptcy Court, as entered on the docket of the Clerk of the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal or seek leave to appeal, petition for certiorari, reargue or seek rehearing has expired and no proceeding for certiorari, reargument or rehearing is pending or if an appeal, petition for certiorari, reargument, or rehearing has been sought, the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order was appealed, from which the reargument or rehearing was sought, or certiorari has been denied and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"<u>GAAP</u>" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied; provided, however, that, all calculations relative to liabilities shall be made without giving effect to Statement of Financial Accounting Standards No. 159.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation, by-laws, or other similar organizational documents of such Person.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Guarantor" means each Person that executes or has executed a guaranty or other similar agreement in favor of Lender, in connection with the Obligations, this Agreement, or any other Loan Document, including A&S Inc., Michael Postal, and Leonard Banner

"Guaranty" means each guaranty agreement executed by a Guarantor to secure the payment and performance of the Obligations to the Lender.

"Hallmark Agreement(s)" means and includes without limitation the Amended and Restated Hallmark Account Agreement(s), the Amended and Restated Gold Crown Sublicense Agreement(s), and the Amended and Restated Guaranty Agreements, each as further described in Section 4.01, and any predecessor agreement to any of the foregoing, and as the same may be amended, restated or otherwise modified from time to time.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million.

"Indebtedness" as to any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of a Person as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) [reserved], (g) [reserved], and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and

36

(ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Information Certificate" means the Information Certificate completed and executed by the Borrower attached hereto as Exhibit D.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, receiverships, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Interest Rate" means a fixed interest rate equal to eleven percent (11%) per annum.

"Interim Financing Order" means the order entered by the Bankruptcy Court, which among other things: (i) authorized the Borrower to enter into the transactions contemplated under the DIP Credit Agreement, including the authorization to accept In-Kind Advances on the terms set forth therein, (ii) granted the superpriority claim status and senior priming and other liens contemplated in such agreement, (iii) subject only to the entry of the Final Financing Order, contained provisions (A) prohibiting claims against any Collateral of the Lender in respect of the Prepetition Financing Documents (as defined in the DIP Credit Agreement) or against any Collateral pledged thereunder and hereunder to the Lender in accordance with the terms of this Agreement, pursuant to 11 U.S.C. § 506(c), (B) granting a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (C) granting a waiver of the equitable doctrine of marshalling, (iv) approving payment by the Borrowers under the DIP Credit Agreement of all amounts, costs, fees and expenses provided for herein, and (v) which was not stayed, vacated, reversed or rescinded.

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions or acquisitions of Indebtedness, capital stock, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"Lender Expenses" means all (a) costs and expenses (including taxes, and insurance premiums) required to be paid by the Borrower under any of the Loan Documents that are paid, advanced, or incurred by Lender, (b) out-of-pocket fees and charges paid or incurred by Lender in connection with Lender's transactions with the Borrower under any of the Loan Documents, (c) customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) by Lender to or for the account of the Borrower (whether by wire transfer or otherwise), together with any out of pocket costs and expenses incurred in connection therewith, (d) out-of-pocket costs and expenses paid or incurred by Lender to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, (e) fees and expenses to initiate electronic reporting by the Borrower to Lender, (f) out-of-pocket examination fees and expenses (including reasonable travel, meals, and lodging) of Lender related to any inspections, examinations, audits or appraisals to the extent of the fees and charges (and up

to the amount of any limitation) contained in this Agreement, (g) out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or Lender's relationship with the Borrower, (h) Lender's costs and expenses (including reasonable attorneys' fees) incurred in advising, structuring, drafting, reviewing, administering (including reasonable travel, meals, and lodging), or amending the Loan Documents and (i) Lender's costs and expenses (including attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with the Cases or any successor case or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any remedial or enforcement action concerning any Collateral.

"<u>Lender</u>" has the meaning specified therefor in the recitals of this Agreement and the term "<u>Lender</u>" also includes any assignee of all or a portion of its interest hereunder to another lender, and any successors and assigns of such Persons.

"<u>Lien</u>" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"<u>Liquidation</u>" means the exercise by the Lender of those rights and remedies accorded to the Lender under the Loan Documents and applicable Laws as a creditor of the Borrower with respect to the realization on the Collateral (subject to the terms of the Plan of Reorganization), including (after the occurrence and during the continuation of an Event of Default) the conduct by the Borrower acting with the consent of the Lender, of any public, private or other similar sale or any other disposition of the Collateral for the purpose of liquidating the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"<u>Loan</u>" shall mean the loan deemed extended to the Borrower pursuant to the Commitment on the Effective Date, as further described in Section 2.01.

"<u>Loan Documents</u>" means this Agreement, the Plan of Reorganization, the Disclosure Statement, the Plan Confirmation Orders, each Guaranty, any Control Agreements, any Collateral Access Agreements, the DIP Orders and any other instrument or agreement entered into, now or in the future, by the Borrower with, to or in favor of Lender in connection with this Agreement.

"<u>Material Adverse Change</u>" means (a) a material adverse change in the business, prospects, operations, results of operations, assets, liabilities or condition (financial or otherwise) of the Borrower taken as a whole, (b) a material impairment of Borrower's ability to perform its obligations under the Loan Documents or of the Lender's ability to enforce the Obligations or realize upon the Collateral, (c) a material impairment of the enforceability or priority of Lender's Liens with respect to the Collateral as a result of an action or failure to act on the part of the Borrower, or (d) any claim against the Borrower or threat of litigation which if determined

38

adversely to the Borrower, would result in the occurrence of an event described in clauses (a), (b) or (c) above. Notwithstanding anything to the contrary, a "Material Adverse Change" shall not be deemed to exist as a result of the Effect of Bankruptcy or the events leading up to and resulting therefrom.

"Material Contract" means, with respect to any Person, all contracts or agreements, the loss of which could reasonably be expected to result in a Material Adverse Change, including without limitation all real property leases for Borrower's store locations and all other personal property leases, licenses, and other contracts or agreements necessary for the orderly operation of the Borrower location.

"Minimum Inventory Requirements" maintenance of inventory levels at the Borrower location of goods, products and merchandise (including goods, products and merchandise from time to time supplied to the Borrower by third parties), as such levels as shall be determined in the reasonable discretion of the Lender or as expressly provided in any Hallmark Agreement, which shall be in amounts necessary to permit the continued orderly on-going operation of the Borrower's business in accordance with the standards set forth in the Hallmark Agreements as going concerns and not as Liquidation, wind-down or other cessation of business.

"Net Proceeds" means (a) with respect to a sale, assignment or other disposition of property or assets, including a Permitted Disposition, proceeds (including cash receivable (when received) by way of deferred payment) received by such Person in cash from such asset disposition, net of: (i) the reasonable and customary costs and expenses actually incurred in connection with such asset disposition (including legal fees and sales commissions); (ii) amounts applied to repayment of Indebtedness (other than the Obligations) secured by a Permitted Lien on the Collateral disposed of that is senior in priority to the Lender's Liens; (iii) transfer or similar taxes; and (iv) reserves for escrows and indemnities, until such reserves are no longer required and such reserves or escrows are released to such Person; (b) with respect to the incurrence or issuance of any Indebtedness by Borrower (other than Permitted Indebtedness), the result of (i) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance minus (ii) the underwriting discounts and commissions, and other reasonable out-of-pocket costs, fees, commissions, premiums and expenses incurred by the Borrower in connection with such incurrence or issuance to the extent such amounts (A) were not deducted in determining the amount referred to in clause (i) above, (B) are, at the time of receipt of such cash or Cash Equivalents, actually paid or payable to a Person that is not an Affiliate of the Borrower, and (C) are properly attributable to such transaction; and (c) with respect to the sale or issuance of any capital stock of the Borrower (or its direct or indirect parent) (or successor thereof), the result of (i) the sum of the cash and Cash Equivalents received in connection with such sale or issuance minus (ii) the underwriting discounts and commissions, and other reasonable out-of-pocket costs, fees, commissions, premiums and expenses, incurred by the Borrower (or its direct or indirect parent) (or successor thereof) in connection with such sale or issuance to the extent such amounts (A) were not deducted in determining the amount referred to in clause (c)(i) above, (B) are, at the time of receipt of such cash or cash equivalents, actually paid or payable to a Person that is not an Affiliate of the Borrower, and (C) are properly attributable to such transaction.

"Note" mean a promissory note of the Borrower substantially in the form attached as Exhibit B hereto including all exhibits and schedules incorporated therein, as the same may be amended, restated, extended, supplemented, or otherwise modified from time to time.

"Obligations" means the Loan, and all other loans, debts, principal, interest, premiums, liabilities, obligations (including indemnification obligations), fees, costs, Lender Expenses, guaranties, and all covenants and duties of any other kind and description owing by Borrower to the Lender pursuant to or evidenced by this Agreement, the Plan of Reorganization, the Disclosure Statement, any Hallmark Agreement, or any other Loan Document (which for the avoidance of doubt shall include the Principal Balance), and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, liquidated or unliquidated, determined or undetermined, voluntary or involuntary, due, not due or to become due, sole, joint, several or joint and several, incurred in the past or now existing or hereafter arising, however arising, and including all interest not paid when due, and all other expenses or other amounts that the Borrower is required to pay or reimburse by the Loan Documents, the Hallmark Agreements, or by law or otherwise in connection with any of the foregoing. Any reference in this Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) maintained for employees of the Borrower or any ERISA Affiliate and covered by Title IV of ERISA.

"Permitted Discretion" means a determination made in the exercise of reasonable (from the perspective of a secured lender) business judgment.

"Permitted Dispositions" means (i) the sale of any furniture, fixture or equipment that is no longer used or useful in the business of the Borrower, or (ii) the sale of all or substantially all of the Borrower's assets as a going concern in a single transaction or series of related transactions as approved by Lender, in its sole discretion, subject to the terms of the Plan of Reorganization; provided that any such going concern sale shall be for cash consideration in an amount in excess of all outstanding Obligations, which amount shall be paid to Lender for application to the Obligations.

"Permitted Indebtedness" means:

(a)    Indebtedness evidenced by this Agreement and the other Loan Documents;

(b)    Indebtedness set forth on the Information Certificate and any Refinancing Indebtedness in respect of such Indebtedness;

(c)    Indebtedness composing Permitted Investments;

(d)    Indebtedness owed to any Person providing property, casualty, liability, or other insurance to the Borrower, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the

40

year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year;

(e)    Indebtedness owing to the purchase of goods and materials, in the ordinary course of Borrower's business, where such purchase is made on short-term credit terms standard within the industry in which Borrower operates; and

(f)    any other Indebtedness consented to in writing by the Lender which consent may be withheld or conditioned in the sole discretion of the Lender, including Indebtedness allowed under the Plan of Reorganization approved by the Bankruptcy Court.

"Permitted Investments" means:

(a)    Investments in cash and Cash Equivalents;

(b)    Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(c)    advances made in connection with purchases of goods, inventory, or services in the ordinary course of business;

(d)    Investments owned by Borrower on the Effective Date and set forth in the schedules hereto;

(e)    Investments received in settlement of amounts due to Borrower effected in the ordinary course of business or owing to Borrower as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of Borrower; and

(f)    deposits of cash made in the ordinary course of business to secure performance of operating leases.

"Permitted Liens" means:

(a)    Liens granted to, or for the benefit of, Lender to secure the Obligations;

(b)    Liens for unpaid taxes, assessments, or other governmental charges or levies that either (i) are not yet delinquent, or (ii) do not have priority over Lender's Liens and the underlying taxes, assessments, or levies are the subject of Permitted Protests;

(c)    judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under this Agreement;

(d)    Liens that are replacements of Permitted Liens to the extent that the original Indebtedness is the subject of permitted Refinancing Indebtedness and so long as the replacement Liens only encumber those assets that secured the original Indebtedness;

(e)      Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of business and not in connection with the borrowing of money, and which Liens either (i) are for sums not yet delinquent, or (ii) are the subject of Permitted Protests,

(f)      Liens on amounts deposited to secure Borrower's obligations in connection with worker's compensation or other unemployment insurance,

(g)      Liens on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness;

(h)      Liens securing Permitted Indebtedness; and

(i)      Liens approved under the terms of the Plan of Reorganization.

"Permitted Protest" means the right of the Borrower to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment; provided, that, (a) a reserve with respect to such obligation is established on Borrower's books and records in such amount as may be reasonably requested by the Lender, (b) any such protest is instituted promptly and prosecuted diligently by Borrower, as applicable, in good faith, and (c) while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lender's Liens.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Plan of Reorganization" or "Plan" means a plan filed in the Cases pursuant to Chapter 11 of the Bankruptcy Code and approved by the Bankruptcy Court pursuant to the Confirmation Order.

"Principal Balance" means at any point of determination, the unpaid portion of (a) the original principal amount of $[_____] (which includes the Exit Fee), plus (b) any and all other costs, fees and expenses from time to time accruing or added to the Principal Balance in accordance with the terms hereof, plus (c) any Lender Expenses.

"Prepayment Event" has the meaning set forth in Section 2.03(b)(i).

"Proceeds" has the meaning specified therefor in the definition of "Collateral" set forth in this Schedule 1.1(a).

"Projections" means Borrower's forecasted (a) balance sheets, (b) profit and loss statements, (c) availability projections, and (d) cash flow statements, all prepared on a basis consistent with Borrower's historical financial statements, together with appropriate supporting details and a statement of underlying assumptions.

42

"<u>Record</u>" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"<u>Refinancing Indebtedness</u>" means refinancings, renewals, or extensions of Indebtedness so long as:

        (a)      such refinancings, renewals, or extensions do not result in an increase in the principal amount of the Indebtedness so refinanced, renewed, or extended, other than by the amount of premiums paid thereon and the fees and expenses incurred in connection therewith and by the amount of unfunded commitments with respect thereto,

        (b)      such refinancings, renewals, or extensions do not result in a shortening of the average weighted maturity (measured as of the refinancing, renewal, or extension) of the Indebtedness so refinanced, renewed, or extended, nor are they on terms or conditions that, taken as a whole, are or could reasonably be expected to be materially adverse to the interests of Lender,

        (c)      if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, or extension must include subordination terms and conditions that are at least as favorable to the Lender as those that were applicable to the refinanced, renewed, or extended Indebtedness, and

        (d)      the Indebtedness that is refinanced, renewed, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended.

"<u>Related Persons</u>" means a Person's Affiliates, officers, directors, employees, attorneys, and agents.

"<u>Reportable Event</u>" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty (30) day notice period has been waived.

"<u>S&P</u>" has the meaning specified therefor in the definition of Cash Equivalents.

"<u>SEC</u>" means the United States Securities and Exchange Commission and any successor thereto.

"<u>Security Interest</u>" has the meaning specified therefor in <u>Section 3.01</u> of this Agreement.

"<u>Solvent</u>" means, with respect to any Person on a particular date, that, (i) at fair valuations, the sum of such Person's assets (and including as assets for this purpose all rights of subrogation, contribution or indemnification arising pursuant to any guarantees given by such Person) is greater than all of such Person's debts and including subordinated and contingent liabilities computed at the amount which, such Person has a reasonable basis to believe, represents an amount which can reasonably be expected to become an actual or matured liability (and including as to contingent liabilities arising pursuant to any guarantee the face amount of such liability as reduced to reflect the probability of it becoming a matured liability); and (ii) such Person is able to pay its debts as they mature and has (and has a reasonable basis to believe it will continue to have) sufficient

capital (and not unreasonably small capital) to carry on its business consistent with its practices as of the Closing Date.

"<u>Subsidiary</u>" or "<u>subsidiary</u>" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the shares of Stock having ordinary voting power to elect a majority of the appliable governing body of such Person (or appoint other comparable managers) of such corporation, partnership, limited liability company, or other entity.

"<u>Supporting Obligations</u>" means supporting obligations (as such term is defined in the Code) and includes letters of credit and guaranties issued in support of Accounts, Chattel Paper, documents, General Intangibles, instruments, or Investment Related Property.

"<u>Taxes</u>" means any taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments and all interest, penalties or similar liabilities with respect thereto; provided, however, that, Taxes shall exclude any tax imposed on the net income or net profits of Lender, in each case imposed by the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Lender is organized or the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Lender's principal office is located in each case as a result of a present or former connection between such Lender and the jurisdiction or taxing authority imposing the tax (other than any such connection arising solely from such Lender having executed, delivered or performed its obligations or received payment under, or enforced its rights or remedies under this Agreement or any other Loan Document).

"<u>Voidable Transfer</u>" has the meaning specified therefor in <u>Section 16.07</u> of this Agreement.

2.    **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, however, that, if Borrower notifies Lender that it requests an amendment to any provision hereof to eliminate the effect of any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions) (an "<u>Accounting Change</u>") occurring after the Effective Date, or in the application thereof (or if Lender notifies Borrower that it requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such Accounting Change or in the application thereof, then Lender and Borrower agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such Accounting Change with the intent of having the respective positions of the Lender and Borrower after such Accounting Change conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be calculated as if no such Accounting Change had occurred. Whenever used herein, the term "<u>financial statements</u>" shall include the footnotes and schedules thereto. Whenever the term "<u>Borrower</u>" is used in respect of a financial covenant or a related definition, it shall be understood to mean Borrower on a consolidated basis with any and all Borrowers under the DIP Credit Agreement (as substantively consolidated or otherwise merged with the Borrower as a successor in interest and/or the

44

Reorganized Debtor, as defined in the Plan of Reorganization), unless the context clearly requires otherwise. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Accounting Standards Codification 825-10 (or any other financial accounting standard having a similar result or effect) to value any Indebtedness or other liabilities of any person at "<u>fair value</u>."

    3.      **Code**. Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein. The meaning of any term defined herein by reference to the Code will not be limited by reason of any limitation set forth on the scope of the Code, whether under Section 9-109 of the Code, by reason of federal preemption or otherwise.

    4.      **Construction**. Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in full in Dollars in cash or immediately available funds of all of the Obligations (including the payment of any Lender Expenses that have accrued irrespective of whether demand has been made therefor and the payment of any termination amount or prepayment premium then applicable other than unasserted contingent indemnification Obligations. Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement for a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record. References herein to any statute or any provision thereof include such statute or provision (and all rules, regulations, and interpretations thereunder) as amended, revised, re-enacted, and for consolidated from time to time and any successor statute thereto.

    5.      **Schedules and Exhibits**. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

**Schedule 6.01**

Deliver to the Lender, each of the financial statements, reports, or other items set forth below at the following times in form and substance satisfactory to Lender:

| As soon as available, but in any event on or before the 15th of each month | Report or reports showing the following information from the operation of Borrower's business:<br><br>• Beginning and ending cash balance<br>• Beginning and ending inventory balance<br>• Profit and Losses (P&L) report which includes, without limitation:<br>   • Hallmark Sales<br>   • Allied Sales<br>   • COGS<br>   • Nonproduct broken out as follows:<br>      o Rent<br>      o Payroll<br>      o G&A<br>   • Secured creditor payments (principal & interest) broken out as follows:<br>      o Hallmark<br>      o CrownMAC<br>      o PNC<br>   • Unsecured creditor payments broken out as follows:<br>      o Landlords<br>      o Allied Vendors<br>      o Employees<br>      o CrownMAC<br>      o All Other |
|---|---|
| As soon as available, but in any event within twenty (20) days after the end of each calendar quarter | • Inventory reporting/roll-forward<br>   o Beginning Hallmark & Allied Inventory<br>   o Hallmark Purchases & COGS<br>   o Allied Purchases & COGS<br>   o Ending Hallmark & Allied Inventory<br>• Cash Flow Statement<br>• Beginning & Ending Balance of Secured & Unsecured Amounts owed |
| As soon as available, on a date to be determined and given to Borrower | • Budget Plan reasonably acceptable to Hallmark, will need to include all components of monthly and quarterly reporting above |

**Schedule 6.02**

Provide Lender with each of the documents set forth below at the following times in form and substance satisfactory to Lender:

| With each monthly, quarterly, or annual report delivered and described on Schedule 6.01 | (a)    a completed Compliance Certificate and all supporting information required to be delivered in connection therewith |
|---|---|
| If requested by Lender in connection with quarterly or annual reporting as described on Schedule 6.01 | (a) a summary of ageing, by vendor, of the Borrower's accounts payable (delivered electronically in an acceptable format, if a Borrower has implemented electronic reporting);<br><br>(b) notice of all claims, offsets, or disputes asserted by Account Debtors with respect to the Borrower's |
| If requested by Lender in connection with quarterly or annual reporting as described on Schedule 6.01 | (a) copies of purchase orders and invoices for Inventory and to be acquired by the Borrower;<br><br>(b) copies of invoices together with corresponding shipping and delivery documents and credit memos together with corresponding supporting documentation with respect to such invoices and credit memos in excess of an amount determined in the reasonable discretion of the Lender,<br><br>(c) such other reports and information as to the as Lender may reasonably request;<br><br>(d) a detailed aging of the Borrower's Accounts, together with a reconciliation to the monthly Account roll-forward and supporting documentation for any reconciling items noted (delivered electronically in an acceptable format, if a Borrower has implemented electronic reporting); and<br><br>(e) a reconciliation of Accounts aging, trade accounts payable aging, and Inventory of the Borrower to the general ledger and the monthly financial statements, including any book reserves related to each category. |

# EXHIBIT A

## FORM OF COMPLIANCE CERTIFICATE

[on Borrower's letterhead]

To:    Hallmark Marketing Company, LLC
        Attn: General Counsel's Office
        2501 McGee Trafficway
        Mail Drop 339
        Kansas City, MO 64108
        Email: Phyllis.Leach@hallmark.com


As Lender party to the Credit Agreement

Re:    Compliance Certificate dated [_____]

Ladies and Gentlemen:

Reference is made to that certain Amended and Restated Credit and Security Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement") dated as of March [____], 2026, by and between LBPO Management LLC, a Maryland limited liability company ("Borrower") and Hallmark Marketing Company, LLC, a Kansas limited liability company its successors and assigns ("Lender")

Pursuant to Schedule 6.01 of the Credit Agreement, the Borrower hereby certifies that:

1.    the undersigned authorized person, acting in his/her capacity as the duly authorized representative of the Borrower, has reviewed the terms of the Loan Agreement and has made, or caused to be made under her/his supervision, a review in reasonable detail of the transactions and condition of the Borrower and such review has not disclosed the existence on and as of the date hereof, and the undersigned does not have knowledge of the existence as of the date hereof, of any event or condition that constitutes a Default or Event of Default (as such terms are defined in the Loan Agreement) [, except [_____]].

2.    Attached hereto are the required [monthly] [quarterly] [annual] consolidated financial statements of the Borrower (and its predecessors in interests) as required under Article 6 and/or Schedules 6.01 and 6.02 of the Loan Agreement.

3.    Set forth on Schedule 1 hereof are any updates to the Information Certificate to make the Information Certificate most recently delivered to the Lender be true, correct, and complete as of the date hereof.

4.    The information and calculations set forth herein and on the attached schedules are true, correct, and complete in all material respects.

IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned this [_____] day of [_____], [_____].

**BORROWER:**

LBPO MANAGEMENT LLC, as Borrower

By: _____

Name:

Title:

****

**SCHEDULE 1 TO COMPLIANCE CERTIFICATE**

## EXHIBIT B

## AMENDED AND RESTATED
## PROMISSORY NOTE

March [_____], 2026                                                      Kansas City, MO

FOR VALUE RECEIVED, LBPO Management LLC, a Maryland limited liability company ("Borrower"), hereby unconditionally promises to pay to the order of Hallmark Marketing Company, LLC, a Kansas limited liability company, its successors and assigns (each a "Lender") in lawful money of the United States and in immediately available funds, the principal amount of [_____]( or if more the aggregate outstanding Principal Balance, as such term is defined in the Loan Agreement. Borrower likewise unconditionally promises to pay Lender interest from and after the date hereof on the outstanding Principal Balance at such interest rates, payable in accordance with Exhibit B-1 attached hereto and incorporated herein and computed in such manner as are specified in the Loan Agreement, in strict accordance with the terms thereof. This Amended and Restated Promissory Note (this "Note") amends and restates but is not a novation of that certain Promissory Note of the Borrower (and certain predecessors in interest to the Borrower) dated November 25, 2025, in favor of the Lender, in the original principal amount of $10,720,562.

This Note is issued pursuant to, and is the "Note" referred to in, the Amended and Restated Credit and Security Agreement of even date herewith (as the same may be amended from time to time, the "Loan Agreement"), by and between Borrower and the Lender. Lender is and shall be entitled to all benefits thereof and of all Loan Documents executed and delivered in connection therewith. This Note is subject to the terms and conditions of the Loan Agreement, including, without limitation, certain restrictions on transfer or assignment as provided in the Loan Agreement. All capitalized terms used herein, unless otherwise defined herein, shall have the meanings ascribed to such terms in the Loan Agreement.

The repayment of the principal balance of this Note is subject to the provisions of the Loan Agreement. The entire unpaid principal balance and all accrued interest on this Note shall be due and payable in such amounts and on such dates as set forth in the Loan Agreement.

All payments of principal and interest shall be made in Dollars, in immediately available funds, to the Lender as specified in the Loan Agreement.

Upon or after the occurrence of an Event of Default and for so long as such Event of Default exists, the principal balance and all accrued interest of this Note may be declared (or shall become) due and payable in the manner and with the effect provided in the Loan Agreement, and the unpaid principal balance hereof shall bear interest at the default rate as and when provided in the Loan Agreement. Borrower agrees to pay, and to save Lender harmless against, any liability for the payment of, all costs and expenses, including, but not limited to, reasonable attorneys' fees, if this Note is collected by or through an attorney-at-law.

Time is of the essence of this Note. To the fullest extent permitted by applicable law, Borrower, for itself and its legal representatives, successors, and assigns, expressly waives

presentment, demand, protest, notice of dishonor, notice of non-payment, notice of maturity, notice of protest, presentment for the purpose of accelerating maturity, diligence in collection, and the benefit of any exemption or insolvency laws.

Wherever possible each provision of this Note shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or remaining provisions of this Note. No delay or failure on the part of the Lender in the exercise of any right or remedy hereunder or under any other Loan Document shall operate as a waiver thereof, nor as an acquiescence in any default, nor shall any single or partial exercise by Lender of any right or remedy preclude any other right or remedy. The Lender, at its option, may enforce its rights against any Collateral securing this Note without enforcing its rights against the Borrower, guarantor of the indebtedness evidenced hereby or any other property or indebtedness due or to become due to Borrower. Borrower agrees that, without releasing or impairing its liability hereunder, the Lender may at any time release, surrender, substitute or exchange any Collateral securing this Note and may at any time release any party primarily or secondarily liable for the indebtedness evidenced by this Note.

The rights of Lender and obligations of Borrower hereunder shall be construed in accordance with and governed by the laws (without giving effect to the conflict of law principles thereof) of the District of Columbia.

[Signature page immediately follows.]

2

IN WITNESS WHEREOF, Borrower has caused this Note to be executed and delivered by its duly authorized officers on the date first above written.

LBPO MANAGEMENT LLC, as Borrower

By: _____
Name:
Title:

**Exhibit B-1**
**Payment Schedule**

See attached.

| Pmt Date | Beginning Bal | Payment 1 | Payment 2 | Interest | Ending Bal | | Monthly Change | Cumulative Payments |
|---|---|---|---|---|---|---|---|---|
| 4/1/2026 | $7,220,974 | $67,500 | $0 | $65,574 | $7,219,047 | | $0 | $67,500 |
| 5/1/2026 | $7,219,047 | $67,500 | $0 | $65,556 | $7,217,103 | | ($1,944) | $135,000 |
| 6/1/2026 | $7,217,103 | $67,500 | $0 | $65,538 | $7,215,141 | | ($1,962) | $202,500 |
| 7/1/2026 | $7,215,141 | $67,500 | $0 | $65,520 | $7,213,161 | | ($1,980) | $270,000 |
| 8/1/2026 | $7,213,161 | $67,500 | $0 | $65,502 | $7,211,163 | | ($1,998) | $337,500 |
| 9/1/2026 | $7,211,163 | $67,500 | $0 | $65,484 | $7,209,147 | | ($2,016) | $405,000 |
| 10/1/2026 | $7,209,147 | $67,500 | $0 | $65,465 | $7,207,112 | | ($2,035) | $472,500 |
| 11/1/2026 | $7,207,112 | $67,500 | $0 | $65,446 | $7,205,058 | | ($2,054) | $540,000 |
| 12/1/2026 | $7,205,058 | $0 | $1,200,000 | $55,046 | $6,060,105 | | ($1,144,954) | $1,740,000 |
| 1/1/2027 | $6,060,105 | $67,500 | $0 | $54,932 | $6,047,537 | | ($12,568) | $1,807,500 |
| 2/1/2027 | $6,047,537 | $67,500 | $0 | $54,817 | $6,034,854 | | ($12,683) | $1,875,000 |
| 3/1/2027 | $6,034,854 | $67,500 | $0 | $54,701 | $6,022,055 | | ($12,799) | $1,942,500 |
| 4/1/2027 | $6,022,055 | $67,500 | $0 | $54,583 | $6,009,138 | | ($12,917) | $2,010,000 |
| 5/1/2027 | $6,009,138 | $67,500 | $0 | $54,465 | $5,996,103 | | ($13,035) | $2,077,500 |
| 6/1/2027 | $5,996,103 | $67,500 | $0 | $54,346 | $5,982,949 | | ($13,154) | $2,145,000 |
| 7/1/2027 | $5,982,949 | $67,500 | $0 | $54,225 | $5,969,674 | | ($13,275) | $2,212,500 |
| 8/1/2027 | $5,969,674 | $67,500 | $0 | $54,103 | $5,956,277 | | ($13,397) | $2,280,000 |
| 9/1/2027 | $5,956,277 | $67,500 | $0 | $53,980 | $5,942,757 | | ($13,520) | $2,347,500 |
| 10/1/2027 | $5,942,757 | $67,500 | $0 | $53,857 | $5,929,114 | | ($13,643) | $2,415,000 |
| 11/1/2027 | $5,929,114 | $67,500 | $0 | $53,731 | $5,915,345 | | ($13,769) | $2,482,500 |
| 12/1/2027 | $5,915,345 | $0 | $1,800,000 | $37,724 | $4,153,069 | | ($1,762,276) | $4,282,500 |
| 1/1/2028 | $4,153,069 | $70,000 | $0 | $37,428 | $4,120,497 | | ($32,572) | $4,352,500 |
| 2/1/2028 | $4,120,497 | $70,000 | $0 | $37,130 | $4,087,627 | | ($32,870) | $4,422,500 |
| 3/1/2028 | $4,087,627 | $70,000 | $0 | $36,828 | $4,054,455 | | ($33,172) | $4,492,500 |
| 4/1/2028 | $4,054,455 | $70,000 | $0 | $36,524 | $4,020,979 | | ($33,476) | $4,562,500 |
| 5/1/2028 | $4,020,979 | $70,000 | $0 | $36,217 | $3,987,197 | | ($33,783) | $4,632,500 |
| 6/1/2028 | $3,987,197 | $70,000 | $0 | $35,908 | $3,953,104 | | ($34,092) | $4,702,500 |
| 7/1/2028 | $3,953,104 | $70,000 | $0 | $35,595 | $3,918,699 | | ($34,405) | $4,772,500 |
| 8/1/2028 | $3,918,699 | $70,000 | $0 | $35,280 | $3,883,979 | | ($34,720) | $4,842,500 |
| 9/1/2028 | $3,883,979 | $70,000 | $0 | $34,961 | $3,848,941 | | ($35,039) | $4,912,500 |
| 10/1/2028 | $3,848,941 | $70,000 | $0 | $34,640 | $3,813,581 | | ($35,360) | $4,982,500 |
| 11/1/2028 | $3,813,581 | $70,000 | $0 | $34,316 | $3,777,897 | | ($35,684) | $5,052,500 |
| 12/1/2028 | $3,777,897 | $0 | $1,200,000 | $23,631 | $2,601,528 | | ($1,176,369) | $6,252,500 |
| 1/1/2029 | $2,601,528 | $75,000 | $0 | $23,160 | $2,549,688 | | ($51,840) | $6,327,500 |
| 2/1/2029 | $2,549,688 | $75,000 | $0 | $22,685 | $2,497,372 | | ($52,315) | $6,402,500 |
| 3/1/2029 | $2,497,372 | $75,000 | $0 | $22,205 | $2,444,577 | | ($52,795) | $6,477,500 |
| 4/1/2029 | $2,444,577 | $75,000 | $0 | $21,721 | $2,391,298 | | ($53,279) | $6,552,500 |
| 5/1/2029 | $2,391,298 | $75,000 | $0 | $21,233 | $2,337,531 | | ($53,767) | $6,627,500 |
| 6/1/2029 | $2,337,531 | $75,000 | $0 | $20,740 | $2,283,271 | | ($54,260) | $6,702,500 |
| 7/1/2029 | $2,283,271 | $75,000 | $0 | $20,242 | $2,228,514 | | ($54,758) | $6,777,500 |
| 8/1/2029 | $2,228,514 | $75,000 | $0 | $19,741 | $2,173,254 | | ($55,259) | $6,852,500 |
| 9/1/2029 | $2,173,254 | $75,000 | $0 | $19,234 | $2,117,488 | | ($55,766) | $6,927,500 |
| 10/1/2029 | $2,117,488 | $75,000 | $0 | $18,723 | $2,061,211 | | ($56,277) | $7,002,500 |
| 11/1/2029 | $2,061,211 | $75,000 | $0 | $18,207 | $2,004,418 | | ($56,793) | $7,077,500 |
| 12/1/2029 | $2,004,418 | $0 | $1,000,000 | $9,207 | $1,013,625 | | ($990,793) | $8,077,500 |
| 1/1/2030 | $1,013,625 | $75,000 | $0 | $8,604 | $947,229 | | ($66,396) | $8,152,500 |
| 2/1/2030 | $947,229 | $75,000 | $0 | $7,995 | $880,225 | | ($67,005) | $8,227,500 |
| 3/1/2030 | $880,225 | $75,000 | $0 | $7,381 | $812,606 | | ($67,619) | $8,302,500 |
| 4/1/2030 | $812,606 | $0 | $812,606 | $0 | $0 | | ($812,606) | $9,115,106 |

## EXHIBIT C

REPRESENTATIONS AND WARRANTIES

**5.1    Due Organization and Qualification; Subsidiaries**.

(a)    Borrower and each entity Guarantor, (i) is duly organized and existing and in good standing under the laws of the jurisdiction of its organization, (ii) is qualified to do business in any jurisdiction where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, and (iii) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)    Except as set forth on Schedule 5.1(b), Borrower has no subsidiaries or Affiliates.

**5.2    Due Authorization; No Conflict**.

(a)    As to Borrower and each Guarantor, the execution, delivery, and performance by such Person of the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Person.

(b)    As to Borrower and each Guarantor, the execution, delivery, and performance by such Person of the Loan Documents to which it is a party do not and will not (i) violate any material provision of federal, state, or local law or regulation applicable to it, its Governing Documents, or any order, judgment, or decree of any court or other Governmental Authority binding on it, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under, any Material Contract of such Person, except to the extent that any such conflict, breach or default could not individually or in the aggregate reasonably be expected to cause a Material Adverse Change, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any of its assets, other than Permitted Liens, or (iv) require any approval of any of such Person's equity interest holders or any approval or consent of any Person under any Material Contract, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of Material Contracts, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Change.

**5.3    Binding Obligations**. Each Loan Document has been duly executed and delivered by Borrower and each Guarantor that is a party thereto and is the legally valid and binding obligation of each such Person, enforceable against such Person in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

**5.4    No Encumbrances**. Except as otherwise set forth in the Plan of Reorganization, all Collateral and other assets of the Borrower are free and clear of Liens except for Permitted Liens.

**5.5    Organizational Identification Number**

Borrower's and each Guarantor's tax identification number and organizational identification numbers, if any, are set forth on Schedule 5.5(c) hereto.

**5.6     Litigation**.

(a)     Except for the Effect of Bankruptcy, there are no actions, suits, or proceedings pending or, to the knowledge of Borrower, after due inquiry, threatened in writing against Borrower (or any predecessor in interest of the Borrower) that (i) either individually or in the aggregate could reasonably be expected to result in a Material Adverse Change or (ii) seeks to enjoin, either directly or indirectly, the execution, delivery or performance by Borrower of the Loan Documents or the transactions contemplated thereby.

**5.7     Compliance with Laws**. No Borrower (or predecessor in interest of the Borrower) (a) is in violation of any laws, rules, regulations, executive orders, or codes (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change.

**5.8     No Material Adverse Change**. All historical financial statements relating to the Borrower (and each predecessor in interest of the Borrower) that have been delivered to Lender present fairly in all material respects, the Borrower (and each predecessor in interest of the Borrower)'s consolidated financial condition as of the date thereof and results of operations for the period then ended. Since June 30, 2025, except for the Effect of Bankruptcy, no event, circumstance, or change has occurred that has or could reasonably be expected to result in a Material Adverse Change with respect to the Borrower (and each predecessor in interest of the Borrower).

**5.9     Fraudulent Transfer**. No transfer of property is being made by Borrower, and no Obligation is being incurred by Borrower in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of Borrower (or any predecessor in interest of the Borrower).

**5.10     Leases**. Except as set forth in the Plan of Reorganization, Borrower (and each predecessor in interest of the Borrower) enjoys peaceful and undisturbed possession under all real and personal property leases material to their business and to which they are parties or under which they are operating, and, subject to Permitted Protests, all of such material leases are valid and subsisting and no material default by the Borrower (or any predecessor in interest of the Borrower) exists under any of them.

**5.11     Reserved**.

**5.12     Complete Disclosure**. All factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about Borrower's industry) furnished by or on behalf of the Borrower in writing to the Lender (including all information contained in the Schedules hereto or in the other

Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents, and all other such factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about Borrower's industry) hereafter furnished by or on behalf of the Borrower in writing to the Lender will be, true and accurate, in all material respects, on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.

**5.13    Material Contracts; No Default**. Except for the Leases (which Borrower will provide to Lender upon request), the Hallmark Agreements, or other agreements with the Lender or Hallmark Cards, Inc., Schedule 5.13 sets forth a detailed description of all of the Material Contracts of Borrower (or each predecessor in interest of the Borrower). Except for matters which, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change, each such Material Contract (other than those that have expired at the end of their normal terms): (a) is in full force and effect and is binding upon and enforceable against the Borrower and, to Borrower's knowledge, after due inquiry, each other Person that is a party thereto in accordance with its terms, (b) has not been otherwise amended or modified, and (c) is not in default due to the action or inaction of the applicable Borrower.

**5.14    Reserved.**

**5.15    Indebtedness**. The Plan of Reorganization and Disclosure Statement contain a true and complete list of all secured Indebtedness of the Borrower outstanding immediately prior to the Effective Date that is to remain outstanding immediately thereafter and accurately sets forth the aggregate principal amount of such Indebtedness as of the Effective Date.

**5.16    Payment of Taxes**. Except as permitted under the Confirmation Order and as otherwise disclosed in writing to Lender prior to the Effective Date, all tax returns and reports of Borrower and each predecessor in interest of the Borrower required to be filed by any of them have been filed.

**5.17    Reserved**.

**5.18    Reserved**.

**5.19    Employee and Labor Matters**. There is (i) no unfair labor practice complaint pending or, to the knowledge of Borrower, threatened against Borrower (or any predecessor in interest of the Borrower) before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against Borrower (or any predecessor in interest of the Borrower) which arises out of or under any collective bargaining agreement and that could reasonably be expected to result in a material liability, (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened in writing against Borrower (or any predecessor in interest of the Borrower) that could reasonably be expected to result in a material liability, or (iii) to the knowledge of Borrower, after due inquiry, no union representation question existing with respect to the employees of Borrower (or any predecessor in interest of the Borrower) and no union organizing activity taking place with respect to any of the employees of Borrower

(or any predecessor in interest of the Borrower). No Borrower or any predecessor in interest of the Borrower has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or similar state law, which remains unpaid or unsatisfied. The hours worked and payments made to employees of Borrower (and each predecessor in interest of the Borrower) have not been found to be in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change. All material payments due from Borrower (and any predecessor in interest of the Borrower) on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrower, except where the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change.

5.20    **Collateral**. This Agreement creates a valid security interest in the Collateral of each Borrower, to the extent a security interest therein can be created under the Code or other applicable Law, securing the payment of the Obligations. Except to the extent a security interest in the Collateral cannot be perfected by the filing of a financing statement under the Code, all filings and other actions necessary or desirable to perfect and protect such security interest have been duly taken or will have been taken upon the filing of financing statements (or other assignments, acknowledgments, or confirmations) listing the Borrower, as a debtor, and the Lender, as secured party, in the jurisdiction(s) listed next to Borrower's name on the Information Certificate (Exhibit D). Upon the making of such filings (or obtaining control or otherwise perfecting Lender's interest in such Collateral), Lender shall have a valid first priority perfected security interest in the Collateral of the Borrower to the extent such security interest can be perfected by the filing of a financing statement or otherwise perfected, subject only to Permitted Liens. All actions by the Borrower necessary to protect and perfect such security interest on each item of Collateral have been duly taken.

5.21    **Insurance**. The Collateral and all owned and leased properties of the Borrower are insured with financially sound and reputable insurance companies which are not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower operates its businesses. Each insurance policy listed is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

5.22    **Locations of Collateral**. No Collateral is stored with a bailee, warehouseman, or similar party, and is located only at, or in-transit between or to, the locations identified on Schedule 5.22 to the Information Certificate, except to the extent Borrower stores Collateral at a warehouse disclosed to Lender or stored in the retail stores that comprise the ordinary places of business operations of the Borrower.

5.23    **Brokers**. No broker or finder brought about the obtaining, making, or closing of the Loan or transactions contemplated by the Loan Documents, and no Borrower, Guarantor, or Affiliate of any such Person has any obligation to any other Person in respect of any finder's or brokerage fees in connection therewith.

**EXHIBIT D**

INFORMATION CERTIFICATE

Dated: [_____], 202____

Reference is made to that certain Amended and Restated Credit and Security Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement") dated as of March [____], 2026, by and between LBPO Management LLC, a Maryland limited liability company ("Borrower") and Hallmark Marketing Company, LLC, a Kansas limited liability company and/or its affiliates, successors, and assigns (each a "Lender" and together the "Lender").

The undersigned represents and warrants to Lender that the information set forth in each attached Schedule is true, accurate and complete as of the date set forth above. The Lender is entitled to rely upon the foregoing in all respects, and the undersigned is duly authorized to execute and deliver this Information Certificate on behalf of the Borrower.

Very truly yours,

**BORROWER:**

LBPO MANAGEMENT LLC


By: _____
Name:
Title:

**Schedule 5.1(b)**

Subsidiaries; Affiliates; Investments

Part 1 - Subsidiaries

Part 2 - Affiliates (Less than fifty (50%) percent Owned by a Borrower)

| Name | Jurisdiction of Organization | Percentage Owned |
|------|------------------------------|------------------|
|      |                              |                  |

Part 3 - Affiliates (Subject to common ownership with a Borrower)

| Name | Jurisdiction of Organization | Percentage Owned |
|------|------------------------------|------------------|
|      |                              |                  |

**Schedule 5.5(a)**

Exact Legal Name/Jurisdiction of Organization

| Name | Jurisdiction of Organization |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

**Schedule 5.5(b)**

Locations

<u>Part 1 - Chief Executive Office</u>

[_____]

[_____]

[_____]

<u>Part 2 - Location of Books and Records</u>

[_____]

[_____]

[_____]

**Schedule 5.5(c)**

Federal Employer Identification Number
Organizational Identification Number

| Name | Organizational Identification Number | Federal Employer Identification Number |
|---|---|---|
|  |  |  |
|  |  |  |

**Schedule 5.13**

Material Contracts

| Name of Agreement | Date of Agreement | Parties to Agreement | Date of Expiration/ Termination |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

**Schedule 5.22**

Locations of Collateral

| Address | Owned/Leased/Third Party | Name/Address of Lessor or Third Party, as Applicable |
|---|---|---|